**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **WILLIAM LEE et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-cv-00830 (APM)** |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

## I.    INTRODUCTION

From 2004 through 2011, the U.S. military faced insurgent attacks in Iraq that Plaintiffs allege were materially supported by Iran.  This case concerns 99 such attacks.  It is brought by over 352 Plaintiffs, who include American service members and military contractors who were injured or killed while serving in Iraq, as well as their family members and estates.  Iran has failed to respond to the suit, and Plaintiffs have moved for default judgment.

Given the scope of Plaintiffs' claims, this litigation will proceed in phases.  Here, the court considers Plaintiffs' motion for default judgment as to four "bellwether" attacks, which involve the claims of 20 Plaintiffs.  The court will reserve damages determinations arising from these four attacks, as well as issues of liability and damages on the remaining 95 attacks for later proceedings.

## II.    LEGAL STANDARD

Plaintiffs seek default judgment against Iran under the Foreign Sovereign Immunities Act ("FSIA") because Iran has failed to defend this lawsuit.  *See* Pls.' Proposed Findings of Fact & Conclusions of Law in Supp. of Their Mot. for Default J., ECF No. 23 [hereinafter Pls.' Proposed Findings].  "[T]he entry of a default judgment is not automatic and requires the exercise of sound

discretion." *Salzman v. Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *2 (D.D.C. Sept. 25, 2019) (internal quotation marks omitted).  A claim for default judgment under the FSIA is governed by the statutory requirement that "[n]o judgment by default shall be entered . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014).  "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (internal quotation marks omitted).  "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required."  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

In addition, "[a] plaintiff seeking default judgment must persuade the trial court that subject-matter jurisdiction and personal jurisdiction over the defendant are satisfied."  *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 21 (D.D.C. 2019).  "A default judgment rendered in excess of a court's jurisdiction is void."  *Jerez*, 775 F.3d at 422.

## III.   FINDINGS OF FACT

At this phase of the litigation, the court's task is to determine whether Iran is liable for four "bellwether" attacks against U.S. servicemen and contractors in Iraq between 2006 and 2009.  The attacks at issue are: (1) an October 22, 2006 attack on a hospital route in Baghdad; (2) a March 23, 2008 attack during a patrol outside Baghdad; (3) a May 17, 2009 attack on a patrol for countering improvised rocket-assisted munitions; and (4) a January 20, 2007 attack on the Karbala Provincial Joint Coordination Center ("PJCC").  All four of these attacks were the subject of Judge Kollar-

Kotelly's unimpeachably thorough opinion, issued after a three-day bench trial, in *Karcher v. Republic of Iran*.  *See* 396 F. Supp. 3d at 33–35 (Oct. 22, 2006 attack); *id.* at 38–40 (Mar. 23, 2008 attack); *id.* at 42–45 (May 17, 2009 attack); *id.* at 45–46 (Jan. 20, 2007 attack).  Judge Moss also considered the January 20, 2007 attack on the Karbala PJCC at length in *Fritz v. Republic of Iran*, 320 F. Supp. 3d 48, 64–71 (D.D.C. 2018).

Per Plaintiffs' request, the court takes judicial notice of the *Karcher* and *Fritz* decisions pursuant to Federal Rule of Evidence 201(b), which "extends to judicial notice of court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). In addition, Plaintiffs have submitted to the court all of the evidence that was presented to the *Karcher* court during its three-day bench trial.  Pls.' Proposed Findings at 2 & n.5.  As "the FSIA does not require this Court to relitigate issues that have already been settled in previous decisions," the court can "review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (internal quotation marks omitted).  The court therefore may rely on the evidence presented to the *Karcher* court, but must nonetheless "reach [its] own, independent findings of fact." *See Rimkus*, 750 F. Supp. at 172.  The court here has independently reviewed the evidence submitted.

A.    **Service of Process**

Before evaluating the evidence, the court makes its factual findings concerning Plaintiffs' attempts to serve Iran, a component of the court's personal jurisdiction analysis.  Plaintiffs attempted to serve Iran by mailing "one copy of the summons, [amended] complaint, and notice of suit, together with a translation of each" by registered mail with return receipt through the U.S. Postal Service to Dr. Mohammad Zarif, Iran's head of the Ministry of Foreign Affairs.

3

*See* Aff. Requesting Foreign Mailing, ECF No. 18; Certificate of Mailing, ECF No. 20 [hereinafter Certificate of Mailing].  When thirty days passed without a response from Iran, Plaintiffs served Iran via diplomatic channels.  *See* Aff. Requesting Foreign Mailing, ECF No. 22 [hereinafter Diplomatic Service Request].  The Department of State transmitted a summons, Amended Complaint, and notice of suit to Iran through the Embassy of Switzerland in Tehran on December 18, 2019.  Letter from J. Hess, Attorney Adviser, Overseas Citizens Servs., Office of Legal Affairs, to Angela D. Caesar, Clerk of Court for the U.S. District Court for the District of Columbia (Jan. 21, 2020), ECF No. 26 [hereinafter Dep't of State Service Attempt].  Thereafter, Iran had sixty days—or until February 18, 2020, accounting for weekends and holidays—to respond to the Amended Complaint.  28 U.S.C. § 1608(d).  It failed to do so.

**B.    Iran's Responsibility for the Bellwether Attacks**

The court next turns to its review of the *Karcher* decision, the evidence before the *Karcher* court, and the *Fritz* decision, as well as supplemental evidence provided to the court regarding Iran's responsibility for each of the bellwether attacks.

*1.    Expert Testimony*

As a threshold matter, Plaintiffs request that the court qualify seven experts in support of their case.  Each of these experts was previously qualified in *Karcher*, and the court relies on the experts' reports, the experts' testimony at the *Karcher* trial, and the *Karcher* court's thorough consideration of each candidate to qualify the following individuals as experts:

- Dr. Matthew Levitt.[1]  The court qualifies Dr. Levitt as an expert "regarding Iran's role as a state sponsor of terrorism; Iran's Islamic Revolutionary Guard Corps, or IRGC, the Islamic Revolutionary Guard Corps Qods Force, or IRGC-QF; Hezbollah; and those

---

[1] For ease of reference, the court has omitted the titles of Plaintiffs' expert witnesses after the first reference.

entities' support and training of the Special Groups in Iraq."  Tr. 1 at 26:6–14; Expert Report of Dr. Matthew Levitt, PX-154 [hereinafter Levitt Report, PX-154];[2] *see also Karcher*, 396 F. Supp. 3d at 18.

- Lieutenant General (Ret.) Michael L. Oates.  The court qualifies Lieutenant General Oates as an expert "on the tactical and strategic threats faced by US and Coalition Forces in Iraq [between] 2003 and 2008[,] . . . including the specific threat to US military forces from [Improvised Explosive Devices ('IEDs')] and other ordnance, including [Explosively Formed Penetrators ('EFPs')]."  Tr. 1 at 86:15–22; Expert Report of Lieutenant General Michael L. Oates, United States Army (Ret.), PX-153 [hereinafter Oates Report, PX-153]; *see also Karcher*, 396 F. Supp. 3d at 18.

- Colonel (Ret.) Leo E. Bradley III.  The court qualifies Colonel Bradley as an expert on U.S. military explosive ordnance disposal operations, which include the U.S. Army's capability "to locate, identify, render safe"—disarm or defuse—"unexploded ordnance, exploit and evaluate that ordnance, and dispose of the ordnance," and IED investigations. Tr. 2 at 7:22–8:2, 12:9–13; Expert Report of Colonel Leo E. Bradley III, U.S. Army (Retired), PX-156; *see also Karcher*, 396 F. Supp. 3d at 17–18.

- Captain (Ret.) Donald Wade Barker.  The court qualifies Captain Barker as an expert on "IEDs, EFPs and counter-IED technology."  Tr. 3 at 10:8–12; Expert Report of CPT (Ret.) Donald Wade Barker, PX-158 [hereinafter Barker Report, PX-158]; *see also Karcher*, 396 F. Supp. 3d at 17.

---

[2] For simplicity, the court has adopted a modified convention for citations to evidence submitted to the *Karcher* court. All transcripts from the *Karcher* trial are denominated with "Tr." and a number 1 through 5 indicating the volume in which the cited testimony appears.  A transcript designated "Tr. 1," for example, appears in the first volume of the transcript from the *Karcher* trial.  Exhibits from the *Karcher* trial are denoted by their title and "PX," followed by the exhibit number assigned to the exhibit during the *Karcher* trial.

- Colonel (Ret.) Kevin Lutz.  The court qualifies Colonel Lutz as an expert "in the use of explosive devices, including IEDs and other ordnance, by transnational terrorist organizations and specifically the tactics, techniques[,] and procedures used by terrorist groups in Iraq between 2003 and 2011."  Tr. 5 at 15:4–11; Expert Report of COL (Ret.) Kevin Lutz, PX-159 [hereinafter Lutz Report, PX-159]; *see also Karcher*, 396 F. Supp. 3d at 18.

- Russell L. McIntyre.  The court qualifies McIntyre as an expert "on IED threats to US forces, specifically in Iraq between 2003 and 2011, and with an additional focus on explosively formed projectiles or penetrators."  Tr. 5 at 64:16–22; Expert Report of Russell L. McIntyre, PX-157 [hereinafter McIntyre Report, PX-157]; *see also Karcher*, 396 F. Supp. 3d at 18.

- Michael P. Pregent.  The court qualifies Pregent as an expert in "intelligence matters, including attribution of terror attacks and . . . evidence collection and analysis in the intelligence field."  Tr. 5 at 173:3–7; Expert Report of Michael P. Pregent, PX-155 [hereinafter Pregent Report, PX-155]; *see also Karcher*, 396 F. Supp. 3d at 18–19.

   2.    *Iran's Role in Iraq*

The roots of Iran's involvement in Iraq date back to the late 20th century, when Iran began supporting Shi'a groups in the region and developed relationships with terrorist organizations that would ultimately operate in Iraq.  In 1979, the Supreme Leader of Iran established what became known as the Islamic Revolutionary Guard Corps ("IRGC"), which was designed to implement the Ayatollah's "vision for an Islamic theocratic government in Iran."  McIntyre Report, PX-157, at 4–5.  Over the course of the 1980s, Iran built up combat forces composed of religious extremists and created "a fully functional militia backed by the Islamic Revolutionary Guard Corps-Qods

Force" ("Qods Force").  Levitt Report, PX-154, at 7; McIntyre Report, PX-157, at 5 & n.6.  The Qods Force "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government."  McIntyre Report, PX-157, at 6.

At the same time, Iran and the IRGC were "provid[ing] critical assistance to newly-emerging Hezbollah, which swore an oath of fealty to Iran." *Id.* at 7.  In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran "bankroll[ed], arm[ed] and train[ed] Hezbollah." *Id.*; *see also* Levitt Report, PX-154, at 9.

Iran's proxies were already operating in Iraq prior to 2003, when the United States and coalition forces launched Operation Iraqi Freedom and dismantled Saddam Hussein's regime. Levitt Report, PX-154, at 6–7.  With Hussein out of power, Iran seized the "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region." *Id.* at 7.  Iran sought to install "weakened decentralized and Shi'a-dominated" leadership in Iraq and therefore set out to "foster unity among Iraq's various Shia parties and movements so that [it] could consolidate Shia political control . . . over the new Iraqi government." *Id.* at 8.

To that end, Iran developed numerous Shi'a proxies with a presence in Iraq.  Iran backed the Office of the Martyr Sadr, a movement that "spoke for Iraq's disenfranchised Shi'a" and was led by Muqtada al-Sadr.  Oates Report, PX-153, at 17.  In 2003, the Office of the Martyr Sadr opened "an armed wing" called Jaysh al-Mahdi ("JAM").  *Id.*  Iran offered the movement and its armed wing "financing and weapons training," and the Qods Force "dispatched Hezbollah operatives . . . to help establish JAM and provide it with logistical assistance." *Id.*  al-Sadr ultimately split JAM into different branches to address competing priorities and developed "Special Groups" that were specifically designed to attack American and coalition forces. *Id.*

at 22–24.  The Special Groups were successful, and "[f]rom 2003 to 2006, the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq," McIntyre Report, PX-157, at 16.  Iran later recruited new leadership for a Special Group called Asayb al-Haq or "AAH."  *Id.* at 38–39.  AAH also "acted as an Iranian proxy in Iraq, carrying out the IRGC's agenda and promoting its interests."  *Id.* at 39.

Iran provided its proxies with training, weapons, and financial support.  Through Hezbollah, Iran brought operatives "into Iran for training and smuggling weapons across the border into Iraq" and sent IRGC and Qods Force operatives to Iraq.  Pregent Report, PX-155, at 12. Iran also used its resources to support EFP attacks specifically:  "one of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs."  Oates Report, PX-153, at 24.  Iran funneled to Special Groups in Iraq EFPs that "were professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor, such as armored patrols and supply convoys."  *Id*.  Iran also backed its proxies with extensive financial resources; by August 2007, Iran, through IRGC and the Qods Force, was estimated to be "providing between $750,000 and $3 million worth of equipment and funding to Special Groups *every month*."  Pregent Report, PX-155, at 12.

### 3.    *Explosively Formed Penetrators (EFPs)*

Three of the four bellwether attacks Plaintiffs claim Iran materially supported involved a uniquely lethal weapon known as an EFP or explosively formed penetrator.  EFPs are explosive devices that are intentionally "designed to defeat armor."  Barker Report, PX-158, at 5.  According to Barker, the earliest known EFPs "appear[ed] on modern battlefields in the 1990s as a weapon deployed in Lebanon by Hezbollah."  *Id.* at 6.

EFPs became insurgents' weapon of choice in Iraq after the United States began to "up-armor" its military vehicles, particularly its Humvees, in response to increased attacks from local militias and terrorist cells. *See id.* at 12–13.  EFPs enabled insurgents to specifically target and explode even these heavily armored U.S. military vehicles, and their use against U.S. forces quickly proliferated starting in 2005. *See id.* at 13–14.

The EFPs that were detonated "in Iraq were generally made with a precision manufactured concave copper disk liner and [high-energy] explosive . . . packed behind the liner." *Id.* at 6 (footnote omitted).  EFPs travel at high speeds and can "pierce through several inches of military-grade armor like a fist through a wall." *Id.* at 7 (internal quotation marks omitted).  The weapons create "a massive blast overpressure, capable of blowing the doors and turrets from vehicles close to the device," and "the heat and force of the penetrator [can] shatter [a] vehicle's armor and materials inward," propelling "razor-sharp shards of Teflon and steel ripping through the interior compartment." *Id.*  The heat generated by EFPs is powerful enough to "ignite engine fuel and set vehicles ablaze." *Id.*

EFPs detonate after being armed via remote frequency or insulated command wire. *Id.* at 10.  EFPs that employ a command-wire trigger allow insurgents to detonate the device from a distance of up to 100 meters from the blast site, while remote-frequency triggers give insurgents a 300-meter range. *Id.*  Once armed, EFPs are "triggered using a passive infra-red device" that is attached to the EFP and can, "for example, detect the heat signature of a passing vehicle" and "send an electrical current [to] set off [an] explosion within the EFP's casing." *Id.*

### 4.    *EFPs in Iraq*

To combat lethal EFP attacks, the U.S. military began adding even more armor to its vehicles and increased its use of Bradley Fighting Vehicles ("Bradleys") in Iraq. *Id.* at 15.  When

the additional armor failed to provide meaningful protection, the U.S. military developed technology that jammed the radio frequencies that insurgents used to trigger EFPs and began using a device known as a Rhino, which was attached to the front of a combat vehicle and simulated the heat of the vehicle to prematurely trigger EFPs. *Id.* at 16. With each advancement in U.S. technology, however, EFP warfare evolved to become even more stealthy and sophisticated. *See id.* at 15–18. For example, when the United States introduced radio-frequency jammers, insurgents began "modulating the frequencies of their remote activators." *Id.* at 16. And when the United States began attaching Rhinos to its vehicles, insurgents began angling EFPs "backward to account for" the early triggers. *Id.* at 18.

The sophistication of the devices in Iraq was beyond the capacity of individuals with basic training in IED construction. *See* Tr. 3 at 18:23–19:10; *see also* Barker Report, PX-158, at 16. Barker opined that insurgents' ability to defeat the United States' sophisticated countermeasures would not have been possible "without the active involvement, training, equipment and support of the IRGC." Barker Report, PX-158, at 16. Oates testified similarly at the *Karcher* trial that "the rapid capability development of the Shi'a militia in Iraq from a weapons training and tactics procedure, the speed with which they achieved this capability and their ability to adapt led [him] to believe that there was external assistance provided." Tr. 1 at 98:5–9.

These opinions are confirmed by U.S. military forensic analyses of IED and EFP detonations. Tr. 5 at 27:14–28:10. Via such analyses, the U.S. military was able to "identify signatures by bomb makers" and "the emerging enemy tactics, techniques and procedures" that were being used. *Id.* "The U.S. military traced much of the machinery used to manufacture the EFPs, high explosives and [passive infra-red] devices deployed in Iraq to Iran and its illicit supply chain." Oates Report, PX-153, at 25. U.S. intelligence ultimately traced tens of thousands of

devices that interfered with the United States' counter-EFP measures from Iran to Baghdad.  Tr. 5 at 48:16–49:12.  Moreover, the U.S. military concluded that Iran and its proxies "provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry."  Office of the Coordinator for Counterterrorism, U.S. Dep't of State, Country Reports on Terrorism 2008 (Apr. 2009), PX-18, at 183.

These reports are consistent with Barker's testimony at the *Karcher* trial.  Barker explained that "EFPs are extremely complicated systems to build," so Iran and its proxies "would build [EFPs] complete, [and] bring them in as a complete total system, ready to go."  Tr. 3 at 44:13–16. Iraqi operatives would then emplace the EFP by "get[ting] in a local vehicle" that was equipped with "a false floor."  *Id.* at 44:19–22.  The operatives would pretend that the vehicle had broken down on the road and "pull over on the side of the road" to "raise the hood."  *Id.* at 44:20–21. Meanwhile, operatives inside the vehicle would "pull[] the floor out," "crawl out," "lay the device in the predetermined position[,] and drive away."  *Id.* at 44:22–24.

5.    *The Attacks*

Having established Iran's presence in Iraq and its assistance in developing and providing EFPs, the court now turns to the four "bellwether" attacks.

a.    <u>October 22, 2006 Attack</u>

Plaintiffs Karar Alabsawi, the estate of David G. Taylor, Michelle Taylor, J.T., Phyllis Taylor, John Taylor, Brian G. Taylor, and Judas Recendez assert that Iran is responsible for an October 22, 2006 attack on U.S. military forces in Iraq.  Pl.'s Proposed Findings at 8–9 (citing Am. Compl., ECF No. 1 [hereinafter Am. Compl.], ¶¶ 482–506).  As discussed below, Plaintiffs Specialist Karar Alabsawi, Specialist Brian Taylor, and Sergeant Judas Recendez served in the U.S. military and were victims of the October 22, 2006, attack, and the estate of David Taylor is

the legal representative of Major David Taylor, who also was a U.S. serviceman and victim of the October 22, 2006 attack. Michelle Taylor, J.T., Phyllis Taylor, and John Taylor are relatives of David Taylor. *See* Am. Compl. ¶¶ 491, 493–495.

On October 22, 2006, two units were rehearsing the route between Forward Operating Base Falcon, in southern Baghdad, and the Baghdad hospital. Tr. 4 at 162:3–16. Major David Haines, Specialist Taylor, Major Taylor, Specialist Alabsawi, and Sergeant Recendez were five of the servicemen involved in the operation. *Id.* at 163:8–10, 15–25. The five men were travelling in an up-armored M114 Humvee equipped with a Level 5 Interim Fragmentary Armor Kit. *See* Barker Report, PX-158, at 23. As they were driving, an explosive device struck the passenger-side front door of the Humvee, killing Major Taylor and inflicting serious injuries on the four other men in the vehicle. Tr. 4 at 164:7–11, 164:23–165:15.

Plaintiffs' experts submitted reports and testimony that the explosive device was an EFP that originated with the IRGC. A military investigation of the attack revealed the presence of copper and high-energy explosive residue from the device, consistent with an EFP. *See* Barker Report, PX-158, at 25. Barker testified that the EFP in this attack was able to overcome the Humvee's Rhino protective device because the insurgents "angled" the EFP's passive infra-red trigger and warheads, "and then the warheads struck the vehicle as designed." Tr. 3 at 46:3–8. Based on the military investigative reports and photos of the damage caused to the Humvee, Barker testified that the explosive device used in the attack "was a sophisticated EFP array" that "used a dual-initiation system" to increase its accuracy. *Id.* at 47:10–13; *see also* Barker Report, PX-158, at 25–28. Likewise, Lutz concluded in his report that the attack "involv[ed] the use of a uniquely concealed, copper-lined EFP array" that was "emplaced on the curb . . . in such fashion as to defeat the vehicle's Rhino anti-[passive infra-red] device." Lutz Report, PX-159, at 38. He further

opined that "[t]he damage to the vehicle strongly indicates that the array was precision manufactured and copper-lined," which contributed to his conclusion that "[a]n IRGC-sponsored Special Group was likely involved in the assembly and emplacement of the array."  *Id.*  Based on the sophistication and precision of the EFP used in the October 22, 2006 attack and the extensive evidence before the *Karcher* court, the court agrees with Plaintiffs' experts that Iran, acting through its proxies, was responsible for the EFP attack on U.S. forces in Iraq on October 22, 2006.

        b.   <u>March 23, 2008 Attack</u>

Plaintiffs estate of Andrew J. Habsieger, Jennifer Renee York, Jason York, Russell Mason, and Andy Pool claim that Iran is liable for a March 23, 2008 attack on U.S. forces in Iraq. Pl.'s Proposed Findings at 9–13 (citing Am. Compl. ¶¶ 933–965).  As discussed below, First Lieutenant Russell Mason and Specialist Andy Pool served in the U.S. military and were victims of the March 23, 2008 attack, and the estate of Habsieger is the legal representative of Private First Class Andrew Habsieger, who was also a U.S. serviceman and victim of the March 23, 2008 attack. Jennifer Renee York and Jason York are the step-siblings of Sergeant Christopher Hake, a U.S. serviceman who was injured in the March 23, 2008 attack.  *See* Am. Compl. ¶¶ 943–944.

On March 23, 2008, a patrol of two armored M2 Bradleys, several Iraqi National Police vehicles, and an M1151 Humvee transporting a "Tactical Psychological Operations" team departed Forward Operating Base Falcon.  Barker Report, PX-158, at 37.  Plaintiff First Lieutenant Mason, a platoon leader commanding the rear Bradley in the patrol, testified about the attack before the *Karcher* court.  *See* Tr. 4 at 52:23–53:4, 58:22–59:3.  According to his testimony, the crew in the lead Bradley on that patrol consisted of Sergeant Steve McCoy, Specialist Jose Rubio, Private George Delgado, and Private First Class Habsieger.  *Id.* at 59:8–13.  In addition, Sergeant

Hake's squad was present and included Specialist Phillip Sime, Specialist Pool, Sergeant Joseph Lloyd, and Specialist Joseph Parker. *Id.* at 71:1–13.[3]

As the patrol began to drive back to Forward Operating Base Falcon, the lead Bradley was struck by an explosive. *See id.* at 61:21–62:1; Barker Report, PX-158, at 38. First Lieutenant Mason "heard a loud pop" on his radio that had been transmitted from the radio on the lead Bradley, and he proceeded to investigate the status of the lead Bradley. Tr. 4 at 62:7–63:6. As he approached the lead Bradley, it became clear to him that the vehicle had been struck by an explosive. *See id.* at 65:3–10. A few moments later, he saw "a person running back to" the rear Bradley who was "completely engulfed in flames"; First Lieutenant Mason later identified the man as Sergeant McCoy. *Id.* at 65:12–66:9. The patrol also came under small arms fire as the soldiers were attempting to evacuate to the hospital. *See id.* at 67:11–68:3. Staff Sergeant Hake, Private First Class Habsieger, and Specialist Delgado all perished in the explosion, and Sergeant McCoy died three months later of the burns he suffered in the attack. Barker Report, PX-158, at 38.

Barker testified that the explosive device that detonated on March 23, 2008, "was a precision-made, very effective EFP" that "was powered on by the command wire and then detonated" when it sensed the Bradley. Tr. 3 at 60:23–61:6; Barker Report, PX-158, at 43. Barker also concluded in his report that, based on the damage to the heavily armored Bradley, "the EFP was precision manufactured and copper-lined." Barker Report, PX-158, at 43. Lutz came to a similar conclusion, opining that "the large penetration hole of the Bradley's armor is indicative of a well-manufactured EFP that was a signature of EFPs provided to Iranian-backed Special Groups by the IRGC and Iran's Hezbollah proxy." Lutz Report, PX-159, at 56. Based on a review of the

---

[3] First Lieutenant Mason was uncertain of serviceman Parker's rank, which may have been Specialist or Private First Class at the time of the attack. *See* Tr. 4 at 71:10–13.

extensive evidence before the *Karcher* court that has been refiled here, the court concludes that the March 23, 2008 attack bears hallmarks of the involvement of Iranian-backed proxies, and Iran was responsible for the EFP attack on March 23, 2008.

        c.    <u>May 17, 2009 Attack</u>

Plaintiffs Sebastian Canine and Steven Richards claim that Iran is liable for a May 17, 2009 attack on U.S. forces in Iraq. *See* Pl.'s Proposed Findings at 10 (citing Am. Compl. ¶¶ 1119–1142). Sebastian Canine is the son of Staff Sergeant Robert Canine, *see* Tr. 4 at 122:16–17, and Steven Richards is the father of U.S. serviceman Nathan Richards, Am. Compl. ¶ 1141.

On May 17, 2009, four up-armored M1151 Humvees were conducting a routine patrol near Baghdad.  Tr. 4 at 107:17–108:2; *id.* at 106:17–19 (noting Staff Sergeant Canine deployed to Baghdad); Barker Report, PX-158, at 50–51.  The Humvees were equipped with two EFP countermeasures:  radio frequency jammers and "a Rhino early initiation device."  *See* T4 at 108:9–22.  Staff Sergeant Robert Canine testified at the *Karcher* trial that he was riding in the lead Humvee of the convoy, which also carried servicemembers Rhett Murphy, Nathan Richards, and Roady Lanteizer.[4]  *Id.* at 107:23–24, 109:1–7.  The lead Humvee was struck on the passenger side—where Staff Sergeant Canine was seated—by an explosive device that was hidden next to a light pole.  Barker Report, PX-158, at 50–51.  Immediately following the explosion, small arms fire targeted the patrol on multiple sides.  Lutz Report, PX-159, at 65; *see also* Barker Report, PX-158, at 51.  Staff Sergeant Canine was severely wounded in the attack, and both of his legs were amputated due to his injuries.  Tr. 4 at 121:15–122:1, 124:9–11.  Richards lost consciousness after the explosion and suffered a concussion and ruptured eardrum.  Am. Compl. ¶ 1137.

---

[4] Staff Sergeant Canine's testimony did not identify the military ranks of Murphy, Richards, or Lanteizer, and Plaintiffs have not provided the court with their ranks.

Barker identified the explosion as an EFP array that was "precision manufactured and copper-lined."  Barker Report, PX-158, at 56.  He noted that the attacked "unit was operating in territory that previously experienced kinetic events directed by Iranian-backed Special Groups," *id.*, which is supported by the fact that there had been "three previous EFP attacks within 3 miles and 25 days of this event," Task Force Troy, IED Event Storyboard (May 17, 2009), PX-133, at 20.  Lutz likewise concluded that "[t]he attack involved the use of a concealed, copper-lined EFP that was likely remotely armed and [passive infra-red] triggered."  Lutz Report, PX-159, at 71.  Based on the damage to the vehicle, he opined that the EFP was "precision manufactured" and was likely "of original Hezbollah and IRGC design that was supplied by the IRGC."  *Id.* at 70–71.  The evidence of copper lining and the attack's consistency with similar Iranian-backed attacks in the immediate vicinity of the attack at a similar time, in addition to a full review of the evidence presented to the *Karcher* court, leads the court to conclude that Iran was responsible for the EFP attack on May 17, 2009.

    d. <u>January 20, 2007 Attack</u>

Plaintiffs Albert Snyder, Kathaleen Freeman, Richard Lee, Marcia Kirby, and Steven Kirby allege that Iran is liable for the January 20, 2007 attack on U.S. forces.  Pl.'s Proposed Findings at 11 (citing Am. Compl. ¶¶ 600–611).  Albert Snyder, Kathaleen Freeman, and Richard Lee are relatives of Captain Brian Freeman.  Am. Compl. ¶¶ 601–603.  Marcia and Steven Kirby are relatives of Evan Kirby.  *Id.* ¶¶ 609–610.  Like the *Karcher* Plaintiffs before them, however, Plaintiffs have failed to present evidence that Evan Kirby was present for the January 20, 2007 attack on U.S. forces.  *See Karcher*, 396 F. Supp. 3d at 47 n.31, 59.  The court therefore cannot grant default judgment to Marcia and Steven Kirby on the present record.

Unlike the first three bellwether attacks, this final bellwether attack does not involve the detonation of an explosive device.  Rather, the January 20, 2007 attack on the PJCC in Karbala was a targeted assault on an Iraqi government facility that operated as a "nexus" of the local provincial government and U.S. soldiers, military police, and interpreters.  *See* Pregent Report, PX-155, at 15.

On the day of the attack, a U.S. team was "assisting the Karbala provincial government with security planning for the upcoming Shi'a religious observation of Ashura."  *Id.* at 16.  A team of insurgents arrived at the Karbala PJCC disguised as American servicemen:  they drove American-model SUVs disguised as security contractor vehicles, approached the complex wearing American combat uniform variants, and spoke in English.  *Id.* at 17.  As the insurgents approached the PJCC, they reached several checkpoints where they impersonated American soldiers and ordered the Iraqi Police manning the checkpoints to surrender their weapons.  *Id.*  They likewise detained at gunpoint the Iraqi Police at the gate to the parking lot, west guard tower, and guard shack.  *Id.*

Arriving at the PJCC, the insurgents exited their vehicles and greeted in English two American soldiers guarding the complex, Private First Class Shawn Falter and Specialist Jonathan Chism, maintaining the ruse that they were American soldiers.  *Id.* at 18.  Private First Class Falter exited his military vehicle and approached the insurgents' SUVs as they walked past.  *Id.* at 18–19.  The insurgent in the back of the group then turned and shot Private First Class Falter in his neck, while another insurgent scaled a Humvee to shoot Specialist Chism.  *Id.* at 19.

Meanwhile, other operatives—who appeared to have entered the PJCC separately—attacked U.S. forces inside the PJCC, specifically in the Command and Control room.  *Id.* at 20–21.  The Command and Control room was a strategic target because seizing control of

17

the command room would cripple the ability of soldiers at the PJCC "to respond to an attack." *Id.* at 20. The insurgents were unable to force entry to the room, but nonetheless managed to shoot into the room and hurl a grenade through a cracked door. *Id.* at 20–21. A soldier in the Command and Control room, Private First Class Johnathon Millican, fell on the grenade to prevent it from harming his fellow soldiers, and the remaining soldiers were able to fend off the insurgent attempting to enter. *Id.*

At the same time, another team of attackers abducted Captain Freeman and First Lieutenant Jacob Fritz from the officers' room. *Id.* at 22–23. They handcuffed Captain Freeman to Specialist Chism, whom they had shot outside the PJCC earlier, and handcuffed First Lieutenant Fritz to Private First Class Falter. *Id.* at 23. The attackers put the two pairs of men in separate SUVs and fled. *Id.* at 23, 25. They followed a ratline—a known route used by the IRGC to smuggle weapons and explosive devices from Iran into Iraq—and the Army's Investigating Officer concluded that the insurgents' use of this route meant the attack had a clear "connection to Iran" and that the escape route had been pre-coordinated. *Id.* at 25 (internal quotation marks omitted).

The attackers' SUVs were stopped at an Iraqi Army checkpoint. *Id.* at 25–26. When they discovered they could not pass the checkpoint, the attackers diverted off the pre-planned route and began executing the U.S. soldier hostages. *Id.* at 26. Each of the soldiers the insurgents had taken hostage were killed, although Captain Freeman did not die until after the Iraqi Army had attempted to rescue him. *Id.* at 26–27.

Iran's connection to the attack on the PJCC was confirmed by many sources. First, a U.S. satellite detected a "training center in Iran that duplicate[d] the layout of the governor's compound in Karbala, Iraq." *Id.* at 27 (emphasis omitted) (internal quotation marks omitted). As Pregent opined, "The mock-up's very existence is direct evidence of Iran's involvement in planning,

supplying and authorizing the [a]ttack, and training the men who carried it out." *Id.* at 28. Moreover, an investigation into the incident revealed that the Iraqi Police Force colluded with the attackers, which is consistent with IRGC-backed groups' successful infiltration of the force. *See id.* at 28–31. Perhaps most critically, after a raid on known senior leadership of AAH and Hezbollah, the United States obtained "a 22-page memorandum that detailed the planning, preparation, approval process and conduct of the Karbala operation, as well as [a senior Hezbollah commander's] role in overseeing other Special Groups operations." *Id.* at 31 (cleaned up). The captured terrorists "admitted that senior leadership within the IRGC-QF knew of and helped plan the" PJCC attack. *Id.* at 32. AAH also took credit for the attack on its website, claiming that "[t]he goal of the operation was to kidnap U.S. soldiers and officers." *Id*. at 33 (internal quotation marks omitted).

Pregent also opined that AAH, "which was created by the IRGC and trained by Hezbollah," was responsible for the January 20, 2007 attack. *Id.* at 37. He based this conclusion on the fact that "the [a]ttack was complex and sophisticated, requiring advance knowledge of the PJCC compound's layout, the location of the officers' room and the [Command and Control] room, and the expected tactical response of the American soldiers on site." *Id.* The "extensive amount of advanced planning and training" suggested Iranian involvement because, to Pregent's knowledge, "neither AAH nor any other Iraqi terror cell active in the Karbala area ever previously demonstrated that level of sophistication prior to the [a]ttack" on January 20, 2007. *Id.*

Pregent testified that Iran was deploying a strategy it had used before to "capture . . . American officers and soldiers as leverage that Iran could use based on Lebanese Hezbollah's successes with Israel and other Shi'a proxies that have kidnapped in the past." Tr. 5 at 186:5–9. "Lebanese Hezbollah and the IRGC-Qods Force," he testified, identified the Karbala PJCC as "a

vulnerable site where Americans could be kidnapped in order to be exchanged for high-value prisoners that Iran wanted back." *Id.* at 174:1–4.

Based on the court's review of the evidence submitted in *Karcher*, as well as the decisions of Judge Kollar-Kotelly in *Karcher* and Judge Moss in *Fritz*, the court concludes that Iran bears responsibility for the January 20, 2007 attack on U.S. forces at the Karbala PJCC.

## IV.    CONCLUSIONS OF LAW

The court next considers three questions of law: (1) whether there is subject matter jurisdiction over the dispute, (2) whether the court has personal jurisdiction over Iran, and (3) whether Iran is liable for Plaintiffs' injuries.

### A.    Subject Matter Jurisdiction

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hesse Shipping Corp.*, 488 U.S. 428, 434 (1989). "Under the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within one of a list of statutory exceptions . . . ." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). Plaintiffs claim that this court has jurisdiction over Iran under a statutory exception known as the "terrorism exception." Pls.' Proposed Findings at 15.

Pursuant to the terrorism exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an

> official, employee, or agent of such foreign state while acting within
> the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

The terrorism exception applies only if three additional requirements are met. First, the foreign state must have both (1) been "designated as a state sponsor of terrorism at the time the" underlying act occurred or designated because of the act and (2) been so-designated at the time the claim was filed or in the six-month period before the claim was filed. *Id*. § 1605A(a)(2)(A)(i)(I). Second, at the time of the attack, the victim must have been a national of the United States, a member of the armed forces, or an employee or contractor of the United States. *Id.* § 1605A(a)(2)(A)(ii). Third, if "the act occurred in the foreign state against which the claim has been brought," the plaintiff must have "afforded the foreign state a reasonable opportunity to arbitrate the claim." *Id.* § 1605A(a)(2)(a)(iii).

Plaintiffs have easily satisfied most of these jurisdictional prerequisites. First, Plaintiffs seek money damages against a foreign state. *See* Am. Compl. at 142. Second, Plaintiffs are seeking to recover for their personal injuries, including "physical injury, extreme mental anguish, and pain and suffering that ultimately led to their deaths" and "severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, [and] the loss of their loved ones' society, companionship, comfort, advice and counsel." *Id.* ¶¶ 1167, 1172, 1177. Third, Iran has been continuously designated as a state sponsor of terrorism since 1984. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2,836, 2,836 (Jan. 23, 1984); *Salzman*, 2019 WL 4673761, at *12 ("Iran is a designated state sponsor of terrorism and has been since 1984."). Fourth, Plaintiffs have submitted under seal documentation establishing that the Plaintiffs claiming injury from the bellwether attacks are U.S. nationals. *See* ECF Nos. 35–37. Fifth, all of the acts Plaintiffs complained of

occurred in Iraq, not Iran, *see, e.g.*, Am. Compl. ¶ 1, so the requirement to afford Iran the opportunity to arbitrate is not implicated here.

The only remaining jurisdictional inquiries are whether Plaintiffs' injuries were (1) caused by (2) "the provision of material support or resources" for (3) "an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking" by "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  *See* 28 U.S.C. § 1605A(a)(1).

### 1.    *An Act of Extrajudicial Killing or Hostage Taking*

The court turns first to whether Plaintiffs' claims are predicated on an extrajudicial killing or hostage taking.[5]

### a.    Extrajudicial killing

The FSIA defines "extrajudicial killing" by reference to the Torture Victim Protection Act of 1991 ("TVPA").  *Id.* § 1605A(h)(7).  Under the TVPA an "extrajudicial killing" is:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Pub. Law No. 102-256, 106 Stat. 73, § 3(a) (1992).  "[T]his definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."  *Owens*, 864 F.3d at 770.

As to the first element, a killing, three of the four attacks resulted in at least one killing, but Plaintiffs have conceded that they have not presented evidence that the May 17, 2009 attack

---

[5] Plaintiffs argue that the January 20, 2007 attack was a hostage taking rather than an extrajudicial killing.  Pls.' Proposed Findings at 17.

resulted in a killing.  *See* Pls.' Proposed Findings at 17 n.9.  The court concludes that this does not preclude jurisdiction over the May 17, 2009 attack.  The *Karcher* court encountered this same question.  There, the court reasoned that while "[t]he text of Section 1605A(a)(1) does not expressly address attempts to commit acts that are listed in that provision," the court was required to "construe[] the FSIA's ambiguities broadly."  396 F. Supp. 3d at 58.  Following the reasoning of a number of other courts in this District, the *Karcher* court held that "injuries resulting from 'deliberated' attempts to kill fall within the scope of Section 1605A(a)(1)."  *Id.* (citing *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017)).  This court similarly concludes that the text of Section 1605A(a)(1) and the court's mandate to construe ambiguities in the FSIA broadly permits the court to exercise jurisdiction where a designated state supplies material resources in an attempt to commit an extrajudicial killing.

Next, the court must determine whether the killings were "deliberated."  "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse."  *Salzman*, 2019 WL 4673761, at *13 (internal quotation marks omitted).  The October 22, 2006, March 23, 2008, and May 17, 2009 attacks all involved the detonation of EFPs.  EFPs must be strategically placed and later armed via either remote frequency or command wire to properly detonate. *See* Barker Report, PX-158, at 10.  Planning an EFP's location and constructing a means to trigger the device require forethought, and an EFP therefore cannot be detonated on "a sudden impulse." *See Salzman*, 2019 WL 4673761, at *13.  In addition, the court received expert testimony that EFPs were constantly retooled to overcome U.S. defenses that attempted to make EFPs less deadly, indicating that EFPs were intentionally designed to inflict maximum harm on their targets.

23

*See* Barker Report, PX-158, at 12–18.  The court therefore concludes that causing or attempting to cause death by detonating an EFP constitutes a deliberate killing.

Finally, there is no evidence that would suggest that the killings and attempted killings in the October 22, 2006, March 23, 2008, and May 17, 2009 attacks were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation. The killings or attempted killings of persons via detonating an EFP at issue here are therefore extrajudicial killings under the FSIA.

b.   Hostage taking

Plaintiffs argue that the January 20, 2007 attack on the Karbala PJCC was a hostage taking. *See* Pls.' Proposed Findings at 17–18.  The FSIA defines "hostage taking" by reference to Article 1 of the International Convention Against the Taking of Hostages ("ICATH").  28 U.S.C. § 1605A(h)(2).  Article 1 of the ICATH provides that a hostage taking occurs when a person "seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the 'hostage') in order to compel a third party," such as a state, "to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."  International Convention Against the Taking of Hostages,  art. 1, ¶ 1, Dec. 17, 1979, 1316 U.N.T.S. 205.  "The essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the Convention."  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359 (D.C. Cir. 2006) (cleaned up).  "There must be some *quid pro quo* arrangement whereby the hostage would have been released upon performance or non-performance of any action by that third party."  *Id.* (internal quotation marks omitted).

Here, the insurgents patently detained U.S. service members by handcuffing them and driving them away from the Karbala PJCC.  *See* Pregent Report, PX-155, at 23–25.  The only remaining question is whether the insurgents detained the servicemen to achieve a quid pro quo arrangement.  On that matter, Pregent testified that Iran intended to "exchange[]" the four servicemen who were kidnapped and ultimately executed in the January 20, 2007 attack on the Karbala PJCC "for high-value prisoners that Iran wanted back."  Tr. 5 at 174:1–4.  The *Karcher* and *Fritz* courts likewise concluded that the Karbala "attack was intended to capture U.S. servicemembers who could be exchanged for Iranian detainees."  *Karcher*, 396 F. Supp. 3d at 57; *Fritz*, 320 F. Supp. 3d at 71.  The court agrees that, because insurgents kidnapped U.S. servicemen and intended to exchange them for Iranian detainees, the January 20, 2007 attack was a hostage taking, as defined in the FSIA.

### 2.    *Material Support or Resources by an Official or Agent of Iran*

Plaintiffs must next establish that an official or agent of Iran provided material support to the actors who carried out the bellwether EFP attacks and attack on the Karbala PJCC.  The FSIA defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1); 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" by reference to 18 U.S.C. § 2339A).

Plaintiffs have provided numerous examples of Iran funneling material support through the IRGC and Qods Force to terrorist proxies in Iraq.  And, as the court in *Karcher* held, the Qods Force "is at least an agent of Iran, if not a part of the government such that individuals working for

[the Qods Force] would be officials or employees of Iran." *Karcher*, 396 F. Supp. 3d at 55. This material support manifested as millions of dollars of funding, training, and advanced weaponry. *See, e.g.*, Pregent Report, PX-155, at 12; Oates Report, PX-153, at 24. Thus, Plaintiffs have easily established that Iran provided material support for the terrorist attacks that harmed them.

    *3. Causation*

    Finally, for the court to have subject matter jurisdiction over this matter, Plaintiffs must prove that Iran's "provision of material support or resources" *caused* Plaintiffs' "personal injury or death." 28 U.S.C. § 1605A(a)(1). The D.C. Circuit has adopted a proximate cause standard for the FSIA terrorism exception. *See Kilburn*, 376 F.3d at 1128; *Owens*, 864 F.3d at 794 ("In *Kilburn*, we held a plaintiff must show proximate cause to establish jurisdiction under § 1605(a)(7), the predecessor of the current FSIA terrorism exception. Because § 1605A(a) restates the predicate acts of § 1605(a)(7), it stands to reason that proximate cause remains the jurisdictional standard." (citation omitted)). The touchstone of proximate causation is the existence of "'some reasonable connection between the act . . . of the defendant and the damage which the plaintiff has suffered.'" *Owens*, 864 F.3d at 794 (quoting *Kilburn*, 376 F.3d at 1128). There are two components to this inquiry: "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury. Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.* (citation omitted) (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

    Plaintiffs have satisfied both components of proximate cause. First, as to the EFP attacks, Iran's support was a "substantial factor" leading to Plaintiffs' injuries because Iran provided the funding, training, and weaponry that was used to injure Plaintiffs. *See* Pregent Report, PX-155, at 12; Oates Report, PX-153, at 24. This support was particularly crucial: as the U.S. military

developed countermeasures to make EFP attacks less lethal, Iran's training, technology, and provision of resources equipped insurgents with EFPs that could respond to U.S. countermeasures and inflict maximum damage.  *See* Tr. 1 at 98:5–9; Oates Report, PX-153, at 25 (noting that the U.S. military traced components of EFPs to Iran's illicit supply chain); Tr. 5 at 48:21–49:12 (noting devices that interfered with counter-EFP measures were likewise traced to Iran).  Second, as to the Karbala PJCC attack, Iran provided support in key aspects of the planning of the attack. In addition to Iran's construction of a duplicate of the Karbala PJCC within its borders, Iran's proxies AAH and Hezbollah were caught with a 22-page planning document that detailed the planning process of the PJCC attack.  *See* Pregent Report, PX-155, at 27–28, 31.  This support was critical because, as Pregent opined, no active "Iraqi terror cell . . . in the Karbala area ever previously demonstrated th[e] level of sophistication" displayed in the attack on the PJCC.  *Id.* at 37.  Iran's involvement in planning the attack and the attack's sophistication bolster this court's conclusion that Iran's support was a substantial factor in Plaintiffs' injuries from the attack on the PJCC.  *See Karcher*, 396 F. Supp. 3d at 56–57.

Plaintiffs' injuries were also a reasonably foreseeable consequence of Iran's conduct.  The U.S. military has successfully traced EFP devices that circumvented the United States' counter-EFP measures to Iran.  Tr. 5 at 48:21–49:12.  It is clear from Iran's financial support and its provision of evolving and ever-more lethal weaponry to insurgents in Iraq that Iran reasonably anticipated—and indeed, intended—that its support would lead to the death and serious injury of U.S. soldiers.  *See Karcher*, 396 F. Supp. 3d at 56–57 (finding harm to plaintiffs was reasonably foreseeable consequence when Iran intended "to kill people, not just disable vehicles"); *see also Owens*, 864 F.3d at 797–98 (finding bombings were reasonably foreseeable consequence of Sudan's provision of "opportunities" to al Qaeda and Osama bin Laden (internal quotation marks

omitted)).   Likewise, the suffering of the families of victims of Iran-supported attacks was a reasonably foreseeable consequence of Iran's support for terrorist attacks in Iraq.  *See Salzman*, 2019 WL 4673761, at *14 (finding "the related suffering of [victims'] family members" was "reasonably foreseeable").   As to the PJCC attack, the evidence shows Iran was extensively involved in a plot that it intended to use to extract and hold hostage U.S. soldiers.  It was reasonably foreseeable that this conduct would result in death or fatal injury to the kidnapped soldiers and cause their families' related suffering.  *See Karcher*, 396 F. Supp. 3d at 57; *Fritz*, 320 F. Supp. 3d at 86 (finding that, due to Iran's assistance in training and preparing for the attack on the Karbala PJCC, "[t]he fact that the soldiers were also tortured and killed was, by any reasonable measure, a foreseeable consequence of Iran's support").

The court therefore concludes that Iran's material support for the extrajudicial killing and hostage taking involved in the four bellwether attacks proximately caused Plaintiffs' injuries, and the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1605A(a)(1).

### B.        Personal Jurisdiction

As with subject matter jurisdiction, the court has "an independent obligation . . . to satisfy itself of its personal jurisdiction before entering a default against a missing party."  *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018).  Under the FSIA, a court has personal jurisdiction over a foreign sovereign where the court has subject matter jurisdiction and "service has been made under" 28 U.S.C. § 1608.  28 U.S.C. § 1330(b).  "In other words, under the FSIA, subject matter jurisdiction plus service of process equals jurisdiction."  *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (internal quotation marks omitted).

The FSIA provides four means for serving a foreign state.  *See* 28 U.S.C. § 1608(a).  First, a plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance

with any special arrangement for service between the plaintiff and the foreign state or political subdivision." *Id.* § 1608(a)(1).  If service cannot be made under such an arrangement, then the plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2).  If the plaintiff cannot serve the defendant via the first two methods, then the plaintiff must attempt to effect service "by sending a copy of the summons and complaint and a notice of suit," as well as "a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3).  If, after thirty days, service cannot be effected by this third option, the plaintiff must attempt service through diplomatic means.  To do so, the plaintiff must provide the clerk of court with two copies of the summons and complaint, and a notice of the suit, along with a translation of each into the official language of the foreign state, which the clerk of court transmits to the Secretary of State. *Id.* § 1608(a)(4).  The Secretary of State will then "transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

Plaintiffs could not serve Iran under the first two mechanisms of service, as the United States and Iran do not have a "special arrangement" for service and "'Iran is not party to an international convention on service of judicial documents.'" *Salzman*, 2019 WL 4673761, at *15 (quoting *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)).  Plaintiffs therefore first attempted to effect service under the third mechanism—via registered mail with return receipt requested.  *See* Certificate of Mailing.  When Iran did not respond after 30 days, Plaintiffs served Iran via diplomatic channels.  *See* Diplomatic Service Request; Dep't of State

Service Attempt.  Under 28 U.S.C. § 1608(c)(1), service was deemed effected "as of the date of transmittal indicated in the certified copy of the diplomatic note"—in this case, December 18, 2019.  *See* Dep't of State Service Attempt.  Accordingly, this court finds that Plaintiffs properly effected service on Iran under 28 U.S.C. § 1608(a)(4).

Because the court concludes that it has subject matter jurisdiction and Plaintiffs have properly effected service, the court likewise has personal jurisdiction over Iran.  *See GSS Grp.*, 680 F.3d at 811.

### C.    Liability

Finally, the court must determine whether Iran is liable for Plaintiffs' injuries with respect to the bellwether attacks.  Plaintiffs bring their claims under 28 U.S.C. § 1605A(c).  *See* Am. Compl. ¶¶ 1165–1178.  Section 1605A(c) provides that "[a] foreign state that is or was a state sponsor of terrorism" and any of its agents are liable "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(c).  Liability is limited, however, to U.S. nationals, members of the armed forces, employees or contractors of the U.S. government, and legal representatives of any of those individuals.  *See id.*

"There is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law."  *Salzman*, 2019 WL 4673761, at *15 (cleaned up) (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Karcher*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338, 2019 WL 2185037, at *6 (D.D.C. May

21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87.  The court has already concluded that Plaintiffs are all U.S. nationals or members of the armed forces and that it has subject matter jurisdiction over Plaintiffs' claims under the terrorism exception.  Accordingly, the court also concludes that Iran is liable for Plaintiffs' injuries under 28 U.S.C. § 1605A(c).

## V.      CONCLUSION AND ORDER

For the foregoing reasons, the court grants Plaintiffs' motion for default judgment against Defendant as to the four bellwether attacks considered herein.  The court does not, however, grant default judgment to bellwether Plaintiffs Marcia Kirby and Steven Kirby.  The court requires further information to establish that Evan Kirby was present for the January 20, 2007 attack on U.S. forces.

Plaintiffs shall appear for a telephonic status conference on February 8, 2021, at 10:30 a.m., to discuss further proceedings in this matter.

Dated:  February 1, 2021

Amit P. Mehta
United States District Court Judge