

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------------------------------x
WILLIAM LEE, *et al.*,                          :
                                                :
                    Plaintiffs,                 :        **Case No.: 19-cv-830**
                                                :
-against-                                       :
                                                :
ISLAMIC REPUBLIC OF IRAN,                       :
                                                :
                    Defendant.                  :
------------------------------------------------------------------------------x

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS[1]

**I.    INTRODUCTION**

On March 22, 2021, the Court appointed me as Special Master in this case "to take evidence and file a report and recommendation regarding the compensatory damages claims of the 20 Plaintiffs implicated in the Court's recent liability decision, 2021 WL 325958 (D.D.C. Feb. 1, 2021) ('Feb. 1 Order')."  In the Order appointing me, the Court provided *inter alia* the following direction:

> The Special Master shall consider all issues related to compensatory damages as to each claim made by each of the 20 Plaintiffs, including recommending findings of fact and conclusions of law as to whether each Plaintiff has standing to seek damages under the statute. To do so, the Special Master shall have authority to exercise all powers set forth in Rule 53(c), including but not limited to the power to take and record evidence and administer oaths. Testimony may be received by sworn affidavits. All of Plaintiffs' evidence shall be preserved by Plaintiffs' counsel, who shall retain it for use by the Court. The Special Master shall be guided in reviewing and evaluating damages claims by Foreign Sovereign Immunities Act ("FSIA") opinions, including *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269, 318 (D.D.C. 2006); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010), and their progeny.

---

[1]    I am filing two Appendices with the Report and Recommendations to provide the Court with the Exhibits relied upon by the Plaintiffs.  Appendix I contains a Declaration of counsel and Exhibits A-N with Exhibit C, an expert report, limited to the first 7 pages.  The expert report is more than 80 pages long.  If the Court wishes to see the entire report, I shall promptly provide it.  Appendix II contains the same Declaration and Exhibits O-DD.

On March 21, 2022, Plaintiffs submitted compensatory damage requests on behalf of 15 of the 20 Plaintiffs and have indicated that they believe that the FSIA opinions referred to by the Court are a sound basis for determining compensatory damages as to these 15 Plaintiffs. Plaintiffs have indicated that the remaining five Plaintiffs were victims of Explosively Formed Penetrator ("EFP") attacks (the "Five WIA Plaintiffs") and that the damages requested for them will be based upon the testimony presented by medical experts during the three-day bench trial in *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (D.D.C. 2016) (CKK). Plaintiffs will submit the compensatory damage requests for the Five WIA Plaintiffs separately.

In this Report and Recommendations, I describe the injuries suffered by the 15 Plaintiffs and recommend damage awards for each, except for the Estate of Andrew J. Habsieger which is not yet established.

## I.    THE 15 PLAINTIFFS' INJURIES AND DAMAGE RECOMMENDATIONS

Following a three-day bench trial in December 2018 in the *Karcher* case, that court found Iran liable for seven bellwether attacks. *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019). Plaintiffs in this case filed their first Proposed Findings of Fact and Conclusions of Law in Support of their Motion for Default Judgment on June 12, 2020, in which they requested default judgment for the 20 Plaintiffs injured in four attacks overlapping with the *Karcher* bellwether attacks, ECF No. 33. The Court granted default judgment in favor of those Plaintiffs on February 1, 2021, *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021), save for two Plaintiffs for whom the Court requested more evidence, which Plaintiffs provided on March 12, 2021, ECF No. 43. The Court subsequently awarded default judgment to them on March 22, 2021, ECF No. 46.

This Section describes the four attacks for which the Court found Iran liable, 518 F. Supp. 3d 475, as well as the injuries sustained by the Plaintiffs in this case and their ensuing claims. This Section constitutes my findings of fact and conclusions of law.

### A.  The October 22, 2006 Attack

Major David G. Taylor, Jr. was killed on October 22, 2006, when an EFP struck his vehicle in an attack that also injured David Haines, a bellwether plaintiff in *Karcher*, 396 F. Supp. 3d at 33-35. While describing the attack, Mr. Haines stated that Major Dave Taylor was in the front passenger seat of his vehicle.[2]

The *Karcher* court adopted the *Karcher* plaintiffs' expert and fact testimony regarding how Mr. Haines was riding in an up-armored Humvee with a "Frag 5 Kit" on its door (Level 5 Interim Fragmentary Armor Kit which attached additional inches of rolled homogenous armor and ballistic glass to the door) when a multi-array EFP penetrated the front passenger door in four places. *See* 396 F. Supp. 3d at 33 (citing Haines T4-163:20, 164:7-20; Expert Rep. of Capt. (Ret.) Donald Wade Barker ("Barker Rep."), PX-158, at 23).[3] *See also* Haines T4-165:1-15; Barker T3-44:5-8, 45:15-18; Barker Rep. at ii, 15.[4] Mr. Haines stated: "I'm not certain, but I believe it killed Dave Taylor instantly."[5]

"[F]ully persuade[d]" that this was an EFP attack, the *Karcher* court granted default judgment against Iran for its "responsibility with its proxies for the EFP attack on Mr. Haines's

---

[2]    Haines T4-163:8-9. The transcripts from the three-day bench trial in *Karcher* (December 3, 4, and 6, 2018) are referred to as follows: "T1" (*Karcher*, Case No. 16-cv-232, ECF No. 69) and "T2" (*id.*, ECF No. 74) refer to the transcripts from the morning and afternoon sessions on December 3, 2018, respectively; "T3" (*id.*, ECF No. 70) and "T4" (*id.*, ECF No. 75) refer to the transcripts from the morning and afternoon sessions on December 4, respectively; and "T5" (*id.*, ECF No. 71) refers to the transcript from December 6.

[3]    Plaintiffs have relied on certain exhibits, along with their numbering scheme ("PX-__"), from *Karcher*.

[4]    Plaintiffs provided me with these documents at my request.

[5]    Haines T4-164:10-11.

vehicle." 396 F. Supp. 3d at 35-36. This Court took judicial notice of the *Karcher* opinion by "rely[ing] on the evidence presented to the *Karcher* court" while "independently review[ing] the evidence submitted." *Lee*, 518 F. Supp. 3d at 480. This Court concluded that, "[b]ased on the sophistication and precision of the EFP used in the October 22, 2006, attack and the extensive evidence before the *Karcher* court, the court agrees with Plaintiffs' experts that Iran, acting through its proxies, was responsible for the EFP attack on U.S. forces in Iraq on October 22, 2006." *Id.* at 486.

The estate of Mr. Taylor, along with Mr. Taylor's widow, Michelle Taylor; minor child, J.T.; mother, Phyllis Taylor; and brother, John Taylor, are Plaintiffs in this case. *See* Amended Complaint ("AC"), ECF No. 12, ¶¶ 487-96. The following chart reflects the claims asserted by each of the Plaintiffs injured in the October 22, 2006, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Declaration of Dina Gielchinsky ("Gielchinsky Declaration").

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Estate of David G. Taylor, Jr. | Plaintiff estate's decedent | Economic losses claim $1,225,650.54 | Letters Testamentary | A |
| | | | Declaration of Michelle Taylor, dated July 27, 2021 | B |
| | | | Appraisal of Present Value of Economic Life of David Taylor, dated October 25, | C |

| | | | 2021, prepared by L. Wayne Plumly, Jr., Ph.D. | |
|---|---|---|---|---|
| Michelle Taylor | David Taylor's widow | Solatium claim $8 million | Copy of Michelle Taylor's U.S. passport | D |
| | | | Declaration of Michelle Taylor, dated July 27, 2021 | B |
| | | | Declaration of Michelle Taylor, dated May 4, 2021 | E |
| J.T. | David Taylor's minor son | Solatium claim $5 million | Copy of J.T.'s U.S. passport | F |
| | | | Declaration of J.T., dated May 4, 2021 | G |
| Phyllis Taylor | David Taylor's mother | Solatium claim $5 million | Copy of Phyllis Taylor's U.S. passport | H |
| | | | Declaration of Phyllis Taylor, dated May 6, 2021 | I |
| John Taylor | David Taylor's brother | Solatium claim $2.5 million | Copy of John Taylor's U.S. passport | J |
| | | | Declaration of John Taylor, dated May 4, 2021 | K |

### 1.    Economic Loss Claim by Estate of David G. Taylor, Jr.

As the representative of Mr. Taylor's estate,[6] Michelle Taylor seeks compensation for economic losses in the form of lost wages, benefits, and retirement pay. *See* 28 U.S.C. § 1605A(c) ("damages may include economic damages"). To support these claims for economic losses, Plaintiffs submit an expert report prepared by L. Wayne Plumly, Jr., Ph.D. (the "Plumly Economic Report for Mr. Taylor"). Dr. Plumly has previously provided expert reports regarding economic losses in terrorism cases which were adopted by the courts, including in *Relvas v. Iran*, No. 14-cv-01752 (RCL) (D.D.C. Feb. 28, 2018), ECF No. 83 (accepting economic claims calculated by Dr. Plumly and adopted by reports and recommendations found at ECF Nos. 50-52, 55-56, 62-63, 65, 71-72, 77) and *John Doe A-1 to A-49 v. Democratic People's Republic of Korea*, No. 18-cv-00252 (DLF) (D.D.C. Feb. 24, 2021), ECF No. 108.

To project Mr. Taylor's future income stream if not for the attack, Dr. Plumly incorporated testimonial evidence that Mr. Taylor planned to pursue a 20-year military career and then secure a management role at a private defense contractor company, and overlaid that information against statistical data generated by the Bureau of Labor Statistics, the Department of Labor, military pay websites, and other relevant sources.[7] From these sources, Dr. Plumly calculated the present value of Mr. Taylor's lost income, assuming that Mr. Taylor, who was 37 years old when he was killed, (1) would have remained in the military for 20 years; (2) had a life expectancy of 78.6 years; (3) would have received an annual military pension of $46,696.43, adjusted annually by 2.055%, the percent change in the Consumer Price Index; (4) would have received full pension benefits at retirement; and (5) would have begun collecting Social Security Retirement ("SSR") benefits at

---

[6]    *See* Letters Testamentary appointing Michelle Taylor as Executor of Mr. Taylor's estate. Exhibit A.

[7]    *See* Plumly Economic Report for Mr. Taylor at 3-4.  Exhibit C.

age 67 when it is assumed he would retire to maximize his return.[8] Dr. Plumly adjusted these income figures for taxes and consumption, adjusted the SSR benefits for inflation, and adjusted the total lost earnings, pension benefits, and SSR benefits to present value at a rate of 2.27%, the average yield of high-grade municipal bonds in September 2021.[9]

Dr. Plumly then deducted from that income stream of $3,636,365.84 (present value of past net annual income plus the present value future net annual income) what Michelle Taylor and their son received, and are expected to receive, from Mr. Taylor's Social Security Benefits and monthly pension distribution.[10] Dr. Plumly adjusted those past and future earnings to present value by 2.055%, the average annual percent change in the Consumer Price Index.[11] Adjusted for taxes, consumption, and benefits, Dr. Plumly calculated the estate of Mr. Taylor' economic claim as $1,225,650.54.[12]

### 1.    Solatium Claims Brought by David Taylor's Family Members

Courts in this District have established the following baseline solatium awards for family members of victims who died as a result of terrorist attacks: The spouses of deceased victims typically receive $8 million; their parents receive $5 million; siblings receive $2.5 million; and children receive $5 million. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) ("*Peterson II*"); *Valore*, 700 F. Supp. at 85; *Heiser*, 466 F. Supp. 2d at 269. Similar

---

[8]      *See id.*

[9]      *See id.* at 4-5.

[10]      *See id.* at 6.

[11]      *See id.*

[12]      *See id.* Having examined the Report of Dr. Plumly, I conclude that it involves a reliable methodology applied reliably to sufficient facts in accordance with Fed. R. Evid. 702.

to the other baseline awards, these amounts are "not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010), and may be adjusted based on "an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011).

### a.    Michelle Taylor[13]

Michelle Taylor described how she dismissed Mr. Taylor when she first met him: "He did not seem to be my type."[14] Their second meeting was more successful; Mr. Taylor invited her and some mutual friends to stay with him in Fort Benning so they could all attend a rock concert. Ms. Taylor recalled how "captivated" she was by Mr. Taylor's kindness: "Dave worked to make everyone comfortable and perfect."[15] He prepared meals for his guests and made Ms. Taylor a CD with songs by the band so she would be familiar with them before the concert.[16] Ms. Taylor remembered leaving that weekend thinking "he was going to be the man that I would marry."[17]

---

[13]    Michelle Taylor's declaration and U.S. passport (Exhibit D) confirm that she is a U.S. citizen (and was so at the time of the attack). She is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). *See also Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 33 (D.D.C. 2018) ("[T]he plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack. Thus, the second element is firmly established."). *See* Declaration of Michelle Taylor, dated May 4, 2021 ("Michelle Taylor May 4, 2021, Decl."), ¶ 1. Exhibit E.

[14]    Michelle Taylor May 4, 2021, Decl., ¶¶ 6-7. Exhibit E.

[15]    *Id.*, ¶¶ 8-9.

[16]    *See id.*, ¶ 9.

[17]    *Id.*, ¶ 10.

The couple became exclusive soon after. Ms. Taylor graduated from law school, and Mr. Taylor received an assignment to deploy to Kosovo in 2001. Ms. Taylor had been offered a position as an attorney at the Department of Justice in Washington, D.C., a job she called "an opportunity of a lifetime," but one that she would have passed up if Mr. Taylor "had anything important to ask me."[18] Mr. Taylor, however, encouraged her to accept the offer.[19]

Mr. Taylor did propose during one of his deployment leaves, and the two were married after his return to the U.S. on December 21, 2002.[20] The couple moved to Mr. Taylor's new duty station in Germany in 2005 when Mr. Taylor received orders to deploy again, this time to Iraq. Ms. Taylor was not concerned because her husband was going to be stationed at the Joint Operations Center, out of harm's way.[21]

Ms. Taylor was eight months pregnant when her husband called her to tell her he had a chance to serve as an officer on a front-line unit: "He would now be leaving his safe position to be fighting insurgents on the streets of Baghdad."[22] Ms. Taylor remembered having "mixed emotions." She was proud of her husband and wanted to "support him in his dreams as he had supported me in mine."[23] But she was also "afraid for him and for our family."[24] Mr. Taylor was able to take leave and be home for the birth of their son on June 28, 2006.[25] He spent just 13 days

---

[18]    *Id.*, ¶ 12.

[19]    *See id.*

[20]    *See id.*, ¶ 13-14; Declaration of Michelle Taylor, dated July 27, 2021 ("Michelle Taylor July 27, 2021, Decl."), ¶ 4. Exhibit B.

[21]    *See* Michelle Taylor May 4, 2021, Decl, ¶ 17.

[22]    *Id.*, ¶ 18.

[23]    *Id.*, ¶ 19.

[24]    *Id.*

[25]    *See id.*, ¶ 19; Michelle Taylor July 27, 2021, Decl., ¶ 4.

with his new son. "Those would be the only days Dave and [J.T.] would ever get to spend together before Dave was murdered."[26]

Ms. Taylor recalled that she was in her bedroom nursing her newborn on October 22, 2006, when her dogs began barking. Her mother answered the door, and then came to get her over her protests that she was occupied with the baby: "she insisted."[27] With the baby still in her arms, Ms. Taylor looked down the hallway. "To my horror, I saw two notification officers. My heart broke."[28] Ms. Taylor's first instinct was to cry for her newborn child: "How would he be okay now that he does not have a dad?"[29]

Ms. Taylor described the pain she felt right after her husband's death as "unbearable and constant," exacerbated by the "pressure of being a brand-new mother."[30] She began having panic attacks and hearing voices in her head: "I lost contact with reality and was hospitalized."[31] She left the hospital only for her husband's funeral and then returned immediately.[32]

Even 15 years later, Ms. Taylor continues to feel agony: "People tell you that time will heal you, but it does not."[33] She misses her husband, the "love of my life" and "my soulmate."[34] She

---

[26]     Michelle Taylor May 4, 2021, Decl., ¶ 19.

[27]     *Id.*, ¶ 21.

[28]     *Id.*

[29]     *Id.*, ¶ 22.

[30]     *Id.*, ¶ 24.

[31]     *Id.*, ¶ 25.

[32]     *See id.*

[33]     *Id.*, ¶ 26.

[34]     *Id.*, ¶¶ 24, 26, 27.

feels "constant guilt and anxiety" over whether she is "doing enough for our son."[35] According to Ms. Taylor, she has lost her "happily ever after."[36]

Considering the loving relationship between Mr. and Ms. Taylor, I find reasonable Plaintiffs' request for $8 million for Michelle Taylor's solatium claim for the injuries she suffered as a result of the October 22, 2006, attack.

### b.  J.T.[37]

Born on June 28, 2006, J.T. was only four months old when his father was killed, leaving him with no memories of Mr. Taylor. J.T. states in his Declaration: "This leaves me heartbroken. Growing up, I would look at the few photos of my father and me during the first weeks of my life, and I desperately wish I could remember what it was like to be close to him."[38] The closest thing J.T. has to his father is a journal Mr. Taylor kept for his newborn son while deployed in Iraq. Mr. Taylor started the journal on his thirteenth day of being a father, and it contains "handwritten entries to me filled with love and advice from a father to his son."[39] J.T. included in his testimony his father's written purpose for keeping the journal, which was to impart "some advice, and some observations on life that I think you might want or need when you're old enough to read and understand."[40] Mr. Taylor also wrote about "mental, physical and spiritual strength," and advised his young son on how to stay strong.[41] J.T. called the journal his "most prized possession"; in fact,

---

[35]    *Id.*, ¶ 28.

[36]    *Id.*, ¶ 29.
[37]    J.T.'s U.S. passport reflects that he is a U.S. citizen (and was so at the time of the attack). He is therefore eligible to bring claims under 28 U.S.C. § 1605A.  Exhibit F.

[38]    Declaration of J.T., dated May 4, 2021, ¶ 4. Exhibit G.

[39]    *Id.*, ¶ 7.

[40]    *Id.*

[41]    *Id.*

when he was evacuated from his home during a hurricane and instructed to take only a few belongings, he made sure to take it with him.[42]

J.T. described feeling "alone and sad" without his father present in his life. He plays baseball and wishes his father were alive to coach him like the other children's fathers do, and to sit in the stands and cheer him on.[43] His school holds a program called "Dads with Donuts," during which students bring their fathers to school and eat donuts together. J.T. attended once or twice with another family member, but stopped going because it "was too painful to attend."[44] "I am not supposed to be sad or depressed at this age," J.T. stated.[45] "I am constantly struggling with feelings that it is not fair that he was killed."[46]

The loss of his father while an infant has left J.T. deprived of important parental care and support, making Plaintiffs' request for $5 million for J.T.'s solatium claim for the injuries he suffered as a result of the October 22, 2006 attack reasonable.

### c. Phyllis Taylor[47]

Phyllis Taylor described her son as a "dream child."[48] Her husband was also in the military, and Mrs. Taylor worked as a tour guide while her family lived abroad. She took her young son with her on her travels and the two would "explore the world" together.[49] Mrs. Taylor was not

---

[42]    *See id.*, ¶ 8.

[43]    *See id.*, ¶ 11.

[44]    *Id.*, ¶ 12.

[45]    *Id.*, ¶ 14.

[46]    *Id.*, ¶ 12.

[47]    Phyllis Taylor's declaration and U.S. passport (Exhibit H) confirm that she is a U.S. citizen (and was so at the time of the attack). She is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Phyllis Taylor, dated May 6, 2021, ¶ 1. Exhibit I.

[48]    *Id.*, ¶ 5.

surprised when he chose the Army for his profession: "It was part of his fabric. Patriotism and the desire to serve pulsed through his veins, woven into his core."[50] Mrs. Taylor supported his decision, "but at the same time, I worried for his safety."[51]

Mrs. Taylor was particularly concerned when her son was deployed to Iraq: "I watched the news and knew that when he went to Iraq he would be stepping straight into danger."[52] She recalled that her son understood the risks but wanted to go. "He said that he might be able to help the Iraqis."[53]

Mrs. Taylor described receiving the phone call from her daughter-in-law's mother telling her that her son had been killed. Mrs. Taylor immediately told her husband: "To this day I will never forget the look on his face."[54] Mrs. Taylor remembered how she "pulled myself together and went to work. I needed to go and take care of business. There was no falling apart."[55] She tied up loose ends and then flew with her family back to the U.S. for her son's funeral. During the trip home, Mrs. Taylor was desperate "to postpone the inevitable. I could not believe I would never get to see him again."[56] Back in North Carolina, people came from "near and far to pay their respects," leaving Mrs. Taylor exhausted.[57] She explained: "We were a family that needed time to

---

[49]   *See id.*, ¶ 6.

[50]   *Id.*, ¶ 10.

[51]   *Id.*

[52]   *Id.*, ¶ 11.

[53]   *Id.*

[54]   *Id.*, ¶ 12.

[55]   *Id.*, ¶ 13.

[56]   *Id.*, ¶¶ 13-14.

[57]   *Id.*, ¶ 15.

recover and find out how to exist again – if that was even possible – and no one was allowing us to do that."[58] Protestors showed up at her son's funeral, "pouring acid into an already excruciating situation."[59]

Mrs. Taylor described how much she misses traveling with her son, and how heartbreaking it feels for her to know that he never got a chance to raise his own son and carry on that tradition of seeing the world with him.[60] She never imagined that that tradition "would stop with me," and laments the fact that there "will be no stories to share or to pass on."[61] She described how the "hurt never subsides," and how her "life will never be the same without him."[62] According to Mrs. Taylor, "[n]othing will erase the agony I feel from the loss of my child. The only way to make it better is to have him back."[63]

I believe Mrs. Taylor when she says that "[n]othing will erase the agony I feel from the loss of my child."  I find reasonable Plaintiffs' request of $5 million for Phyllis Taylor's solatium claim for the injuries she suffered as a result of the October 22, 2006 attack.

---

[58]    *Id.*, ¶ 16.

[59]    *Id.*, ¶ 17.

[60]    *See id.*, ¶ 19.

[61]    *Id.*, ¶ 20.

[62]    *Id.*, ¶ 21.

[63]    *Id.*, ¶ 14.

### d.  John Taylor[64]

John Taylor is David Taylor's younger brother by four years.[65] His testimony is replete with examples of how much he looked up to his older brother; one of Mr. Taylor's earliest memories is being walked by his older brother to a local store to buy candy. Mr. Taylor was four, and remembered the "pure joy" he felt.[66] A military family, the Taylors relocated to Germany that year. Mr. Taylor did whatever his older brother did: David joined the Cub Scouts; so did John. David joined the Boy Scouts; so did John. David joined the Eagle Scouts; so did John. David ran for class president and won; so did John. When John delivered his speech as president at his high school graduation, he modeled it after David's.[67] John even attended college on an ROTC scholarship like his older brother had, but soon realized that "unlike David, the military was not for me." Mr. Taylor dropped out of the ROTC program and pursued a degree to become an English teacher.[68]

The two brothers stayed in close contact while David was moved around by the Army. They spoke several times a week, and Mr. Taylor visited his brother as often as possible. Mr. Taylor recalled watching his brother jump out of an airplane when he visited him at Fort Bragg: "David was fearless," Mr. Taylor stated in his Declaration. "Unlike him, I would never have considered jumping out of a plane."[69] During another visit to his brother's duty station at Fort

---

[64]     John Taylor's declaration and U.S. passport (Exhibit J) confirm that he is a U.S. citizen (and was so at the time of the attack). He is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of John Taylor, dated May 4, 2021, ¶ 1. Exhibit K.

[65]     *See id.*, ¶ 4.

[66]     *Id.*, ¶¶ 4-5.

[67]     *See id.*, ¶¶ 7, 11-12.

[68]     *Id.*, ¶ 14.

[69]     *Id.*, ¶ 17.

Benning, David announced that he had a surprise for his brother. David had secured Mr. Taylor a slot as an extra on the movie "We Were Soldiers," starring Mel Gibson. Mr. Taylor called the experience "a personal highlight."[70]

The Taylor family spent Christmas of 2005 together in Germany, where David had been transferred. In a "remarkable coincidence," David's apartment building was located next to the one in which the brothers had lived as children. David told his family over that holiday that he was being deployed to Iraq. "I had no idea that this would be the last time I would see my brother alive," Mr. Taylor stated.[71]

Mr. Taylor received news that something happened to his brother via a phone call from the principal of his school while he was at a college fair with his class.[72] Mr. Taylor recalled the bus ride back to school as "eerily quiet," and noted that was "odd because the bus was filled with high school students." Every now and then, one of the students would hush each other. Mr. Taylor realized they knew that something happened to his brother, but no one knew how bad the news was going to be.[73] When Mr. Taylor arrived at school, the principal, assistant principal, school psychologist, and another teacher were waiting for him. The principal told him that David had been killed. Mr. Taylor described himself as "shocked." He went home to call his mother, and the two cried together on the phone.[74]

---

[70] *Id.*, ¶ 18.

[71] *Id.*, ¶¶ 20-22.

[72] *See id.*, ¶¶ 31-32.

[73] *Id.*, ¶ 33.

[74] *Id.*, ¶¶ 35-36.

After David's death, Mr. Taylor "struggled."[75] Teaching was his passion, but he found it hard to work. He could not talk about his brother's death. He kept his "emotions bottled up inside." Mr. Taylor stated that he was "in a state of depression."[76]

David's Colonel subsequently gave Mr. Taylor a video of the mission during which he had been killed – he videoed every mission and would then review the video to identify mistakes or areas of improvement required.[77] Mr. Taylor described how he replays that video often, and never stops hoping for a different outcome.[78] He and his family have "not been the same since" his brother's death.[79]

Given the closeness of the brothers and the obvious loss suffered by John Taylor, I find reasonable Plaintiffs' $2.5 million request for John Taylor's solatium claim for the injuries he suffered as a result of the October 22, 2006 attack.

## B.  March 23, 2008, Attack

Private First Class Andrew J. Habsieger and Staff Sergeant Christopher Michael Hake were killed on March 23, 2008, after an EFP struck their vehicle, an M2A2 Bradley Fighting Vehicle. The *Karcher* court adopted the *Karcher* plaintiffs' expert and fact testimony regarding how that vehicle was attacked by "an EFP slug that cut all the way through the armored vehicle from left to right." *See* 396 F. Supp. 3d at 39 (citing Barker Rep., at 38). "As the slug 'passed through the vehicle's fuel tank,' '[t]he blast energy immediately ignited' the tank, 'setting the vehicle on fire

---

[75]    *Id.*, ¶ 41.

[76]    *Id.*, ¶ 42.

[77]    *See id.*, ¶¶ 45-46.

[78]    *See id.*, ¶ 47.

[79]    *Id.*, ¶ 52.

and burning alive [Mr.] Hake and [Mr.] Habsieger, and killing [Mr.] Delgado.'" *Id.* The Bradley burned for "three or four hours" before the flames could be extinguished. *Id.* at 38 (citing Mason, T4-69:20-70:2). "The charred remains of Private George Delgado, PFC Andrew J. Habsieger, and Staff Sergeant Christopher M. Hake were among the soldiers eventually identified inside." *Id.* (citing Mason T4-53:21-23, 59:9-13, 70:3-7; Barker Rep. at 40). "Although the Bradley's commander … managed to evacuate through a hatch, he would die within months from his burn wounds." *Id.* at 39.

Finding "sufficient evidence that the weapon that destroyed the lead Bradley was an EFP," and that the EFP was one "provided to Iranian-backed Special Groups by the IRGC and Iran's Hezbollah proxy," the *Karcher* court granted default judgment against Iran for its "responsibility with its proxies for this EFP strike." *Id.* at 39-40 (internal quotation marks and citations omitted). This Court took judicial notice of the *Karcher* opinion by "rely[ing] on the evidence presented to the *Karcher* court" while "independently review[ing] the evidence submitted." *Lee*, 518 F. Supp. 3d at 480. This Court concluded that, "[b]ased on a review of the extensive evidence before the *Karcher* court that has been refiled here, the court concludes that the March 23, 2008 attack bears hallmarks of the involvement of Iranian-backed proxies, and Iran was responsible for the EFP attack on March 23, 2008." *Id.* at 487.

Plaintiffs in this case injured as a result of this attack include the estate of Andrew J. Habsieger, whose family members were bellwether plaintiffs in *Karcher* (AC, ¶¶ 933-38); Jennifer Renee York and Jason York, the stepsister and stepbrother of Christopher M. Hake, whose estate and other family members were bellwether plaintiffs in *Karcher* (AC, ¶¶ 939-45); Russell "Rusty" Mason, an occupant of a vehicle in the same convoy as the one in which Messrs. Habsieger and Hake were killed on March 23, 2008 (AC, ¶¶ 946-55); and Andy Pool, an occupant of the same

vehicle as Russell Mason during the attack (AC, ¶¶ 956-65). Messrs. Mason and Pool survived the EFP attack, and their damages will therefore be submitted as part of the forthcoming Proposed Findings of Fact and Conclusions of Law for the Five WIA Plaintiffs.

The following chart reflects the claims asserted by each of the other Plaintiffs injured in the March 23, 2008, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Gielchinsky Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Estate of Andrew J. Habsieger | Plaintiff estate's decedent | Economic losses claim Pending | | |
| | | Pain and suffering claim Pending | | |
| Jason York | Christopher Hake's stepbrother | Solatium claim $2.5 million | Copy of Jason York's birth certificate | L |
| | | | Declaration of Jason York, dated May 4, 2021 | M |
| Jennifer York | Christopher Hake's stepsister | Solatium claim $2.5 million | Copy of Jennifer York's birth certificate | N |

| | | | Declaration of Jennifer York, dated May 5, 2021 | O |
|---|---|---|---|---|

### 1.    Economic Losses and Pain and Suffering Claims by Estate of Andrew J. Habsieger

The formation of Mr. Habsieger's estate is currently pending. Upon its completion, Plaintiffs will submit evidence of, and proposed findings of fact and conclusions of law for, its economic loss claim and its pain and suffering claim.

### 2.    Solatium Claims Brought by Christopher Hake's Family Members

Courts in this Circuit awarding damages under the FSIA to stepparents and stepsiblings adhere to the definition of "immediate family" set forth in the Restatement (Second) of Torts § 46(2), which has been held to include relatives who resided in the same household as the victim. *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (listing case examples and holding that the definition does not include nieces and nephews who did not live in the immediate household).

The court in *Valore* applied this extended definition, explaining that "where claimants 'were members of the victim's household' such that they were 'viewed as the functional equivalents of family members,'" the immediate-family requirement could include stepsiblings. *Valore*, 700 F. Supp. 2d at 79 (citing *Bettis*, 31 F.3d at 337). *See also Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 29 (D.D.C. 2009) (citing *Bettis* and awarding compensation to the non-adoptive stepfather and stepson of the victim when they "lived in the same household" as the victim and the victim treated his stepfather "like he was his biological" parent and provided for his stepson "financially, emotionally, [and] socially"); *Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2022 WL 168261, at *2 (D.D.C. Jan. 19, 2022) (awarding damages to step-

relatives without deduction for their step status); *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (holding that "[h]ere, every non-biological or half-family member has shown that he or she was sufficiently close to the direct victim to meet the 'functional equivalent' test").

The *Karcher* plaintiffs requested $3.125 million for Mr. Hake's half-siblings' solatium claims, reflecting a 25% upward departure from the $2.5 million baseline typically awarded to siblings of a deceased service member. That request was based on the Hake family's testimony in that case expressing exacerbated suffering based on the horrific circumstances of his death. The testimony of Mr. Hake's stepsiblings described below does not reflect the same response; accordingly, Plaintiffs seek the baseline amounts awarded to siblings.

### a.    Jason York[80]

Jason York was less than two years older than his stepbrother Christopher Hake.[81] Mr. York was four when his parents divorced, and eight when his father married Mr. Hake's mother.[82] Though Mr. Hake lived primarily with his father about three hours away from Mr. York during their childhood, he spent "a lot of time" with the "York side" of the family, including holidays: "Chris usually stayed with us many days during school breaks as well as a few weeks during the summers with us in Sayre, where he and I shared a bedroom. Also, our big family often went camping together over Memorial Day and Labor Day weekends."[83] Mr. York stated that he never considered him a stepsibling: "Chris was the only brother I ever had."[84]

---

[80]    Jason York's declaration and birth certificate (Exhibit L) confirm that he is a U.S. citizen (and was so at the time of the attack). He is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Jason York, dated May 5, 2021, ¶ 1. Exhibit M.

[81]    *See id.*, ¶ 9.

[82]    *See id.*, ¶ 5.

[83]    *Id.*, ¶¶ 7-8.

[84]    *Id.*, ¶ 6.

Because the brothers were so close in age, and the only boys in the family, they spent a lot of time together playing baseball and basketball with the neighborhood kids and competing over video games.[85] They rode bikes together, and when they were old enough, motorcycles. "Chris got his own motorcycle that traveled back and forth from Enid to Sayre so we could ride together."[86]

Mr. York was not surprised when his brother enlisted in the military: "For as long as I can remember, Chris wanted to be part of the military." He was impressed by his brother's commitment and service, especially when he was assigned to deal with the aftermath of the September 11, 2001, attacks on the Pentagon.[87]

Mr. York recalled the last time he saw his brother in person. Mr. Hake, his wife, and their new baby traveled to Oklahoma during the summer of 2007. Mr. York had not seen his brother for a while and teased him about his receding hairline. When they parted, Mr. York shook his hand and "told him to be careful and make sure he came back." Mr. Hake deployed to Iraq that November.[88]

Mr. York heard about his brother's attack on the news, not knowing that his brother had been involved. "I remember thinking that somewhere, four families were suffering. Little did I know I was a member of one of those families."[89] Mr. Hake's grandmother called him to tell him his brother had died. Mr. York left work, but did not go home. Instead, he went to a bar – "probably to hide myself away but also to talk to a friend of mine who had been an Army sniper. I told him

---

[85]   *See id.*, ¶ 9.

[86]   *Id.*, ¶ 10.

[87]   *Id.*, ¶¶ 12-14.

[88]   *Id.*, ¶¶ 16-17.

[89]   *Id.*, ¶ 18.

my brother had been killed. I drank a lot that afternoon."[90] He drove to his father's house the following day and answered the door when the Army representatives came to tell them what they already knew.[91]

Mr. York worked hard to keep his emotions in check until after the funeral: "I did not want to focus on the reality that I had lost my one and only brother."[92] When the service ended, he went back to his hotel room, where he "cried like a baby." Mr. York explained: "I cried because I would never see my brother again."[93]

"Overwhelming sadness" hits Mr. York at various times; he feels it on the anniversary of Mr. Hake's death, Veterans Day, and Memorial Day.[94] He also feels it during less expected times, such as television and movie scenes depicting dying soldiers, and news reports of fatal shootings.[95] He described his frustration that so many people "cannot understand what I've lost."[96] Mr. York stated: "I lost my only brother in 2008."[97]

Despite the step-relationship of Mr. York and Mr. Hake, I find that their relationship and regard for one another was sufficient to support Plaintiffs' request for $2.5 million for Jason York's solatium claim for the injuries he suffered as a result of the March 23, 2008, attack.

---

[90]  *Id.*, ¶ 20.

[91]  *See id.*, ¶ 21.

[92]  *Id.*, ¶¶ 22-24.

[93]  *Id.*, ¶ 26.

[94]  *Id.*, ¶ 27.

[95]  *See id.*, ¶¶ 29-30.

[96]  *Id.*, ¶ 29.

[97]  *Id.*, ¶ 33.

### b. Jennifer York[98]

Three years younger than Mr. Hake, Jennifer York was four when her father married Mr. Hake's mother.[99] She recalled spending "every other, if not nearly every, weekend" with her father, and Mr. Hake often being there.[100] She also recalled spending holidays or days around the holidays together with Mr. Hake. She stated: "Thinking about those times, especially Christmases with Chris, still makes me smile because the Christmas season was his most favorite time of year. Period. He never stopped smiling."[101]

Like her brother Jason, she never thought of Mr. Hake as a stepbrother: "we were always just brother and sister."[102] The two used to skate together, and looked forward to staying up all night and watching movies.[103] After Mr. Hake got his driver's license at 16, they drove around their small town together listening to music for so long that the gas would run out.[104]

Ms. York stated that she missed her brother after he joined the Army, but stayed in touch with him through email and social media, as well as phone calls. "I wished I could see him more often."[105] Mr. Hake promised his sister he would come home to see her. "I am heartbroken when

---

[98]    Jennifer York's declaration and birth certificate (Exhibit N) confirm that she is a U.S. citizen (and was so at the time of the attack). She is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Jennifer York, dated May 5, 2021, ¶ 1. Exhibit O.

[99]    *See id.*, ¶ 5.

[100]    *Id.*

[101]    *Id.*, ¶ 6.

[102]    *Id.*, ¶ 8.

[103]    *See id.*, ¶ 10.

[104]    S*ee id.*, ¶ 11.

[105]    *Id.*, ¶¶ 12-16.

I think of his promise."[106] When he deployed to Iraq in 2005, Ms. York sent him care packages "filled with lots of junk food for him and the other soldiers in his unit."[107]

Ms. York stated regarding the regrets she has over her last contact with her brother before he was killed. Mr. Hake had been deployed to Iraq for the second time in November 2007, and called her from his base a few weeks before her wedding day to tell her he did not want her to marry her fiancée. Ms. York told him it was none of his business; her brother responded that "he was trying to look out for me, he loved me, and he wanted what was best for me."[108] Angry at her brother, Ms. York did not reach out to him again for weeks. She relented after hearing increasing news coverage on how dangerous the situation was in Iraq and messaged him to ask how he was doing. She also wanted to "reconnect after our hurtful phone conversation."[109] She sent that message soon before the attack occurred and never received a response. Ms. York stated how, "[t]o this day, I am haunted by the fact that our last contact was filled with anger."[110]

Ms. York was still sleeping when her father called her on the morning of March 24, 2008 to tell her that her brother had been killed. Unable to listen to the news, she hung up. She called back ten minutes later and accused him of lying. When she heard her stepmother screaming in the background, she knew it was true.[111]

---

[106]   *Id.*, ¶ 12.

[107]   *Id.*, ¶ 17.

[108]   *Id.*, ¶ 21.

[109]   *Id.*, ¶¶ 21-22.

[110]   *Id.*, ¶ 21.

[111]   *See id.*, ¶¶ 23-24.

Ms. York stated that her family's dynamic has changed since her brother's death, and that holidays have not been the same. When her family got together, they were all "incredibly sad." They would talk about Mr. Hake, and she would cry. Her family's gatherings have dwindled: "As I think about it, in many ways, Chris was what held our family together."[112] Even 14 years after her brother's death, Ms. York still cannot listen to songs that remind her of him.[113] She divorced her husband and is engaged to a man named Christopher, but while others call him "Chris," she cannot. "'Chris' is and will always be my brother."[114] She is still unable to "let go of the fact that our last contact was a phone conversation filled with anger." She laments having "lost every opportunity to make things right between us." She thinks about how she can never apologize to her brother. "I will feel the impact of these powerful regrets until the day I die."[115]

Notwithstanding a brief break in relations due to Ms. York's indignation over Mr. Hake's advice not to marry her fiancée, I find that the relationship of Ms. York and Mr. Hake was sufficiently close to support Plaintiffs' request for $2.5 million for Jennifer York's solatium claim for the injuries she suffered as a result of the March 23, 2008 attack.

### C. May 17, 2009, Attack

During the evening of May 17, 2009, then-Staff Sergeant Robert Canine was manning the truck commander's position in the right front seat of a M1151 up-armored High Mobility Multipurpose Wheeled Vehicle ("HMMWV" or "Humvee") when his vehicle was struck by an EFP on the front right passenger side where he was seated. *Karcher*, 396 F. Supp. 3d at 42. The

---

[112]   *Id.*, ¶ 32.

[113]   *See id.*, ¶¶ 27, 29.

[114]   *Id.*, ¶ 38.

[115]   *Id.*, ¶¶ 39-40.

EFP was followed by enemy small arms fire from multiple directions. *See id.* at 43. During the *Karcher* trial, Mr. Canine stated that Specialist (Ret.) Nathan Richards was the gunner in the vehicle.[116]

The *Karcher* court adopted the *Karcher* plaintiffs' expert and fact testimony describing how the EFP entered the Humvee's engine bay, and propelled by blast overpressure, "separated the armor from the [engine's] firewall, allowing penetration into the cab." *Id.* (citing Barker T3-65:3-18; Barker Rep., at 53; Canine T4-113:19). The EFP traumatically amputated Mr. Canine's right leg and injured his left leg so extensively that he was ultimately required to amputate it. *See id.* at 43-44.

Listing a "variety of indicators that at least one EFP was involved," and finding "sufficient evidence to attribute this attack to Iran," the *Karcher* court granted default judgment against Iran for its "responsibility with its proxies for this EFP strike." 396 F. Supp. 3d at 44-45. Taking into account "[t]he evidence of copper lining and the attack's consistency with similar Iranian-backed attacks in the immediate vicinity of the attack at a similar time, in addition to a full review of the evidence presented to the *Karcher* court," this Court concluded that "Iran was responsible for the EFP attack on May 17, 2009." *Lee*, 518 F. Supp. 3d at 487–88.

Plaintiffs in this case injured as a result of this attack include Sebastian Canine, the son of *Karcher* bellwether plaintiff Robert Canine (AC, ¶¶ 1119-32); and Steven Richards, the father of Nathan Richards, who was injured in the same attack (AC, ¶¶ 1133-42).

The following chart reflects the claims asserted by each of the Plaintiffs injured in the May 17, 2009, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Gielchinsky Declaration.

---

[116]    Canine T4-109:4-7. Mr. Richards is a plaintiff in the case of *Stearns, et al. v. Islamic Republic of Iran*, Case No. 17-cv-131 (RCL) (D.D.C.).

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Sebastian Canine | Robert Canine's son | Solatium claim $2.5 million | Copy of Sebastian Canine's birth certificate | P |
| | | | Declaration of Sebastian Canine, dated April 30, 2021 | Q |
| Steven Richards | Nathan Richards' father | Solatium claim $2.5 million | Copy of Steven Richards' birth certificate | R |
| | | | Declaration of Steven Richards, dated April 26, 2021 | S |

### 1.    Solatium Claims Brought by Robert Canine's Family Members

Courts in this District have established baseline solatium awards for family members of victims who survived terrorist attacks: Spouses receive $4 million, parents and children receive $2.5 million, and siblings receive $1.25 million. *See Peterson II*, 515 F. Supp. 2d at 52. Courts have awarded upward departures from those amounts when the victim's family members endured especially severe suffering. *See, e.g.*, *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43-44 (D.D.C. 2012) (awarding 20% upward departure to victim's sister who "suffered a 'nervous breakdown' following Anthony's death for which she sought medical treatment and was prescribed medication for approximately one year") (citing Report of the Special Master (Estate of Anthony Brown), ECF No. 51, at 11–13, 17).

### a.    Sebastian Canine[117]

Sebastian Canine was eight years old when his father was injured in an EFP attack, rendering him a double below-the-knee amputee, and old enough to remember all the fun activities he used to enjoy with his formerly physically fit father: jumping on their trampoline, playing with punching bags, fishing, and playing ball.[118] He described a happy family of three, eating dinner, running errands, and spending time at a nearby park together.[119] Mr. Canine recalled that "we laughed a lot."[120]

His father's deployments were hard on Mr. Canine. He described how, as a child, he "zipped my jacket up over my head because I wanted to shut it all out" after his father deployed to Iraq during the summer of 2008.[121] His father tried to make it easier by sending him pictures and writing him notes, which Mr. Canine preserved by scrapbooking them with his mother.[122] Mr. Canine also read his father's emails to his mother and added his own response into his mother's reply. "I often picked an emoji to include at the end."[123]

Mr. Canine remembered two soldiers coming to his house on May 17, 2009, and hearing his mother crying. "While she talked to one of the soldiers, the other soldier sat with me while I played with my Legos." Mr. Canine understood that his father had been hurt, but "did not know

---

117    Sebastian Canine's declaration and birth certificate (Exhibit P) confirm that he is a U.S. citizen (and was so at the time of the attack). He is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Sebastian Canine, dated April 30, 2021, ¶ 1. Exhibit Q.

118    *See id.*, ¶¶ 2, 4-6.

119    *See id.*, ¶¶ 7-8.

120    *Id.*, ¶ 5.

121    *Id.*, ¶ 9.

122    *See id.*, ¶ 10.

123    *Id.*, ¶ 11.

or appreciate how serious it really was."[124] His mother traveled to Walter Reed Army Medical Center in Bethesda, Maryland, where his father was being treated. Mr. Canine stayed with his great aunt for about a month, after which his grandfather brought him to be with his parents. Mr. Canine remembered being "very nervous and scared" when he arrived at the hospital. He described seeing his father, "sitting up in his hospital bed" and "hooked up to tubes of some kind." That moment is when Mr. Canine realized how badly his father had been injured, and he "freaked out" and "cried." Mr. Canine stated that "[e]verything about that place and seeing my Dad there upset me," recalling "all the other soldiers without legs, wearing eyepatches."[125]

Eventually, Mr. Canine's family moved into a townhouse, and he remembered feeling "very sad" watching his father scoot around on the floor and "work so hard to get himself up the stairs one at a time."[126] It also made him unhappy to witness the physical pain his father was suffering, which surfaced anew with each additional surgery his father underwent.[127]

Mr. Canine stated that his father's personality changed after the attack, describing him as "grumpy," "annoyed," and "angry." Mr. Canine missed running errands and playing Legos with his father, but it seemed that his father did not want to spend time with him anymore, so he retreated to his room.[128] He also described a "long period" where his father drank a lot. He remembered his mother complaining that his father was drinking too much.[129]

---

[124]    *Id.*, ¶ 12.

[125]    *Id.*, ¶¶ 13-14.

[126]    *Id.*, ¶ 16.

[127]    *See id.*, ¶¶ 17-18.

[128]    *Id.*, ¶ 20.

[129]    *Id.*, ¶ 22.

"We were not a happy family anymore," Mr. Canine stated. In 2012, his mother left his father and took him with her. He spent a few days a week with his father, but did not want to, explaining that his father "did not want to go anywhere, he was often in a bad mood, and he did not seem to want me there."[130]

As a young child, it bothered Mr. Canine that "my friends had normal families where fathers and sons did lots of things I could not do with my Dad."[131] He feels like he "lost a childhood filled with happiness."[132] As an adult, even 13 years after the attack, it still upsets Mr. Canine to see how much pain his father continues to suffer, and how limited he is.[133] Their relationship has improved, but he worries about how his father will manage as he gets older.[134] He has had to accept that the future holds "a lot of challenges," and stated: "I know there will be more and more he cannot do, and I feel badly that he will need my help more often."[135]

The *Karcher* plaintiffs requested $20 million as compensation for Mr. Canine's injuries, and the special master in that case has not issued a report and recommendation yet. Given the disruption to Sebastian Canine's life and relationship with his father, I find reasonable Plaintiffs' request for $2.5 million for Sebastian Canine's solatium claim for the injuries he suffered as a result of the May 17, 2009 attack.

---

[130]   *Id.*, ¶ 23.

[131]   *Id.*, ¶ 25.

[132]   *Id.*, ¶ 31.

[133]   *See id.*, ¶¶ 26, 29.

[134]   *See id.*, ¶¶ 28-29, 31.

[135]   *Id.*, ¶¶ 29, 32.

2.    **Solatium Claims Brought by Nathan Richards' Family Members**

As stated above, parents of victims who survived terrorist attacks are typically awarded $2.5 million in solatium damages. *See Peterson II*, 515 F. Supp. 2d at 52. Family members with solatium claims are typically not awarded amounts greater than the surviving direct victim's assault, battery, and intentional infliction of emotional distress claims. Nathan Richards, the direct victim, is a plaintiff in *Stearns, et al. v. Islamic Republic of Iran*, Case No. 17-cv-131 (RCL) (D.D.C.), for which damages have not been submitted for award yet. Based on his injuries, described below, the plaintiffs in that case will seek an amount greater than $2.5 million. Plaintiffs in this case also respectfully submit that Steven Richards' damages are particularly severe, given that he has lost contact with his son, and therefore warrant an award of $2.5 million.

a.    **Steven Richards**[136]

Steven Richards described his son before the attack as "sensitive," with a "tender heart" and a "strong sense of right and wrong."[137] At 10 years old, Nathan took his parents' separation badly, and was "heartbroken" when they finalized their divorce, even though he was already serving in the military at the time.[138] Nathan lived with Mr. Richards every weekend since the separation, and father and son went to church every Sunday and spent a lot of time fishing, "an activity we both loved."[139]

---

[136]    Steven Richards' declaration and birth certificate (Exhibit R) confirm that he is a U.S. citizen (and was so at the time of the attack). He is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Steven Richards, dated April 26, 2021, ¶ 1. Exhibit S.

[137]    *Id.*, ¶¶ 5-6.

[138]    *Id.*, ¶¶ 8-9.

[139]    *Id.*, ¶ 10.

Mr. Richards recalled being concerned about his son's academic performance and was heartened when he joined the military. The two spoke regularly during basic training, and Mr. Richards remembered that his son was "proud of his accomplishments."[140] One of the letters his son wrote to him described how he ran an obstacle course in his father's honor. "I was so moved that I had that letter framed. It hangs on my wall where I can see it every day."[141] In other letters, his son "detailed how much he loved and missed me."[142] Mr. Richards described how he still cries when he remembers his son showing him all the medals and ribbons he received, and pinning one onto his father's shirt.[143]

During his son's first deployment to Iraq, Mr. Richards "prayed for his safe return home," concerned about the "terrifying" encounters his son was facing there. He hoped his son would not need to go back for a second tour.[144] His son returned from Iraq, and Mr. Richards flew to visit him. They spent time together catching up and lifting weights. Mr. Richards remembered that during that time, his son told him he was his best friend.[145] When his son announced that he was being redeployed, Mr. Richards begged him to tell his superiors about his physical ailments that

---

[140]    *Id.*, ¶ 14.

[141]    *Id.*, ¶ 15.

[142]    *Id.*

[143]    *See id.*, ¶ 18.

[144]    *Id.*, ¶¶ 19-25.

[145]    *See id.*, ¶ 26.

put him at risk – he was allergic to bees and had an injured knee.[146] His son insisted on going back "because he had a job to do."[147] Mr. Richards was proud but afraid for his son.[148]

Mr. Richards' fear was justified, and his son returned from that second deployment "a changed man." The Amended Complaint in *Stearns, et al. v. Islamic Republic of Iran*, Case No. 17-cv-131 (RCL) (D.D.C.), which includes Nathan Richards as a plaintiff in that case, alleges how, as a result of the attack, "he sustained a concussion and was knocked unconscious." *Stearns*, ECF No. 14, at ¶¶ 1261-64. He developed vertigo, and was diagnosed with a Traumatic Brain Injury ("TBI") and Post-Traumatic Stress Disorder ("PTSD"). He has had "nightmares and flashbacks as well as experienced survivor's guilt." *Id.*, ¶¶ 1265-67. According to Mr. Richards, his son "became angry and negative," and misinterpreted ordinary interactions, which led to frequent conflicts.[149] Formerly best friends, his son became "rude and disrespectful" to Mr. Richards, "saying mean things about me and calling me a weak man or coward every time we spoke."[150]

The worst was yet to come. Eventually, Mr. Richards' son stopped speaking to him, even changing his phone number so he could no longer be reached.[151] Mr. Richards no longer has any contact with his son, and stated that "it feels like he is not my son anymore. He remains so only in

---

[146]    *See id.*, ¶ 27.

[147]    *Id.*, ¶ 29.

[148]    *See id.*, ¶ 30.

[149]    Steven Richards Decl., ¶ 37.

[150]    *Id.*, ¶ 39.

[151]    *See id.*, ¶ 40.

my memory."[152] Mr. Richards worries about his son, and "whether the head injuries he sustained will worsen over time." His son is "always in the back of my mind."[153]

I recognize that there has not yet been a determination of the damages for Nathan Richards, the directly injured victim. Nevertheless, I find reasonable Plaintiffs' request for $2.5 million for Steven Richards' solatium claim – particularly the destruction of a father-son relationship -- for the injuries he suffered as a result of the May 17, 2009 attack.

### D. January 20, 2007, Attack

The *Karcher* court adopted the expert testimony and report of Michael Pregent, the *Karcher* plaintiffs' expert in intelligence matters, including attribution of terror attacks, Pregent T5-173:3-7, regarding the January 20, 2007, attack on the Provincial Joint Coordination Center ("PJCC") in Karbala, Iraq. The *Karcher* court also cited from the U.S. Army's formal AR 15-6 Investigation after the attack, PX-96 ("Karbala AR 15-6") and took judicial notice of certain findings by Judge Randolph Moss in *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018), another case involving the same attack. *See Karcher*, 396 F. Supp. 3d at 46-52; *Karcher*, No. 16-cv-232 (CKK), 2019 WL 4305482, at *1-2 (D.D.C. Sept. 11, 2019).

Specifically, the *Karcher* court described how the PJCC in Karbala was an Iraqi compound where U.S. forces collaborated with Iraqi civil authorities, including police, to strengthen governance of the Karbala province in central Iraq. *See* 396 F. Supp. 3d at 46 (citing Expert Report of Michael P. Pregent ("Pregent Rep."), PX-155 at 15 & n.38). It consisted of a main building attached to the Iraqi governor's building. The main building faced an outdoor courtyard and, beyond the courtyard, a parking lot. U.S. soldiers lived at the PJCC for up to a week at a time in

---

[152]    *Id.*, ¶ 42.

[153]    *Id.*, ¶ 43.

barracks that were located to the side of the courtyard and the main building. Because the PJCC was an Iraqi government facility, Iraqi police bore principal responsibility for security, and staffed security checkpoints at various locations in and around the facility. American forces assisted with security, and operated Humvees positioned around the main building, including in the courtyard and in the parking lot. *See Fritz*, 320 F. Supp. 3d at 65.

On January 20, 2007, U.S. military personnel stationed at the PJCC were preparing security for Shi'a worshippers on a holiday on which Sunni insurgents had staged major attacks in previous years. *See* 396 F. Supp. 3d at 46 (citing Pregent Rep., at 16). At approximately 6:00 PM, a convoy of seven to nine American-looking SUVs approached the first of two Iraqi police checkpoints. *See id.* (citing Pregent Rep., at 16-17; Pregent T5-186:25-187:21). These SUVs were "modified with decoy antennas, brush guards and signage to make them appear the same as American security contractor trucks." *Id.* at 47 (citing Pregent Rep., at 17). The Iraqi police permitted the vehicles to pass through the checkpoints. *See id.* (citing Pregent T5-186:25-187:21, 194:5-6). The convoy then ordered the Iraqi police to surrender their weapons, which they did. *See id.* One of the SUVs stopped at each of the checkpoints, and another in between them. *See id.* (citing Pregent Rep., at 17). After the other SUVs reached the PJCC's parking lot, some of the assailants "detained at gunpoint" Iraqi police officers posted in the vicinity, others secured the perimeter, and the remainder headed for the gated entrance to the PJCC. *Id.* (citing Pregent Rep., at 17; Karbala AR 15-6 at 1, 5). Two SUVs managed to "push[ ] the metal gate open," after which five individuals dressed as American soldiers exited the lead SUV, greeted in English two soldiers sitting guard in a Humvee, and walked past them through the courtyard into the main building. *Id.* at 47-48 (citing Karbala AR 15-6 at 5; Pregent Rep., at 18-19). One of those soldiers left the driver's seat of the Humvee and walked toward the SUVs, while the other remained in the gunner position. *See id.* at

48 (citing Pregent Rep. at 18-19). Three more individuals from the lead SUV disembarked, greeted, and passed the soldier who approached the SUV. One of these three suddenly turned and shot him, while another mounted the back of the Humvee and shot the gunner. *See id.* (citing Pregent Rep., at 19). The guards at the main building's entrance were disarmed by the third assailant. *See id.* (citing Karbala AR 15-6 at 5).

Meanwhile, assailants within the building attacked the command room – the "nerve center of the PJCC" – where U.S. troops were located. *Id.* (citing Pregent Rep., at 20). When an attacker started shooting into the room, those soldiers tried to push the door closed but caught the muzzle of the assailant's AK-47. *See id.* (citing Pregent Rep., at 20-21; Karbala AR 15-6 at 6). The assailant continued firing through the gap and threw a grenade into the room. *See id.* (citing Pregent Rep. at 20; Karbala AR 15-6 at 6). After sustaining wounds from the initial shots, one of the soldiers in the room "followed the bouncing grenade and fell on it when it came to a stop," blunting its force and enabling his fellow soldiers to continue defending the room, dying in the process. *Id.* Soldiers in the command room then heard shots in the hallway, and another grenade was thrown into the room where Captain Brian Freeman and another soldier were stationed. *See id.* (citing Pregent Rep. at 22; Karbala AR 15-6 at 6). Both were captured and escorted to the SUVs. *See id.* (citing Karbala AR 15-6 at 7; Pregent Rep. at 22-23). The assailants handcuffed Mr. Freeman and three other soldiers and loaded them into two of the SUVs. *See id.* (citing Pregent Rep. at 23). All four service members were still alive, despite two having already been shot. *See id.* (citing Karbala AR 15-6 at 5, 7).

As the assailants within the building withdrew, they tossed a grenade into the hallway of the PJCC building, which "left a hole in the concrete floor and blew the doors in the hallway off of their hinges" in the command room. *Id.* (citing Pregent Rep. at 23). Those assailants also

"increased their rate of fire" to neutralize the threat from the soldiers in the control room. *Id.* at 48-49. Meanwhile, other assailants outside used "some form of home-made explosive device" – possibly "barrels filled with fuel and burning oil" and equipped with charges and timers – to disable Humvees in the courtyard and outside of it. *Id.* at 49 (citing Pregent Rep. at 23 & n. 63). As some assailants were attacking within the main building, others were firing at the U.S. barracks next door, which prevented U.S. soldiers in the unit located there from aiding the troops in the main building or the abductees in the courtyard. *See id.* (citing Pregent Rep. at 24; Karbala AR 15-6 at 5). Then-Private First Class Evan Kirby was one of the soldiers in the barracks, and he described how he ran to the second floor of the front of the barracks and was thrown to the ground by the "force of a nearby explosion." Declaration of Evan Kirby, dated December 11, 2009 (submitted to *Karcher* special master), ¶¶ 13-14.[154] Another unit of U.S. soldiers took up position on the PJCC's roof, but "the assailants had already completed their assault, abducted the four servicemen, and exfiltrated." 396 F. Supp. 3d at 49 (citing Pregent Rep. at 24). That unit could not fire at the departing SUVs because "[t]he explosion from the Humvee positioned in the courtyard knocked [those] soldiers ... to their backs, and subsequent rising smoke and dust obscured their vision." *Id.* (citing Pregent Rep. at 24). Other assailants were firing at the back of the PJCC. *See id.* (citing Pregent T5-206:18-20; Karbala AR 15-6 at 5).

After the assailants left, the SUVs carrying the hostages sped along "a known 'ratline'" – a route used by the IRGC [Islamic Revolutionary Guard Corps] to smuggle weapons, ammunition, mortars, rockets, EFPs and IEDs from Iran into Iraq." *Id.* (citing Pregent Rep. at 25). The hostage convoy headed southeast toward Hillah. *See id.* (citing Pregent Rep. at 25). The Iraqi army and Iraqi police started pursuing the SUVs, which turned onto a back road once they "[r]ealiz[ed] that

---

[154]    This Declaration is Exhibit BB in the instant case.

their escape route was compromised." *Id.* at 61 (citing Pregent Rep. at 26). Knowing now that they "could not escape with hostages," the assailants stopped their SUVs, and killed or fatally wounded all four of the U.S. service members. *See id.* (citing Karbala AR 15-6 at 3, 9; Pregent Rep. at 26-27). The only service member still alive when Iraqi officers arrived, Mr. Freeman, was in severe condition from a gunshot wound to the head and, despite an "attempt[] to control the bleeding and appl[y] CPR," he died in an ambulance on the way to the Regional Embassy Office. *Id.* (citing Karbala AR 15-6 at 9; Pregent Rep. at 27).

The *Karcher* court found "sufficient evidence to support the[] conclusion[] that Iran's IRGC and Hezbollah planned and orchestrated the January 20, 2007 attack on the Karbala Provincial Joint Coordination Center in Iraq, which was carried out at their direction by [Asa'ib Ahl al-Haq]." *Id.* at 52 (citing Pregent Rep. at 7, 37). Based on its review of the evidence submitted in *Karcher*, as well as the decisions in *Karcher* and *Fritz*, this Court concluded "that Iran bears responsibility for the January 20, 2007 attack on U.S. forces at the Karbala PJCC." *Lee*, 518 F. Supp. 3d at 489–90; ECF No. 46.

Plaintiffs in this case injured as a result of this attack include Albert Snyder, Kathaleen Freeman, and Richard Lee, the stepfather, stepmother, and stepbrother of *Karcher* bellwether estate plaintiff Brian Freeman, who was killed in the attack (AC, ¶¶ 600-04); and Marcia Kirby and Steven Kirby, the parents of *Karcher* bellwether plaintiff Evan Kirby, who was injured in the same attack (AC, ¶¶ 605-11).

The following chart reflects the claims asserted by each of the Plaintiffs injured in the January 20, 2007, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Gielchinsky Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Albert Snyder | Stepfather of Brian Freeman | Solatium claim $6 million | Copy of Albert Snyder's U.S. passport | T |
| | | | Declaration of Albert Snyder, dated April 12, 2021 | U |
| Kathaleen Freeman | Stepmother of Brian Freeman | Solatium claim $6 million | Copy of Kathaleen Freeman's birth certificate | V |
| | | | Declaration of Kathaleen Freeman, dated April 12, 2021 | W |
| Richard Lee | Stepbrother of Brian Freeman | Solatium claim $3 million | Copy of Richard Lee's U.S. passport | X |
| | | | Declaration of Richard Lee, dated April 14, 2021 | Y |
| Marcia Kirby | Mother of Evan Kirby | Solatium claim $1,875,000 | Copy of Marcia Kirby's birth certificate | Z |
| | | | Declaration of Marcia Kirby, dated August 5, 2021 | AA |

| | | | Declaration of Evan Kirby, dated December 11, 2019 | BB |
|---|---|---|---|---|
| Steven Kirby | Father of Evan Kirby | Solatium claim $1,875,000 | Copy of Steven Kirby's birth certificate | CC |
| | | | Declaration of Steven Kirby, dated August 6, 2021 | DD |
| | | | Declaration of Evan Kirby, dated December 11, 2019 | BB |

### 1. Solatium Claims Brought by Brian Freeman's Family Members

As stated above, courts have established baseline solatium awards for family members of victims who died as a result of terrorist attacks, awarding parents $5 million and siblings $2.5. *See Peterson II*, 515 F. Supp. 2d at 52; *Valore*, 700 F. Supp. 2d at 85; *Heiser*, 466 F. Supp. 2d at 269. Also as stated above, this Circuit awards comparable FSIA damages to stepparents and stepsiblings who resided in the same household as the victim and acted as the "functional equivalent" of an immediate family member. *See Bettis*, 315 F.3d at 337; *Valore*, 700 F. Supp. 2d at 79; *Heiser*, 659 F. Supp. 2d at 29; *Pennington*, 2022 WL 168261, at *2; *Fritz*, 324 F. Supp. 3d at 63.

### a.    Albert Snyder[155]

Albert Snyder met Brian Freeman's mother in 1984, when Brian was nine years old. Mr. Snyder recalled that he "knew the instant I met Brian it was going to be all or nothing as a family. From that moment on the three of us did everything together."[156] Mr. Snyder and Ms. Freeman married the next year, with 10-year old Mr. Freeman acting as best man at the wedding.[157]

Mr. Snyder and his new stepson spent "hours together fishing, kayaking, and camping," which created "an unbreakable bond between us."[158] Mr. Snyder hoped to continue the tradition one day with Mr. Freeman's son.[159] He stated that "I did not think of Brian as a stepson but rather as a son I loved very much."[160]

Mr. Snyder described how Mr. Freeman "fell in love with the military," and hoped it would provide him a path toward his desire to "help people and enter politics."[161] Still, Mr. Snyder was "very worried for his safety;" when Mr. Freeman was called into active duty in 2005, he had a wife and two young children.[162] "I could not bear the thought of something happening to him."[163]

Mr. Snyder recalled that the newspaper reported on the attack, calling it the deadliest day in Iraq so far. Mr. Snyder's daughter-in-law and children were staying with him and his wife, and

---

[155]    Albert Snyder's declaration and U.S. passport (Exhibit T) confirm that he is a U.S. citizen (and was so at the time of the attack). He is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Albert Snyder, dated April 12, 2021, ¶ 1. Exhibit U.

[156]    *Id.*, ¶ 5.

[157]    *See id.*, ¶ 6.

[158]    *Id.*, ¶¶ 7-8.

[159]    *See id.*, ¶ 9.

[160]    *Id.*, ¶ 20.

[161]    *Id.*, ¶ 13.

[162]    *Id.*, ¶ 15.

[163]    *Id.*

they all feared the worst. Mr. Freeman's wife emailed him, and when she could not reach him, called the Red Cross and the office of a senator whom Mr. Freeman knew. Finally, she called her neighbors, and they told her that the Army had been there looking for her.[164] Military chaplains arrived at Mr. Snyder's house to inform them that Mr. Freeman had been killed. "Life as I knew it changed in an instant," and the family started to cry. Mr. Freeman's young son asked what was wrong, and Mr. Snyder "had to explain to this innocent child that his father had been killed."[165]

Mr. Snyder stated that "his heart was broken. I felt so empty and hollow."[166] He misses Mr. Freeman every day. "I will never recover from this unbearable loss."[167]

The *Karcher* plaintiffs submitted proposed findings of fact and conclusions of law seeking $6 million in damages for the solatium claim brought by Mr. Snyder's wife, Kathleen Freeman – Mr. Freeman's mother. That amount represents an upward departure of 20% in damages comparable to the 20% upward departure Judge Moss adopted for the Karbala victims' families' solatium awards in *Fritz*, 324 F. Supp. 3d at 62 (adopting report and recommendation in *Fritz*, No. 15-cv-456, 2018 WL 5046229, *22-23 (D.D.C. Aug. 13, 2018)). The *Fritz* court found the upward departure warranted because the deaths of the kidnapped service members, "and the manner in which they occurred, have wrought profound harm to each of these families—emotional, physical, and financial." *Id.*

The *Fritz* court also adopted the special master's recommendation to award the stepmother of one of the service members $1.5 million at the request of the plaintiffs in that case – 25% of the

---

[164]    *See id.*, ¶¶ 16-17.

[165]    *Id.*, ¶ 18.

[166]    *Id.*, ¶ 19.

[167]    *Id.*, ¶ 21.

amount the court awarded to that service member's biological mother. *Id*. The stepmother, Vanessa Chism, and the direct victim lived in the same household for portions of a three-year period, during which the direct victim turned 18. *See id.* The special master stated that "it is not clear that the duration of the relationship should matter," but noted that there "is a suggestion in the case law that the age at which the relationship commenced could be a relevant factor." *Id.* The special master opined that "[i]t would not be unreasonable to award a higher amount to Vanessa" than the $1.5 million plaintiffs requested on her behalf, "but in light of Vanessa's testimony – which indicates that while she feels a loss, the focus of her concern is the effect that Bryan's death has had on her husband," the plaintiffs' request was reasonable and appropriate. *Id.*

Here, Mr. Snyder lived in the same household with Mr. Freeman starting from when Mr. Freeman was 10, and his testimony reflects his consideration of Mr. Freeman as his own son, and his own profound loss at Mr. Freeman's death. Given that another Special Master awarded other parents of the Karbala victims $6 million representing an upward departure of 20%, I find it reasonable to award the same sum of $6 million for Albert Snyder's solatium claim for the injuries he suffered as a result of the January 20, 2007 attack.

### b. Kathaleen Freeman[168]

Kathaleen Freeman married Brian Freeman's father when Brian was just five years old, and she stated that "we instantly became an extremely close family."[169] The two biked, swam, and cooked together: "We loved spending time together."[170] She stated how she "became a mother

---

[168]    Kathaleen Freeman's declaration and birth certificate (Exhibit V) confirm that she is a U.S. citizen (and was so at the time of the attack). She is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Kathaleen Freeman, dated April 12, 2021, ¶ 1. Exhibit W.

[169]    *Id.*, ¶ 5.

[170]    *Id.*, ¶ 6.

figure in his life," and "Brian eagerly called me mom."[171] Mrs. Freeman thought of him as her own son.[172] She recalled that he was in East Berlin when the Berlin Wall was coming down, and he called her to "share that once in a lifetime moment with me."[173]

Mrs. Freeman was "very worried" when Mr. Freeman was called back to active duty in the fall of 2005 and recalled that her last words to him were "be safe and come home to us!"[174] On January 21, 2007, her husband received a phone call from the Army seeking confirmation of his address and the fact that he was Mr. Freeman's father. The caller would not provide any further information.[175] Mr. Freeman's mother then called them and told them that Army officers had visited the home of Mr. Freeman's wife, who was staying with her. "We knew that something horrible had happened to Brian."[176] When they did receive news, the first account they heard was that Mr. Freeman had died instantaneously in a mortar attack. Later, they discovered that he had been "brutally murdered by terrorists."[177]

Mrs. Freeman stated that her "first concern was my husband," as he is a "frail man, riddled with health problems."[178] She described her own loss as "excruciating and continual."[179] She continues to rely on her faith to help her cope with "the unbearable loss of my son," but she

---

[171]    *Id.*

[172]    *See id.*

[173]    *Id.*, ¶ 9.

[174]    *Id.*, ¶¶ 13-14.

[175]    *See id.*, ¶ 15.

[176]    *Id.*, ¶ 16.

[177]    *Id.*, ¶ 17.

[178]    *Id.*, ¶ 18.

[179]    *Id.*, ¶ 19.

continues to "miss Brian every minute of every day."[180] Mrs. Freeman stated: "Not a moment goes by where I do not think about him."[181]

Mrs. Freeman lived in the same household with Mr. Freeman starting from when Mr. Freeman was five, and her testimony reflects how she considered Mr. Freeman as a son, and her own profound loss at his death. In light of the fact that another Special Master recommended an award of $6 million to other Karbala victims' parents representing an upward departure of 20%, I have recommended the same $6 million to Brian's stepfather. Since Kathaleen Freeman was Brian Freeman's stepmother from the time Brian was five-years-old, I find that it is reasonable to award $6 million for Kathaleen Freeman's solatium claim for the injuries she suffered as a result of the January 20, 2007 attack.

### c.  Richard Lee[182]

Richard Lee was 13 when his mother married Mr. Freeman's father, and Brian Freeman was five.[183] Like his mother, Mr. Lee also stated that "we instantly became an extremely close family."[184] Mr. Lee's parents worked a lot, and he took care of Mr. Freeman as his "big brother": "I cooked for him, helped him with his homework and looked out for him."[185] Mr. Lee recalled

---

[180]    *Id.*, ¶ 22.

[181]    *Id.*, ¶ 11.

[182]    Richard Lee's declaration and U.S. passport (Exhibit X) confirm that he is a U.S. citizen (and was so at the time of the attack). He is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Richard Lee, dated April 14, 2021, ¶ 1. Exhibit Y.

[183]    *See id.*, ¶ 5.

[184]    *Id.*

[185]    *Id.*, ¶¶ 6, 8.

that Mr. Freeman "tagged along with all my friends."[186] As they grew older, Mr. Freeman became Mr. Lee's best friend.[187]

Mr. Lee was a Marine and gave his younger brother military advice and guidance. It was Mr. Lee, along with Mr. Freeman's father, who pinned Mr. Freeman's graduation bars on his uniform, and it was Mr. Lee who reassured Mr. Freeman when he confided that he was scared to deploy to Iraq.[188]

It was also Mr. Lee who contacted his military connections to find out the truth about his brother's "vicious murder," and who felt that he had to "swallow my pain" and "tak[e] care of every aspect concerning Brian's death" for his parents: "I could not crumble, for fear if I did then everyone else would follow."[189]

Mr. Lee stated that his brother's death "has been extremely traumatic;" even more than when his own father died when he was just 12 years old.[190] "On the outside I seem functional, but, on the inside, I am broken."[191] Mr. Lee "feel[s] his loss every day."[192]

In light of the extremely close family and military relationship between Richard Lee and Brian Freeman, I find it reasonable to award $3 million for Mr. Lee's solatium claim for the injuries

---

[186]    *Id.*

[187]    *See id.*, ¶ 9.

[188]    *See id.*, ¶¶ 12-13.

[189]    *Id.*, ¶¶ 15-16.

[190]    *Id.*, ¶ 18.

[191]    *Id.*, ¶ 17.

[192]    *Id.*

he suffered as a result of the January 20, 2007 attack, reflecting the 20% upward departure of $2.5 million adopted in *Fritz* for baseline damages.

### 2.    Solatium Claims Brought by Evan Kirby's Family Members

Although Mr. Kirby is a bellwether plaintiff in *Karcher*, and not a plaintiff in this case, Plaintiffs include a summary of some of his injuries resulting from the January 20, 2007, attack here (in addition to those described below, Mr. Kirby also suffers from TBI symptoms), to give context to the damages claimed by his parents, who are Plaintiffs in this case.[193]

Born in Columbus, Ohio on May 31, 1986, Evan Kirby was just 20 years old when the PJCC was attacked on January 20, 2007.[194] Having completed his shift as a guard at the front gate of the PJCC, Mr. Kirby went into the main building to use his laptop, but his laptop battery died. He then headed to his barracks, ate an Army "MRE" – a Meal Ready to Eat – and listened to his radio.[195] Suddenly, he heard explosions and "pops" coming from the main building he had just left, which was under attack. "The force of the explosions was powerful enough to blow doors open and window glass out" in the adjacent barracks.[196] Mr. Kirby thought he would die then and there.[197]

Smoke enveloped the barracks as Mr. Kirby headed to the second floor. He heard more explosions and also screaming at the front gate.[198] Another "nearby explosion" threw Mr. Kirby

---

[193]    The *Karcher* plaintiffs submitted evidence of Mr. Kirby's damages to the special master appointed in that case, but a report and recommendation has not yet been issued.

[194]    *See* Declaration of Evan Kirby, dated December 11, 2019 ("Evan Kirby Decl."), ¶ 2. Exhibit BB.

[195]    *See id.*, ¶ 11.

[196]    *Id.*, ¶ 12.

[197]    *See id.*

[198]    *See id.*, ¶ 13.

to the ground: "My legs were bent in an unnatural way back towards my head. In addition, the hard metal plate in the back of my armor vest was thrust into my back injuring my back and spine."[199] (Mr. Kirby's medical records, submitted to the special master in *Karcher*, reflect recurring complaints about backaches and lumbago after the attack.) "Dazed and stunned," Mr. Kirby watched as helicopters landed to pick up the injured.[200] "That was the first time I knew that there had been casualties."[201] He saw a body bag and "wondered who it was." He later learned that "it was Millican," a soldier in his unit.[202] Mr. Kirby's superior instructed him to guard the main building with orders that if anyone entered but did not say "friendly," Mr. Kirby was to shoot them.[203] Mr. Kirby found out that service members were missing, and although he followed his orders, "what I really wanted to do was participate in the search to find the missing men."[204] "As we waited for news, I huddled with the other men."[205]

News did come in of the service members who were killed, some of whom had served with Mr. Kirby for months. Mr. Kirby described subsequently "hearing the screams" and seeing "the faces" of those dead service members in his nightmares.[206] He stopped taking the sleeping pills he was prescribed in order to stave off those nightmares.[207] He attended memorial services for his

---

[199]    *Id.*, ¶ 14.

[200]    *Id.*, ¶¶ 15, 17.

[201]    *Id.*, ¶ 17.

[202]    *Id.*

[203]    *Id.*

[204]    *Id.*, ¶ 18.

[205]    *Id.*

[206]    *Id.*, ¶ 20.

[207]    *Id.*

fallen friends, and "[a]s I looked upon the battlefield crosses for my Army brothers, with their helmets and rifles and boots displayed, I cried and cried."[208] (Mr. Kirby's medical records reflect his complaints of high irritability, sleep disturbances, and frequent nighttime awakenings in the months after the attack.)

Mr. Kirby continued his tour in Iraq until it concluded in 2008, and then returned to his station in Fort Richardson, Alaska.[209] For the coming months, he worked from morning until evening, drank an entire bottle of tequila until 2:00 a.m., and then went to bed, only to repeat the same routine the next day.[210] (Plaintiffs' counsel have represented to me that his medical records during that time reflect repeated references to excessive alcohol use and dependence, along with symptoms of PTSD, anxiety, insomnia, and concentration and memory difficulties.) The nightmares were overwhelming, and Mr. Kirby was consumed by survivor's guilt. He became forgetful and started experiencing panic attacks which he described manifesting as "a shortness of breath, tingling in parts of my body, and a numbness that I have difficulty describing."[211] One evening, Mr. Kirby "took a 44-magnum revolver to my head and pulled the trigger."[212]

The bullet was a dud, and Mr. Kirby lived. "The reality that I had almost committed suicide was a real eye-opener."[213] "Still, I chose not to seek treatment because I did not want it to impact my service."[214] "I dug deep down into myself and became the tough soldier I needed to be."[215] Mr.

---

[208]    *Id.*, ¶ 22.

[209]    *See id.*, ¶ 23.

[210]    *See id.*

[211]    *Id.*, ¶¶ 24-26.

[212]    *Id.*, ¶ 24.

[213]    *Id.*

[214]    *Id.*, ¶ 25.

Kirby was deployed to Afghanistan between 2009-2010,[216] and upon returning home noticed an increase in his forgetfulness, PTSD symptoms, and back injury pain.[217] His panic attacks became so severe he was admitted to the hospital for them.[218] He was prescribed anti-anxiety and anti-depressant medication starting in 2012 and sought counseling through the VA but did not find the sessions productive.[219] (Plaintiffs' counsel have represented to me that his medical records between 2012 - 2018 reflect numerous reports of panic attacks, anxiety, sleep problems, anger, and depression, and prescriptions for Sertraline, Fluoxetine, Hydroxyzine, Trazodone, Prozac, and Visteril.) In 2014, the memories of the attack and "the loss of my buddies" all resurfaced when Mr. Kirby happened upon a tow truck driver wedged between a car and his truck. Mr. Kirby tried to free the driver, but he "died in my arms."[220] "Images of Millican, the body bag, and the attack overwhelmed me and I began drinking again, often to excess."[221]

Mr. Kirby stated that "I think of the men who were killed on January 20, 2007 every single day."[222] When he sleeps, he still experiences nightmares, and when he can't sleep, "the images of the attack at Karbala often return to me."[223] "My panic attacks are real," he stated.[224] Mr. Kirby

---

[215]    *Id.*

[216]    *See id.*, ¶ 9.

[217]    *See id.*, ¶ 26.

[218]    *See id.*, ¶ 25.

[219]    *See id.*, ¶ 27.

[220]    *Id.*, ¶ 31.

[221]    *Id.*

[222]    *Id.*, ¶ 32.

[223]    *Id.*, ¶ 33.

[224]    *Id.*

still feels survivor's guilt: "I wished I could have taken their place."[225] "I feel pain because of the fact that I am alive and those men are not."[226]

The *Karcher* plaintiffs submitted that Mr. Kirby's physical and emotional injuries warranted an award of $3,750,000, and the special master has not issued a report and recommendation yet.

### a. Marcia Kirby[227]

Marcia Kirby stated that "Evan has not been the same since the attack."[228] The "baby of the family," he was bright, and an excellent athlete.[229] He was also "kind, with a pleasant disposition."[230] Mrs. Kirby recalled that "he cared about people," and would plow snow for their elderly neighbors without being asked, and without pay.[231] Mrs. Kirby described herself as a "present parent" who attended all of her son's practice sessions and games.[232] In fact, when he was young, Mrs. Kirby worked at his school: "It allowed me to be on the same schedule as his school day and to see him throughout the day."[233]

---

[225]    *Id.*, ¶ 21.

[226]    *Id.*

[227]    Marcia Kirby's declaration and birth certificate (Exhibit Z) confirm that she is a U.S. citizen (and was so at the time of the attack). She is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Marcia Kirby, dated August 5, 2021 ("Marcia Kirby Decl."), ¶ 1. Exhibit AA.

[228]    *Id.*, ¶ 2.

[229]    *Id.*, ¶¶ 3, 10.

[230]    *Id.*, ¶ 12.

[231]    *Id.*

[232]    *See id.*, ¶¶ 9-10.

[233]    *Id.*, ¶ 8.

Mrs. Kirby was not surprised when her son enlisted in the Army; his father and older brother also served in the Army.[234] Still, Mrs. Kirby worried when he deployed, and prayed for his safety every day.[235] They spoke once a week during his deployment, and Mrs. Kirby felt comforted after those conversations.[236]

When Mr. Kirby returned home after deployment, his mother saw that "he began to fall apart."[237] He lived with his parents for five years because he was so depressed, he could not take care of himself.[238] He drank heavily and got into fights at bars.[239] Mrs. Kirby worried about him putting his life and others' lives in danger when he drove while intoxicated.[240] Mrs. Kirby also described her son's nightmares and crying in his sleep: "Hearing him cry made me cry. I would have given anything for Evan to have been spared from experiencing the traumatic events of the attack."[241] He was newly irritable and ill-tempered, getting angry at his mother when she tried to help him.[242]

---

[234]    *See id.*, ¶ 14.

[235]    *See id.*, ¶ 15.

[236]    *See id.*, ¶ 16.

[237]    *Id.*, ¶ 17.

[238]    *See id.*, ¶ 18; Evan Kirby Decl., ¶ 21.

[239]    *See* Marcia Kirby Decl., ¶¶ 18-19.

[240]    *See id.*, ¶ 19.

[241]    *Id.*, ¶¶ 21-22.

[242]    *See id.*, ¶ 24.

Mrs. Kirby described watching her son "give up on so much of his life" as "unbearable."[243] She suffered a recent heart attack, and cannot follow instructions to manage her stress "because I will never stop worrying about Evan."[244]

The *Karcher* Plaintiffs requested $3,750,000 in damages for Mr. Kirby, representing 75% of the $5 million baseline for surviving soldiers who have suffered physical injuries such as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as "lasting and severe psychological pain." *Peterson II*, 515 F. Supp. 2d at 54. This baseline amount is adjusted based on the nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment. *See id.* at 52 n.26. Although the $3,750,000 that the *Karcher* Plaintiffs requested in damages for Mr. Kirby remains pending, that claim seems reasonable to me and, accordingly, so does Plaintiffs' request for $1,875,000 for Marcia Kirby's solatium claim for the injuries she suffered as a result of the January 20, 2007 attack (reflecting 75% of the $2.5 million baseline awarded to parents of surviving servicemembers). *See id.* at 52.

### b. Steven Kirby[245]

Like his wife, Steven Kirby was also not surprised that his son followed in his footsteps and joined the Army, which he called "the ultimate testament to our relationship."[246] "I was both

---

[243]    *Id.*, ¶ 29.

[244]    *Id.*, ¶ 30.

[245]    Steven Kirby's declaration and U.S. birth certificate (Exhibit CC) confirm that he is a U.S. citizen (and was so at the time of the attack). He is therefore eligible to bring claims under 28 U.S.C. § 1605A. *See* Declaration of Steven Kirby, dated August 6, 2021, ¶ 1. Exhibit DD.

[246]    *Id.*, ¶ 14.

humbled and proud," Mr. Kirby recalled.[247] Mr. Kirby and his son spoke during deployments, during which Evan asked his father for advice.[248]

Mr. Kirby agreed with his wife that when their son returned home after the attack, "he was a broken man."[249] Despite his prior military service, Mr. Kirby felt that he and his wife "were out of our depth. … We knew that he was struggling because of what happened to him in Iraq but did not know how to help him."[250] He found his son's drinking and mental health struggles to be "devastating."[251]

Since their son moved out of their house in 2020, Mr. and Mrs. Kirby visit him "nearly every day to make sure things are in order" – their son lives with his partner, who also struggles with mental health issues, and their young child.[252] "Without our support, I do not know how they would manage."[253] Mr. Kirby stated that he "love[s] Evan and worr[ies] about him every day."[254]

Although the $3,750,000 that the *Karcher* Plaintiffs requested in damages for Mr. Kirby remains pending, that claim seems reasonable to me and, accordingly, so does Plaintiffs' request for $1,875,000 for Steven Kirby's solatium claim for the injuries he suffered as a result of the January 20, 2007, attack (reflecting 75% of the $2.5 million baseline awarded to parents of surviving servicemembers).

---

[247]    *Id.*

[248]    *See id.*, ¶ 17.

[249]    *Id.*, ¶ 21.

[250]    *Id.*, ¶ 25.

[251]    *Id.*, ¶ 26.

[252]    *Id.*, ¶¶ 29-30.

[253]    *Id.*, ¶ 30.

[254]    *Id.*, ¶ 32.

## CONCLUSION

For the reasons stated herein, my recommendations to the Court are that the following Plaintiffs receive the following awards:

### A.    The October 22, 2006 Attack

| | |
|---|---|
| Estate of David G. Taylor, Jr. (deceased) | $1,225,650.54 |
| Michelle Taylor (David Taylor's Widow) | $8 million |
| J.T. (David Taylor's Minor Son) | $5 million |
| Phyllis Taylor (David Taylor's Mother) | $5 million |
| John Taylor (David Taylor's Brother) | $2.5 million |

### B.  March 23, 2008 Attack

| | |
|---|---|
| Estate of Andrew J. Habsieger (Economic claim) | Pending (To Be Filed) |
| Estate of Andrew J. Habsieger (Pain and Suffering) | Pending (To Be Filed) |
| Jason York (Christopher Hake's Stepbrother) | $2.5 million |
| Jennifer York (Christopher Hake's Stepsister) | $2.5 million |

### C.  May 17, 2009 Attack

| | |
|---|---|
| Sebastian Canine (Robert Canine's Son) | $2.5 million |
| Stephen Richards (Nathan Richards' Father) | $2.5 million |

### D.  January 20, 2007 Attack

| | |
|---|---|
| Albert Snyder (Brian Freeman's Stepfather) | $6 million |
| Kathaleen Snyder (Brian Freeman's Stepmother) | $6 million |
| Richard Lee (Brian Freeman's Stepbrother) | $3 million |
| Marcia Kirby (Evan Kirby's Mother) | $1,875,000 |
| Steven Kirby (Evan Kirby's Father) | $1,875,000 |

I have provided a copy of this Report and Recommendations to Plaintiffs' counsel and invited them to identify any errors that they believe I have made.  They made some suggested

corrections which I reviewed before arriving at the final draft of this Report and Recommendations.

Date:   April 11, 2022                              /s/ Stephen A. Saltzburg
                                                    Special Master