UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

--------------------------------------------------------------------------x

WILLIAM LEE, *et al.*,                                                     :
                                                                          :
                Plaintiffs,                  :          **Case No.: 19-cv-830**
                                                                          :
-against-                                                                 :
                                                                          :
ISLAMIC REPUBLIC OF IRAN,                                                 :
                                                                          :
                Defendant.                   :

--------------------------------------------------------------------------x

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING
DAMAGES FOR THREE PLAINTIFFS IDENTIFIED IN THE
COURT'S JANUARY 30, 2023 ORDER**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

I.    PROCEDURAL BACKGROUND ............................................................ 1

II.   CATEGORIES OF CLAIMS ................................................................... 4

III.  THE THREE PLAINTIFFS' INJURIES .................................................. 6

   A.   ADAM MATTIS - DECEMBER 8, 2005, ATTACK - BAGHDAD ............... 6

      1.   Assault, Battery, and Intentional Infliction of Emotional Distress Claim ................. 7

         a.   Adam Mattis's Background ................................................. 7

         b.   The Attack ......................................................................... 8

         c.   Treatment at 10th Combat Support Hospital ........................ 10

         d.   Adam Mattis's Discharge from the 10th Combat Support Hospital and Return to Duty ................................................................................. 12

         e.   Adam Mattis's Course of Treatment for the Injuries to His Right Arm, Hand, and Chest ......................................................................... 13

         f.   Adam Mattis's Traumatic Brain Injury .............................. 19

         g.   Adam Mattis's Psychological Injuries ............................... 25

         h.   Request for Damages ....................................................... 34

   B.   TERRANCE PETERON - DECEMBER 8, 2005, ATTACK - BAGHDAD ......... 36

      1.   Assault, Battery, and Intentional Infliction of Emotional Distress Claim ................. 37

         a.   Terrance Peterson's Background ........................................ 37

         b.   Injuries at Point of Attack .............................................. 39

         c.   Terrance Peterson's Surgical Procedures and Rehabilitation .............. 40

            i.   Lower Extremities Injuries, Surgical Procedures, and Rehabilitative Therapies ................................................................................. 42

            ii.  Upper Extremities Injuries, Surgical Procedures, and Rehabilitative Therapies ................................................................................. 45

d.    Terrance Peterson's Radiological Findings, Shrapnel, and Degenerative Changes .................................................................................................. 48

e.    Terrance Peterson's Traumatic Brain Injury ......................................... 50

f.    Terrance Peterson's Psychological Injuries ........................................... 55

g.    Request for Damages ............................................................................... 59

2.    Economic Loss Claim ..................................................................................... 61

C.    JAMES GMACHOWSKI – OCTOBER 22, 2006, ATTACK - BAGHDAD ............... 63

1.    Assault, Battery, and Intentional Infliction of Emotional Distress Claim ................. 64

a.    James Gmachowski's Background ......................................................... 64

b.    Injuries at Point of Attack and Attack Aftermath ................................. 66

c.    James Gmachowski's Traumatic Brain Injury ...................................... 69

i.    TBI and Headache Syndrome ....................................................... 70

ii.    Insomnia ......................................................................................... 73

iii.    Tinnitus and Hearing Loss ............................................................ 76

e.    James Gmachowski's Chronic Pain Syndrome ..................................... 78

f.    James Gmachowski's Polypharmacy and Side Effects ........................ 82

g.    James Gmachowski's Psychological Injuries ........................................ 84

h.    Request for Damages ............................................................................... 93

2.    Economic Loss Claim ..................................................................................... 95

CONCLUSION .............................................................................................................. 97

# TABLE OF AUTHORITIES

**Cases**

*Borochov v. Islamic Republic of Iran*,
No. 22-7058, 2024 U.S. App. LEXIS 5653 (D.C. Cir. Mar. 8, 2024)........................................ 4

*Brewer v. Islamic Republic of Iran*,
664 F. Supp. 2d 43 (D.D.C. 2009) ............................................................................. 94

*Campuzano v. Islamic Republic of Iran*,
281 F. Supp. 2d 258 (D.D.C. 2003) ................................................................... 59, 60

*Harrison v. Republic of Sudan*,
882 F. Supp. 2d 23 (D.D.C. 2012) ........................................................................... 94

*Karcher v. Islamic Republic of Iran*,
396 F. Supp. 3d 12 (D.D.C. 2019) ............................................................................. 1

*Kirschenbaum v. Islamic Republic of Iran*,
572 F. Supp. 2d 200 (D.D.C. 2008) ................................................................... 35, 93

*Lee v. Islamic Republic of Iran*,
518 F. Supp. 3d 475 (D.D.C. 2021) ........................................................................... 1

*Lee v. Islamic Republic of Iran*,
656 F. Supp. 3d 11 (D.D.C. 2023) ................................................................... passim

*Peterson v. Islamic Republic of Iran*,
515 F. Supp. 2d 25 (D.D.C. 2007) ..................................................................... 35, 94

*Wultz v. Islamic Republic of Iran*,
864 F. Supp. 2d 24 (D.D.C. 2012) ........................................................................... 93

**Statutes**

28 U.S.C. § 1605A(c) ............................................................................................. 61, 95

## INTRODUCTION

The Special Master in this Report and Recommendations addresses the physical and emotional injuries sustained by Specialist ("SPC") (Ret.) Adam Mattis, Captain ("CPT") (Ret.) Terrance Peterson, III, and Staff Sergeant ("SSG") (Ret.) James Gmachowski, for whom the Court granted default judgment against the Defendant, Islamic Republic of Iran, in its January 30, 2023, Order, 656 F. Supp. 3d 11, 37, 42 (D.D.C. 2023).

## I. PROCEDURAL BACKGROUND

Plaintiffs in this case filed their first Proposed Findings of Fact and Conclusions of Law in Support of their Motion for Default Judgment on June 12, 2020, ECF No. 33, in which they requested default judgment for 20 Plaintiffs injured in four attacks overlapping with the bellwether attacks in *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019). The Court granted default judgment in favor of those Plaintiffs on February 1, 2021. *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021) ("*Lee I*").

On March 10, 2021, Plaintiffs moved to appoint me as Special Master to address the compensatory damages claims of the 20 Plaintiffs implicated in *Lee I*, ECF No. 42, and the Court granted on their motion on March 22, 2021, ECF No. 45. I filed three reports and recommendations ("R&Rs") for the 20 Plaintiffs. *See* ECF Nos. 59 ("First R&R"), 67 ("Second R&R"), and 91 ("Third R&R"). This Court adopted the recommendations in all three R&Rs. *See* Mem. Op., ECF No. 83 & Order & J., ECF No. 84 (adopting First R&R); Mem. Op., ECF No. 98 & Order & J., ECF No. 101 (adopting Second R&R); Mem. Op., ECF No. 105 & Order & J., ECF No. 106 (adopting Third R&R). In its Orders adopting the Second and Third R&Rs, the Court accepted the modified damages framework proposed by Plaintiffs and recommended by me to the Court in those R&Rs. This modified framework took into account the aggravating circumstances of explosively formed penetrator ("EFP") attacks, recognizing the "major differences between injuries resulting

from EFP attacks and other types of explosive warfare." ECF No. 98 at 4 (citing Second R&R at 7-37).[1] Specifically, "[t]he particularly high velocity at which EFPs travel is unparalleled[, and t]he focused nature of an EFP blast creates more intense blast waves, which especially in a vehicle, reflect off of objects and cause significant 'brisance' and greater destruction for those who are proximate to these blast waves." *Id.* (citing Second R&R at 9-11). This Court acknowledged that:

> The resulting injuries are more complex than those caused by other explosives, because they include novel medical issues like traumatic amputations and heterotopic ossification, are polytraumatic in nature, often require numerous surgeries and lengthy hospital stays, and are resistant to healing and prolonged in nature, such as the impact of shrapnel embedded in the body, which can cause persistent infections. The impact of the attack can cause neurological and psychological issues, including TBI [traumatic brain injury], post-traumatic stress disorder (PTSD), and major depressive disorder (MDD).

*Id.* at 4-5 (citing Second R&R at 11-37). *See also* ECF No. 105 at 3 ("This court agreed with the Special Master's reasoning, and adopted the proposed damages framework 'as an appropriate assessment of the aggravating circumstances present with respect to . . . EFP injuries,' consistent with practice in this Circuit, including *Peterson II*, *Valore*, and their progeny, regarding injured servicemembers.") (citing Mem. Op., ECF No. 98, at 5). The framework adopted is reflected as follows:

---

[1]    The damages requested for the surviving Plaintiffs is based upon the testimony presented by medical experts during the three-day trial in *Karcher, et al. v. Islamic Republic of Iran*, No. 16-cv-232 (D.D.C. 2016) (CKK), attesting that the physical and emotional injuries caused by EFPs are substantially worse than those caused by other types of blasts, often resulting in lifelong disability and chronic pain. The *Karcher* plaintiffs described this testimony in their post-trial Proposed Findings of Fact and Conclusions of Law, *Karcher* ECF No. 80 (the "*Karcher* PFFCL"), and argued that in light of these more serious injuries, as well as the better understanding of them by the medical community in recent years, the damages awarded to victims of EFP attacks in Foreign Sovereign Immunities Act ("FSIA") cases should be increased where the evidence supports more grievous injuries. In a May 30, 2024, modification to his own initial framework for EFP injuries to which the *Karcher* plaintiffs objected, the Special Master appointed in *Karcher* recommended that courts increase typical *Peterson II* damages awards by a series of percentage amounts correlating to the uniquely devastating effects of EFP injuries (*i.e.*, 25% increase for physical injuries; 25% increase for psychological injuries; 15% increase for 1+ years of hospitalization; and 15% increase for permanent impairment). *See Karcher*, ECF No. 169. The *Karcher* plaintiffs did not object to this formula, which was adopted by the *Karcher* court on June 7, 2024. *See Karcher*, ECF Nos. 171 & 172.

| Category | Characteristic Injuries | Proposed Damages |
|---|---|---|
| **Category 1** | Psychological injuries (<u>without</u> traumatic brain injury ("TBI") diagnosis/severe shrapnel/ fractures/orthopedic injuries/polytrauma) | Baseline: $2 million Range: $1.5 - $8 million |
| **Category 2** | Mild TBI with psychological injuries (<u>without</u> severe shrapnel/fractures/ orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $5 million Range: $3 - $7 million |
| **Category 3** | Mild TBI with psychological injuries (<u>with</u> severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million Range: $4 - $10 million |
| **Category 4** | Mild TBI with psychological injuries (<u>with</u> polytrauma/traumatic amputations) | Baseline: $15 million Range: $10 - $20 million |
| **Category 5** | Moderate/severe TBI (<u>without</u> severe shrapnel/fractures/orthopedic injuries/ polytrauma/traumatic amputations) | Baseline: $20 million Range: $15 - $25 million |
| **Category 6** | Moderate/severe TBI (<u>with</u> severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $30 million Range: $25 - $50 million |

*See* ECF No. 98 at 4 (citing Second R&R at 37-38).

This Court also entered liability against Iran for 27 attacks in its January 30, 2023, Order, 656 F. Supp. 3d 11 (D.D.C. 2023) ("*Lee II*"). Plaintiffs moved for the appointment of Jim Letten, Esq. and Franklin D. Rosenblatt, Esq. as additional Special Masters to issue R&Rs for damages for the 51 family member Plaintiffs and Plaintiff estates of decedents implicated by *Lee II*. *See* ECF No. 85. This Court appointed those Special Masters on July 5, 2023. *See* ECF No. 85. Plaintiffs moved to expand my appointment to the 17 surviving Plaintiffs granted default judgment in *Lee II*, see ECF No. 30, which this Court ordered on January 12, 2024. *See* ECF No. 131. I filed my R&R for two of the 17 surviving Plaintiffs on June 24, 2024, which is pending. *See* ECF No. 134.

The subject of this PFFCL is three additional surviving Plaintiffs granted default judgment in *Lee II*, arising out of attacks on December 8, 2005, October 22, 2006, and April 6, 2007. All of

those attacks contained fatalities, in accordance with Plaintiffs' statements to this Court that they will only make further submissions in this case regarding attacks for which there is evidence of fatalities (in compliance with *Borochov v. Islamic Republic of Iran*, No. 22-7058, 2024 U.S. App. LEXIS 5653 (D.C. Cir. Mar. 8, 2024)). *See* Notice of New Authority, ECF No. 133. *See Lee II*, 656 F. Supp. 3d at 37 ("one soldier was killed" in the December 8, 2005, attack; *see id.* at 42 ("The [October 22, 2006] attack injured PV2 Gmachowski and PFC Norager and killed two others.").

## II.    CATEGORIES OF CLAIMS

Plaintiffs are bringing two categories of claims:

(i)    Economic loss claims: Two of the three Plaintiffs subject to this PFFCL seek compensation for economic losses in the form of lost wages, benefits, and retirement pay. See 28 U.S.C. § 1605A(c) ("damages may include economic damages"). To support these claims for economic losses, Plaintiffs submit reports prepared by L. Wayne Plumly, Jr., Ph.D. Dr. Plumly submitted forensic economic expert reports for other Plaintiffs in this case, which were adopted by this Court. *See* ECF Nos. 98 at 7; 105 at 4-5, 7; 123 at 12.

(ii)    Assault, battery, and intentional infliction of emotional distress ("IIED") claims: Plaintiffs seek damages for their assault, battery, and IIED claims pursuant to the modified damages framework adopted by this Court which accounts for the more grievous injuries caused by the aggravating circumstances of EFP attacks. For ease of reference, the table below contains the Plaintiffs' names, category of injury and damage amounts requested for each of the surviving Plaintiffs that were severely injured in an EFP terrorist attack.

| Name | Category of Injury | Non-Economic Damages | Summary of Injuries |
|------|--------------------|-----------------------|---------------------|
| Adam Mattis | Category 3 | $7,000,000 | • Permanent nerve injury to right arm and hand caused by severe shrapnel injury<br>• Soft tissue injury to right leg caused by shrapnel |

| | | | |
|---|---|---|---|
| | | | • Diagnosed TBI and cognitive deficits<br>• ████████████<br>• ████████████ |
| Terrance Peterson, III | | $10,000,000 | • Fractures to all four extremities<br>• Shrapnel injuries to face, hands, arms, legs<br>• Severe open fracture to left upper extremity necessitating a groin flap skin graft and external fixator<br>• Severe fractures to right foot necessitating external fixator and subsequent surgeries resulting in arthritic development, continued pain, and altered gait<br>• Deep lacerations to left arm necessitating blood transfusion, bicep graft, brachial plexus disorder, and to left leg, right hand, head<br>• Diagnosed TBI and continuing symptoms, including daily headaches, cognitive deficits, imbalance<br>• ████████████ |
| James Gmachowski | | $10,000,000 | • Severe shrapnel injury and burn to back resulting in tissue and muscle atrophy and loss, loss of function, unrelenting pain<br>• Diagnosed TBI with continuing symptoms including headaches, sleep issues, and hearing loss<br>• ████████████ |

| | | | |
|---|---|---|---|
| | | | ███████████ |
| | | | • Polypharmacy complications |

## III.    THE THREE PLAINTIFFS' INJURIES

### A.    ADAM MATTIS - DECEMBER 8, 2005, ATTACK - BAGHDAD

SPC (Ret.) Adam Mattis (then a Private First Class, "PFC") and CPT (Ret.) Terrance Peterson (then a Second Lieutenant ("2LT")) were injured on December 8, 2005, when an EFP struck their vehicle, the second in a five-vehicle convoy from 1st Battalion, 76th Field Artillery Regiment, 4th Brigade Combat Team, 3rd Infantry Division, which was conducting a combat patrol heading south on Route Pluto. *See Lee II*, 656 F. Supp. 3d at 37. This Court found "satisfactory evidence in the record to demonstrate that the explosive responsible for Messrs. Mattis and Peterson's injuries in the December 8, 2005, attack was an EFP traceable to Iran and its proxies" and granted default judgment in favor of those Plaintiffs against Iran. *Id.*

Mr. Mattis suffered severe physical and mental anguish and extreme emotional pain and suffering as a result of the December 8, 2005, attack, and submits claims for assault, battery, and IIED. The following chart reflects the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Declaration of Dina Gielchinsky ("Gielchinsky Decl.").

| Plaintiff | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|
| Adam Mattis | Assault, Battery, IIED $7 million | Copy of Adam Mattis's birth certificate | A |
| | | Declaration of Adam Mattis, dated August 23, 2023 | B |
| | | Copy of Adam Mattis's medical record excerpts from the following facilities: 10th Combat Support Hospital, Iraq (2005); Winn Army Community Hospital, Fort Stewart, GA (2006); Ralph H. Johnson VA Medical Center, | C |

| | | Charleston, SC (2006-2009); Baltimore VA Medical Center, Baltimore, MD (2009-2016); Alvin C. York VA Medical Center, Murfreesboro, TN (2013-2014) | |
|---|---|---|---|
| | | Orders, Department of the Army, dated January 28, 2011 | D |
| | | Veterans Affairs Ratings Disability Summary, generated March 9, 2022 | E |
| | | Department of Veterans Affairs Determination Letter dated July 12, 2007 | F |
| | | Department of Veterans Affairs Determination Letter dated March 24, 2009 | G |
| | | Department of Veterans Affairs Determination Letter dated December 3, 2007 | H |
| | | Expert Report of Dr. Shean Phelps dated August 27, 2018, *Karcher*, PX-160, ECF No. 91 (redacted) | I |
| | | Proposed Findings of Fact and Conclusions of Law submitted in *Karcher* on March 20, 2019, ECF No. 80 ("*Karcher* PFFCL") | J |
| | | Medical Expert Report of Dr. Russell Gore dated November 23, 2018, *Karcher*, PX-161 | K |
| | | Testimony by Dr. Charles Marmar in the *Karcher* trial | L |
| | | Testimony by Dr. Russell Gore in the *Karcher* trial | M |
| | | Medical Expert Report of Dr. Charles Marmar dated September 15, 2018, *Karcher*, PX-163 | N |
| | | Department of Veterans Affairs Determination Letter dated October 26, 2011 | O |

## 1. Assault, Battery, and Intentional Infliction of Emotional Distress Claim

### a. Adam Mattis's Background

Adam Mattis was born in Pennsylvania on August 19, 1982.[2] He grew up in a very rural area and was a physically active boy, having ridden his dirt bike everywhere – "for hours and hours" – and competed in dirt bike competitions.[3] Medical records following the December 8, 2005, attack in Iraq indicate that Mr. Mattis used to "ride mountain bikes, play golf and do yard

---

[2] *See* Ex. B, Declaration of Adam Mattis, dated August 23, 2023, ¶ 2.
[3] *See id.* ¶ 6.

work."[4]

For a few years after graduating Maplewood High School in 2000, Mr. Mattis sold web platforms he had created to various auto dealerships.[5] When he returned home in 2003, he hoped "to figure out what I wanted to do with my life,"[6] and admitted that while at his family's church, he recalls having "an experience that changed the direction of my life."[7] After asking God for guidance, he received a "message" that "clearly" told him he "should follow a path of military service. I should enlist in the Army."[8] Mr. Mattis joined the Army in November 2003.[9] Once in Iraq, he was stationed at a Forward Operating Base ("FOB") in the Green Zone.[10]

### b.    The Attack

On December 8, 2005, then-PFC Mattis was the driver of an up-armored M1114 Humvee in a multi-vehicle convoy.[11] As the unit headed out on its mission, CPT Ted Putnam was seated behind PFC Mattis, First Lieutenant ("1LT") Kevin Smith was seated in the front passenger seat, 2LT Peterson was seated behind 1LT Smith, and SPC Adam Krebs was in the turret as the vehicle's gunner.[12] Mr. Mattis recalled how "an EFP struck the commander's side" and "penetrated the engine compartment, floorboards, right door, and the right tire."[13] He explained how the vehicle kept moving and came to a stop, but he has "no idea how far we drove or how we stopped."[14] He acknowledged that "[e]ven after 17 years, some memories of those moments come to mind in slow

---

[4] *See* Ex. C at MATTIS00029.
[5] *See* Ex. B, Declaration of Adam Mattis, dated August 23, 2023, ¶ 8.
[6] *Id.* ¶ 9.
[7] *Id.*
[8] *Id.*
[9] *See id.* ¶ 10.
[10] *See id.* ¶ 11.
[11] *See id.* ¶¶ 4, 13, 14.
[12] *See id.* ¶ 14.
[13] *Id.* ¶ 16.
[14] *Id.*

motion."[15]

Once the vehicle was no longer moving, PFC Mattis reached for 1LT Smith and "saw how he was slumped in his seat"; PFC Mattis "knew he [Smith] was dead."[16] PFC Mattis also remembered 2LT Peterson and SPC Krebs screaming while all of this was going on.[17] Not long after the EFP struck the vehicle, PFC Mattis was placed in another vehicle, and 2LT Peterson was "thrown on top of" him."[18] Because 2LT Peterson was "shaking and bleeding profusely," PFC Mattis "did not think he [Peterson] would make it because he was losing so much blood."[19] PFC Mattis recalled that "[e]verything in those moments was terrifying."[20]

Still unaware that he himself had been injured,[21] PFC Mattis got out from under 2LT Peterson and returned to his Humvee, where he was "horrified by what I saw: there was blood everywhere – which I believe was primarily Terry's [Peterson's] blood – and Krebs was very bloody."[22] When soldiers pried open 1LT Smith's door, PFC Mattis "saw lots of blood pour out of the vehicle," about which he said: "It was unreal and extremely upsetting. Those sickening images are with me today."[23]

PFC Mattis was transferred to a different armored vehicle along with 2LT Petersen and SPC Krebs, "who were still screaming," and they traveled to an aid station at a different FOB than the one where he had been stationed.[24] Mr. Mattis described that when he was first evaluated by medical personnel, he "saw blood pouring out of my right sleeve, and I started feeling pain."[25]

---

[15] *Id.*
[16] *Id.* ¶ 17.
[17] *See id.*
[18] *Id.* ¶ 18.
[19] *Id.*
[20] *Id.*
[21] *See id.* ¶ 17.
[22] *Id.* ¶ 19.
[23] *Id.*
[24] *Id.* ¶ 20.
[25] *Id.* ¶ 21.

### c.    Treatment at 10th Combat Support Hospital

Soon after the attack, Mr. Mattis arrived at the 10th Combat Support Hospital ("CSH") in Iraq. Records from that facility generally describe his injuries as, "Impaled – Right Upper Arm, Front; Impaled – Chest; Front."[26] Records further document the entrance and exit wounds in Mr. Mattis's right arm as well as shrapnel in the exit wound and bruising on the right side of his chest.[27] In addition, medical records from the following year further detail the extent of Mr. Mattis's initial injuries as well as his condition at that time, detailing how he had been:

> …injured in December 2005 when EFD [sic] hit his truck and he sustained shrapnel wounds to the chest and RUE/RLE [right upper extremity/right lower extremity]. Injuries to the RLE were limited to soft tissue of the thigh but in the RUE he sustained right ulnar nerve injury and has limited ROM [range of motion], residual weak grip and paresthesias [tingling or numb feeling]. He endorses severe Anxiety D/O [disorder] with daily panic attacks, sleep disturbance secondary to nightmares and significant guilt and remorse over events he witnessed.[28]

Years later, Mr. Mattis described some of his injuries as follows:

> Shrapnel had impacted various parts of my body – including my right arm, thigh, and buttocks – described as, 'peppering.' One piece, which I call the 'through and through penetrator,' had entered and exited my right arm just below my shoulder and lodged in my chest in an area just below my right armpit.[29]

The large fragment, the one Mr. Mattis described as the "through and through penetrator," was "about 3/4 of an inch in diameter and made of copper – copper from the EFP itself."[30] At some point, Mr. Mattis learned that this large fragment had "actually cauterized an artery."[31] Dr. Shean Phelps, qualified by the *Karcher* court as an expert regarding the treatment of combat injuries, including polytrauma and blast injuries, particularly those sustained as a result of EFP strikes in

---

[26] Ex. C at MATTIS000001-4.
[27] *Id.*
[28] Ex. C at MATTIS000048-53.
[29] Ex. B, Declaration of Adam Mattis, dated August 23, 2023, ¶ 22.
[30] *Id.* ¶¶ 22, 23.
[31] *Id.* ¶ 22.

Iraq,[32] explained how this was typical for an EFP, which "shears through plated vehicle armor and soft tissue alike – analogous to a superheated, hyper-velocity guillotine blade – very often completely separating or tearing the limb from the service member while cauterizing the wound (at least temporarily) due to intense thermal radiation imparted by the liquefied, missile-like slug projectile."[33] When, however, "you move them and get them out the vehicle, they just start bleeding like a fire hose."[34] Indeed, Mr. Mattis reported that after the attack, he "didn't think I needed medical treatment" until he noticed "blood pouring out of my right sleeve, and I started feeling pain."[35]

Initial treatment included the surgical removal of shrapnel, following which Mr. Mattis's wound was "irrigated with pulse lavage," a method to irrigate grossly contaminated wounds.[36] Records reflect that prior to surgery, Mr. Mattis received Ancef [an antibiotic], Morphine, and Ativan ("for anxiety prior to shrapnel removal") by IV as well as lidocaine by injection.[37]

At some point after it was surgically removed, someone gave Mr. Mattis the "through and through penetrator" piece of shrapnel; he still has it today.[38] When Mr. Mattis looks at the fragment, he "cannot help but think about the significant damage to the vehicle and how none of us should have survived the attack…I will never forget the worst result of all: Kevin [Smith] was killed in the attack."[39] This shrapnel was not the only piece of shrapnel imbedded in Mr. Mattis's body, as medical records from 2013 indicate that in addition to the right shoulder surgery to remove shrapnel in 2005, a "shrapnel removal attempt 2006" had been "unsuccessful for complete removal

---

[32] *See* Ex. J, *Karcher* PFFCL, at 11.
[33] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 13.
[34] Ex. J, *Karcher* PFFCL at 131 (citing Dr. Phelps's trial testimony).
[35] Ex. B, Declaration of Adam Mattis, dated August 23, 2023, ¶ 21.
[36] Ex. C at MATTIS000001-4.
[37] *Id.*
[38] *See* Ex. B, Declaration of Adam Mattis, dated August 23, 2023, ¶ 23.
[39] *Id.*

– some shrapnel remains to right rotator cuff."[40]

Mr. Mattis shared additional recollections concerning his treatment and recovery at the CSH, which included watching a "wound vac" [wound vacuum] "drain[] fluids at the spot where the shrapnel had been imbedded."[41] He recalled how the sight of it was "incredibly disturbing" and "gross."[42]

Additionally, soon, if not immediately, following the attack, Mr. Mattis suffered with tinnitus [ringing in the ears] "as well as some hearing loss in my right ear" which, he noted, "became permanent."[43]

### d.    Adam Mattis's Discharge from the 10th Combat Support Hospital and Return to Duty

Within a day or so following the attack, after briefly receiving treatment at the CSH, Mr. Mattis formally returned to duty with "Work/Duty Limitations."[44] He was confined to the bunk house at his FOB, "basically isolated from everyone," and felt "horribly alone, and to some degree, felt the unit had forgotten him."[45] He also struggled with feelings that he had "abandoned" his team.[46] The fact that he remained unaware of Messrs. Peterson's and Krebs's condition for weeks added to his distress.[47]

While at the FOB, a medic cared for Mr. Mattis – care which included cleaning his wounds and "helping me shower daily after taping a garbage bag around my arm to protect the injured areas."[48] Mr. Mattis found it "very upsetting to be incapable of caring for myself."[49]

---

[40] Ex. C at MATTIS000087-91.
[41] Ex. B, Declaration of Adam Mattis, dated August 23, 2023, ¶ 24.
[42] *Id.*
[43] *Id.* ¶ 28.
[44] Ex. C at MATTIS000010.
[45] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 29.
[46] *Id.*
[47] *See id.*
[48] *Id.* ¶ 31.
[49] *Id.*

During this period, because Mr. Mattis's right arm remained in a sling – medical records indicate his arm was in a sling for two months[50] – his "elbow became incredibly stiff."[51] Mr. Mattis had a range of limitations, including his inability to rotate his right arm at the elbow and, as result, he found it "impossible to do ordinary things like turning a radio dial."[52]

While in "isolation," Mr. Mattis became "very anxious" and had "nothing but time to ruminate about what had happened and what I might not be able to do on my own" as well as "what I could not do at all and what I could only minimally do…."[53] He confessed that at times, he was "overwhelmed" by these thoughts and concerns, along with his realization that he "could no longer continue in the Army and have a military career – the goal I set for myself after I'd received the message."[54]

Sometime around January 1, 2006, a couple of months before his deployment was scheduled to end, Mr. Mattis left Iraq and returned to Fort Stewart in Georgia, where he had been stationed prior to the attack.[55] Since paperwork authorizing treatment was not in place upon his arrival, Mr. Mattis had to care for himself – using his left hand as best he could.[56] Mr. Mattis recalled how, until sometime in February, his "wound was still open and infected," and he was still experiencing "a lot of pain."[57]

e.    **Adam Mattis's Course of Treatment for the Injuries to His Right Arm, Hand, and Chest**

Mr. Mattis finally began a course of treatment at the Winn Army Community Hospital

---

[50] *See* Ex. C at MATTIS000007-8.
[51] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 32.
[52] *Id.*
[53] *Id.* ¶ 30.
[54] *Id.*
[55] *See id.* ¶¶ 12, 33.
[56] *See id.* ¶ 33.
[57] *Id.*

("Winn Hospital") in Fort Stewart in February 2006, and this treatment continued for months. Medical records from February reflect that the "[m]otion of the shoulders was abnormal," and a neurological evaluation indicated, "[s]ensory exam abnormalities were noted in the median and ulnar distributions of the right upper extremity."[58] Mr. Mattis described his condition at the time in this way: "[a]lthough the wound had, for the most part, closed, I still struggled with limited range of motion in my right shoulder and arm…I could not raise my right arm over my head to reach something off a shelf or change a light bulb in a ceiling fan."[59] Mr. Mattis further explained that the stiffness in his elbow made other actions "very challenging," and noted, "[m]any of these limitations still exist today."[60]

 Mr. Mattis has also recalled how, in addition to his right shoulder area, his right hand and some fingers had been affected; these issues stemmed from nerve injuries he sustained.[61] He further explained how at "unexpected times," he experienced the following:

> While I was in the hospital…I was hit by a blinding pain when I moved my right arm in certain ways, and the pain often traveled all the way down to my right hand. It was as if I could draw a line of pain that began at or near my right bicep, continued down the arm, and ended at the fingers in my hand – specifically at my right ring finger and pinky finger.[62]

Winn Hospital medical records from February 2006 acknowledge "paresthesias in his right hand" as well as pain and decreased range of motion in his fingers, elbow, wrist, and shoulder.[63]

 Following his initial evaluation at Winn Hospital, records reflect a recommendation that he follow up with physical therapy "to aggressively work to restore ROM [range of motion] and function to the right upper extremity" as well as a follow-up with occupational therapy.[64] Mr.

---

[58] Ex. C at MATTIS000015.
[59] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 34.
[60] *Id.*
[61] *Id.* ¶ 27.
[62] *Id.* ¶ 26.
[63] Ex. C at MATTIS000015.
[64] *Id.* at MATTIS000052.

Mattis's records from the following month, March 2006, reflect that he continued to experience pain and deal with limitations; specifically, his occupational therapy records reflect his complaints that while at rest, he experienced a "4-5/10 dull pain" to his right breast/axilla [area where the arm connects to the shoulder] as well as a rating of 7-8/10 due to a "sharp pain that started at humerus [upper arm bone] and went to tips of fingers 4 days ago when holding a glass."[65] Occupational therapy records later that month confirm he continued to suffer from radiating pain – from his shoulder to his right fingertips.[66]

Around this time, occupational therapists also documented a contracture [a tightening of the area] of his right elbow and recommended continued exercises to work on his range of motion and the continued use of heat hot packs.[67] A Joint Active Symptoms ("JAS") splint, a device which seeks to improve range of motion, was ordered to correct this right elbow extension and flexing to aid in the bending of his arm,[68] and in May, an occupational therapist provided additional instructions for the device's use.[69]

In addition, after meeting with an orthopedist, records document that Mr. Mattis was still experiencing joint pain which was "localized in the shoulder" – specifically, "adhesive capsulitis right shoulder" (an inflammatory condition characterized by shoulder stiffness, pain, and significant loss of passive range of motion), "cubital tunnel syndrome" (where symptoms of numbness and shooting pain are experienced along the medial aspect of the forearm), and "elbow joint stiffness," as well as pain in the arms.[70] In May 2006, Mr. Mattis continued to suffer with much of the same conditions which included pain and stiffness in the joint.[71]

---

[65] *See id.* at MATTIS000007-8.
[66] *See id.* at MATTIS000010.
[67] *See id.* at MATTIS000009.
[68] *See id.* at MATTIS000007-8.
[69] *See id.* at MATTIS000019.
[70] *Id.* at MATTIS000012-13.
[71] *See id.* at MATTIS000017-18.

Records from May also reflect Mr. Mattis's complaints of pain while at physical therapy; in fact, he complained of pain "throughout all" range of motion work with his upper extremity, and he was "very apprehensive" about the activity itself.[72] The therapist's notes also indicate Mr. Mattis was "unable to tolerate formal strength testing today due to apprehension, guarding, and c/o [complained of] pain with most UE [upper extremity] activity."[73] It was recommended that he continue physical therapy over the next four weeks at the clinic as well as at home.[74]

Occupational therapy records from later that month reflect Mr. Mattis's description of 6/10 pain level at certain times and a constant pain level of 2/10 at rest.[75] In addition to continued physical therapy, records include a recommendation that Mr. Mattis "resurrect use of JAS splint daily for elbow extension" as well as use an elbow extension splint "for nighttime wear."[76]

Separate from the pain Mr. Mattis experienced in his shoulder area and which ran down his right arm, medical records from February and March 2006 also reflect Mr. Mattis's complaint of paresthesia and a decreased range of motion in the shoulder, elbow, wrist, and fingers.[77] In May, while continuing to undergo physical and occupational therapy, he experienced pain and specific sensations, as reflected by his statements in orthopedic records of "right shoulder pain and tingling at SF [small finger], RF [ring finger] of right hand."[78]

Mr. Mattis also had difficulties simply using his right hand. In March 2006, his assessment revealed "significantly decreased R[ight] hand gross grip strength/pinch strength, wrist ext/flex [extension and flexing]."[79] Mr. Mattis further explained that simple tasks were and are still

---

[72] *Id.* at MATTIS000015-16.
[73] *Id.*
[74] *See id.*
[75] *See id.* at MATTIS000019.
[76] *Id.*
[77] *See id.* at MATTIS000005-6.
[78] *Id.* at MATTIS000017-18.
[79] *Id.* at MATTIS000007-8.

challenging, as he is, for example, currently unable use his right hand to turn a doorknob or hold a coffee mug handle "the way most people do" and must "primarily rel[y] upon the thumb and index finger."[80] Mr. Mattis has plainly stated that the nerve damage to his right hand "essentially rendered my ring finger and pinky finger useless."[81]

In October 2007, Mr. Mattis first sought treatment at the Ralph A. Johnson VA Medical center in Charleston, South Carolina ("Charleston VA"), and at his initial visit, his "chief complaint" was of arm pain and PTSD – the records note he "still has pain in his arm and limited rom [range of motion]" from the attack.[82] Records also indicate that Mr. Mattis had received two orthopedic opinions and had been told that "regaining strength and mobility is now very unlikely, and as a result, he [Mr. Mattis] found it 'disillusioning.'"[83] In September 2011, Mr. Mattis was still assessed to be "positive for right arm pain," something he said he "lives with."[84] More recently, Mr. Mattis explained how he continues to deal with "a constant, dull throbbing pain in that arm, and there are spikes of pain that take their toll on me."[85]

On May 31, 2006, as part of the process to be honorably discharged from his service for medical reasons, Mr. Mattis underwent a physical exam before the Military Physical Medical Evaluation Board ("MEB"),[86] which assesses whether a service member's long-term medical condition would enable him or her to meet certain standards. At his first "fitness for service evaluation" (MEB PT I), his existing "problems" included, but were not limited to, "contracture elbow right," "cubital tunnel syndrome," and "joint pain, localized in the shoulder."[87] These

---

[80] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 27.
[81] *Id.*
[82] Ex. C at MATTIS000054-58.
[83] *Id.*
[84] *Id.* at MATTIS000031-35.
[85] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 26.
[86] *See* Ex. C at MATTIS000020.
[87] *Id.*

records also recognize the following additional "problems" and related medications, which are discussed *infra*: "anxiety disorder," "adjustment disorder with anxiety," and "acute stress disorder NOS [providing a general diagnosis]."[88] Records from his physical therapy examination in June again reflect his chief complaint as "Shoulder/Elbow/Wrist/Hand pain, paresthesias, weakness."[89]

Later in June, Mr. Mattis was further evaluated at the orthopedic clinic as part of the MEB process, and on that date, the records reflect his diagnoses were "Adhesive capsulitis of shoulder," "joint pain, localized in elbow," and "elbow joint stiffness."[90]

Following an assignment to the U.S. Army Transition Center at Fort Stewart, Mr. Mattis received an honorable discharge from the Army; September 12, 2006, was determined to be his official date of retirement "for permanent physical disability."[91] Mr. Mattis retired with the rank of Specialist.[92]

The VA has assigned service-connected disability ratings with regard to Mr. Mattis's various injuries, and these determinations have been evaluated and modified over the years. Currently, the VA's "overall or combined rating" for Mr. Mattis is 90%.[93] With regard to the specific injuries to Mr. Mattis's shoulder, a July 12, 2007, VA letter confirmed a 40% disability rating concerning his "adhesive capsulitis and degenerative changes, right shoulder;"[94] that determination was reduced to 30% as reflected in a subsequent letter dated March 24, 2009.[95] In addition, a December 3, 2007, VA letter confirmed a disability rating of 10% for "neuropathy, right hand, involving the median and ulnar nerve."[96]

---

[88] *Id.*
[89] Ex. C at MATTIS000023-24.
[90] *Id.* at MATTIS000025-26.
[91] Ex. D, Orders, Department of the Army, dated February 24, 2011.
[92] *See id.*
[93] *See* Ex. E, VA Disability Ratings Summary.
[94] Ex. F, Department of Veterans Affairs Determination Letter dated July 12, 2007.
[95] *See* Ex. G, Department of Veterans Affairs Determination Letter dated March 24, 2009.
[96] Ex. H, Department of Veterans Affairs Determination Letter dated December 3, 2007.

In his expert report, Dr. Phelps noted that "EFPs in particular are acknowledged to cause the most devastating and catastrophic injuries in modern combat" and also "exact an extreme physical and psychological toll on their intended victims."[97] Dr. Phelps further described how an EFP has the capability to cause much more significant injuries than other projectiles or shrapnel propelled by another type of blast as follows:

> EFPs produce injuries that are often exceptionally devastating because not only do they cause secondary fragmentation effects similar to their IED 'cousins,' but they do so while transferring much higher levels of explosive energy…into the victim than the less sophisticated IED-type weapons that disperses…rather than concentrates the force of the blast wave.[98]

Thus, it is not surprising that Mr. Mattis continues to deal with the long-term effects – both physical and emotional – stemming from the injuries caused by the shrapnel that impacted his body along with the behaviors and symptoms which developed and which are commonly associated with TBI and PTSD, each of which is discussed further *infra*. In fact, when Mr. Mattis reflected on how his life has been affected by what occurred on December 8, 2005, he explained:

> To many people, it may seem as if my physical limitations are few and do not cause me any difficulties, but if someone looks closely, they can see when I do something physical that seems to involve my right arm, I have actually either favored my left arm, or I adjusted positions so I did not actually extend my right arm...Yes, I have found creative ways to live my daily life, but it does not mean I do not hate knowing all the things I cannot do that I once did – what most people do and take for granted. These facts continue to frustrate and upset me.[99]

### f.    Adam Mattis's Traumatic Brain Injury

A "Traumatic Brain Injury Screening" conducted in October 2007 reflects Mr. Mattis's recollection that "immediately afterwards" – after the explosion – he had been "dazed, confused or 'seeing stars,'" and his "memory problems or lapses, irritability, sleep problems" "began [at] or

---

[97] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 7.
[98] *Id.* at 8.
[99] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 48.

got worse" after the event.[100] In addition, records from that same day indicate that Mr. Mattis identified "forgetfulness" as among "other physical symptoms that have lasted 3 months or longer and have interfered with ADLs [activities of daily living]."[101] As a result of these evaluations, Mr. Mattis screened positive for Traumatic Brain Injury ("TBI"), and a TBI referral was ordered.[102]

Mr. Mattis continued to experience symptoms affecting his memory and cognitive function, and in November 2007, he sought a referral for neuropsychological testing because of his concerns about how his attention, concentration, and memory deficits were impacting his job.[103] The Consult Requests from that date indicate a diagnosis of "Cognitive Deficits in OIF [Operation Iraqi Freedom] combat veteran."[104]

 [105] [106] Yet,

medical records from the Baltimore VA Medical Center in Maryland ("Baltimore VA") in December 2009 reflect Mr. Matti's previous TBI diagnosis and note that at that time, "Screening [for TBI] was not required due to TBI diagnosis."[107]

Medical experts have determined that separate from or in addition to PTSD, traumatic brain

---

[100] Ex. C at MATTIS000054-58.
[101] *Id.* at MATTIS000058-62.
[102] *Id.*
[103] *See id.* at MATTIS000048-53.
[104] *Id.* at MATTIS000043-46.
[105] *Id.* at MATTIS000048-53.
[106] *Id.*
[107] *Id.* at MATTIS000038-42.

injuries can directly cause emotional injuries, cognitive challenges, and other behavioral changes. The *Karcher* plaintiffs' medical experts testified that the medical community had dispelled previous medical misconceptions regarding TBI and now understand that it is characterized by significant physiological (not only psychological) effects on its victims, and that "mild TBI" is not mild at all. In fact, mild TBI may be attended by cognitive and memory dysfunction, as well as chronic vestibular and balance deficits, that never resolve.[108]

The *Karcher* medical experts also explained how exposure to a single mild TBI can cause PTSD, clinical depression, and other cognitive and psychiatric disorders due to changes that result in specific brain networks.[109] Dr. Russell Gore, qualified by the *Karcher* court as an expert in TBI and its consequences, diagnosis, and treatment,[110] further discussed the relationship between these conditions as follows:

> While PTSD is commonly associated with anxiety, shame, anger, re-experiencing of traumatic events, and fear, both TBI and PTSD are associated with increased vigilance, enhanced startle response, impulsive behaviors, anxiety, social isolation, and sleep disruption. Vestibular disorders, commonly associated with persistent symptoms after TBI, are characterized by headaches, dizziness, and cognitive fogginess triggered by busy visual environments, termed visual motion sensitivity.[111]

Dr. Charles Marmar, qualified by the *Karcher* court as an expert regarding post-traumatic stress disorder, major depressive disorder, and neurocognitive disorder following traumatic brain injury, as well as PTSD in veterans surviving EFP attacks,[112] shed light on these effects through his testimony wherein he noted that TBI commonly co-occurs with PTSD and clinical depression "because of injury during TBIs to emotion control centers in the brain, which are mostly in the

---

[108] *See* Ex. J, *Karcher* PFFCL, at 119-26.
[109] *See* Ex. K, Medical Expert Report dated November 23, 2018, by Dr. Russell Gore, *Karcher*, PX-161 at 50-54.
[110] *See* Ex. J, *Karcher* PFFCL, at 11.
[111] *See* Ex. K, at 52.
[112] *See* Ex. J, *Karcher* PFFCL, at 11.

front of the brain, and then variable other side effects of what we call post-concussive syndrome."[113] In addition, at trial, Dr. Gore considered the connections between PTSD and traumatic brain injuries, and testified: "[T]here's no question that these networks are overlapping and these conditions are linked."[114]

Dr. Gore further explained that both "moderate and severe [TBI] injuries may result…[in the loss of] higher-level functions" which include "memory, and emotional deficits and even personality changes."[115] Dr. Gore also acknowledged the majority of U.S. troops with TBI have been diagnosed with "mild" TBI, but the prognosis for mild TBI is not dissimilar to that for moderate to severe TBIs.[116] He further elaborated that "[e]ven exposure to a single mTBI, [mild TBI] compared with an injury control group not sustaining an mTBI, has been associated with increased long-term risk of developing memory and cognitive problems, mood disorders, sleep disorders, and epilepsy."[117] Similarly, when assessing "Chronic Mild Neurocognitive Disorder Following TBI," Dr. Marmar described how "closed head injury survivors may report reduced cognitive efficiency, including difficulty concentrating and difficulty performing usual activities."[118]

Furthermore, even "years after injury," explained Dr. Gore, individuals may suffer the effects of a TBI – "[t]he resulting disability and symptoms" which include "physical cognitive, emotional (affective), and sleep related symptoms…"[119] Dr. Gore's analysis concerning these lasting effects helps to explain a basis for Mr. Mattis's challenges connected to his ongoing concentration and cognitive issues. Mr. Mattis's medical records from September 2011 included

---

[113] Ex. L, Testimony by Dr. Charles Marmar in the *Karcher* trial, T3-118:12-14; 119:-10.
[114] Ex. M, Testimony by Dr. Russell Gore in the *Karcher* trial, T4-23:19-21.
[115] Ex. K, Medical Expert Report of Dr. Russell Gore dated November 23, 2018, *Karcher,* PX-161 at 45.
[116] *See id.* at 5-6; 26-27; Ex. J, *Karcher* PFFCL, ECF No. 80 at 122.
[117] Ex. K, Medical Expert Report of Dr. Russell Gore dated November 23, 2018, *Karcher,* PX-161 at 47-48.
[118] Ex. N, Medical Expert Report of Dr. Charles Marmar dated September 15, 2018, *Karcher,* PX-163 at 13.
[119] Ex. K, Medical Expert Report of Dr. Russell Gore dated November 23, 2018, *Karcher,* PX-161 at 46.

an assessment at the Baltimore VA which acknowledges, ████████████████████ [120]

Additionally, within a PHQ-9 questionnaire – which administers a questionnaire regarding nine

symptoms of depression – ████████████████████████████████████████████

████████████████████████████████████████████ [121] Furthermore,

after relocating to Tennessee in 2013, medical records from the Alvin C. York Veterans

Administration Medical Center – almost exactly eight years to the day following the attack – reflect

that Mr. Mattis again reported "experienc[ing] some memory problems at times because of his

TBI…." [122]

████████████████████████████████████████████████

██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ [124] ████████████████████████████

████████████████████████████████████████ [125] ████

████████████████████████████████████████████████

████████████████ [126] ████████████████████████████

---

[120] Ex. C at MATTIS00033.
[121] Id. at MATTIS000031-35.
[122] Id. at MATTIS000070-73.
[123] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 45.
[124] Id. ¶ 46.
[125] Id.
[126] Id. ¶ 47.

███████████████████████████[127] ████████████████████████████████████████

███████[128] ████████████████████████████████████████

Although a March 24, 2009, VA letter awarded Mr. Mattis a rating of 10% for his TBI injuries,[129] following an appeal, the rating was increased to 40% and the rating was retroactively applied to October 3, 2008.[130] The VA Disability Ratings Summary from March 9, 2022, reflects the 40% rating.[131]

In an effort to provide additional guidance concerning the uniqueness of and extensive, lasting effects of EFPs, the *Karcher* plaintiffs' medical experts also testified as to the various reasons why the "characteristic of EFPs, along with the proximity of the service members in the vehicle struck by an EFP to those blast waves, result in particularly devastating cases of TBI."[132] The *Karcher* PFFCL included a summary of their experts' testimony where they concluded that an EFP's blast waves result in exceptionally devastating traumatic brain injury.[133] Reasons for this include (i) the EFP's ability to travel at an extremely high velocity, causing it to deposit more kinetic energy into its ultimate target than typical improvised explosive devices ("IEDs"), resulting in a higher-energy blast and more destruction to tissue; (ii) the EFP's direction of all its energy in a uniquely focused blast wave against its target, unlike an IED which disperses the force of the blast waves it generates; (iii) the close proximity of an EFP and its blast wave to its target; and (iv) the confinement of the EFP's blast wave to the walls of the military vehicle, creating more intense waves which reflect off of the solid surfaces of the vehicle and create multiple wave reflections.[134]

---

[127] *Id.* ¶ 48.
[128] *Id.* ¶ 47.
[129] *See* Ex. G, Department of Veterans Affairs Determination Letter dated March 24, 2009.
[130] *See* Ex. O, Department of Veterans Affairs Determination Letter dated October 26, 2011.
[131] *See* Ex. E, VA Disability Ratings Summary.
[132] *See* Ex. J, *Karcher* PFFCL, ECF No. 80 at 126.
[133] *See id.* at 118-19, 126-28.
[134] *See id.* at 126.

Separate from the cognitive and behavioral effects caused by the traumatic brain injury Mr. Mattis has dealt with, he has also experienced tinnitus since the attack, a TBI symptom.[135] For example, in September 2011, an audiology consult was ordered because Mr. Mattis was found to have "some decreased hearing and some tinnitus."[136] And as recently as August 2023, Mr. Mattis explained that because he may hear "an annoying far-away ringing sound," he cannot "sleep in a room with complete silence"; instead, he must sleep with white noise so he does not hear it.[137] Because of the hearing limitations, he also has to either turn his left ear in the direction of someone speaking or ask people to repeat themselves.[138]

In his expert report, Dr. Marmar noted that following a head injury, separate from affecting executive functioning, "[p]hysical disturbances" may include…dizziness or vertigo and "ringing in the ears (tinnitus)."[139] Dr. Phelps further explained:

> [t]he force of the typical high energy blast wave generated by an EFP very often imparts more than sufficient force to cause TBI that result in both short term and long-term impairments…colloquially referred to as a 'concussion,' often results in the blast-exposed patient experiencing severe unrelenting headaches, ear pain, tinnitus…depression, confusion…along with cognitive deficits affecting memory, concentration, and attention – sometimes for several months or more.[140]

He also indicated that "even with mild TBI," the symptoms "may actually evolve over time, often increasing in severity, and may cause considerable decline in global functioning."[141]

### g.    Adam Mattis's Psychological Injuries

The enduring effects of the injuries Mr. Mattis sustained went far beyond his physical injuries, recovery, and limitations. The emotional injuries, which include a psychological impact,

---

[135] *See* Ex. K, Medical Expert Report dated November 23, 2018, by Dr. Russell Gore, *Karcher*, PX-161 at 47.
[136] Ex. C at MATTIS000031-35.
[137] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 28.
[138] *See id.*
[139] Ex. N, Medical Expert Report of Dr. Charles Marmar dated September 15, 2018, *Karcher*, PX-163 at 12.
[140] Ex. I, Medical Expert Report of Dr. Shean Eric Phelps dated August 27, 2018, *Karcher*, PX-160 at 20-21.
[141] *Id.* at 21.

have affected many aspects of his daily life and continue today, more than 18 years after the attack.



[142] *See* Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 37.
[143] *Id.* ¶ 38.
[144] *Id.* ¶ 43.
[145] *See id.* ¶ 41.
[146] *Id.* ¶ 42.
[147] *See* Ex. C at MATTIS000011 & MATTIS000098.
[148] *See id.* at MATTIS000011.
[149] *See id.* at MATTIS000014.
[150] *See id.* at MATTIS000011.
[151] *See id.* at MATTIS000020-24.



[152]



[153] In his expert report, referencing studies focusing upon Vietnam veterans' experiences, Dr. Marmar explained: "The most common co-occurring disorders were Alcohol Abuse, MDD [major depressive disorder] and Generalized Anxiety Disorder. Co-occurring disorders including MDD and Alcohol Use Disorder are common in civilians as well as in veterans with PTSD."[154]

[155]

[156]

---

[152] *Id.* at MATTIS000027-30.
[153] *See id.*
[154] Ex. N, Medical Expert Report of Dr. Charles Marmar dated September 15, 2018, *Karcher*, PX-163 at 7.
[155] Ex. C at MATTIS000027-30.
[156] *Id.*



In his own words, Mr. Mattis shared more about his experiences in this way:

> Many nights have been plagued by what could be called nightmares and flashbacks which often caused me to wake up in a panic. Apart from replaying some of the actual events of the day [of the attack], my nightmares often focused upon scenarios where I might have acted differently, and because of those changes, Kevin [Smith] may have survived and others, including me, might not have sustained injuries. Beginning soon after the attack, I was afraid to go to sleep because these episodes were so intense. Often, I could not sleep for days.[159]

In addition, Mr. Mattis described how even years after the attack, he "ha[s] been and constantly continue[s] to be hypervigilant, needing to know there is a clear path to and from entrances and exits."[160] He also noted that "for years, I would not drive in a car if I were not the driver…and especially because of what occurred on the day of the attack, when I saw trash on the road, I slowed down and made sure I maintained a 'safe distance' from the debris…."[161]



---

[157] *Id.*
[158] *Id.*
[159] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 38.
[160] *Id.* ¶ 39.
[161] *Id.* ¶ 40.
[162] *Id.* ¶ 42.



[163] Ex. C at MATTIS000054-58.
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.* at MATTIS000058-62.
[168] *Id.*
[169] *Id.* at MATTIS000048-53.



[170] *Id.*
[171] *Id.* at MATTIS000047-48.
[172] *Id.* at MATTIS000035-37.
[173] *Id.*
[174] *Id.* at MATTIS000038-42.
[175] *Id.* at MATTIS000031-35.
[176] *Id.* at MATTIS000099-101.
[177] *Id.* at MATTIS000091-97.



[178]

[179]

[180]

[181]

[182]

[183]

As briefly discussed *supra*, Dr. Marmar explained that "Alcohol Use Disorder…is a common co-occurring condition for individuals with PTSD and TBI. Among individuals with alcohol and drug use disorders, the neurocognitive effects of these substances contribute to and aggravate TBI-associated neurocognitive changes."[184] He further noted, "[i]n our culture, the commonest 'treatment' for those suffering from PTSD, alone or in combination with TBI and MDD, is self-medication with alcohol which may initially alleviate anxiety and depressive symptoms but over time complicates and intensifies the symptoms of PTSD, TBI and MDD."[185]

---

[178] *Id.*
[179] *Id.* at MATTIS000076-84.
[180] *Id.*
[181] *Id.*
[182] *Id.* at MATTIS000070-73.
[183] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 42.
[184] Ex. N, Medical Expert Report of Dr. Charles Marmar dated September 15, 2018, *Karcher,* PX-163 at 14.
[185] *Id.*



---

[186] Ex. C at MATTIS000076-84.
[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] *See id.*
[191] Ex. C at MATTIS000084-86.
[192] *Id.* at MATTIS000063-65.
[193] *Id.*



When Mr. Mattis reflected upon how, having survived the attack, his life has been impacted by an ongoing sense of guilt, he acknowledged:

---

[194] *Id.* at MATTIS000070-73.
[195] *Id.* at MATTIS000066-69.
[196] *Id.* at MATTIS000070-73.
[197] *Id.* at MATTIS000074-75.
[198] Ex. B, Declaration of Adam Mattis, August 23, 2023, ¶ 41.
[199] *Id.* ¶ 49.
[200] *Id.*
[201] *Id.* ¶ 44.

> I will continue to suffer through feelings of survivor's guilt and sense of loss stemming from the knowledge that I never completed what I intended as a soldier, and most of all, for the fact that I was allowed to live when Kevin [Smith] – a truly incredible man, soldier and leader – lost his life on December 8, 2005. My admiration for him, combined with the guilt I feel that he is gone, and I am here, have motivated me. I want my life to have some value; I want to live in a way that is worthy of all Kevin was and can no longer be. Through it all, my distress over all that occurred that day in Iraq haunts me and affects my daily life.[202]

Medical records recognize Mr. Mattis's struggles with guilt as early as November 2007, as they document how "[h]e endorses…significant guilt and remorse over events he witnessed."[203] During the *Karcher* trial, in an effort to explain the long-term effects survivor's guilt – such as that which Mr. Mattis described and experienced – Dr. Marmar testified as to the source and effects as follows:

> Survivor's guilt is a sense of guilt about the fact that I am alive or I am alive and not injured when the people that I deeply cared about on the battlefield died or were badly injured. You know, when I ask war fighters why they served, particularly in a volunteer army, they often say to me: I went to war to serve my country. But I fought in war to bring my teammates back. So my goal changed once I was in battle. And if they leave their teammates injured or dead on the battlefield, they can often have searing guilt for being the ones that walked away. And survivor's guilt is specifically a high risk for depression, suicide and alcohol use.[204]



[205]

[206]

### h.    Request for Damages

---

[202] *Id.* ¶ 50.
[203] Ex. C at MATTIS000048-53.
[204] Ex. L, Testimony of Dr. Charles Marmar in the *Karcher* trial, T3-124:7-20.
[205] *See* Ex. O, Department of Veterans Affairs Determination Letter dated October 26, 2011.
[206] *See* Ex. E, VA Disability Ratings Summary.

Courts have awarded at least $5 million in cases of significant physical injuries (as are often present with EFP victims), that do *not* include TBI. For example, a suicide bombing victim in *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200 (D.D.C. 2008) was awarded $5 million for his shrapnel injuries and a fracture which left him with a slightly misshapen arm. *See id*. at 207, 212-13. *See also Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) ("*Peterson* II"), (awarding serviceman who suffered compound fracture of his right leg, injuries to the toes on his left foot, and shrapnel wounds $5 million). These awards do *not* include any discussion of TBI diagnoses.

Mr. Mattis's injuries, without taking into account his TBI or his emotional injuries, were severe – as detailed above, shrapnel peppered his body with one bigger piece lodging in his chest below his right armpit.[207] His shrapnel injuries continue to cause him "a constant, dull throbbing pain" in his arm, and at times he experiences "spikes of pain."[208] His right ring finger and pinky finger are "useless," rendering him unable to perform simple tasks like holding a coffee mug or turning a doorknob.[209] He continues to have limited range of motion in his right shoulder and arm.[210]

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████[211] Mr. Mattis's permanent tinnitus and hearing loss sustained as a result of the attack[212] are likely the symptoms of his TBI, ████████████████████████

---

[207] *See* Ex. B, Declaration of Adam Mattis, dated August 23, 2023, ¶¶ 22, 25.
[208] *Id.* ¶ 26.
[209] *Id.* ¶ 27.
[210] *See id.* ¶¶ 34, 48.
[211] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 49-50.
[212] *See* Ex. B, Declaration of Adam Mattis, dated August 23, 2023, ¶ 28.



Accordingly, Plaintiffs request, and I recommend, that the Court award $7 million for Adam Mattis, corresponding to the middle range of awards for Category 3 victims who sustained mild TBI with psychological injuries and severe shrapnel and orthopedic injuries.

| Category 3 | Mild TBI with psychological injuries (with severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million Range: $4 - $10 million |
|---|---|---|

## B.    TERRANCE PETERON - DECEMBER 8, 2005, ATTACK - BAGHDAD

CPT (Ret.) Terrance Peterson (then a 2LT) was also injured on December 8, 2005, when an EFP struck his vehicle. *See Lee II*, 656 F. Supp. 3d at 37. This Court found "satisfactory evidence in the record to demonstrate that the explosive responsible for Messrs. Mattis and Peterson's injuries in the December 8, 2005, attack was an EFP traceable to Iran and its proxies" and granted

---

[213] *See id.* ¶¶ 45-46.
[214] *See id.*
[215] *See id.* ¶ 47.
[216] *See id.* ¶¶ 37, 38.
[217] *Id.* ¶ 38.
[218] *See id.* ¶¶ 39-40.
[219] *See id.* ¶ 42.
[220] *Id.* ¶ 41.
[221] *See id.* ¶ 43.

default judgment in favor of those Plaintiffs against Iran. *Id.*

Mr. Peterson suffered severe physical and mental anguish and extreme emotional pain and suffering as a result of the December 8, 2005, attack, and submits claims for assault, battery, and IIED, and economic loss. The following chart reflects the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Gielchinsky Decl.

| Plaintiff | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|
| Terrance Peterson | Assault, Battery, IIED<br><br>$10 million | Copy of Terrance Peterson's birth certificate | P |
| | | Declaration of Terrance Peterson, dated August 7, 2024 | Q |
| | | Copy of Terrance Peterson's medical record excerpts from the following facilities: 10th Combat Support Hospital, Iraq (2005); Water Reed Medical Center, Bethesda, MA (2006); Winn Army Community Hospital, Fort Stewart, GA (2006); Raymond W. Bliss Army Health Center, Fort Huachuca, Arizona (2018); Southern Arizona VA, Tucson, AZ (2023-2024) | R |
| | | Copy of Official Military Personnel File for Terrance Peterson | S |
| | | Copy of Significant Activity Report for December 8, 2005, attack | T |
| | | Copy of Kevin Smith's Casualty Report | U |
| | | Medical Expert Report of Dr. Romney Andersen, dated September 18, 2018, *Karcher*, PX-162 | V |
| | | VA Benefit Letter to Terrance Peterson, dated October 4, 2023 | W |
| | Economic loss claim<br><br>$548,153.33 | Economic loss declaration of Terrance Peterson, dated May 9, 2023 | X |
| | | Appraisal of Present Value of Economic Life on Terrance Peterson III, dated August 18, 2024, prepared by L. Wayne Plumly, Jr., Ph.D. | Y |

1.    **Assault, Battery, and Intentional Infliction of Emotional Distress Claim**

a.    **Terrance Peterson's Background**

Terrance Peterson was born in Winfield, Illinois, on July 20, 1982. The middle sibling of three children, Mr. Peterson's early years were filled with admiration for his father who served with the U.S. Army's elite First Infantry Division, and subsequently in the U.S. Air Force and Military Police.[222]

Although his parents divorced when he was in third grade, and he and his sisters were raised by his mother, Mr. Peterson's admiration for his father led him to join JROTC while in high school and to commit to following a military career. He applied to both West Point Academy and The Citadel and received his acceptance to The Citadel in August 2001.[223]

After the events of 9/11, Mr. Peterson's father, who was then serving in the Army Reserves, was called up, and then deployed to Iraq in 2003. His father returned from Iraq a changed man, no longer the "invincible superhero" he remembered – still, Mr. Peterson's commitment to serve did not waiver.[224] After enlisting in the South Carolina National Guard in 2003, he joined the U.S. Army in May 2005 and deployed to Iraq in November of the same year.[225]

On December 8, 2005, Mr. Peterson's unit, the 1st Battalion, 76th Field Artillery, was traveling in a 5-vehicle convoy south on Route Pluto in Baghdad, when his vehicle was struck by a multi-array EFP, severely injuring him, Adam Mattis, and one other service member. His friend and mentor, Captain Kevin Smith, was killed in the attack.[226]

Mr. Peterson was sitting behind Kevin Smith in the vehicle at the time of the attack, a fact that he attributes to saving his own life. According to Mr. Peterson:

> Kevin was sitting in front of me pulling up the map on his computer to show me where we were located. As I leaned forward to see the map, there was a massive

---

[222] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶¶ 2, 6-7.
[223] *Id*. ¶¶ 6, 10-11.
[224] *Id*. ¶¶ 15-16.
[225] *See* Ex. S, Official Military Personnel File. *See also* Ex. R, PETERSON000191.
[226] *See* Ex. T, SIGACT Report. *See also* Ex. U, Casualty Report.

explosion. A projectile entered the vehicle and hit my seat. The only reason I was not instantly killed is because I was leaning forward to look at the map.[227]

### b.    Injuries at Point of Attack

After the attack, Mr. Peterson was transported back to FOB (Forward Operating Base) Loyalty and then to the 10th Combat Support Hospital in Baghdad.[228] He had a tourniquet applied to his brachial artery to stop the bleeding in his left arm, and suffered multiple open puncture wounds to his face, hands, both arms, both thighs, and left leg, as well as fractures to both hands including an avulsion fracture (a fracture where a section of bone is pulled away from the main bone structure) to his left wrist with the tendons exposed.[229] Additionally noted in his medical records were fractures to his left forearm, a fracture to his left index finger metacarpal bone, fractures to his right thumb knuckle area, index, and right middle and index fingers, and a fracture to his right foot.[230] His records also noted deep lacerations to his left arm and leg, as well as his right hand and to his head.[231] Mr. Peterson described how he had so many fractures, his orthopedist told him his bones looked like corn flakes.[232] Dr. Shean Phelps, qualified by the *Karcher* court as an expert regarding the treatment of combat injuries, including polytrauma and blast injuries, particularly those sustained as a result of EFP strikes in Iraq,[233] explained the EFP's particular engineering design which allowed it to "shatter" bones, pointing to the EFP's "detonation velocity," which serves as "an overall indicator of the energy or power of detonation," and its "brisance," the term "used to denote the ability of a high explosive to shatter substances."[234] The

---

[227] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 22.
[228] *See* Ex. T, SIGACT Report.
[229] *See* Ex. R, PETERSON000001-PETERSON000010.
[230] *See id.*, PETERSON000011-PETERSON000012.
[231] *See id.*, PETERSON000158-PETERSON000159. *See also id.*, PETERSON000001-PETERSON000010.
[232] *See* Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 32.
[233] *See* Ex. J, *Karcher* PFFCL, at 11.
[234] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 14-15.

"advanced geometry of EFP weapon design" employed both of those factors, allowing it to "crush soft-tissue and bone."[235]

Mr. Peterson's tourniquet was removed at the Combat Support Hospital and the bleeding controlled with a pressure dressing. Blood was obtained for transfusion, and he was admitted to the OR (Operating Room) with a morphine drip for pain control.[236]

Mr. Peterson spent two days undergoing various surgeries before he was transported to Landstuhl Regional Medical Center in Germany on December 10, 2005.[237] He recalled that while awaiting his transport to Germany, he was placed in a tent with other wounded service members crying in pain as they awaited transport; he described how they were all "reduced to little children."[238]

After additional procedures at Landstuhl Regional Medical Center to irrigate his wounds and stabilize his fractures, Mr. Peterson was medevacked to Walter Reed National Military Medical Center on December 12, 2005, where he spent the next nine months undergoing repeated surgical procedures and receiving rehabilitative treatments.[239]

### c.    Terrance Peterson's Surgical Procedures and Rehabilitation

Upon arrival at Walter Reed, Mr. Peterson began receiving daily occupational and physical therapy for the injuries to all four of his extremities. Additionally, he underwent a groin flap skin graft to his left wrist, a procedure where surgeons harvest a large, split thickness "pedicle" of skin – a thick flap of tissue consisting of overlying skin and underlying fascia and muscle, nourished by the superficial circumflex artery left attached to its femoral artery source, *i.e.*, Mr. Peterson's

---

[235] *Id.* at 16.
[236] *See id.*, PETERSON000001-PETERSON000010.
[237] *See id.*, PETERSON000160.
[238] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 29.
[239] *See* Ex. R, PETERSON000025-PETERSON000027. *See also* Ex. R, PETERSON000159- PETERSON000160.

groin/lower abdominal area. This pedicle, while still attached to its point of origin, was then sewn to form a semi-loose tube of tissue and stitched into place over Mr. Peterson's left hand, thereby "filling" the tissue and muscle deficit. Mr. Peterson described the multitude of surgeries he underwent during that time in his declaration:

> I had over thirty surgeries to repair the multiple parts of my body damaged in the bombing attack. My left arm was severely injured from my shoulder down to my wrist which included a severed brachial artery and fractures in my forearm, wrist, and hand. I was told by an orthopedist that the bones in my left hand were so shattered they looked like corn flakes. My left hand was also missing a piece of flesh at the wrist and had to be sewn to my hip for a month using a groin flap.[240]

Surgical procedures at Walter Reed also included repeated irrigation and debridement to his left arm and leg and his right foot wound, a wound vac placement on his left upper arm, an "external fixator" placement on his left wrist to hold the shattered bones in place, and a delayed primary closure of his right upper arm wound.[241] Dr. Romney Anderson, qualified by the *Karcher* court as an expert on the treatment and prognosis for orthopedic blast injuries, including injuries from EFP attacks,[242] explained what "external fixators" are in his expert report. Noting that fractures that are "caused by blast injuries are generally more serious than fractures that occurred secondary to more routine injuries,"[243] Dr. Andersen stated that blast injury fractures "frequently required more extensive surgery to regenerate bone, thus necessitating the use of a circular multiplanar external fixation device."[244] Essentially, this device operates as "a frame to first shorten the bone and then lengthen it to regenerate the bone."[245] He described how they "were often painful and remained in place for several months," and added that "[s]uch treatments

---

[240] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 32.
[241] *See* Ex. R, PETERSON000050-PETERSON000052.
[242] *See* Ex. J, Karcher PFFCL, at 10-11.
[243] Ex. V, Expert Report of Dr. Romney Andersen, dated September 17, 2018, at 7.
[244] *Id.* at 8.
[245] *Id.*

consistently had nearly 100% complication rates that included pin site infections, tissue death, and failure of adequate fracture healing."[246]

Initial medications at Walter Reed included opioids Oxycodone and Methadone for pain management, ███████████████████████████████████████████████████ ████████████████████████[247] However, despite these medications, pain became a constant issue. Throughout his nine months at Walter Reed, Mr. Peterson's pain level remained consistently high. As he noted, his pain worsened because he was "unable to walk or move very much," causing him to develop bed sores.[248] His "pain made it difficult to sleep even with a morphine drip."[249]

### i. Lower Extremities Injuries, Surgical Procedures, and Rehabilitative Therapies

Although Mr. Peterson was discharged from Walter Reed Inpatient's physical therapy on January 12, 2006, he was still receiving physical therapy as an outpatient 3-5 times a week and noted fatigue when attempting to perform his ADLs (Activities of Daily Living). On January 19, 2006, his physical therapist noted that his ability to walk was compromised due to the fractures and fasciotomies[250] that he'd had in his right foot, as well as the soft tissue injuries to his left foot.[251]

In order to keep his fractures stabilized and the bones aligned, Mr. Peterson had external fixators placed on both his right foot and left wrist. On January 31, 2006, he had the external fixator device which was placed on his right foot on December 20, 2005,[252] removed and was scheduled to have the device removed from his left wrist a week later. By February 6, 2006, he reached

---

[246] *Id.*
[247] *See* Ex. R, PETERSON000011-PETERSON000012.
[248] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 32.
[249] *Id.*
[250] Fasciotomies refers to a surgical procedure wherein the fascia is cut to relieve the tension or pressure and improve the circulation of the surrounding tissue. *See* https://www.ncbi.nlm.nih.gov/books/NBK556153/.
[251] *See* Ex. R, PETERSON000015-PETERSON000016.
[252] *See id.*, PETERSON000160.

42

another milestone and was cleared to begin walking with a crutch. A follow up procedure to remove his left bicep grafts was performed on February 3, 2006, and he was noted as showing improvement in tying his shoes.[253]

Despite an April 5, 2006, fitting for a foot insert to help support his fractured right foot, Mr. Peterson continued to experience worsening foot pain while walking.[254] As of July 21, 2006, his active medications included 800mg Ibuprofen ████████, and he planned to follow up regarding additional surgical options at Eisenhower Medical Center.[255]

In October 2006, Mr. Peterson was assigned back to his unit at Fort Stewart, Georgia, and transferred his medical care to Winn Army Community Hospital. At Winn, he was assessed as needing a surgical fusion in his right foot to help his fracture heal and would subsequently require long-term recovery and rehabilitation.[256] His metatarsal-tarsal fusion surgery took place nearly four months later, on February 19, 2007, and required him to be non-weight bearing for eight weeks post-surgery.[257]

After a second surgical procedure on the same foot, in April 2007, he noted that he had pain in his ankle which he was told was a possible by-product of his two prior foot surgeries. Despite imaging studies that showed the union of the metatarsal bone in his right foot – an indication of its healing – he continued to report pain at the fusion site.[258] A subsequent CT scan on June 18, 2007, noted mild arthritic changes in the first metatarsophalangeal joints. It was assessed that Mr. Peterson was experiencing possible biomechanical issues post his surgical procedures, and he would require an external bone stimulator to augment the healing of his

---

[253] *See id.*, PETERSON000015-PETERSON000016. *See also id.*, PETERSON000020-PETERSON000023.
[254] *See id.*, PETERSON000032-PETERSON000033 and PETERSON000036-PETERSON000037.
[255] *See id.*, PETERSON000036-PETERSON000037.
[256] *See id.*, PETERSON000048-PETERSON000049.
[257] *See id.*, PETERSON000061-PETERSON000062 and PETERSON000063-PETERSON000064.
[258]  *See id.*, PETERSON000065-PETERSON000066. *See also id.*, PETERSON000067-PETERSON000068 and PETERSON000069-PETERSON000071.

fracture, as well as customized inserts.[259] According to Dr. Andersen, even when EFP victims successfully underwent limb salvage, they "often developed post-traumatic arthritis of the reconstructed extremity," which "often led to long-term pain, and the patient developed a loss of range of motion and decreased limb strength."[260]

Even with the multiple surgical procedures, the pain in his foot remained high. In a follow up visit on January 31, 2008, at the Fort Stewart Hawks Clinic, Mr. Peterson rated his foot pain as a level 7 out of 10 and explained that he had been using Naproxen for pain relief.[261] His pain issues continued through March 2008, and he indicated that Naproxen was no longer providing adequate relief.[262] His pain continued into the following month and extended to his knees, and it was recommended that he try Celebrex for his chronic pain issues.[263]

Mr. Peterson described this long and slow healing process, stating that upon his return to Fort Stewart, he was initially unable to walk due to the multiple bone fusions in his right foot and needed to use a wheelchair. He explained that it took months for him to be able to use a cane and even then, he had to limit the time he was on his feet. Moreover, the bones in his right foot were "very fragile and prone to refracture."[264] He stated: "A doctor told me that with the type of injuries I sustained in my foot it was sometimes better to amputate. I refused to even consider it. The idea of losing anything else was too much to contemplate."[265]

Mr. Peterson expressed that he felt that his worst injury was to his right foot, which required multiple surgical procedures and compromised the sensation in his foot. Even currently, he

---

[259] *See id.*, PETERSON000067-PETERSON000068, PETERSON000069-PETERSON000071, and PETERSON000072-PETERSON000074.
[260] Ex. V, Expert Report of Dr. Romney Andersen, dated September 17, 2018, at 13.
[261] *See* Ex. R, PETERSON000093-PETERSON000094.
[262] *See id.*, PETERSON000099-PETERSON000101.
[263] *See id.*, PETERSON000102-PETERSON000104 and PETERSON000105-PETERSON000107.
[264] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 37.
[265] *Id.*

experiences daily sharp "stabbing pain" in his right foot which often wakes him at night. He described how repeated use of the foot can exacerbate his pain and he can no longer move his big toe.[266] He stated that his injury also changed the way he walks which "triggered unusual wear and tear" in his right knee and hip, causing pain in other areas of the body as well.[267]

### ii.   Upper Extremities Injuries, Surgical Procedures, and Rehabilitative Therapies

As described, in January 2006, Mr. Peterson had a groin flap skin graft to his left hand. A subsequent procedure was performed to separate the hand and arm area from the groin and to put in place a groin drain at the donor site. As a result of the skin graft on his left hand and the fractures to his right fingers, his range of motion in his right thumb and index were greatly reduced and movement in his left digits was also hampered due to the sutures.[268] An additional surgery for skin grafts on his left bicep area was performed on February 3, 2006, and was followed by a number of occupational therapy sessions to increase his range of motion.[269] Dr. Andersen explained the frequent need for grafts resulting from EFP injuries by describing how the "surrounding soft tissue in an extremity was often destroyed as a result of a blast injury," which "frequently required complex reconstructive efforts to take soft tissue from another part of the body to cover the defect."[270] However, since the transferred tissue "never possessed the same level of function as the lost tissue, it often merely covered the defect."[271] Dr. Andersen relayed how in his professional experience, "the victim's remaining loss of function to the extremity is usually permanent and therefore results in an additional disability."[272]

---

[266] *Id.* ¶ 34.
[267] *Id.*
[268] *See* Ex. R, PETERSON000013-PETERSON000014.
[269] *See id.*, PETERSON000022-PETERSON000024.
[270] Ex. V, Expert Report of Dr. Romney Andersen, dated September 17, 2018, at 8.
[271] *Id.*
[272] *Id.*

Mr. Peterson also sustained various fractures to his right digits, and in March 23, 2006, a shrapnel fragment was removed from his right index finger.[273] While at Walter Reed, he received Occupational Therapy once or even twice per day to help with his extensive hand and wrist injuries.[274] Mr. Peterson's injuries, combined with repeated surgical procedures, resulted in a 1-2 inch loss of length in his left arm due to bone loss.[275]

An external fixator was placed on his left wrist to allow his left hand fracture to heal and was subsequently removed on February 6, 2006, along with the external fixator on his right foot.[276] Also impacting his left upper extremity was his initially open radius and ulnar fracture which required an ORIF (an Open Reduction Internal Fixation) of the radius and a resection of his ulna.[277] That procedure repairs fractured bone using either plates, screws or an intramedullary rod to stabilize the bone.

By March 2006, Mr. Peterson was experiencing chronic pain in his left arm and right foot and on March 23, 2006, he had an additional piece of shrapnel removed from his right index finger.[278] Another procedure for his groin flap revision was scheduled for May 31, 2006.[279]

In November 2006, he was evaluated by his occupational therapist at Winn Army Community Hospital for nerve damage to both the back of his left hand and to a portion of his left forearm.[280] During the evaluation, he informed the occupational therapist regarding the "big chunk" of bone missing in his left ulna, and a constant throbbing pain at a level of 3 out of 10 in his left wrist. Dr. Andersen confirmed in his expert testimony that blast injuries by EFPs were so

---

[273] *See* Ex. R, PETERSON000028-PETERSON000029.
[274] *See id.*, PETERSON000050-PETERSON000052.
[275] *See id.*
[276] *See id.*, PETERSON000020-PETERSON000021.
[277] *See id.*, PETERSON000034-PETERSON000035. *See also id.*, PETERSON000139-PETERSON000140.
[278] *See id.*, PETERSON000028-PETERSON000029.
[279] *See id.*, PETERSON000034-PETERSON000035.
[280] *See id.*, PETERSON000057-PETERSON000058.

intense that they "often removed a portion of the bone."[281] The occupational therapist noted that Mr. Peterson still had significant limitations to his ADLs which included dressing himself independently and writing.[282]

The impact on his left hand and distal forearm continued to be an issue even a year later, limiting his ADLs – he had difficulty writing, dressing independently, gripping the steering wheel of a vehicle, and pulling on his boots.[283] Mr. Peterson described the impact of his hand and finger injuries as follows: "The blast also severely damaged the thumb, pointer finger and knuckles on my right hand. The knuckle under my thumb and pointer finger had been completely blown off by shrapnel. Those fingers are now shorter and do not function, and I experience arthritic pain in them every day."[284]

On October 24, 2007, Mr. Peterson underwent an electrodiagnostic evaluation of his left hand and arm. It was assessed that the area of numbness in his left hand was confined to the skin graft and was due to the inability to reinnervate the area.[285] Dr. Andersen described how nerve injuries were common consequences of EFP injuries "because often the nerve had been transected and/or it had sustained damage over a long segment."[286]

Mr. Peterson expressed that he felt he had plateaued in terms of additional surgical and therapeutic options for his left wrist and right foot, and his pain and neuropathy continued to impact his ADLs through January 2008. At that time, it was noted that he still had difficulty gripping the steering wheel of his vehicle for long periods of time and he continued to struggle with pulling on his boots due to loss of traction in his left wrist.[287]

---

[281] Ex. V, Expert Report of Dr. Romney Andersen, dated September 17, 2018, at 7.
[282] *See* Ex. R, PETERSON000057-PETERSON000058.
[283] *See id.*, PETERSON000083-PETERSON000084.
[284] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 33.
[285] *See* Ex. R, PETERSON000085-PETERSON000088.
[286] Ex. V, Expert Report of Dr. Romney Andersen, dated September 17, 2018, at 9.
[287] *See* Ex. R, PETERSON000089-PETERSON000090. *See also id.*, PETERSON000091-PETERSON000092.

Mr. Peterson had also sustained shrapnel injuries to his left shoulder from the attack. As part of his MEB (Medical Examination Board) evaluation in October 2006, he had imaging of the shoulder which was a follow up to X-rays that had been done in May of that year. A CT scan showed that a piece of shrapnel was still embedded in his left shoulder.[288] Pain in his left shoulder continued to be an issue especially at the site of his shrapnel scars. Radiological findings in May 2007 showed two pieces of shrapnel in the soft tissues of the left shoulder and excision surgery was scheduled for later that month.[289]

Due to the injury to his brachial artery which required a blood transfusion while in Iraq, Mr. Peterson developed a brachial plexus disorder with a painful numbness that radiated through his arm, and a tingling and burning sensation in his right arm and hand. By 2015, his right arm and hand pain were spiking to a level of 7 out of 10 and he was again referred to physical therapy.[290]

### d. Terrance Peterson's Radiological Findings, Shrapnel, and Degenerative Changes

Radiological findings and reports of Mr. Peterson's injuries demonstrate the extent of his injuries and the degenerative changes caused by them and his subsequent surgical procedures, along with his chronic challenges with retained shrapnel fragments.

Dr. Phelps described the shrapnel injuries particularly caused by EFPs in his expert report, observing that "high-energy blast wounds" such as those from EFPs are "typically characterized by massive zones of injury to bone, muscle and soft tissue leaving large areas of devitalized tissue contaminated by retained foreign materials often of unknown composition – of which the long-term health risks are unknown."[291] Those shrapnel materials often lead to a "particular set of

---

[288] *See id.*, PETERSON000055-PETERSON000056 and PETERSON000059-PETERSON000060.
[289] Ex. W, PETERSON000069-PETERSON000071.
[290] Ex. W, PETERSON000108-PETERSON000112. *See also*, Ex. W, PETERSON000001-PETERSON000010.
[291] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 17.

complications with regard to infection, and biological and chemical contamination."[292] As Dr. Phelps further noted, current medical protocols followed by the U.S. military and the International Committee for the Red Cross recommend against surgical removal of these fragments unless removal is necessitated; thus these fragments can remain in the individual's body for years.[293] Dr. Phelps added that "some foreign materials (especially copper, tungsten, depleted uranium and nickel-based alloys) can cause significant long-term debilitating effects merely by their presence, and may necessitate later surgeries."[294]

Mr. Peterson's December 10, 2005, X-rays on his left wrist and forearm noted his "severely comminuted open fracture of the distal ulna…[and] fracture of the radius" as well as the "multiple bony fragments [that] are displaced into the dorsal soft tissues of the wrist." Also noted were "scattered shrapnel fragments … along the lateral upper arm and forearm with extensive soft tissue injury."[295] A left knee radiology report dated three days later also noted "several irregular densities, most likely representing shrapnel injury."[296]

A follow up to his left wrist series on December 14, 2005, revealed that "2-3 cm of the ulna are absent on the bases of prior trauma, and multiple tiny fracture fragments are seen in this location." Additionally, "several sub 2 mm metallic shrapnel fragments were noted" in the lower joint of the second finger.[297] Follow up radiological reports of his right wrist showed wrist and finger fractures as well as shrapnel and soft tissue swelling.[298]

---

[292] *Id.* at 18.
[293] *See id.*
[294] *Id.* at 18-19.
[295] Ex. R, PETERSON000148-PETERSON000149.
[296] *Id.*, PETERSON000145-PETERSON000146.
[297] *Id.*, PETERSON000144-PETERSON000145.
[298] *See id.*, PETERSON000143- PETERSON000144.

Mr. Peterson's May 25, 2006, bilateral hand films also revealed "traumatic degenerative changes" including "posttraumatic osteolysis" (bone degeneration) of his left ulna, as well as shrapnel fragments in his index finger on the same hand and in the fingers of his right hand.[299]

Shrapnel fragments were still present in his left forearm and in both hands in an X-ray series on October 25, 2006.[300] A subsequent CT of his left shoulder revealed 2 pieces of shrapnel as well.[301] Shrapnel fragments were again noted in the left wrist as of October 2007 along with "degenerative changes."[302]

On December 20, 2005, a radiological series was taken of his right foot. The X-rays showed the external fixation of his comminuted fracture as well as the fixation screws utilized to hold the bones in place.[303] By the end of January 2006, a follow up report on his right foot was already showing "mild disuse osteoporosis."[304] A follow up CT scan of the right foot and ankle in June 2007 showed his healed fracture with metallic screws and "degenerative changes."[305]

As of October 2007, shrapnel fragments were also noted in his left knee with a 9 mm metallic fragment at the level of the "patellofemoral joint likely abutting or within the bone" and small fragments within the soft tissues. A right finger and hand series on the same day noted shrapnel in his right hand specifically in the areas of the 2nd and 3rd fingers and metacarpals (bones of the palm) as well as traumatic changes in the upper portion of his index finger along with associated soft tissue swelling.[306]

### e.    Terrance Peterson's Traumatic Brain Injury

---

[299] *Id.*, PETERSON000133.
[300] *See id.*, PETERSON000128-PETERSON000130.
[301] *See id.*, PETERSON000125- PETERSON000126.
[302] *Id.*, PETERSON000117.
[303] *See id.*, PETERSON000137-PETERSON00038.
[304] *Id.*, PETERSON000135-PETERSON000136.
[305] *Id.*, PETERSON000118.
[306] *Id.*, PETERSON000114-PETERSON000115.

During his stay at Walter Reed, Mr. Peterson complained of headaches which he stated were "unrelenting."[307] A psychiatric consult at Walter Reed, dated July 25, 2006, noted his issue with headaches and the psychiatrist encouraged him to keep a headache log. Also noted were complaints of "concentration difficulties and irritability" and the fact that he had been "dazed" after the blast.[308]

In the course of his August 20, 2007, RBANS (Repeatable Battery for the Assessment of Neuropsychological Status) assessment to evaluate his neuropsychological status, Mr. Peterson described a possible LOC (Loss of Consciousness) post-blast that may have lasted a few minutes. In his declaration, Mr. Peterson stated that an eyewitnesses told him that he was unconscious for ten minutes following the explosion.[309] He added that after the blast he was "foggy" and remained "foggy" for two weeks afterwards. He indicated that this "foggy" feeling has been ongoing and feels that he is "mentally a lot slower" as if "fumbling- for memories."[310]

Although subsequent screening for TBI approximately one year later was negative, on August 28, 2022, he was granted a 70% Service-Connected Disability rating that included PTSD and TBI, along with a 30% rating for migraine tension headaches. His combined rating as of that date was 100%.[311]

A June 15, 2023, TBI consultation at the Southern Arizona VA included a prior history of Mr. Peterson's injuries. The consultation detailed that on the date of the attack, he was sitting in the right rear passenger seat of the Humvee when it was hit by the explosion not more than 10 feet from the side of the vehicle.[312] Although the record notes that he had no recollection of losing

---

[307] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 40.
[308] Ex. R, PETERSON000038-PETERSON000042.
[309] *See* Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 55.
[310] Ex. R, PETERSON000075-PETERSON000077.
[311] *See* Ex. W, October 4, 2023, VA Benefit Information. *See also* Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 55.
[312] *See* Ex. R, PETERSON000158- PETERSON000160.

consciousness, he stated that he was later told by witnesses that he'd had an LOC (Loss of Consciousness) for approximately 10 minutes. He stated that the last thing he can recall is seeing the blast as a "black fog" and feeling the blast wave. The next memory he has is lying on the ground outside the vehicle after being extracted and a medic rendering aid to him. He noted that he recalls not being able to hear anything immediately after the explosion because his "brain was not working" and also recalls feeling dazed and not being able to speak but trying to yell for someone to apply a tourniquet to his arm.[313] He admitted to only a spotty recollection of events after the blast: "I have fragments of the journey, I have memories of being scared and waking up after surgeries."[314] He reported that he only regained mental clarity approximately 48 hours after his injury.[315]

Mr. Peterson's Southern Arizona VA records make numerous references to a diagnosis of TBI attributed to the blast in 2005.[316] His April 5, 2023, Primary Care Note states that although he was not diagnosed with TBI, ███████████████████████████████████

███████████████████████████████████████████████████████████████

████████████ As such, he was referred for a polytrauma consultation.[317]

His June 15, 2023, TBI consultation at the Southern Arizona VA, noted a variety of TBI-related symptoms, ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████[318] Although this consultation referred to his August 20, 2007, RBANS results as indicative of average or above average functionality, ███████████████████████████████

---

[313] *Id.*
[314] *Id.*
[315] *Id.*
[316] Ex. R, PETERSON000187- PETERSON000190. *See also id.*, PETERSON000183-PETERSON000186, PETERSON000181-PETERSON000182, PETERSON000150-PETERSON000157.
[317] *See id.*, PETERSON000150-PETERSON000157.
[318] *See id.*, PETERSON000160-PETERSON000163.



[319]

[320] all of which are symptoms of TBI,[321] per Dr. Russell Gore, qualified by the *Karcher* court as an expert in TBI and its consequences, diagnosis, and treatment.[322] The TBI consultation also noted a confirmed diagnosis of OSA (Obstructive Sleep Apnea) for which he was prescribed a CPAP. A brain CT was ordered; however, as of July 3, 2023, no brain imaging had been scheduled.[323]

As of December 2023, Mr. Peterson's TBI Treatment Plan Note indicated a plethora of TBI-related symptomatology including

[324] all of which were reported by Dr. Gore as comprising TBI symptoms.[325]

Due to his extensive symptomatology and the results of his RBANS testing, Mr. Peterson's records regarding his TBI include mentions of a "mTBI, uncomplicated, secondary to blast event 12/8/05 during OIF deployment, with brief LOC"[326] *and* an "Acute TBI diagnosed 2005."[327] This

---

[319] *Id.*, PETERSON000161-PETERSON000162, PETERSON000168-PETERSON000169.

[320] *Id.*, PETERSON000160-PETERSON000161.

[321] See Ex. K, Medical Expert Report dated November 23, 2018, by Dr. Russell Gore, *Karcher*, PX-161 at 47.

[322] *See* Ex. J, Karcher PFFCL, at 11.

[323] *See* Ex. R, PETERSON000169. *See also id.,* PETERSON000176-PETERSON000180.

[324] *See id.*, PETERSON000183- PETERSON000186.

[325] *See* Ex. K, Medical Expert Report dated November 23, 2018, by Dr. Russell Gore, *Karcher*, PX-161 at 47-48.

[326] Ex. R, PETERSON000168.

[327] *Id.*, PETERSON000150- PETERSON000157.

difficulty in assessing the extent of a servicemember's TBI injury and associated symptomatology is not atypical, as noted by Dr. Phelps. Dr. Phelps explained how "military personnel with combat-related polytrauma/blast trauma frequently do not identify symptoms such as headaches, nausea, vomiting, etc., as components of their injury exposure."[328] He noted that since service members often view these symptoms as "part of the job"; they do not realize that symptomatology such as "persistent pain (i.e., throbbing headaches, etc.) may be an important indicator of blast exposure."[329]

      Mr. Peterson stated that he continues to have headaches every day,



[330]

[331] Dr. Phelps explained how TBI symptoms do not always resolve, and sometimes worsen, as is the case with Mr. Peterson. Specifically, the long term effects of TBI "are associated both with the development of a chronic pattern to – and oftentimes increased severity of – those same mild TBI symptoms in addition to more profound impairments in psychosocial/emotional and high-level neurobehavioral measures such as executive decision making and the formation of short- and long-term memories, more chronically disrupted sleep patterns, and significant mental and physical impairments."[332] As described above, Dr. Gore explained how a "mild" TBI diagnosis is not dissimilar to a moderate or severe TBI, and that "[e]ven exposure to a single mTBI, compared with an injury control group

---

[328] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 31.
[329] *Id.*
[330] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶¶ 40, 55.
[331] *Id.* ¶ 55.
[332] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 22.

not sustaining an mTBI, has been associated with increased long-term risk of developing memory and cognitive problems, mood disorders, sleep disorders, and epilepsy,"[333] which symptoms may continue for years after injury,[334] which has been true with Mr. Peterson.

### f.    Terrance Peterson's Psychological Injuries

Mr. Peterson was only three weeks into his deployment when he was injured in the EFP attack.

███████████████████████████████████

██████████████ [335]

After beginning his MEB (Medical Examination Board) process to be medically boarded out of service,[336] he began a vicious cycle of surgeries to repair the shattered bones in his foot. He was also dealing with chronic pain and unrelenting headaches at the time. He stated that his "dream of being a soldier"[337] which had ended after only three weeks of service in Iraq took him to a "dark place."[338] ████████████████████████████[339]

In his declaration, Mr. Peterson expressed that the time he spent at Walter Reed recovering from his physical injuries was also the most difficult for him since he was surrounded by wounded service members many of whom had become "shadows of their former selves."[340] He stated that he is still haunted by the expression of a little girl visiting her father who had lost both his arms: "The look of fear and horror when she saw her disfigured father left me heartbroken for both the soldier and his little girl."[341]

---

[333] Ex. K, Medical Expert Report of Dr. Russell Gore dated November 23, 2018, *Karcher,* PX-161 at 47-48.
[334] *See id.* at 46.
[335] *See* Ex. R, PETERSON000025-PETERSON000027.
[336] *See id.*, PETERSON000053-PETERSON000054.
[337] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 38.
[338] *Id.*
[339] *Id.*
[340] *Id.* ¶ 36.
[341] *Id.*



---

[342] Ex. R, PETERSON000025-PETERSON000027.
[343] *See id.*
[344] *See id.*
[345] *Id.*



---

[346] *See id. See also id.*, PETERSON000030-PETERSON000031.

[347] *Id.*, PETERSON000080-PETERSON000082.

[348] *Id.*

[349] *See id.*, PETERSON000038-PETERSON000042 and PETERSON000043-PETERSON000045.

[350] *Id.*, PETERSON000046-PETERSON000047.

[351] *Id.*

[352] *See id.*, PETERSON000025-PETERSON000027.



---

[353] *Id.*, PETERSON000065-PETERSON000066.
[354] *See id.*, PETERSON000093-PETERSON000094.
[355] *See id.*, PETERSON000100.
[356] *See id.*, PETERSON000102-PETERSON000104.
[357] *See* Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶¶ 41, 44-45.
[358] *Id.* ¶ 45.
[359] *Id.* ¶ 46.
[360] *See id,* ¶¶ 46-47.



### g.    Request for Damages

Plaintiffs request, and I recommend, that the Court award him $10 million, less than the $15 million awarded to plaintiff Noam Rozenman in *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 265, 276 (D.D.C. 2003). Mr. Rozenman's injuries were noted to be particularly severe because of his many shrapnel-caused entry wounds and burns, increased wounding due to chemicals in his body released from the bomb, damage to his leg which necessitated a steel plate

---

361 *See id.* ¶ 50.
362 *Id.*
363 *Id.*
364 *Id.* ¶ 54.
365 *Id.*
366 *Id. See also* Ex. R, PETERSON000185-PETERSON000190.
367 Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 58.
368 *Id.*

and resulted in a permanent limp, nerve damage in his left leg and right hand, and permanent PTSD which prevented him from appearing at trial. Mr. Rozenman spent six weeks in a hospital, followed by two weeks in a rehabilitation center learning to walk on crutches, and then attended physical and occupational therapy for an additional month. *See id.* at 267. Many of these injuries were also suffered by Mr. Peterson, but in exacerbated form.

Mr. Peterson spent nearly a year as an inpatient and outpatient at Walter Reed, during which was in "in agony" the entire time, even with a morphine drip.[369] He underwent over thirty surgeries on the multiple parts of his body that had been injured during the attack, including his left arm and hand, which were riddled with fractures[370] and deep lacerations necessitating a blood transfusion and severed artery repair (without pain medication because he had lost too much blood),[371] and resulting in a brachial plexus disorder. His soft tissue injuries to his left hand were so severe that the hand had to be "sewn to my hip for a month using a groin flap."[372] His left wrist continues to be immobile because of the bone that was "blown away" from the site.[373] The knuckles under his right thumb and pointer fingers were also "completely blown off by shrapnel" and those fingers "do not function" and cause Mr. Peterson arthritic pain.[374] His injured right foot, which required multiple bone fusions and hardware for years after the attack to keep it intact, causes him "sharp stabbing pain" daily and often nightly. His gait has changed as a result, which causes him neck, knee and hip pain, on top of the pain he suffers from his injuries to his knees from the blast.[375]

---

[369] Ex. Q, Declaration of Terrance Peterson, dated August 7, 2024, ¶ 32.
[370] *See id.*
[371] *See id.* ¶ 27.
[372] *Id.* ¶ 32.
[373] *Id.*
[374] *Id.* ¶ 33.
[375] *See id.* ¶¶ 33-34, 39, 48.

Mr. Peterson's TBI caused him "unrelenting headaches" which decreased temporarily but recently "came back with force," presenting every day,[376]



This explains why I recommend that the Court grant Plaintiffs' request and award $10 million for Terrance Peterson, III, corresponding to the highest end of the range of awards for Category 3 victims who sustained mild TBI with psychological injuries with severe shrapnel/fractures/orthopedic injuries.

| **Category 3** | Mild TBI with psychological injuries (with severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million<br>Range: $4 - $10 million |
| --- | --- | --- |

### 2.    Economic Loss Claim

Mr. Peterson seeks compensation for economic losses in the form of lost wages, benefits, and retirement pay. *See* 28 U.S.C. § 1605A(c) ("damages may include economic damages"). To support his claims for these economic losses, Plaintiffs submit an expert report prepared by L. Wayne Plumly, Jr., Ph.D.[383]

---

[376] *Id.* ¶ 40.
[377] *See id.* ¶¶ 40, 55.
[378] *See id.* ¶ 55.
[379] *See id.* ¶ 56.
[380] *See id.* ¶ 38.
[381] *See id.* ¶ 41.
[382] *Id.* ¶ 54.
[383] *See* Ex. Y, Appraisal of Present Value of Economic Life on Terrance Peterson III, dated August 18, 2024, prepared by L. Wayne Plumly, Jr., Ph.D.

To project Mr. Peterson's future income stream if not for the attack, Dr. Plumly incorporated testimonial evidence that Mr. Peterson wished to pursue a 20-year military career and overlaid that information against statistical data generated by the Bureau of Labor Statistics ("BLS"), military pay websites, and other sources.[384] From these sources, Dr. Plumly calculated the present value of Mr. Peterson's lost income, assuming that Mr. Peterson, who was 23.39 years old when he was injured, (1) would have remained in the military for 20 years; (2) had a life expectancy of 77.13 years; (3) would have received an annual military pension of $56,595.08, adjusted annually by 2.775%, the average annual percent change in the Employment Cost Index; (4) would have obtained employment after his military service as a CIA case officer with an annual salary of $107,590, adjusted annually by 3.215%, the percentage change in the Average Hourly Earnings of Production and Nonsupervisory Workers; and (5) would have begun collecting Social Security Retirement ("SSR") benefits at age 67, which would have maximized his return.[385] Dr. Plumly then adjusted these income figures for taxes and consumption, adjusted the SSR benefits for inflation, and adjusted the total lost earnings, pension benefits, and SSR benefits to present value at a rate of 3.39%, the average yield of 30-year Treasury Bonds for the relevant period.[386]

Dr. Plumly then deducted from that income stream of $5,807,455.14 (present value of past net annual income plus the present value future net annual income) what Mr. Peterson actually earned and will continue to earn as a civilian since his attack, as his "injuries prevented me from continuing my service, and after a lengthy hospitalization and rehabilitation period, I separated from the Army on July 26, 2008, as a Captain (O3)."[387] Dr. Plumly calculated his salaries from his various jobs from July 2010 to February 2017 (including as a gun range instructor and in

---

[384] See id. at 3-4.
[385] See id.
[386] See id. at 4-5.
[387] Ex. X, Economic loss declaration of Terrance Peterson III, dated May 9, 2023, ¶ 7.

construction), and his current and future annual salary of $104,000 in his position as a border patrol agent in Arizona, adjusted annually by 3.215%. Dr. Plumly adjusted those amounts for taxes and consumption as well.[388] The difference is $548,153.33.  Plaintiffs request, and I recommend, that the Court award this amount for Mr. Peterson's economic loss claim.[389]

### C.    JAMES GMACHOWSKI – OCTOBER 22, 2006, ATTACK - BAGHDAD

On October 22, 2006, Private First Class ("PFC") (Ret.) Tyler Norager and Staff Sergeant ("SSG") (Ret.) James Gmachowski, then a Private Second Class ("PV2"), were conducting a mounted patrol along Route Florida as part of a four-vehicle convoy from the 1st Battalion, 26th Infantry Regiments, 2nd Battalion, 1st Infantry Division when the lead vehicle was struck on the passenger side by an EFP. The attack injured PV2 Gmachowski and PFC Norager and killed two others. *See* 656 F. Supp. 3d at 42. The Court found sufficient evidence in the record to conclude that the explosive used om the attack was a multi-array, precision-manufactured EFP "likely assembled and emplaced" by an IRGC-sponsored Special Group," and that "Iran, acting through its proxies, was responsible for the October 22, 2006 EFP attack on U.S. forces." *Id.*

SSG (Ret.) James Gmachowski suffered severe physical and mental anguish and extreme emotional pain and suffering as a result of the October 22, 2006, attack, and submits claims for assault, battery, and IIED, as well as an economic loss claim. The following chart reflects the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Gielchinsky Decl.[390]

| Plaintiff | Claim(s) Asserted | Evidence | Exhibit |
|-----------|-------------------|----------|---------|
| James Gmachowski | IIED, Assault, Battery | Copy of James Gmachowski's birth certificate | Z |

---

[388] *See* Ex. Y, Appraisal of Present Value of Economic Life on Terrance Peterson III, dated August 18, 2024, prepared by L. Wayne Plumly, Jr., Ph.D, at 4-5.
[389] *See id.* at 5-6.
[390] Plaintiffs plan to submit evidence in support of Mr. Norager's claim at a later date.

| | $10 million | Declaration of James Gmachowski, dated August 28, 2023 | AA |
|---|---|---|---|
| | | James Gmachowski's Military Records: DD214 and Enlisted Record Brief | BB |
| | | Medical record excerpts from the following facilities: 28th Combat Support Hospital, Iraq, Landstuhl Regional Medical Center, Landstuhl, German, Martin Army Community Hospital, Walter Reed National Military Medical Center, Fort Belvoir Community Hospital, VA Ratings Decision, March 14, 2016. | CC |
| | Economic Loss Claim $2,675,719.90 | Economic loss declaration of James Gmachowski, dated July 26, 2023 | DD |
| | | Appraisal of Present Value of Economic Life of James Gmachowski, dated July 21, 2024, prepared by L. Wayne Plumly, Jr., Ph.D. | EE |

### 1.      Assault, Battery, and Intentional Infliction of Emotional Distress Claim

#### a.      James Gmachowski's Background

James Gmachowski was born in Castro Valley, California, on March 26, 1987. His interest in joining the military began at a very early age. Both of his grandfathers and step-grandfathers had served in World War II and Vietnam, and other family members could trace their military service as far back as the Civil War. Early on, he felt that military service was very much in his "blood" and he "never considered doing anything else" with his life.[391]

During his sophomore year in high school, he met with a military recruiter and enlisted the summer prior to his senior year. While at Fort Benning, Georgia, for Basic Training, Mr. Gmachowski found his stride. Although he found Basic Training to be grueling, he enjoyed every minute and "got into the best shape" of his life.[392]

---

[391] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶¶ 2, 10.
[392] Id. ¶¶ 10-11.

In February 2006, Mr. Gmachowski was sent to Germany for what was supposed to be a year of training. Instead, he was deployed to Iraq only six months later in August 2006.[393] However, he was grateful to learn that a servicemember he had trained with in Germany, Sergeant ("SGT") Willsun Mock, was going to be his unit's Squad Leader in Iraq. Mr. Gmachowski respected SGT Mock as a leader and considered him a close personal friend.[394]

On the morning of October 22, 2006, Mr. Gmachowski's unit, Company C, 1st Battalion, 26th Infantry, was traveling in Baghdad in the vicinity of Forward Operating Base Loyalty when the vehicle he was driving was hit by a multi-array EFP.[395] Mr. Gmachowski, at the time a PV2,[396] described "the noise the bomb made as it exploded" as "deafening." He stated: "At first, I was unaware that I had been physically injured but then I had trouble breathing and my arm felt weird. I was in shock."[397] When he regained his bearings, Mr. Gmachowski was able to observe the others in his vehicle, whose condition he described as follows: "my close friend Mock, our Squad Leader, [was] spitting up blood"[398]; their gunner had collapsed and their interpreter who had been sitting behind SGT Mock "had been killed instantly and his brains were splattered everywhere."[399] Another servicemember who had been sitting next to the interpreter was no longer in the vehicle[400] and Mr. Gmachowski later learned that he had been able to escape the vehicle.[401] The remaining servicemembers were evacuated for treatment, but SGT Mock – Mr. Gmachowski's close friend and mentor – died in the bed right next to his before the doctors even had a chance to operate.[402]

---

[393] *Id.* ¶ 12. *See also* Ex.BB, DD214, dated January 7, 2016.
[394] *See* Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 14.
[395] *Id.* ¶¶ 4-5.
[396] *See* Ex. BB, Enlisted Record Brief.
[397] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 15.
[398] *Id.* ¶ 16.
[399] *Id.*
[400] *See id.*
[401] *Id.*
[402] *See id.* ¶ 18.

Although he would go on to deploy to Iraq twice more, in 2007 and 2010-2011, Mr. Gmachowski's injuries and his struggle with the TBI that resulted from the October 22, 2006, attack continued to impact his life and career, and in February 2016, he medically retired from service.[403]

### b.      Injuries at Point of Attack and Attack Aftermath

Mr. Gmachowski was evacuated to the nearest aid station after the attack and flown by helicopter 45 minutes later to the Combat Support Hospital ("CSH") in Baghdad, where he remained for six days.[404] His initial medical records describe his physical injuries as including a severe shrapnel injury to his right latissimus dorsi muscle, a large muscle in the back whose primary function is to move the upper extremities, along with a third-degree full thickness burn.[405]

He was also experiencing TBI symptoms and received a Glasgow Coma Scale score of 15 as reflected on his initial Trauma Record.[406] According to Dr. Gore, the Glasgow Coma Scale, or "GCS," measures the "patient's functioning in three areas at the time of the injury: (1) verbal response, (2) eye opening, and (3) motor response. These variables quantify the victim's level of consciousness and ability to interact verbally and physically with medical personnel at the time of the initial assessment post injury."[407] The GCS thus indicates the level of initial severity of the TBI.[408] As Dr. Gore noted in his report, "[a] GCS score of 13 or higher correlates with a mild brain injury."[409] Mr. Gmachowski's TBI screen in Baghdad was due to his reporting concussive

---

[403] *See* Ex. BB, DD214, dated January 7, 2016. *See also* Ex. CC, GMACHOWSKI000805-GMACHOWSKI000827.
[404] *See* Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 17.
[405] *See* Ex. CC, GMACHOWSKI000002-GMACHOWSKI000005 and GMACHOWSKI000008-GMACHOWSKI000009. *See also id.*, GMACHOWSKI000505 and GMACHOWSKI000809-GMACHOWSKI000811.
[406] Ex. Q, GMACHOWSKI000001.
[407] Ex. K, Medical Expert Report dated November 23, 2018, by Dr. Russell Gore, *Karcher*, PX-161 at 39.
[408] *Id.*
[409] *Id.* at 40.

symptoms: "I was confused and my head was pounding, and I felt dizzy and nauseous."[410] He reported that the explosion had occurred approximately 1-2 meters from his vehicle.[411]

Although the shrapnel was surgically removed at the Baghdad CSH, Mr. Gmachowski continued to experience pain in his midback and neck on the right side.[412] Records from the CSH note a "significant amount of muscle and joint tightness" as well as a "1.5 by 2.5 inch burn area."[413] He described how after his shrapnel was removed, he was released to transitional care; however, during a routine checkup the next morning, the chief medical officer noted the severity of his burn and ordered Mr. Gmachowski to be transferred back to the CSH immediately. The following day, "the burnt tissue along with a large piece of my right latissimus dorsi muscle was removed leaving a hole in my back the size of a grapefruit."[414]

Due to the severity of Mr. Gmachowski's wound, he was scheduled for transfer to Landstuhl Regional Medical Center in Landstuhl, Germany. While he was awaiting transfer, a memorial service was held for his commander and friend, SGT Mock, but he was unable to attend due to his injuries—something he deeply regrets.[415]

After being transferred to Landstuhl, Mr. Gmachowski underwent a further TBI screen. On this TBI screen, he indicated that he had felt dazed after the explosion and was experiencing anxiety and irritability. He was assessed as having a positive TBI screen and recommended to follow up with neurology and behavioral health.[416]

Just weeks after the attack, in November 2006, Mr. Gmachowski was diagnosed with sensorineural hearing loss. He had suffered bilateral tinnitus right after the blast, and noted that

---

[410] Ex. R, Declaration of James Gmachowski, dated August 28, 2023, ¶ 20.
[411] Ex. CC, GMACHOWSKI000040-GMACHOWSKI000043.
[412] *See id.*, GMACHOWSKI000002-GMACHOWSKI000005.
[413] *Id.*
[414] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶¶ 21-22.
[415] *See id.* ¶ 23.
[416] *See* Ex. CC, GMACHOWSKI000006-GMACHOWSKI000007.

even weeks later, he was having difficulty making out words. Audiometry testing showed mild to moderate high frequency hearing loss in his right ear compared to a prior exam in March 2006.[417]

While at Landstuhl, Mr. Gmachowski continued to experience pain in the right shoulder area and was prescribed Oxycodone. His medical record from October 30, 2006, notes an open wound of 10 cm x 4 cm in size.[418] He underwent repeated dressing changes for the open wound on his right side between October and November 2006[419]; however, the site was noted as having "purulent discharge" during a dressing change on November 2, 2006.[420] He indicated that due to the size of his wound, he required assistance with various ADLs (Activities of Daily Living) for approximately one month including packing, bathing, and pulling on clothing.[421]

By January 2007, Mr. Gmachowski was still experiencing pain in his right shoulder area with certain movements, and he was referred for a physical therapy consult.[422] During a physical therapy evaluation on January 22, 2007, he reported tightness or stiffness in the area of his shrapnel injury and pain with moderate to heavy lifting. He was given a home exercise program, and it was assessed that he would be able to "return to downrange without restrictions."[423] Two days later, he reported improvement in his pain, but a continued sensitivity in the area of the injury.[424]



[417] *See id.*, GMACHOWSKI000021-GMACHOWSKI000023. *See also* Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 25.
[418] *See* Ex. CC, GMACHOWSKI000010-GMACHOWSKI000011.
[419] *See id*, GMACHOWSKI000014-GMACHOWSKI000015, GMACHOWSKI000016, GMACHOWSKI000017, GMACHOWSKI000018, and GMACHOWSKI000019-GMACHOWSKI000020.
[420] *Id.*, GMACHOWSKI000012-GMACHOWSKI000013.
[421] *See id.*, GMACHOWSKI000247-GMACHOWSKI000253.
[422] *See id.*, GMACHOWSKI000024-GMACHOWSKI000025.
[423] *Id.*, GMACHOWSKI000026-GMACHOWSKI000028.
[424] *See id.*, GMACHOWSKI000029-GMACHOWSKI000030.
[425] *Id.*, GMACHOWSKI000031-GMACHOWSKI000032.
[426] *See id. See also* Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 24.



[427]

[428]

[429]

### c.    James Gmachowski's Traumatic Brain Injury

As noted above, Mr. Gmachowski experienced TBI symptoms immediately after the attack and indicated that the explosion had occurred approximately 1-2 meters from his vehicle.[430] His Trauma Record after the attack indicated a Glasgow Coma Scale score of 15, confirming a mild TBI.[431]

Mr. Gmachowski returned to Iraq for his deployment on March 26, 2007.[432]



[433]

[434]

[435]

---

[427] *See* Ex. CC, GMACHOWSKI000029-GMACHOWSKI000030 and GMACHOWSKI000031-GMACHOWSKI000032.

[428] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 24.

[429] *Id.*

[430] *See id.* ¶ 20; *see also* Ex. CC, GMACHOWSKI000040-GMACHOWSKI000043.

[431] *See id.*, GMACHOWSKI000001.

[432] *See* Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 29.

[433] *Id.* ¶ 30.

[434] *Id.*

[435] *See* Ex. CC, GMACHOWSKI000038-GMACHOWSKI000039.

### i.      TBI and Headache Syndrome

Dr. Russell Gore explained in his report that since EFPs are "designed so that their blast waves are even stronger and more focused than those caused by other types of IEDs,"[436] they can "result in particularly devastating cases of TBI."[437] As Dr. Gore noted, persistent headaches are a major indicator of TBI, along with "cognitive deficits, balance and vestibular disorders, visual and auditory deficits, psychiatric symptoms, sleep disruption and chronic pain."[438]

Mr. Gmachowski experienced headaches multiple times a week following the October 22, 2006, attack, which have still not resolved to this day.[439] He described suffering multiple concussions from playing football in high school but indicated that those injuries did not cause him the type or frequency of headaches he has suffered from since the attack.[440]

After the completion of his 2007 deployment, Mr. Gmachowski reported: "I also continued having debilitating ongoing headaches three-five days a week. There were times when the pain was so bad it felt like someone was stepping on my head. I took Topiramate and received Botox injections."[441] These headaches persisted. Mr. Gmachowski reported during a TBI evaluation on June 13, 2008, that he was having headaches 1-2 times per week in his temporal-parietal area on both sides, which felt clamp-like and sharp. He described his average headache pain level as being 4-5 out of 10, with escalation to a level of 8-9 at times. His headaches often resolved with Ibuprofen which he was taking on average twice a week. He also acknowledged having some short-term memory loss, insomnia and nightmares.[442]

---

[436] Ex. K, Medical Expert Report dated November 23, 2018, by Dr. Russell Gore, *Karcher*, PX-161 at 5.
[437] *Id.*
[438] *Id.* at 49.
[439] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 45.
[440] *See* Ex. CC, GMACHOWSKI000239-GMACHOWSKI000246.
[441] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 31.
[442] *See id.*, GMACHOWSKI000040-GMACHOWSKI000043.

Mr. Gmachowski was diagnosed with mild TBI in June 2008, with loss of consciousness under one hour (Glasgow Coma Scale was 13-15) and post traumatic amnesia (under 24 hours), headache syndrome, secondary insomnia, tinnitus, and hearing loss. ██████████ ████████████████████████████ and advised to follow up with the audiology and TBI clinic.[443]

A subsequent neurological evaluation for his headaches in August 2009 indicated that he was suffering from chronic mild headaches with a pain level of 5 out of 10 (or less) that occurred five days a week. During the course of this evaluation, Mr. Gmachowski claimed that he'd had exposure to multiple blasts including the one on October 22, 2006; however, his headaches began occurring in 2006-2007. These headaches were still ongoing and generally peaked during the day and faded before bedtime. He noted that his bad headaches had been occurring more frequently over the past 3-4 months and various medications including Naproxen and Migranal had not helped. He differentiated between his mild headaches which he described as pressure pain and his bad headaches which he described as "vice-like and throbbing"[444] with a duration of several hours. He noted some blurry vision during these headaches.[445] A brain CT was ordered, and he was prescribed Indocin (NSAID used for pain) several times a day, and Midrin (used to treat headaches) to be taken at headache onset.[446]

Mr. Gmachowski underwent a subsequent MRI of his brain on August 20, 2012, but the MRI showed no acute intracranial findings.[447] A repeat brain MRI on August 29, 2013, also showed no abnormality.[448] (Dr. Gore testified that the injuries to the brain's white matter caused

---

[443] *See id.*
[444] *Id.*, GMACHOWSKI000047-GMACHOWSKI000049.
[445] *See id.*
[446] *See id.*
[447] *See id.*, GMACHOWSKI000800-GMACHOWSKI000801.
[448] *See id.*, GMACHOWSKI000239-GMACHOWSKI000246.

by mild TBI are generally not diagnosable even using state-of-the-art imaging.[449]) In 2013, Mr. Gmachowski sustained another blow to the head during a workout which resulted in further exacerbation of his headaches.[450] He continued to report tension-type headaches in 2014 twice a week,[451] and by 2015, Mr. Gmachowski was scheduled for Botox injections for his headaches, and prescribed Maxalt 10 mg at migraine onset.[452] He was cautioned to avoid regular use of Fioricet (a combination of acetaminophen, Butalbital and caffeine used to treat tension headaches) in order to prevent rebound headaches.[453]

When Mr. Gmachowski was again evaluated for migraine headaches on April 7, 2015, he described how since the attack in 2006, his headaches had been occurring multiple days per week and were resistant to medication. He listed the trial medications he had been prescribed previously, including Pamelor, Imitrex, Midrin and Indocin, but reported that he had no relief from any of these medications. He reported that his current headaches occurred 3-4 times per week and lasted 2-6 hours with a peak intensity level of 8 out of 10. His headaches were located in his suboccipital, bi-temporal areas (back of the head and in the temple area on both sides) and included photo or phonophobia, nausea, fatigue, and irritability.[454]

On February 15, 2016, Mr. Gmachowski was granted a 30% Service-Connected Disability Rating by the VA for "headaches with photophobia (claimed as headache syndrome and light sensitivity)."[455]

---

[449] *See* Ex. M, Testimony by Dr. Russell Gore in the *Karcher* trial T4- 10:22-11:1.
[450] *See* Ex. CC, GMACHOWSKI000064-GMACHOWSKI000065.
[451] *See id.*, GMACHOWSKI000218-GMACHOWSKI000222.
[452] *See id.*, GMACHOWSKI000239-GMACHOWSKI000246.
[453] *See id.*
[454] *See id.*
[455] *Id.*, GMACHOWSKI000806, GMACHOWSKI000812.

He continued having Botox injections to help control his chronic migraines. During this period, he was on many different medications, including:[456]

- Ondansetron (for nausea);
- Butalbital/acetaminophen/caffeine (used to relieve tension headaches) up to every 6 hours but no more than 2 days per week;
- Topiramate twice a day (for migraines);

- Methocarbamol (used to treat muscle spasms) up to twice a day;
- Meloxicam (nonsteroidal anti-inflammatory) daily;
- Pantoprazole (antacid) daily;
- Cetirizine daily (for allergies); and
- Rizatriptan (for migraines).

To this day, Mr. Gmachowski's headaches have not resolved.[457]

### ii. Insomnia

Dr. Gore noted in his expert report the correlation between TBI and sleep disorders:

> TBI, including mild and moderate/severe injuries, is associated with long-term disability and increased risk for developing other associated disabling conditions. These disabilities may result in profound impairment of physical and mental function, psychosocial and emotional dysfunction, high-level neurobehavioral dysfunction such as executive dysfunction and memory deficits, chronic disruption of sleep, increased risk of substance abuse or other self-destructive behaviors, and increased risk of suicide.[458]

Additionally, per Dr. Gore, "blast TBI" symptoms can "overlap with symptoms of psychiatric and sleep disorders. Complicating the picture after exposure to a blast injury is the

---

[456] *See id.*, GMACHOWSKI000264-GMACHOWSKI000266.

[457] *See* Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 45.

[458] Ex. K, Medical Expert Report dated November 23, 2018, by Dr. Russell Gore, *Karcher*, PX-161 at 47.

association between blast TBI, combat related stress disorders, and injury to primary sensory functions commonly associated with blast exposures."[459]

Mr. Gmackowski's battle with insomnia and nightmares began shortly after his attack. As he described in his declaration, shortly after leaving Landstuhl, he had "trouble falling asleep and when I did, I had nightmares and reliving every minute of the attack in my dreams. I was prescribed Ambien to help me sleep at the clinic in Schweinfurt where I was receiving wound care. I stopped taking Ambien shortly after I started because I hated how it made me feel groggy, tired, and unable to function."[460]

On November 10, 2007, Mr. Gmachowski underwent a Combat Operational Response Assessment, during which he reported difficulty going to sleep, insomnia, and nightmares of the attack. He indicated that he could recall every minute of the of day of the attack and had ongoing nightmares of "the moment." He reported that he tried Trazodone but did not like the side effects of the medication.[461]

As noted above, Mr. Gmachowski's June 13, 2008, TBI evaluation at Martin Army Community Hospital included self-reported issues with insomnia and nightmares twice a month. The evaluator noted that that he'd stated that he awakened from these nightmares "kinda scared." Prior medications included Ambien and Trazodone, but Mr. Gmachowski had indicated that he had experienced no relief with Ambien, and that Trazodone had left him feeling hungover.[462] Mr. Gmachowski reported that these issues continued to plague him in 2011: "Five years had passed,

---

[459] *Id.* at 49.
[460] *See* Ex. AA, Declaration of James Gmachowski., dated August 28, 2023, ¶ 24.
[461] Ex. CC, GMACHOWSKI000033-GMACHOWSKI000034.
[462] *Id.*, GMACHOWSKI000040-GMACHOWSKI000043.

and I remained stuck. The nightmares and flashbacks about the attack continued to affect my sleep and part of my waking hours."[463]

As of April 2013, Mr. Gmachowski was still grappling with sleep issues and was referred by the TBI clinic to the Walter Reed Sleep Clinic for an evaluation. During his assessment, he mentioned that although he attempted to go to bed early, he still had difficulty initiating sleep. He added that sometimes he was awakened by dreams or night sweats and other times talked in his sleep. He was assessed as having "delayed phase sleep syndrome" and Melatonin was recommended to help his sleep schedule.[464]

In November 2014, Mr. Gmachowski returned to the Walter Reed Sleep Clinic for a reassessment of his sleep issues. He noted that his sleep issues developed after his deployment, and that he relied on Ambien to help him sleep since without the medication, he would awaken 2-5 times nightly. He stated that his wife had witnessed apneas (suspension of breathing during sleep) and was concerned about his sleep. ███████████████████████████[465]



Additionally, Mr.

[463] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 37.
[464] Ex. CC, GMACHOWSKI000066-GMACHOWSKI000068.
[465] Id., GMACHOWSKI000195-GMACHOWSKI000203.
[466] Id.
[467] See id.
[468] Id.

Gmachowski was diagnosed with a "REM sleep disorder" which was noted to have possibly originated from his TBIs.



469

470

471

472                                                                                        473

### iii.    Tinnitus and Hearing Loss

As noted above, Mr. Gmachowski experienced bilateral tinnitus following the attack and was diagnosed with sensorineural hearing loss in November 2006, with his right ear showing a mild to moderate frequency hearing loss compared to a prior exam in March 2006.[474] As Dr. Phelps explained in his expert report, "the typical high energy blast wave generated by an EFP very often imparts more than sufficient force to cause TBI that result in both short-term and long-term

---

[469] *Id.*
[470] *See id.*, GMACHOWSKI000612-GMACHOWSKI000614, GMACHOWSKI000623.
[471] *Id.*, GMACHOWSKI000254-GMACHOWSKI000258.
[472] *See id.*
[473] *See* Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 45.
[474] *See* Ex. CC, GMACHOWSKI000021-GMACHOWSKI000023.

impairments."[475] These "blast-exposed"[476] patients suffering from mild TBI can experience a variety of symptoms including "severe unrelenting headaches, ear pain, tinnitus, seizures, dizziness, nausea, vomiting, gait and balance problems, visual disturbances, slurred speech, disorientation, irritability, depression, confusion, extremity weakness and numbness, along with cognitive deficits affecting memory, concentration, and attention – sometimes for several months or more."[477] Dr. Russell Gore noted that depending on the area of the brain injury symptoms of TBI can include "neuro-sensory losses, and loss of higher-level functions such as balance, coordination, memory, and emotional deficits and even personality changes."[478]

In August 2008, Mr. Gmachowski received a SPRINT examination (Speech Reception In Noise Test) due to his reporting bilateral hearing loss and difficulty understanding speech in the presence of background noise. His score was in the 67th percentile and he was advised to change his MOS (Military Occupational Specialty) if he chose to remain on active duty.[479] During the assessment it was noted that he was experiencing tinnitus periodically in both ears.[480]

Mr. Gmachowski's tinnitus again became an issue in August 2012 when he reported a "thumping" or "ringing"[481] in his right ear along with a slight hearing loss and a sensation of pressure "as if something is sitting on [the] ear drum."[482] He noted that this sensation was also accompanied by a pressure headache that he described as feeling as if "someone is stepping on my head."[483] He reported that this current issue had been ongoing since June 2012, and added that he

---

[475] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 20.
[476] *Id.* at 20-21.
[477] *Id.* at 21.
[478] Ex. K, Medical Expert Report dated November 23, 2018, by Dr. Russell Gore, *Karcher*, PX-161 at 45.
[479] *See* Ex. CC, GMACHOWSKI000044-GMACHOWSKI000046.
[480] *See id.*
[481] *Id.*, GMACHOWSKI000054-GMACHOWSKI000058.
[482] *Id.*
[483] *Id.*

experienced some unsteadiness at times as well.[484] He also reported high-pitched ringing in both ears.[485] His records from these visits at the Kimbrough Ambulatory Care Center Practice and the Otolaryngology clinics note his exposure to an explosive injury and prior diagnoses of TBI.[486]

Due to the issue in his right ear, an MRI was ordered, and results were normal. Mr. Gmachowski was given a course of steroids to ascertain if that would help the condition and was assessed as having tinnitus with stapedial spasms (spasms in the middle ear that contract causing a thumping, clicking or fluttering sound).[487]

By April 2013, his H1 (auditory fitness for duty assessment of mild impairment) hearing loss profile from November 27, 2006, was updated to H2 (auditory fitness for duty assessment of moderate impairment), indicating moderate high frequency sensorineural bilateral hearing loss.[488]

In mid-November 2014, Mr. Gmachowski was again re-evaluated for bilateral hearing loss and constant ringing in both ears. He stated that he was having difficulty hearing his spouse and child from other parts of the house and difficulty hearing in settings with high background noise, such as restaurants. He was also suffering with bothersome tinnitus. Comprehensive audiometry showed mild to moderate to severe mid and high frequency sensorineural hearing loss in both ears, and his fitness for duty hearing profile was updated to H3 (worst of the hearing profile assignments and potentially disqualifying).[489] A month later he was fitted with hearing aids.[490]

e.    **James Gmachowski's Chronic Pain Syndrome**

Mr. Gmachowski's musculoskeletal pain was compounded by pain from his original injury and burn site. Immediately after the attack, he began complaining of back pain in his midback and

---

[484] *See id.*, GMACHOWSKI000059-GMACHOWSKI000061.
[485] *See id.*
[486] *See id.*
[487] *See id.*, GMACHOWSKI000062-GMACHOWSKI000063.
[488] *See id.*, GMACHOWSKI000069-GMACHOWSKI000072.
[489] *See id.*, GMACHOWSKI000204-GMACHOWSKI000207.
[490] *See id.*, GMACHOWSKI000215-GMACHOWSKI000217.

lower back regions, accompanied by bilateral spasms (on both sides of his back).[491] He was prescribed Naproxen for the pain and Cyclobenzaprine for the spasms.[492]

He was diagnosed with cervicalgia (neck pain) in January 2011 and referred to physical therapy for several sessions.[493] On September 8, 2011, Mr. Gmachowski reported right upper back numbness as well as numbness and tingling in his right thumb and index finger. He received trigger point dry needling for the pain and was again referred to physical therapy.[494]

Chronic pain particularly in the area proximate to his injury continued to be an issue, and nearly a year later in August 2012, he complained of a "constant nagging"[495] pain in the area just above his scapula.[496] He was prescribed Baclofen for the right shoulder muscle spasm and Mobic (NSAID used in treatment of pain and inflammation) and was again referred for physical therapy.[497]

Mr. Gmachowski's back and neck pain continued into 2014 and included some tingling in his right hand.[498] While at the Fort Belvoir COOPH (Co-Occurring Partial Hospitalization Program), it was recommended that he have BFA (Battlefield Acupuncture) for the upper back "stabbing" pain that he had endured for seven years since the attack. He reported an average pain level of 4 out of 10, increased at times to 7 out of 10.[499] ████████████████

████████████████████████████████████████

████████████████████████████████████ [500]

---

[491] *See id.*, GMACHOWSKI000035-GMACHOWSKI000037.
[492] *See id.*
[493] *See id.*, GMACHOWSKI000050-GMACHOWSKI000051.
[494] *See id.*, GMACHOWSKI000052-GMACHOWSKI000053.
[495] *Id.*, GMACHOWSKI000054-GMACHOWSKI000058.
[496] *See id.*
[497] *See id.*
[498] *See id.*, GMACHOWSKI000131-GMACHOWSKI000134.
[499] *Id.*, GMACHOWSKI000150-GMACHOWSKI000152.
[500] *See id.*

His physical therapy record dated December 9, 2014, noted chronic right shoulder and neck pain since his October 22, 2006, attack, adding that though the injury had healed, the right latissimus area "remains very painful and sensitive to this day."[501]

By January 2015, Mr. Gmachowski began receiving regular trigger point injections to relieve his right upper back pain. He reported a pain level of 4-5 out of 10 and indicated that the pain interfered with his sleep, emotions, concentration, and recreational activities. He stated that he had tried physical therapy with some success, and had also tried using a TENS unit, as well as other therapies including chiropractic, acupuncture, massage. He had also tried medications including Percocet and was currently taking Mobic.[502] An MRI of his thoracic spine showed mild degenerative disk disease in the lower thoracic spine. His pain management physician indicated that his pain was "likely myofascial" but she could not rule out referred pain from the cervical spine.[503]

Subsequent records from February and March 2015 confirmed that Mr. Gmachowski's neck pain included "facetogenic, discogenic and myofascial sources"[504] and a lower back pain source of "sacroiliitis"[505] that was also of "myofascial origin."[506] His March 3, 2015, physical therapy record included a diagnosis of "myofascial pain syndrome."[507] In his discussion of EFP-related complications, Dr. Phelps explained that "musculoskeletal injuries will typically result in myofascial pain, a chronic condition that affects the fascia (connective tissue that covers the muscles)." Dr. Phelps noted that "myofascial pain is common among service members with

---

[501] *Id.*, GMACHOWSKI000223-GMACHOWSKI000228.
[502] *See id.*, GMACHOWSKI000229-GMACHOWSKI000233.
[503] *Id.*
[504] *Id.*, GMACHOWSKI000234-GMACHOWSKI000237. *See also id.*, GMACHOWSKI000238 and GMACHOWSKI000828-GMACHOWSKI000833.
[505] *Id.*
[506] *Id.*
[507] *Id.*, GMACHOWSKI000238.

polytrauma and is characterized by muscular pain associated with trigger points,"[508] and added that "shoulder pain can be especially problematic as there is a high prevalence of myofascial trigger points in the shoulder girdle muscle of patients who have sustained traumatic shoulder injuries."[509] Thus, myofascial shoulder pain can cause issues with "proper sleep hygiene but also may be a primary source of sleep disturbances due to constant myofascial triggering when the patient lies recumbent."[510]

In his responses to the Oswestry Disability Index, a questionnaire used to ascertain how back pain has impacted a patient's ability to function, Mr. Gmachowski indicated that he was sleeping less than 6 hours per night due to the pain.[511] Since he indicated that Baclofen and Flexeril had not been effective, he was prescribed a trial of Robaxin which has anti-spasmodic properties. He noted that he was also taking Meloxicam (commonly referred to as Mobic, it is a NSAID used to treat inflammation and pain) with some relief. Since he did not receive pain relief from the trigger point injections, a diagnostic right-sided SIJ (sacroiliac joint) injection was scheduled.[512]

Mr. Gmachowski's myofascial pain issues continued and in August 2015 he received an LESI (lumbar epidural steroid injection) for lower back pain with significant relief. For his continuing upper back pain, he received osteopathic manipulation—a treatment which was recommended that he continue due to his chronic pain.[513] This pain has not relented.[514]

Mr. Gmachowski's VA Decision Rating from 2016 noted muscle swelling, loss of deep fascia in the wound area, "ragged, depressed and adherent scars indicating wide damage to muscle

---

[508] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 52.
[509] *Id.*
[510] *Id.*
[511] *See* Ex. CC, GMACHOWSKI000697.
[512] *See id.*, GMACHOWSKI000234-GMACHOWSKI000237.
[513] *See id.*, GMACHOWSKI000259.
[514] *See* Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 45.

groups," some loss of muscle substance, and visible atrophy.[515] Additionally, it was noted that "tests of endurance compared with the corresponding muscles of the uninjured side indicate severe impairment of function."[516]

### f.    James Gmachowski's Polypharmacy and Side Effects

Dr. Phelps provided the World Health Organization's definition of "polypharmacy": "the administration of many drugs at the same time or the administration of an excessive number of drugs."[517] As he noted, polypharmacy in traumatically wounded veterans is common and "increases the likelihood that patients may have significant adverse events and/or various levels of allergic reactions to their medication."[518] Dr. Phelps noted the cumulative effects of "blast-related polytrauma" often generate a "host of other complications,"[519] including among other issues, "immune, cardiovascular, endocrine and central nervous system dysfunction (secondary to chronic opioid medication usage as well as other combined medication)."[520] He further explained that for polytrauma patients, polypharmacy "is frequently unavoidable,"[521] and these patients require close monitoring by case management and "multi-disciplinary treatment teams which specifically include a Doctor of Pharmacy (aka: 'PharmD') who is specially trained in the management of complex medication regimens."[522]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[515] Ex. CC, GMACHOWSKI000809- GMACHOWSKI000811.
[516] *Id.*
[517] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 27 (quoting World Health Organization).
[518] *Id.* at 28.
[519] *Id.* at 26.
[520] *Id.* at 27.
[521] *Id.*
[522] *Id.* at 28.



An April 29, 2015, polypharmacological review again confirmed the diagnosis of chronic PTSD, with additional diagnoses of bruxism (grinding of teeth) and migraine headaches.[525]

Due to his nightmares and insomnia, Mr. Gmachowski was prescribed Clonidine .3 mg and Zolpidem ER. Yet it was noted that he still reported nightmares 3-4 times per week with these medications, though he was sleeping through the night. For his migraine headaches, Mr. Gmachowki's medications included Topiramate 50 mg twice daily for prevention, Maxalt as needed, and occasionally Fioricet.[529] It was noted that he received Botox injections for his headaches which had caused some lessening of his tension headaches but had not yet impacted his

---

[523] *See* Ex. CC, GMACHOWSKI000218-GMACHOWSKI000222.
[524] *See id.*, GMACHOWSKI000254-GMACHOWSKI000258.
[525] *See id.*
[526] *See id.*
[527] *See id.*
[528] *Id.*
[529] *See id.*

migraines.[530]



[531]

[532]

Although Mr. Gmachowski's most recent record from 2022 indicates a significant reduction in his active medications, the number of medications that he had been prescribed since the date of his attack necessitated regular medication management through 2015.[533]

### g.     James Gmachowski's Psychological Injuries

In his expert report, Dr. Phelps noted that polytrauma injuries (multiple traumatic injuries to a wide range of body organs and systems), "particularly those caused by EFPs – significantly complicate the assessment, treatment, recovery, rehabilitation of wounded service members into the civilian world."[534] Moreover, polytrauma encompasses both physical injuries as well as injury "after affects"[535] which can include "post-Traumatic Stress Injury/Disorder ('PTSI/PTSD'), profound sleep disorder, behavioral and psychosocial disturbances (including emotional disassociation, social isolation, depression, psychosis, suicidality/homicidality and substance

---

[530] *See id.*
[531] *See id.*
[532] *See id.*, GMACHOWSKI000260-GMACHOWSKI000263.
[533] *See id.*, GMACHOWSKI000608- GMACHOWSKI000609.
[534] Ex. I, Medical Expert Report dated August 27, 2018, by Dr. Shean Eric Phelps, *Karcher*, PX-160 at 24.
[535] *Id.* at 25.

abuse, etc.).”[536] In his report, Dr. Phelps linked combat-related polytrauma to "significant emotional distress," explaining that veterans with blast exposures report "broader spectrums of physical injury, higher levels of admission and discharge opioid analgesic utilization, reduced improvement in long-term pain intensity and much higher rates of PTSD and other psychiatric diagnoses than in non-blast related combat injured individuals."[537]



The linkage between PTSD and alcohol abuse is well established. According to Dr. Marmar, "AUD" (Alcohol Use Disorder) is a "common co-occurring condition for individuals

[536] *Id.*
[537] *Id.* at 44-45.
[538] Ex. CC, GMACHOWSKI000038-GMACHOWSKI000039.
[539] *Id.*
[540] *See id.*
[541] *Id.*, GMACHOWSKI000040-GMACHOWSKI000043.
[542] *Id.*
[543] *See id.*
[544] *See id.*, GMACHOWSKI000064-GMACHOWSKI000065.
[545] *See id.*, GMACHOWSKI000834-GMACHOWSKI000840.

with PTSD and TBI."[546] Dr. Marmar added that though the most common "treatment"[547] for "those suffering from PTSD, alone or in combination with TBI and MDD, is self-medication with alcohol which may initially alleviate anxiety and depressive symptoms,"[548] alcohol consumption "over time complicates and intensifies the symptoms of PTSD, TBI and MDD."[549] Dr. Marmar pointed out that Iraq and Afghanistan veterans with PTSD and AUD comorbidity are "associated with more severe AUD, poorer treatment response, greater impairment and higher mortality compared to AUD alone, creating an urgent mandate for effective treatments."[550]



---

[546] Ex. N, , Medical Expert Report of Dr. Charles Marmar dated September 15, 2018, *Karcher,* PX-163 at 14.
[547] *Id.*
[548] *Id.*
[549] *Id.*
[550] *Id.* at 15.
[551] Ex. CC, GMACHOWSKI000463-GMACHOWSKI000471.
[552] *Id.*
[553] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 38.
[554] Ex. CC, GMACHOWSKI000073-GMACHOWSKI000074.



[555] *See id.*, GMACHOWSKI000722.
[556] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 38.
[557] *Id.*
[558] *See* Ex. CC, GMACHOWSKI000466.
[559] *See id.*, GMACHOWSKI000465.
[560] *See id.*, GMACHOWSKI000501.
[561] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 39.
[562] *See* Ex. CC, GMACHOWSKI000464- GMACHOWSKI000465.
[563] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 39.



[564] *See* Ex. CC, GMACHOWSKI000464- GMACHOWSKI000465.
[565] *See id.*
[566] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 40.
[567] *See* Ex. C, GMACHOWSKI000721.
[568] *Id.*
[569] *Id.*
[570] *Id.*
[571] *See id.*
[572] *Id.*



[573] *See id.*
[574] *See id.*, GMACHOWSKI000764.
[575] *See id.*, GMACHOWSKI000464- GMACHOWSKI000465.
[576] *Id.*, GMACHOWSKI000084-GMACHOWSKI000087.
[577] *Id.*, GMACHOWSKI000093-GMACHOWSKI000097.
[578] *See id.*
[579] *See id.*, GMACHOWSKI000076-GMACHOWSKI000080. *See also id.*, GMACHOWSKI000110-GMACHOWSKI000113, GMACHOWSKI000125-GMACHOWSKI000130, GMACHOWSKI000135-



GMACHOWSKI000140,        GMACHOWSKI000145-GMACHOWSKI000149,        GMACHOWSKI000841-
GMACHOWSKI000842,        GMACHOWSKI000162-GMACHOWSKI000163,        GMACHOWSKI000178-
GMACHOWSKI000180, GMACHOWSKI000214.

[580] *See id.*, GMACHOWSKI000105-GMACHOWSKI000109.

[581]    *See id.*,    GMACHOWSKI000084-GMACHOWSKI000087.    *See also id.*,    GMACHOWSKI000088-
GMACHOWSKI000092,        GMACHOWSKI000098-GMACHOWSKI000104,        GMACHOWSKI000110-
GMACHOWSKI000113,        GMACHOWSKI000116-GMACHOWSKI000120,        GMACHOWSKI000121-
GMACHOWSKI000124.

[582] *See id.*, GMACHOWSKI000153-GMACHOWSKI000161

[583] *See id.*

[584] *Id.*

[585] *Id.*

[586] *See id.*, GMACHOWSKI000164-GMACHOWSKI000169.

[587] *See id.*, GMACHOWSKI000843-GMACHOWSKI000851.

[588] *See id.*, GMACHOWSKI000170-GMACHOWSKI000177.

[589] *Id.*



---

590 *Id.*, GMACHOWSKI000181-GMACHOWSKI000194.
591 *Id.*
592 Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 44.
593 Ex. CC, GMACHOWSKI000181-GMACHOWSKI000194.
594 *See id.*
595 *Id.*



596 *Id.*
597 *Id.*, GMACHOWSKI000463-GMACHOWSKI000464.
598 *See id.*, GMACHOWSKI000465-GMACHOWSKI000467.
599 *See id.*, GMACHOWSKI000465.
600 *See id.*, GMACHOWSKI000469-GMACHOWSKI000471.
601 *See id.*, GMACHOWSKI000267-GMACHOWSKI000274, GMACHOWSKI000284-GMACHOWSKI000291, GMACHOWSKI000294-GMACHOWSKI000300.
602 Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 42.
603 *Id.*
604 *Id.*

Mr. Gmachowski stated that his headaches, nightmares, and neck and shoulder pain have impacted his life and were the physical "ongoing reminders of the attack in Iraq in 2006";[605] ███

██████████████████████████████████████████████[606]██

██████████████████████████████████████[607]████████

████████████████████[608]

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████[609]███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████[610]█████████████████████████

███████████████████████████████████████████████[611]

███████████████████████████████████████████████

████████████████████████[612]

h.    **Request for Damages**

As stated above, courts have awarded at least $5 million in cases of severe physical injuries which did not include TBI. *See, e.g., Kirschenbaum*, 572 F. Supp. 2d at 213; *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (awarding $5 million to victim in a suicide bombing attack who suffered shrapnel wounds in his legs, forehead, face, and scalp, a fractured

---

[605] *Id.*, ¶ 45.
[606] *Id.*
[607] *Id.*
[608] *See id.*
[609] *Id.* ¶ 46.
[610] *Id.*
[611] *See id.*
[612] *See id.* ¶ 47.

left tibia, and ruptured eardrums); *Peterson II*, 515 F. Supp. 2d 25 at 54 (awarding serviceman who suffered compound fracture of his right leg, injuries to the toes on his left foot, and shrapnel wounds $5 million). More serious physical injuries (also not including any discussion of TBI diagnoses) of these types have merited increased awards. *See, e.g.*, *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 37, 49 (D.D.C. 2012) (awarding $7.5 million to U.S. Navy member who suffered fractures to both knees, hearing loss, and severe lower back trauma and who could no longer lift over 100 pounds).

Mr. Gmachowski's severe back injuries, TBI, and extremely severe psychological injuries, warrant more than the awards in those cases, and more than the $7 million awarded to the plaintiff in *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009), who exhibited severe psychological injuries. Mr. Brewer was injured when a bomb was detonated outside of the U.S. Embassy Annex in Lebanon in 1984. *See id.* at 47. He was physically injured – he lost consciousness twice and sustained numerous cuts, contusions, and lacerations, *see id.* at 48 – but the court focused primarily on his psychological injuries. Mr. Brewer continued to suffer from depression, excessive drinking, nightmares, lack of impulse control, inability to concentrate, headaches, and ringing in his ears and was diagnosed with PTSD approximately ten years after the attack. *See id.* at 49. He was awarded $7 million in damages. *See id.* at 57.

As described above, Mr. Gmachowski suffered a severe burn to his back and muscle injury, necessitating tissue and muscle removal and leaving him with "a hole in my back the size of a grapefruit."[613] His records reflect continued neck, shoulder, and back pain from his injury, despite years of different treatments, multitudes of medications, and physical therapy,[614] and he has presented with muscle atrophy and degenerative disk disease in his lower thoracic spine. His TBI

---

[613] Ex. AA, Declaration of James Gmachowski, dated August 28, 2023, ¶ 22.
[614] *See id.* ¶ 31.

symptoms have persisted; he experiences "debilitating ongoing headaches" multiple times a week, and hearing lost so significant he wears hearing aids.[615] █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

Accordingly, I recommend that the Court accept Plaintiffs' request and award $10 million for James Gmachowski, corresponding to the highest end of the range of awards for Category 3 victims who sustained mild TBI with psychological injuries with severe shrapnel/fractures/orthopedic injuries.

| **Category 3** | Mild TBI with psychological injuries (with severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million<br>Range: $4 - $10 million |
|---|---|---|

### 2.    Economic Loss Claim

Mr. Gmachowski seeks compensation for economic losses in the form of lost wages, benefits, and retirement pay. *See* 28 U.S.C. § 1605A(c) ("damages may include economic damages"). To support his claims for these economic losses, Plaintiffs submit an expert report prepared by L. Wayne Plumly, Jr., Ph.D.[616]

To project Mr. Gmachowski's future income stream if not for the attack, Dr. Plumly incorporated testimonial evidence that he wished to pursue a 20-year military career followed by a career in law enforcement in California, and calculated the present value of that income, including military pension, by applying relevant annual percentage adjustments generated by the BLS, military pay websites, and other sources.[617] In doing so, Dr, Plumly assumed that Mr.

---

[615] *Id. See also id.* ¶ 45.
[616] *See* Ex. EE, Appraisal of Present Value of Economic Life of James Gmachowski, dated July 21, 2024, prepared by L. Wayne Plumly, Jr., Ph.D.
[617] *See id.* at 3-4.

Gmachowski, which was 19.58 years old when he was injured, (1) would have remained in the military for 20 years; (2) had a life expectancy of 76.75 years; (3) would have received an annual military pension of $38,254.93, adjusted annually by 2.775%, the average annual percent change in the Employment Cost Index; (4) would have obtained employment after his military service as a law enforcement officer in California with an annual salary of $111,770, adjusted annually by 3.215%, the percentage change in the Average Hourly Earnings of Production and Nonsupervisory Workers; and (5) would have begun collecting Social Security Retirement ("SSR") benefits at age 67, which would have maximized his return.[618] Dr. Plumly then adjusted these income figures for taxes and consumption, adjusted the SSR benefits for inflation, and adjusted the total lost earnings, pension benefits, and SSR benefits to present value at a rate of 3.39%, the average yield of 30-year Treasury Bonds for the relevant period.[619]

According to Mr. Gmachowski, after his attack, he "stayed in the Army despite my emotional and physical injuries and was promoted…."[620] "Eventually, my injuries proved insurmountable, ad I could not continue my service. I retired on February 14, 2016, as a Staff Sergeant (E-6).[621] Dr. Plumly then calculated Mr. Gmachowski's actual income, accounting for the multiple jobs he held between March 2016 and October 2022, and factored in his plan to attain a Master's degree and work as a therapist, earning an annual salary of $50,160, adjusted annually by 3.215%.[622] Dr. Plumly also adjusted all these income figures for taxes and consumption as well, and to present value.[623] Finally, Dr. Plumly totaled the difference between the two calculations as

---

[618] *See id.*
[619] *See id.* at 5.
[620] Ex. DD, Economic loss declaration of James Gmachowski, dated July 26, 2023, ¶ 4.
[621] *Id.*
[622] *See* Ex. EE, Appraisal of Present Value of Economic Life of James Gmachowski, dated July 21, 2024, prepared by L. Wayne Plumly, Jr., Ph.D at 4.
[623] *See id.* at 5.

$2,675.719.90.  I recommend that the Court award this amount for Mr. Gmachowski's economic loss claim.[624]

## CONCLUSION

For the reasons stated above, I believe that Plaintiffs' damage requests are reasonable and I recommend the following compensatory damages awards for the three Plaintiffs identified herein:

| Plaintiff | Assault, Battery, IIED | Economic loss claim |
|---|---|---|
| Adam Mattis | $7 million | |
| Terrance Peterson, III | $10 million | $548,153.33 |
| James Gmachowski | $10 million | $2,675,719.90 |

Dated:        March 11, 2025                          Respectfully submitted,

/s/ Stephen A. Saltzburg
Special Master

---

[624] *See id.* at 5-6.