**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| **WILLIAM LEE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-cv-00830 (APM)** |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.     INTRODUCTION**

From 2004 through 2011, the U.S. military faced insurgent attacks in Iraq that Plaintiffs allege were materially supported by Defendant Islamic Republic of Iran ("Iran"). This case involves 99 attacks and is brought by over 352 Plaintiffs, consisting of military servicemembers and contractors, their estates, and their family members. Plaintiffs seek relief for the personal injuries of surviving and deceased victims and emotional distress endured by the families of those injured or killed.

Given the number of Plaintiffs, this litigation is proceeding in phases. In *Lee v. Islamic Republic of Iran* (*Lee I*), this court found Iran liable for four of the 99 alleged attacks. 518 F. Supp. 3d 475 (D.D.C. 2021). Later, this court found Iran liable for another 27 attacks. *Lee v. Islamic Republic of Iran* (*Lee II*), 656 F. Supp. 3d 11 (D.D.C. 2023). The court now must determine whether Iran is liable for 13 additional attacks against U.S. servicemembers in Iraq between 2005 and 2009. Collectively, these 13 attacks give rise to claims by (1) two surviving servicemembers; (2) the estates of three deceased servicemembers; and (3) over three dozen family members of

victims injured or killed in the attacks.  As explained below, the court finds Iran responsible for these attacks and liable for Plaintiffs' injuries.

## II.    LEGAL STANDARD

Plaintiffs seek default judgment against Iran under the Foreign Sovereign Immunities Act (FSIA) because Iran has failed to defend this lawsuit.  *See* Submission of Evidence for Thirteen Attacks Not Yet Adjudicated, ECF No. 142 [Pls.' 3d Proposed Findings]; *see also* Pls.' Second Proposed Findings of Fact & Conclusions of L. in Supp. of Their Mot. for Default J., ECF No. 53 [hereinafter Pls.' 2d Proposed Findings]; Order, ECF No. 141.  "[T]he entry of a default judgment is not automatic and requires the exercise of sound discretion."  *Salzman v. Islamic Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *2 (D.D.C. Sept. 25, 2019) (internal quotation marks omitted).  A claim for default judgment under the FSIA is governed by the statutory requirement that "[n]o judgment by default shall be entered . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014).  "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (internal quotation marks omitted).  "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required."  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020).

In addition, "[a] plaintiff seeking default judgment must persuade the trial court that subject-matter jurisdiction and personal jurisdiction over the defendant are satisfied."  *Karcher v.*

2

*Islamic Republic of Iran* (*Karcher I*), 396 F. Supp. 3d 12, 21 (D.D.C. 2019). "A default judgment rendered in excess of a court's jurisdiction is void." *Jerez*, 775 F.3d at 422.

## III.    FINDINGS OF FACT

The court's Findings of Fact will consist of two parts. *See Karcher v. Islamic Republic of Iran* (*Karcher II*), No. 16-cv-232 (CKK), 2021 WL 133507, at *6 (D.D.C. Jan. 14, 2021). First, the court will incorporate prior factual findings from its opinions in *Lee I* and *Lee II*, which collectively address Plaintiffs' attempts to serve Iran, Iran's relationship with Hezbollah and other proxy groups operating in Iraq, and the nature and use of explosively formed penetrators ("EFPs"), a signature Iranian weapon. Second, the court will analyze each attack and determine whether it can be traced back to Iran and its proxies.

The court takes judicial notice of the decisions in *Karcher* and *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018), two other cases brought against Iran for its role in killing and injuring U.S. servicemembers in Iraq. The court does so pursuant to Federal Rule of Evidence 201(b), which "extends to judicial notice of court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). As "the FSIA does not require this Court to relitigate issues that have already been settled in previous decisions," the court can "review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (internal quotation marks omitted). The court therefore may rely on the evidence presented in *Karcher* and *Fritz* but must nonetheless "reach [its] own independent findings of fact." *See Rimkus*, 750 F. Supp. 2d at 172. This court has done so.

### A.    Service of Process

As a threshold matter, the court must make a factual finding concerning Plaintiffs' attempts to serve Iran, which is a component of the court's personal jurisdiction analysis. The court addresses the legal sufficiency of these attempts later in this opinion.

Plaintiffs attempted to serve Iran by mailing "one copy of the summons, [amended] complaint, and notice of suit, together with a translation of each" by registered mail with return receipt through the U.S. Postal Service to Dr. Mohammad Zarif, Iran's head of the Ministry of Foreign Affairs. *See* Aff. Requesting Foreign Mailing, ECF No. 18; Certificate of Mailing, ECF No. 20 [hereinafter Certificate of Mailing].

When 30 days passed without a response from Iran, Plaintiffs served Iran via diplomatic channels. *See* Aff. Requesting Foreign Mailing, ECF No. 22 [hereinafter Diplomatic Service Request]. The Department of State transmitted a summons, Amended Complaint, and notice of suit to Iran through the Embassy of Switzerland in Tehran on December 18, 2019. Ltr. from J. Hess, Attorney Advisor, Overseas Citizens Servs., Office of Legal Affairs, to Angela D. Caesar, Clerk of Court for the U.S. Dist. Court for the Dist. of Columbia (Jan. 21, 2020), ECF No. 26 [hereinafter Dep't of State Service Attempt]. Thereafter, Iran had 60 days—or until February 18, 2020, accounting for weekends and holidays—to respond to the Amended Complaint. 28 U.S.C. § 1608(d). It failed to do so.

### B.    Iran's Responsibility for the 13 Attacks

#### 1.    *Expert Testimony*

In *Lee I* and *Lee II*, this court recognized several experts that were previously qualified in *Karcher I*. *See Lee I*, 518 F. Supp. 3d at 481–82; *Lee II*, 656 F. Supp. 3d at 23. The court incorporates herein its prior qualification of Dr. Matthew Levitt, Lieutenant General (Ret.) Michael

4

L. Oates, Captain (Ret.) Donald Wade Barker, Colonel (Ret.) Kevin Lutz, Russell L. McIntyre, and Michael P. Pregent.[1]

### 2. *Iran's Material Support to Hezbollah and Other Proxies in Iraq*

The roots of Iran's involvement in Iraq date back to the late 20th century, when Iran began supporting Shi'a groups in the region and developed relationships with terrorist organizations that would ultimately operate in Iraq. In 1979, the Supreme Leader of Iran, Ayatollah Khomeini, established what became known as the Islamic Revolutionary Guard Corps ("IRGC"), which was designed to implement the Ayatollah's "vision for an Islamic theocratic government in Iran." McIntyre Report, PX-1572, at 4–5.[2] During the 1980s, Iran created "a fully functional militia backed by the Islamic Revolutionary Guard Corps-Qods Force" ("Qods Force"). Levitt Report, PX-154, at 7; McIntyre Report, PX-157, at 5 & n.6. The Qods Force "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government." McIntyre Report, PX-157, at 6.

At the same time, Iran and the IRGC were "provid[ing] critical assistance to newly emerging Hezbollah, which swore an oath of fealty to Iran." *Id.* at 7. In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran "bankroll[ed], arm[ed] and train[ed] Hezbollah." *Id.*; *see also* Levitt Report, PX-154, at 9.

Iran's proxies were already operating in Iraq prior to 2003, when the United States and coalition forces launched Operation Iraqi Freedom and dismantled Saddam Hussein's regime.

---

[1] For ease of reference, the court has omitted the titles of Plaintiffs' expert witnesses after the first reference.

[2] For simplicity, the court has adopted a modified convention for citations to evidence submitted to the *Karcher I* court. All transcripts from the *Karcher I* trial are denominated with "Tr." and a number 1 through 5 indicating the volume in which the cited testimony appears. A transcript designated "Tr. 1," for example, appears in the first volume of the transcript from the *Karcher I* trial. Exhibits from the *Karcher I* trial are denoted by their title and "PX," followed by the assigned exhibit number used during the *Karcher I* trial.

Levitt Report, PX-154, at 6–7.  With Hussein out of power, Iran seized the "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region."  *Id.* at 7.  Iran sought to install "weakened decentralized and Shi'a-dominated" leadership in Iraq and therefore set out to "foster unity among Iraq's various Shia parties and movements so that [it] could consolidate Shia political control . . . over the new Iraqi government."  *Id.* at 8.

To that end, Iran developed numerous Shi'a proxies with a presence in Iraq.  Iran backed the Office of the Martyr Sadr, a movement that "spoke for Iraq's disenfranchised Shi'a" and was led by Muqtada al-Sadr.  Oates Report, PX-153, at 17.  In 2003, the Office of the Martyr Sadr opened "an armed wing" called Jaysh al-Mahdi ("JAM").  *Id.*  Iran offered the movement and its armed wing "financing and weapons training," and the Qods Force "dispatched Hezbollah operatives . . . to help establish JAM and provide it with logistical assistance."  *Id.*  al-Sadr ultimately split JAM into different branches to address competing priorities and developed "Special Groups" that were specifically designed to attack American and coalition forces.  *Id.* at 22–24.  The Special Groups were successful, and "[f]rom 2003 to 2006, the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq."  McIntyre Report, PX-157, at 16.  Iran later recruited new leadership for a Special Group called Asayb al-Haq or "AAH."  *Id.* at 38–39.  AAH also "acted as an Iranian proxy in Iraq, carrying out the IRGC's agenda and promoting its interests."  *Id.* at 39.

Iran provided its proxies with training, weapons, and financial support.  Through Hezbollah, Iran brought operatives "into Iran for training and smuggling weapons across the border into Iraq" and sent IRGC and Qods Force operatives to Iraq.  Pregent Report, PX-155, at 12.  Iran also used its resources specifically to support EFP attacks: "[O]ne of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs."

6

Oates Report, PX-153, at 24.  Iran funneled to Special Groups in Iraq EFPs that "were professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor, such as armored patrols and supply convoys."  *Id.*  Iran also backed its proxies with extensive financial resources; by August 2007, Iran, through IRGC and the Qods Force, was estimated to be "providing between $750,000 and $3 million worth of equipment and funding to Special Groups every month."  Pregent Report, PX-155, at 12.

### 3.    *Explosively Formed Penetrators*

The 13 attacks at issue involve a uniquely lethal weapon known as an explosively formed penetrator, or EFP.  EFPs are explosive devices that are intentionally "designed to defeat armor." Barker Report, PX-158, at 5.  According to Barker, the earliest known EFPs "appear[ed] on modern battlefields in the 1990s as a weapon deployed in Lebanon by Hezbollah."  *Id.* at 6.  EFPs became insurgents' weapon of choice in Iraq after the United States began to "up-armor" its military vehicles, particularly its Humvees, in response to increased attacks from local militias and terrorist cells.  *See id.* at 12–13.  EFPs enabled insurgents to specifically target and explode even these heavily armored U.S. military vehicles, and their use against U.S. forces quickly proliferated starting in 2005.  *See id.* at 13–14.

The EFPs that were detonated "in Iraq were generally made with a precision manufactured concave copper disk liner and [high-energy] explosive [("HE")] . . . packed behind the liner."  *Id.* at 6 (footnote omitted).  EFPs travel at high speeds and can "pierce through several inches of military-grade armor like a fist through a wall."  *Id.* at 7 (internal quotation marks omitted).  The weapons create "a massive blast overpressure, capable of blowing the doors and turrets from vehicles close to the device," and "the heat and force of the penetrator [can] shatter [a] vehicle's armor and materials inward," propelling "razor-sharp shards of Teflon and steel ripping through

7

the interior compartment." *Id.*  The heat generated by EFPs is powerful enough to "ignite engine fuel and set vehicles ablaze." *Id.*

EFPs detonate after being armed via remote frequency or insulated command wire. *Id.* at 10.  EFPs that employ a command-wire trigger allow insurgents to detonate the device from a distance of up to 100 meters from the blast site, while remote-frequency triggers give insurgents a 300-meter range. *Id.*  Once armed, EFPs are "triggered using a passive infra-red device" that is attached to the EFP and can, "for example, detect the heat signature of a passing vehicle" and "send an electrical current [to] set off [an] explosion within the EFP's casing." *Id.*

4.      *EFPs in Iraq*

To combat lethal EFP attacks, the U.S. military began adding even more armor to its vehicles and increased its use of Bradley Fighting Vehicles ("Bradleys") in Iraq. *Id.* at 15.  When the additional armor failed to provide meaningful protection, the U.S. military developed technology that jammed the radio frequencies that insurgents used to trigger EFPs and began using a device known as a Rhino, which was attached to the front of a combat vehicle and simulated the heat of the vehicle to prematurely trigger EFPs. *Id.* at 16.  With each advancement in U.S. technology, however, EFP warfare evolved to become even more stealthy and sophisticated. *See id.* at 15–18.  For example, when the United States introduced radio-frequency jammers, insurgents began "modulating the frequencies of their remote activators." *Id.* at 16.  And when the United States began attaching Rhinos to its vehicles, insurgents began angling EFPs "backward to account for" the early triggers. *Id.* at 18.

The sophistication of the devices in Iraq was beyond the capacity of individuals with basic training in improvised explosive device ("IED") construction.  *See* Tr. 3 at 18:23–19:10; *see also* Barker Report, PX-158, at 16.  Barker opined that insurgents' ability to defeat the United

States' sophisticated countermeasures would not have been possible "without the active involvement, training, equipment and support of the IRGC."  Barker Report, PX-158, at 16.  Oates testified similarly in *Karcher* that "the rapid capability development of the Shi'a militia in Iraq from a weapons training and tactics procedure, the speed with which they achieved this capability and their ability to adapt led [him] to believe that there was external assistance provided."  Tr. 1 at 98:5-9.

These opinions are confirmed by U.S. military forensic analyses of IED and EFP detonations.  Tr. 5 at 27:14–28:10.  Via such analyses, the U.S. military was able to "identify signatures by bomb makers" and "the emerging enemy tactics, techniques and procedures" that were being used.  *Id.*  "The U.S. military traced much of the machinery used to manufacture the EFPs, high explosives and [passive infra-red] devices deployed in Iraq to Iran and its illicit supply chain."  Oates Report, PX-153, at 25.  U.S. intelligence ultimately traced tens of thousands of devices that interfered with the United States' counter-EFP measures from Iran to Baghdad.  Tr. 5 at 48:16–49:12.  Moreover, the U.S. military concluded that Iran and its proxies "provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry."  Office of the Coordinator for Counterterrorism, U.S. Dep't of State, Country Reports on Terrorism 2008 (Apr. 2009), PX-18, at 183.

These reports are consistent with Barker's testimony at the *Karcher* trial.  Barker explained that "EFPs are extremely complicated systems to build," so Iran and its proxies "would build [EFPs] complete, [and] bring them in as a complete total system, ready to go."  Tr. 3 at 44:13-16.  Iraqi operatives would then emplace the EFP by "get[ting] in a local vehicle" that was equipped with "a false floor."  *Id.* at 44:19-22.  The operatives would pretend that the vehicle had broken down on the road and "pull over on the side of the road" to "raise the hood."  *Id.* at 44:20-21.

Meanwhile, operatives inside the vehicle would "pull[] the floor out," "crawl out," "lay the device in the predetermined position[,] and drive away." *Id.* at 44:22-24.

### 5. The Attacks

Having established Iran's presence in Iraq and its assistance in developing and providing EFPs, the court now turns to Plaintiffs' evidence of the 13 attacks at issue. The court here has independently reviewed the evidence, including supplemental evidence from expert Lutz regarding Iran's responsibility for each attack. *See* Pls.' 3d Proposed Findings, Ex. A, Consolidated Expert Report of Col. (Ret.) Kevin Lutz, ECF No. 142-1 [hereinafter Lutz Report].

The court will analyze the attacks using the following framework adopted by the *Karcher I* court. First, the court will "summarize each attack and identify the harms inflicted" on the respective Plaintiffs. *Karcher I*, 396 F. Supp. 3d at 30. Then, the court will "identify the key elements of the attack" that indicate whether it was in fact an EFP strike. *Id.* On this point, the court will "make its determinations primarily by applying the evidence of EFP characteristics," rather than relying on expert testimony. *Id.* Finally, the court "shall trace the connection," if any, to Iran, based in part on "Mr. Lutz's assessment that a given attack was likely the work of an Iran-sponsored Special Group." *Id.*

### a. August 7, 2005 Attack in Baghdad: Specialist Anthony Kalladeen

Plaintiff Maria Vidal claims that Iran is liable for an August 7, 2005 attack on U.S. forces. *See* Am. Compl., ECF No. 12, ¶¶ 225–230. Maria Vidal is the mother of Specialist ("SPC") Anthony N. Kalladeen. *Id.* ¶ 229. SPC Kalladeen was killed in the attack. *Id.* ¶ 227.

On August 7, 2005, SPC Kalladeen was part of a patrol traveling in northwest Baghdad serving as a gunner in an M1114 HMMWV. Lutz Report at 1. At approximately 2:45 p.m., a two-EFP array struck the patrol, killing SPC Kalladeen and one other soldier, and wounding four other

soldiers. *Id.* SPC Kalladeen was wearing the proper protective gear at the time of attack. *Id.* at 2. While the unit was moving casualties, it came under small-arms fire. *Id.*

The court finds sufficient evidence in the record showing that the explosive responsible for SPC Kalladeen's death was an EFP. SPC Kalladeen's casualty report lists the cause of death as "Multiple system trauma/Multiple projectile injuries." *Id.* SPC Kalladeen's autopsy report originally reported the fatal attack as being caused by a vehicle-borne IED but was later corrected to show that the device was an EFP. *Id.* The SIGACT report notes that the device "was 2X EFP (1X copper and 1X steel)." *Id.* The casualty report and autopsy report both list the device in the attack as an EFP. *Id.*

Lutz concluded that the "attack that killed SPC Kalladeen was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Id.* at 3. He opines that the "two EFP array of original Hezbollah and IRGC design" was "supplied by the IRGC," then "assembled and emplaced by an IRGC-sponsored Special Group." *Id.* at 1. He based this conclusion on the "totality of the records," including that the device was likely precision-manufactured and copper-lined, consistent with an Iranian EFP. *Id.* at 2–3. Accordingly, the court agrees that the August 7, 2005 attack that killed SPC Kalladeen is traceable to Iran and its proxies.

> b.      September 26, 2005 Attack in FOB Rustamiyah: Master Sergeant Tulsa Tuliau

Plaintiff Masina Tuliau claims that Iran is responsible for a September 26, 2005 attack on U.S. forces. *See* Am. Compl. ¶¶ 231–236. Masina Tuliau is the mother of Master Sergeant ("MSG") Tulsa T. Tuliau. *Id.* ¶ 235. MSG Tuliau was killed in the attack. *Id.* ¶ 233.

On September 26, 2005, MSG Tuliau was traveling on Route Pluto outside of Forward Operating Base ("FOB") Rustamiyah in a patrol from the 3rd Psychological Operations Battalion

Special Police Training Team.  Lutz Report at 4.  The patrol was headed to meet the 3rd Order

Bridge in Salman Pak when an EFP hit the vehicle, killing MSG Tuliau and another servicemember

and wounding another servicemember and two civilian interpreters.  *Id.* at 4–5.

The court finds sufficient evidence in the record showing that the explosive responsible for

MSG Tuliau's death was an EFP.  The SIGACT report and MSG Tuliau's casualty report note his

vehicle was struck by an IED, but the Explosive Ordnance Disposal team ("EOD") "subsequently

determined that the device used in the attack was an EFP."  *Id.*  Lutz also explains that the damage

to the vehicle and injuries to those inside are consistent with an EFP attack.  *Id* at 5.

Lutz found it likely that the "attack that killed MSG Tuliau was part of the EFP campaign

orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-

trained Special Group proxies."  *Id.*  Although Lutz acknowledged that "the available

documentation for this attack is less comprehensive than other datasets [he has] reviewed," he

nonetheless noted that the location of the attack was in an area dominated by Iranian proxy groups,

EOD identified the weapon involved as an EFP, and the damage to the vehicle and injuries

sustained by those in the vehicle were consistent with an "EFP campaign orchestrated by the IRGC

and Hezbollah."  *Id.*  Accordingly, the court agrees that the September 26, 2005 attack that killed

MSG Tuliau is traceable to Iran and its proxies.

c.      <u>February 20, 2006 Attack in Hindiyah: Staff Sergeant Jay Collado<br>and First Lieutenant Justin Waldeck</u>

Plaintiffs Judy Collado, Kaiya Collado, and First Lieutenant ("1LT") Justin Waldeck claim

that Iran is responsible for a February 20, 2006 attack on U.S. forces.  Am. Compl. ¶¶ 290–301.

Judy Collado is the widow of Staff Sergeant ("SSG") Jay T. Collado, and Kaiya Collado is SSG

12

Collado's daughter. *Id.* ¶¶ 294–295. SSG Collado was killed and 1LT Waldeck was injured in the attack.[3] *Id.* ¶¶ 292, 300.

On February 20, 2006, SSG Collado and 1LT Waldeck were part of a Marine Military Transition Team that was attached to the 2nd Brigade Combat Team, 4th Infantry Division, which was heading from Hindiyah to an Iraqi compound in Karbala for training. Lutz Report at 6. SSG Collado was driving an M1114 HMMWV, of which 1LT Waldeck was truck commander. *Id.* While en route, the driver's side of the vehicle was struck by an EFP, killing SSG Collado and injuring three others, including 1LT Waldeck. *Id* at 6, 8. SSG Collado and 1LT Waldeck were both wearing the proper protective gear at the time of the attack. *Id.* at 7.

The court finds sufficient evidence in the record showing that the explosive responsible for SSG Collado's death and 1LT Waldeck's injuries was an EFP. The SIGACT Report lists the "Mode of Attack" as an IED "contain[ing] an explosive formed penetrator." *Id.* at 7. Lutz notes that the massive trauma to SSG Collado's body was consistent with an EFP attack. *Id.* at 7–8.

After reviewing the totality of the record, Lutz concluded that "the attack that killed SSG Collado and wounded 1LT Waldeck was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Id.* Based on the evidence that the attack was perpetrated with an EFP, the court agrees that the February 20, 2006 attack that killed SSG Collado and injured 1LT Waldeck is traceable to Iran and its proxies.

---

[3] This court has jurisdiction over injuries stemming from a defendant nation's acts of material support for extrajudicial killing. *See* 28 U.S.C. § 1605A(a)(1). Although jurisdiction does not flow from attempted killings, *see Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1061 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025), courts retain jurisdiction over survivors' claims for non-lethal injuries suffered in an attack that resulted in the killing of another, like 1LT Waldeck. *See Boothe v. Islamic Republic of Iran*, No. 22-cv-1747 (TSC), 2026 WL 809887, at *9 (D.D.C. Mar. 24, 2026); *see also infra* IV.A.1.

13

d.      October 13, 2006 Attack in Baghdad: Corporal Kenny Frances
        Stanton, Jr.

Plaintiffs Estate of Kenny Frances Stanton, Jr., Gloria Magana, Mario Stanton, Brandie Stanton, and Terrymarie Stanton claim that Iran is responsible for an October 13, 2006 attack on U.S. forces.  Am. Compl. ¶¶ 467–476.  Gloria Magana is the mother of Corporal ("CPL") Kenny Frances Stanton, Jr., and the remaining plaintiffs are CPL Stanton's siblings.  *Id.* ¶¶ 471–475.  CPL Stanton was killed in the attack.  *Id.* ¶ 469.

On the night of October 13, 2006, a four-vehicle patrol from the 57th Military Police Company, 372 Military Police Battalion, 89th Military Police Brigade was traveling through northwest Baghdad.  Lutz Report at 9.  The patrol was followed by two Iraqi Police patrol vehicles escorting a black BMW, which soldiers later recounted was "suspicious."  *Id.* at 10.  The suspicious vehicle turned onto Creek Road, switched off its running lights, and disappeared.  *Id.*  The patrol then followed the vehicle onto Creek Road, when an EFP emplaced in a storm drain on the north side of the road struck the driver's side of the third vehicle, an M1114 HMMWV driven by CPL Stanton.  *Id.* at 9.  CPL Stanton was killed from facial and neck wounds, and two other soldiers in his vehicle were wounded.  *Id.* at 9–10.  CPL Stanton was wearing the proper protective equipment at the time of the attack.  *Id.* at 10.  All IED defeat jamming systems were engaged.  *Id.*

The court finds sufficient evidence in the record showing that the explosive responsible for CPL Stanton's death was an EFP.  The investigating officer to the AR 15-6 Investigation Report of October 24, 2006, noted that the attack was perpetrated with an "IED/EFP" that substantially damaged the vehicle and rendered it inoperable.  *Id.*  EOD inspected the vehicle at Camp Liberty and determined that the blast was caused by an EFP array.  *Id.* at 13.  Copper slugs were recovered from the damage.  *Id.*  The CJTF-Troy Report notes that no evidence of a firing system was recovered, but EOD determined that the EFP was most likely command wire fired, with the

14

command wire later retrieved by the trigger man. *Id.* Based on this information, the court agrees that the device used in the attack was an EFP.

Based on the totality of the evidence, Lutz concludes that the attack "was part of an IRGC and Hezbollah EFP campaign and was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Id.* at 15. The recovery of copper slugs strongly indicates that the EFP was precision manufactured, and the extensive damage to the vehicle suggests that HE explosives were used in the EFP's construction. *Id.* Accordingly, the court agrees that the October 13, 2006 attack that killed CPL Stanton is traceable to Iran and its proxies.

e.       February 2, 2007 Attack in FOB Mahmudiyah: Captain Kevin Landeck

Plaintiffs Richard and Victoria Landeck claim that Iran is responsible for a February 2, 2007 attack on U.S. forces. Am. Compl. ¶¶ 634–640. Richard and Victoria Landeck are the parents of Captain ("CPT") Kevin C. Landeck. *Id.* ¶¶ 638–639. CPT Landeck was killed in the attack. *Id.* ¶ 636.

On February 2, 2007, CPT Landeck was sitting in the rear passenger seat of an up-armored M1114 HMMWV that was part of a patrol from B Battery, 2-15 Field Artillery driving from FOB Mahmudiyah to Patrol Base Lutafiyah. Lutz Report at 16. Members of the unit later reported that they had previously encountered other explosive devices in the region, although not in this exact place. *Id.* at 17. When turning west at the southern corner of the eastern bypass of ASR Jackson, an EFP struck the passenger side of the vehicle, deflating all four tires and penetrating the armor. *Id.* at 16. CPT Landeck was killed, likely instantaneously. *Id.*

The court finds sufficient evidence in the record showing that the explosive responsible for CPT Landeck's death was an EFP. A witness described the damage as including "2 or 3 holes in the front and 1 or 2 to the rear passengers [sic] door," each up to about two to three inches wide.

15

*Id.* at 17.  The investigating officer to the AR 15-6 Investigation Report noted that the cause was likely an EFP array, due to the vehicle armament penetration and significant casualties.  *Id.*  The patrol leader provided a sworn statement that the attack involved an "EFP array; multiple EFP[]s from what I gather."  *Id.*  The SIGACT report title also attributed the attack to an EFP, though the body of the report and the IED report do not mention EFPs.  *Id.* at 18.  The damage was also consistent with that of other EFP attacks on M1114 HMMWVs.  *Id.* at 21.

Lutz finds that the totality of the record supports Iran and its Hezbollah-trained proxies as the perpetrator of the attack.  *Id.*  The damage on the vehicle demonstrates the EFP was likely precision manufactured and used high-energy, or HE, explosives.  *Id.*  The Event Storyboards also state that the device "is assessed to be JAM," noting similarities between this attack and JAM's prior attacks, including the area and attack technique.  *Id.* at 19.  Accordingly, the court agrees that the February 2, 2007 attack that killed CPT Landeck is traceable to Iran and its proxies.

f.      June 11, 2007 Attack in Baghdad: Private First Class Cameron Payne

Plaintiff Denise Jackson claims that Iran is responsible for a June 11, 2007 attack on U.S. forces.  Am. Compl. ¶¶ 767–772.  Denise Jackson is the mother of Private First Class ("PFC") Cameron K. Payne.  *Id.* ¶ 771.  PFC Payne was killed in the attack.  *Id.* ¶ 769.

On June 11, 2007, PFC Payne was the gunner of an M1151 HMMWV traveling in a convoy east through Baghdad.  Lutz Report at 22.  The convoy was heading from FOB Rustamiyah to the Ranger Joint Security Station (COP Cajimat).  *Id.* at 23.  PFC Payne's vehicle, the second in the convoy, was struck by a multi-array copper EFP.  *Id.* at 22.  The EFP penetrated through the shield and turret of the vehicle, killing PFC Payne.  *Id.*  PFC Payne was wearing the proper protective gear at the time of the attack.  *Id.* at 26.  Another servicemember in his vehicle was wounded.  *Id.* at 22.  After the attack, the patrol took sniper fire from the northwest.  *Id.* at 24.  The Event

16

Storyboard included an intelligence theory that the attack was retaliation for a prior operation by Coalition Forces. *Id.* at 23.

The court finds sufficient evidence in the record showing that the explosive responsible for PFC Payne's death was an EFP. The investigating officer to the AR 15-6 Investigation Report determined that the convoy was attacked by a command-wire detonated, multiple arrayed copper EFP. *Id.* Later reports vary between listing the cause as an EFP or IED. *Id.* at 24–26. Lutz notes that he did not have access to forensic evidence, but he finds no reason to doubt the investigator's findings that the device was a copper EFP array. *Id.* at 27. Particularly given that EFPs are often mistakenly labeled as IEDs, *see* Am. Compl. ¶ 13, the court agrees with Lutz that the device in the attack was likely a command-wire detonated copper EFP array.

Lutz concludes that the copper-lined EFP and command wire indicate that the EFP attack was designed and perpetrated by Iran's Hezbollah-trained Special Group proxies. Lutz Report at 27. Based on the totality of the evidence, the court agrees that the June 11, 2007 attack that killed PFC Payne is traceable to Iran and its proxies.

g.     June 23, 2007 Attack in Baghdad: Staff Sergeant Michael Dean Moody, Jr.

Plaintiffs Estate of Michael Dean Moody, Jr., Michael Dean Moody, Sr., Connie Moody, and Kedrick Dante Moody claim that Iran is responsible for a June 23, 2007 attack on U.S. forces. Am. Compl. ¶¶ 773–781. Michael Dean Moody, Sr. and Connie Moody are the parents of SSG Michael Dean Moody, Jr., and Kedrick Dante Moody is SSG Moody's brother. *Id.* ¶¶ 777–780. SSG Moody was killed in the attack. *Id.* ¶ 775.

On June 23, 2007, a four-vehicle convoy was traveling east on 7th Street in Muhalla 731 after providing security at the site of a prior EFP strike. Lutz Report at 28. The lead vehicle in the convoy, an M1151 HMMWV, was struck by an EFP. *Id.* The attack killed SSG Moody, the

truck commander, the gunner, and wounded two others, one of whom later died of their wounds. *Id.* The convoy then came under small arms fire. *Id.* SSG Moody was wearing proper protective equipment at the time of the attack. *Id.* at 32.

The court finds sufficient evidence in the record showing that the explosive responsible for SSG Moody's death was an EFP. The investigating officer to the AR 15-6 Investigation Report determined that the lead vehicle of the convoy was struck by an EFP on the passenger's side, piercing the ballistic glass. *Id.* at 29. Though other reports refer to the device as an IED, the Event Storyboard discusses the prevalence of EFPs planted by JAM cells in the area to target Coalition Forces. *Id.* at 30–31. Based on the type of damage, investigating officer's report, and Event Storyboard, the court agrees with Lutz's conclusion that an EFP was used in the June 23, 2007 attack. *Id.* at 33.

Lutz notes that the damage to the vehicle indicates that the EFP was likely precision manufactured and used HE explosives. *Id.* In light of these details of the EFP attacks, Lutz finds that the attack was likely carried out by Iran-backed Hezbollah-trained Special Group proxies. *Id.* Based on the totality of the evidence, the court agrees that the June 23, 2007 attack that killed SSG Moody is traceable to Iran and its proxies.

h.      June 25, 2007 Attack in Riassa: Private First Class Andre Craig, Jr.

Plaintiffs Aundra Craig, Joyce Craig, Debra Cook-Russell, Nashima Williams Craig, Matthew Craig, Jonathan Craig, Andre Brown, Michael Cook, and Valencia Cook claim that Iran is responsible for a June 25, 2007 attack on U.S. forces. Am. Compl. ¶¶ 782–795. Aundra Craig and Joyce Craig are the parents of PFC Andre Craig, Jr., and the remaining plaintiffs are PFC Craig's siblings. *Id.* ¶¶ 786–794. PFC Craig was killed in the attack. *Id.* ¶ 784.

On June 25, 2007, a seven-vehicle combat patrol drove south on Route Florida through Riassa, heading from Combat Outpost Bushmaster to FOB Rustamiyah. Lutz Report at 34. En route, an EFP struck the turret of the sixth vehicle, an M1151 HMMWV. *Id.* The EFP appeared to have been aimed to specifically target the gunner, who was PFC Craig. *Id.* PFC Craig was killed after massive trauma from the blast, including shrapnel to the face and an amputated right arm beneath the elbow. *Id.* at 34–35. PFC Craig was wearing the proper protective gear at the time of attack. *Id.* at 35.

The court finds sufficient evidence in the record showing that the explosive responsible for PFC Craig's death was an EFP. The investigating officer to the AR 15-6 Investigation Report noted that "the patrol was attacked by an explosively formed projectile (EFP)." *Id.* The Serious Incident Report also lists the device as an "IED/EFP" that destroyed the vehicle's turret. *Id.* The SIGACT originally listed an IED as the mode of attack, but it was subsequently updated to show that the device was an EFP. *Id.* at 35–36. The Event Storyboard of the attack notes that brass residue was left inside the EFP, indicating a brass plate was used. *Id.* at 36. Further, intelligence indicated the device was likely placed in its location due to the increased number of convoys traveling through the region. *Id.* Based on this information and the significant damage to the vehicle, the court agrees with Lutz's conclusion that an EFP was used in the June 25, 2007 attack. *Id.* at 39–40.

Lutz notes that the damage to the vehicle indicates that the device was a precision-manufactured EFP using HE explosives. *Id.* at 40. Considering this information, Lutz finds that the EFP was likely manufactured and detonated by Iran-backed Hezbollah-trained Special Group proxies. *Id.* Based on the totality of the evidence, the court agrees that the June 25, 2007 attack that killed PFC Craig is traceable to Iran and its proxies.

19

> i.       July 19, 2007 Attack in Husseinyah: Colonel Daniel Dudek

Plaintiffs Colonel ("COL") Daniel Dudek, Margaret Dudek, Katie Woodard, Sarah Dudek, and Andrew Dudek claim that Iran is responsible for a July 19, 2007 attack on U.S. forces. Am. Compl. ¶¶ 818–828.   Margaret Dudek is the mother of COL Dudek, and the remaining plaintiffs are COL Dudek's siblings. *Id.* ¶¶ 824–827.  COL Dudek was wounded in the attack and now suffers from limited paralysis in his hips and legs, and complete paralysis in his ankles and feet.[4]  *Id.* ¶¶ 820–823.

On July 19, 2007, COL Dudek, then a Major, was driving south through Husseinyah in a five-vehicle convoy.  Lutz Report at 41.  COL Dudek was riding as the rear airguard in a Stryker, which was the lead vehicle in the convoy.  *Id.*  An EFP hit the right front side of the Stryker, killing a servicemember and wounding COL Dudek.  *Id.*  After the strike, the vehicle came under small-arms fire.  *Id.* at 42.  COL Dudek was wearing the proper protective gear at the time of attack.  *Id.* at 43.

The court finds sufficient evidence in the record showing that the explosive responsible for COL Dudek's injuries was an EFP.  The SIGACT Report lists the mode of attack as a "Directional IED," with a note from the brigade commander that the device was a "PEFP [sic]."  *Id.* at 42.  The Report also notes the use of HE projectiles.  *Id.*  The Event Storyboard refers to the brigade commander's comments that the device, given the damage, appeared to be a possible EFP.  *Id.* Given the record evidence, particularly the damage to the vehicle, the court agrees with Lutz's conclusion that the device that injured COL Dudek was an EFP.  *Id.* at 43.

Lutz finds that the use of HE explosives and damage to the vehicle indicate that the device was a precision-manufactured EFP deployed by Iran-backed Hezbollah-trained Special Group

---

[4] *See supra* n.3; *infra* IV.A.1.

proxies. *Id.* Based on the totality of the evidence, the court agrees that the July 19, 2007 attack that wounded COL Dudek is traceable to Iran and its proxies.

    j.  September 4, 2007 Attack in New Baghdad: Private Second Class Randol Shelton

  Plaintiff Darlene Shelton claims that Iran is responsible for a September 4, 2007 attack on U.S. forces. Am. Compl. ¶¶ 846–851. Darlene Shelton is the mother of Private Second Class ("PV2") Randol Shelton. *Id.* ¶ 850. PV2 Shelton was killed in the attack. *Id.* ¶ 848.

  On September 4, 2007, PV2 Shelton was riding in an M1151 HMMWV, part of a 14-vehicle convoy, through New Baghdad. Lutz Report at 45. In the late morning, an EFP struck the truck commander's door and its junction with the rear passenger door. *Id.* PV2 Shelton and two other servicemembers were killed, and two additional servicemembers were wounded. *Id.* PV2 Shelton was wearing all assigned protective gear at the time of attack. *Id.* at 48.

  The court finds sufficient evidence in the record showing that the explosive responsible for PV2 Shelton's death was an EFP. The SIGACT report notes that the device was determined to be an EFP, possibly activated through passive infrared sensors rather than a wire. *Id.* at 46. Although a wire was found on the scene, EOD found it was not set up to trigger an EFP. *Id.* An individual who was detained at the scene tested positive for explosive residue. *Id.* Further testing indicated the use of ammonium nitrate in the EFP, a high explosive. *Id.* at 48. The Event Storyboard also notes that EOD determined the device to be an EFP. *Id.* at 46. Based on this information, the court agrees with Lutz's conclusion that the device used in the September 4, 2007 attack was an EFP. *Id.* at 48.

  Lutz finds that the use of HE explosives and damage to the vehicle indicate that the device was a precision-manufactured EFP deployed by Iran-backed Hezbollah-trained Special Group

proxies. *Id.* Based on the totality of the evidence, the court agrees that the September 4, 2007 attack that killed PV2 Shelton is traceable to Iran and its proxies.

### k.   March 11, 2008 Attack in Babil Province: Staff Sergeant Laurent West

Plaintiff Michelle West claims that Iran is responsible for a March 11, 2008 attack on U.S. forces. Am. Compl. ¶¶ 900–904. Michelle West is the widow of SSG Laurent West. *Id.* ¶ 903. SSG West was killed in the attack. *Id.* ¶ 902.

On March 11, 2008, SSG West was riding as a truck commander in an M1114 HMMWV, traveling south through Babil Province. Lutz Report at 49. SSG West's vehicle, which was the first in a five-vehicle patrol, was struck by an EFP on the passenger's side. *Id.* SSG West was killed and two soldiers in his vehicle were wounded. *Id.* SSG West was wearing the proper protective gear at the time of the attack. *Id.* at 50.

The court finds sufficient evidence in the record showing that the explosive responsible for SSG West's death was an EFP. The investigating officer to the AR 15-6 Investigation Report determined that the attack was carried out with an EFP that was triggered by passive infrared sensors. *Id.* The truck was not using its Rhino counter-IED system, as previous patrols found it inhibited maneuverability for the lead vehicle. *Id.* A witness statement used in the officer's report discusses how the EFP flattened two tires and sprayed shrapnel through the vehicle. *Id.* Lutz notes that the trauma listed in SSG West's autopsy report is consistent with an EFP strike. *Id.* at 51. Based on this information, the court finds that the March 11, 2008 attack was perpetrated using an EFP. *Id.*

Lutz finds that the damage to the vehicle indicates that the EFP used HE explosives and was precision-manufactured, suggesting the attack is traceable to Iran-backed Hezbollah-trained

22

Special Group proxies. *Id.* Based on the totality of the evidence, the court agrees that the March 11, 2008 attack that killed SSG West is traceable to Iran and its proxies.

l.    April 30, 2008 Attack in Bayaa: Specialist Ronald J. Tucker

Plaintiffs Estate of Ronald J. Tucker, Susan Arnold, David Arnold, Samantha Tucker, Brandon Arnold, and Daisy Tucker claim that Iran is responsible for an April 30, 2008 attack on U.S. forces. Am. Compl. ¶¶ 1042–1052. Susan Arnold is SPC Ronald J. Tucker's mother, David Arnold is SPC Tucker's stepfather, and the remaining plaintiffs are SPC Tucker's siblings. *Id.* ¶¶ 1046–1051. SPC Tucker was killed in the attack. *Id.* ¶ 1044.

On April 30, 2008, SPC Tucker was driving north in a mine-resistant ambush-protected vehicle ("MRAP") through Bayaa as part of a three-vehicle patrol. Lutz Report at 52. SPC Tucker's vehicle, the first in the patrol, was struck by a dual-array EFP on the driver's side, with slugs traveling through the vehicle and exiting out the truck commander's window. *Id.* SPC Tucker and the truck commander were killed, and four other soldiers were wounded. *Id.* The MRAP caught fire after the EFP attack. *Id.* SPC Tucker was wearing the proper protective gear at the time of attack. *Id.* at 53.

The court finds sufficient evidence in the record showing that the explosive responsible for SPC Tucker's death was an EFP. The investigating officer to the AR 15-6 Investigation Report determined that the vehicle was struck by a multiple-array EFP. *Id.* The EFP was command-wired and angled up to hit the driver and truck commander. *Id.* The investigating officer also determined that SPC Tucker was killed by the EFP, not the resulting vehicle fire. *Id.* The JTF Troy Report, drafted by EOD, also noted that the device was a command-wired dual-array EFP. *Id.* The SIGACT Report similarly lists the "IED Type" as an EFP, and the description as dual-array and command-wired. *Id.* at 56. The Event Storyboard notes this EFP strike was part of an ongoing

23

offensive against Coalition Forces. *Id.* at 57. Based on this evidence, the court agrees with Lutz's conclusion that the device used in the April 30, 2008 attack was an EFP. *Id.*

Lutz notes that the damage to the vehicle strongly suggests that the EFP was precision-manufactured and used HE explosives. *Id.* at 58. Further, reports suggest that JAM Special Groups members were behind the attack. *Id.* at 56. Based on the totality of the evidence, the court agrees that the April 30, 2008 attack that killed SPC Tucker is traceable to Iran and its proxies.

m.          February 26, 2009 Attack in Baghdad: Corporal Brian Connelly

Plaintiffs Kara Connelly, Jean Dammann, Mark Dammann, and Kevin Connelly claim that Iran is responsible for a February 26, 2009 attack on U.S. forces. Am. Compl. ¶¶ 1110–1118. Kara Connelly is the widow of CPL Brian Connelly, Jean and Mark Dammann are CPL Connelly's parents, and Kevin Connelly is CPL Connelly's brother. *Id.* ¶¶ 1114–1117. CPL Connelly was killed in the attack. *Id.* ¶ 1112.

On February 26, 2009, CPL Connelly was riding as the gunner in an MRAP, which was the second vehicle of a four-vehicle convoy traveling north through Baghdad. Lutz Report at 59. An EFP struck the MRAP's turret, separating it from the vehicle, killing CPL Connelly, and wounding two soldiers in his vehicle. *Id.* CPL Connelly was wearing the proper protective gear at the time of the attack. *Id.* at 60.

The court finds sufficient evidence in the record showing that the explosive responsible for CPL Connelly's death was an EFP. The investigating officer to the AR 15-6 Investigation Report noted that EOD determined the device used in the attack was an EFP. *Id.* The SIGACT Report also describes the attack as an EFP strike. *Id.* The Event Storyboard states that this attack was the second EFP strike in the region in the last 24 hours. *Id.* Based on this information, the court finds that the February 26, 2009 attack that killed CPL Connelly involved an EFP. *Id.* at 61.

Lutz notes that the damage to the vehicle strongly suggests that the EFP was precision-manufactured and used HE explosives. *Id.* Based on the totality of the evidence, the court agrees that the February 26, 2009 attack that killed CPL Connelly is traceable to Iran and its proxies.

## IV.  CONCLUSIONS OF LAW

The court next considers three questions of law: (1) whether there is subject matter jurisdiction over the claims arising from the 13 attacks at issue, pursuant to the FSIA's terrorism exception to sovereign immunity; (2) whether the court has personal jurisdiction; and (3) whether Iran is liable for Plaintiffs' injuries. *See Lee II*, 656 F. Supp. 3d at 51.

### A.  Subject Matter Jurisdiction

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). "Under the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within one of a list of statutory exceptions . . . ." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). Plaintiffs claim that this court has jurisdiction over Iran under a statutory exception known as the "terrorism exception." Pls.' 2d Proposed Findings at 2; Pls.' Proposed Findings of Fact & Conclusions of L. in Supp. of Their Mot. for Default J., ECF No. 23, at 15.

Pursuant to the terrorism exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an

> official, employee, or agent of such foreign state while acting within
> the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

In addition to criteria set forth in § 1605A(a)(1), the terrorism exception applies only if three additional requirements are met. First, the foreign state must have both (1) been "designated as a state sponsor of terrorism at the time the" underlying act occurred or designated because of the act and (2) been so-designated at the time the claim was filed or in the six-month period before the claim was filed. *Id.* § 1605A(a)(2)(A)(i)(I). Second, at the time of the attack, the victim must have been a national of the United States, a member of the armed forces, or an employee or contractor of the United States. *Id.* § 1605A(a)(2)(A)(ii). Third, if "the act occurred in the foreign state against which the claim has been brought," the plaintiff must have "afforded the foreign state a reasonable opportunity to arbitrate the claim." *Id.* § 1605A(a)(2)(a)(iii).

Plaintiffs have easily satisfied most of these jurisdictional prerequisites. First, Plaintiffs seek money damages against a foreign state. *See* Am. Compl. at 142. Second, Plaintiffs are seeking to recover for their personal injuries, including "physical injury, extreme mental anguish, and pain and suffering that ultimately led to their deaths" and "severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, [and] the loss of their loved ones' society, companionship, comfort, advice and counsel." *Id.* ¶¶ 1167, 1172, 1177. Third, Iran has been continuously designated as a state sponsor of terrorism since 1984. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836, 2836 (Jan. 23, 1984); *Salzman*, 2019 WL 4673761, at *12 ("Iran is a designated state sponsor of terrorism and has been since 1984."). Fourth, Plaintiffs have submitted documentation establishing that the primary, non-family victims of the 13 attacks are U.S. nationals or servicemembers. *See generally* Sealed Mot. for Leave to File Certain Docs.

26

Under Seal, ECF No. 143, 28 U.S.C. § 1605A(a)(2)(A)(ii) Appx., ECF No. 143-5.  Fifth, the relevant acts occurred in Iraq, not Iran, *see, e.g.*, Am. Compl. ¶ 1, so the requirement to afford Iran the opportunity to arbitrate is not implicated here.

The only remaining jurisdictional inquiries are whether Plaintiffs' injuries were (1) caused by (2) "the provision of material support or resources" for (3) "an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking" by "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  *See* 28 U.S.C. § 1605A(a)(1).  The court addresses these three factors in reverse order, starting with whether Plaintiffs' claims are predicated on an extrajudicial killing.

### *1.      An Act of Extrajudicial Killing*

The FSIA defines "extrajudicial killing" by reference to the Torture Victim Protection Act of 1991 (TVPA).  *Id.* § 1605A(h)(7).  Under the TVPA an "extrajudicial killing" is:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Pub. Law No. 102-256, § 3(a), 106 Stat. 73 (1992).  "[T]his definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."  *Owens*, 864 F.3d at 770.

The first element requires a "completed killing."  *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1061 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025).  That is, "an act of . . . extrajudicial killing" must result in the taking of another's life and thus does not reach attempted killings or the death of an attacker.  *Id.*; *see also Cabrera v. Islamic Republic of Iran*, No. 18-cv-2065 (JDB), 2025 WL 1423739, at *6–7 (D.D.C. May 16, 2025).  Individuals who

27

sustain nonlethal injuries from an act of extrajudicial killing satisfy this jurisdictional element. *See Boothe v. Islamic Republic of Iran*, No. 22-cv-1747 (TSC), 2026 WL 809887, at *9 (D.D.C. Mar. 24, 2026). In other words, an attack's survivor can assert a claim under the TVPA so long as the attack also resulted in a "completed killing." Based on the record evidence, each of the relevant 42 Plaintiffs are the estates of victims of extrajudicial killings, family members of the deceased, or servicemembers injured in an act of extrajudicial killing of another or their family members, thereby satisfying the first element. *See generally* Lutz Report.

Next, the court must determine whether the killings were "deliberated." *Owens*, 864 F.3d at 770. "A deliberated killing is simply one undertaken with careful consideration, not on a sudden impulse." *Salzman*, 2019 WL 4673761, at *13 (internal quotation marks omitted). Each of the 13 attacks at issue involved the detonation of EFPs. EFPs must be strategically placed and later armed via either remote frequency or command wire to properly detonate. *See* Barker Report, PX-158, at 10. Planning an EFP's location and constructing a means to trigger the device requires forethought, and an EFP therefore cannot be detonated on "a sudden impulse." *See Salzman*, 2019 WL 4673761, at *13. In addition, the court received expert testimony that EFPs were constantly retooled to overcome U.S. defenses that attempted to make EFPs less deadly, indicating that EFPs were intentionally designed to inflict maximum harm on their targets. *See* Barker Report, PX-158, at 12–18.

Finally, there is no evidence that would suggest that the killings in any of the 13 attacks were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation. The killings of persons at issue here are therefore extrajudicial killings under the FSIA.

2.    *Material Support or Resources by an Official or Agent of Iran*

Plaintiffs next must establish that an official or agent of Iran provided material support to the actors who carried out the EFP attacks. The FSIA defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" by reference to 18 U.S.C. § 2339A).

Plaintiffs have provided numerous examples of Iran funneling material support through the IRGC and Qods Force to terrorist proxies in Iraq. And, as the court in *Karcher* held, the Qods Force "is at least an agent of Iran, if not a part of the government such that individuals working for [the Qods Force] would be officials or employees of Iran." *Karcher I*, 396 F. Supp. 3d at 55. This material support manifested as millions of dollars of funding, training, and advanced weaponry. *See, e.g.*, Pregent Report, PX-155, at 12; Oates Report, PX-153, at 24. Thus, Plaintiffs have established that Iran provided material support for the terrorist attacks that harmed them.

3.    *Causation*

Finally, for the court to have subject matter jurisdiction over this matter, Plaintiffs must prove that Iran's "provision of material support or resources" caused Plaintiffs' "personal injury or death." 28 U.S.C. § 1605A(a)(1). The D.C. Circuit has adopted a proximate cause standard for the FSIA terrorism exception. *See Kilburn*, 376 F.3d at 1128; *Owens*, 864 F.3d at 794 ("In *Kilburn*, we held a plaintiff must show proximate cause to establish jurisdiction under § 1605(a)(7), the predecessor of the current FSIA terrorism exception. Because § 1605A(a) restates the predicate acts of § 1605(a)(7), it stands to reason that proximate cause remains the jurisdictional standard."

29

(citation omitted)).  The touchstone of proximate causation is the existence of "'some reasonable connection between the act . . . of the defendant and the damage which the plaintiff has suffered.'" *Owens*, 864 F.3d at 794 (quoting *Kilburn*, 376 F.3d at 1128).  There are two components to this inquiry: "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury.  Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct."  *Id.* (citation omitted) (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

Plaintiffs have satisfied both components of proximate cause.  Iran's support was a "substantial factor" leading to Plaintiffs' injuries because Iran provided the funding, training, and weaponry that was used to injure Plaintiffs.  *See* Pregent Report, PX-155, at 12; Oates Report, PX-153, at 24; Pls.' 2d Proposed Findings, Ex. B, ECF No. 53-2 [hereinafter *Lee II* Lutz Report], at 198.  This support was particularly crucial with respect to EFPs: as the U.S. military developed countermeasures to make EFP attacks less lethal, Iran's training, technology, and provision of resources equipped insurgents with EFPs that could respond to U.S. countermeasures and inflict maximum damage.  *See* Tr. 1 at 98:5-9; Oates Report, PX-153, at 25 (noting that the U.S. military traced components of EFPs to Iran's illicit supply chain); Tr. 5 at 48:21–49:12 (noting devices that interfered with counter-EFP measures were likewise traced to Iran).

Plaintiffs' injuries were also a reasonably foreseeable consequence of Iran's conduct.  The U.S. military has successfully traced EFP devices that circumvented the United States' counter-EFP measures to Iran.  Tr. 5 at 48:21–49:12.  The U.S. government also has confirmed that the IRGC-Qods Force "coordinated the training of JAM Special Groups."  *Lee II* Lutz Report at 198.  It is clear from Iran's financial support and its provision of evolving and ever-more lethal weaponry to insurgents in Iraq that Iran reasonably anticipated—and indeed, intended—that its

30

support would lead to the death of U.S. soldiers.  *See Karcher I*, 396 F. Supp. 3d at 56–57 (finding harm to the plaintiffs was reasonably foreseeable consequence when Iran intended "to kill people, not just disable vehicles"); *see also Owens*, 864 F.3d at 797–98 (finding bombings were a reasonably foreseeable consequence of Sudan's provision of "opportunities" to al Qaeda and Osama bin Laden (internal quotation marks omitted)).  Likewise, the suffering of the families of victims of Iran-supported attacks was a reasonably foreseeable consequence of Iran's support for terrorist attacks in Iraq.  *See Salzman*, 2019 WL 4673761, at *14 (finding "the related suffering of [victims'] family members" was "reasonably foreseeable").

The court therefore concludes that Iran's material support for the extrajudicial killings and attempted killings involved in the 13 attacks proximately caused Plaintiffs' injuries, and the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1605A(a)(1).

### B.    Personal Jurisdiction

As with subject matter jurisdiction, the court has "an independent obligation . . . to satisfy itself of its personal jurisdiction before entering a default against a missing party."  *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018).  Under the FSIA, a court has personal jurisdiction over a foreign sovereign where the court has subject matter jurisdiction and "service has been made under" 28 U.S.C. § 1608.  28 U.S.C. § 1330(b).  "In other words, under the FSIA, subject matter jurisdiction plus service of process equals jurisdiction."  *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (internal quotation marks omitted).

The FSIA provides four means for serving a foreign state.  *See* 28 U.S.C. § 1608(a).  First, a plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision."  *Id.* § 1608(a)(1).  If service cannot be made under such an arrangement, then the

plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). If the plaintiff cannot serve the defendant via the first two methods, then the plaintiff must attempt to effect service "by sending a copy of the summons and complaint and a notice of suit," as well as "a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). If, after 30 days, service cannot be effected by this third option, the plaintiff may attempt service through diplomatic means. To do so, the plaintiff must provide the clerk of court with two copies of the summons and complaint and a notice of the suit, along with a translation of each into the official language of the foreign state, which the clerk of court transmits to the Secretary of State. *Id.* § 1608(a)(4). The Secretary of State will then "transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

Plaintiffs could not serve Iran under the first two mechanisms of service, as the United States and Iran do not have a "special arrangement" for service and "'Iran is not party to an international convention on service of judicial documents.'" *Salzman*, 2019 WL 4673761, at *15 (quoting *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)). Plaintiffs therefore first attempted to effect service under the third mechanism—via registered mail with return receipt requested. *See* Certificate of Mailing. When Iran did not respond after 30 days, Plaintiffs served Iran via diplomatic channels. *See* Diplomatic Service Request; Dep't of State Service Attempt. Under 28 U.S.C. § 1608(c)(1), service was deemed effected "as of the date of transmittal indicated in the certified copy of the diplomatic note"—in this case, December 18,

2019.  *See* Dep't of State Service Attempt.  Accordingly, this court finds that Plaintiffs properly effected service on Iran under 28 U.S.C. § 1608(a)(4).

Because the court concludes that it has subject matter jurisdiction and Plaintiffs have properly effected service, the court likewise has personal jurisdiction over Iran.  *See GSS Grp.*, 680 F.3d at 811.

### C.    Liability

Finally, the court must determine whether Iran is liable for Plaintiffs' injuries with respect to the 13 attacks at issue.  Plaintiffs bring their claims under 28 U.S.C. § 1605A(c).  *See* Am. Compl. ¶¶ 1165–1178.  Section 1605A(c) provides that "[a] foreign state that is or was a state sponsor of terrorism" and any of its agents are liable "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(c).  The section "creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity."  *Karcher II*, 2021 WL 133507, at *67; *see also Karcher I*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338 (RJL), 2019 WL 2185037, at *6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87.  "Importantly, Section 1605A(c) also creates vicarious liability 'for the acts of [Iran's] officials, employees, or agents,' in this case, the IRGC and its leadership, Hezbollah, and Iraqi proxies."  *Karcher II*, 2021 WL 133507, at *67 (quoting 28 U.S.C. § 1605A(c)).  Liability is limited, however, to U.S. nationals, members of the armed forces, employees or contractors of the U.S. government, and legal representatives of any of those individuals.  *See* 28 U.S.C. § 1605A(c).

Plaintiffs' § 1605A(c) claims fall into three categories: (1) U.S. soldiers injured in Iraq by acts of extrajudicial killings of other servicemembers that Iran materially supported; (2) the estates of U.S. soldiers killed in Iraq as a result of such acts; and (3) the family members of the injured and deceased U.S. soldiers. *See generally* Am. Compl. The first two categories comprise the § 1605A(c) claims of five Plaintiffs.

**Surviving Plaintiffs**: (1) Justin Waldeck; (2) Daniel Dudek. Am. Compl. ¶¶ 290–301, 818–828.

**Estates of Deceased U.S. Soldiers**: (1) Gloria Magana, on behalf of the Estate of Kenny Frances Stanton, Jr.; (2) Michael Dean Moody, Sr., on behalf of the Estate of Michael Dean Moody, Jr.; (3) Susan Arnold, on behalf of the Estate of Ronald Tucker. Am. Compl. ¶¶ 472, 778, 1047.

These Plaintiffs' claims "derive from the injuries or deaths of members of the U.S. armed forces." *See Karcher II*, 2021 WL 133507, at \*68. "Given the factual and legal overlap," this court's finding of "subject-matter jurisdiction over each of these Plaintiff's claims also establishes their entitlement to relief under 28 U.S.C. § 1605A(c)." *Id.*; *see also Salzman*, 2019 WL 4673761, at \*15 ("There is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." (cleaned up) (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017))); *Allan*, 2019 WL 2185037, at \*6 ("[M]ost courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605A(c)."). The court has subject matter

34

jurisdiction over these Plaintiffs' claims under the terrorism exception; accordingly, the court also concludes that Iran is liable for these Plaintiffs' injuries under 28 U.S.C. § 1605A(c).

The remaining § 1605A(c) claims at issue are those of family members of U.S. soldiers injured or killed in the 13 attacks. *See generally* Am. Compl. Family members may recover for emotional distress under § 1605A(c) if: "(1) they are members of a victim's immediate family" and "(2) they are present at the time, or the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019) (internal quotation marks omitted). Liability is limited to U.S. nationals. *See* 28 U.S.C. § 1605A(c)(1).

The second prong is easily met—"acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Murphy*, 740 F. Supp. 2d at 73; *see Karcher II*, 2021 WL 133507, at *69 ("[T]he Court is satisfied that these acts of terrorism were 'sufficiently extreme and outrageous to demonstrate that' Iran's intent was 'to inflict severe emotional harm on even those not present at the site of the act.'" (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015))).

As for the first, the "'immediate family' requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover." *Roth*, 78 F. Supp. 3d at 400 (quoting *Murphy*, 740 F. Supp. 2d at 75). Here, the family-member Plaintiffs allege that they are immediate family, which the court accepts as true. *See Argonaut Ins. Co. v. Lynchburg Steel & Specialty Co.*, 308 F. Supp. 3d 218, 221 (D.D.C. 2018) (stating that a "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint" (internal quotation marks omitted)); *see* Am. Compl. ¶¶ 229, 294–295, 471–475, 638–639, 771, 777–780, 786–794, 818–828, 850, 903, 1046–1051, 1114–1117. But these Plaintiffs have neither offered allegations nor

35

provided evidence establishing that they are U.S. nationals, as required by 28 U.S.C. § 1605A(c)(1).  In the absence of such evidence, the court makes no final determination as to the § 1605A(c) claims of the family-member Plaintiffs arising from the 13 attacks.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, the court grants the motion for default judgment against Defendant as to the 13 attacks considered herein as to the injured servicemember and estate claims, but not the immediate family-member claims.  Plaintiffs may within 30 days submit additional evidence establishing a family-member Plaintiff is a U.S. national.

Dated: April 28, 2026

Amit P. Mehta
United States District Judge