**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILLIAM LEE, et al.,      ) | |
|     ) | |
|    Plaintiffs,     ) | |
|     ) | |
|       v.     ) | Case No. 19-cv-00830 (APM) |
|     ) | |
| ISLAMIC REPUBLIC OF IRAN,     ) | |
|     ) | |
|    Defendant.     ) | |

**MEMORANDUM OPINION AND ORDER**

## I.  INTRODUCTION

From 2004 through 2011, the U.S. military faced insurgent attacks in Iraq that Plaintiffs allege were materially supported by Defendant Islamic Republic of Iran ("Iran").  This case involves 99 attacks and is brought by over 352 Plaintiffs, consisting of military servicemembers and contractors, their estates, and their family members.  Plaintiffs seek relief for the personal injuries of surviving and deceased victims and emotional distress endured by the families of those injured or killed.

Given the number of Plaintiffs, this litigation is proceeding in phases.  In *Lee v. Islamic Republic of Iran* (*Lee I*), this court found Iran liable for four of the alleged 99 attacks.  518 F. Supp. 3d 475 (D.D.C. 2021).  Then, this court found Iran liable for another 27 attacks.  *Lee v. Islamic Republic of Iran* (*Lee II*), 656 F. Supp. 3d 11 (D.D.C. 2023).  And most recently, this court found Iran liable for 13 more attacks.  Mem. Op. & Order, ECF No. 194 [hereinafter *Lee III*].  The court must now determine whether Iran is liable for 17 additional attacks against U.S. servicemembers and contractors in Iraq between 2004 and 2008.

Collectively, these 17 attacks implicate the claims of: (1) two Plaintiffs personally injured in the attacks; (2) 12 Plaintiffs representing the estates of individuals killed in the attacks, and (3) 68 Plaintiffs seeking damages as a family member of a victim injured or killed in the attacks. As explained below, the court finds Iran responsible for these attacks and liable for Plaintiffs' injuries.

## II.    LEGAL STANDARD

Plaintiffs seek default judgment against Iran under the Foreign Sovereign Immunities Act (FSIA) because Iran has failed to defend this lawsuit. *See* Submission of Evidence for Seventeen Attacks Not Yet Adjudicated, ECF No. 149 [hereinafter Pls.' 4th Proposed Findings]; Pls.' Second Proposed Findings of Fact & Conclusions of L. in Supp. of Their Mot. for Default J., ECF No. 53 [hereinafter Pls.' 2d Proposed Findings]; *see also* Order, ECF No. 141. "[T]he entry of a default judgment is not automatic and requires the exercise of sound discretion." *Salzman v. Islamic Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *2 (D.D.C. Sept. 25, 2019) (internal quotation marks omitted). A claim for default judgment under the FSIA is governed by the statutory requirement that "[n]o judgment by default shall be entered . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (internal quotation marks omitted). "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020).

In addition, "[a] plaintiff seeking default judgment must persuade the trial court that subject-matter jurisdiction and personal jurisdiction over the defendant are satisfied." *Karcher v. Islamic Republic of Iran* (*Karcher I*), 396 F. Supp. 3d 12, 21 (D.D.C. 2009). "A default judgment rendered in excess of a court's jurisdiction is void." *Jerez*, 775 F.3d at 422.

## III.   FINDINGS OF FACT

The court's Findings of Fact will proceed in two parts. *See Karcher v. Islamic Republic of Iran* (*Karcher II*), No. 16-cv-232 (CKK), 2021 WL 133507, at *6 (D.D.C. Jan. 14, 2021). First, the court will incorporate its prior factual findings from its opinions in *Lee I*, *Lee II*, and *Lee III*, including findings about Plaintiffs' attempts to serve Iran, Iran's relationships with Hezbollah and other proxy groups operating in Iraq, and the nature and use of explosively formed penetrators, or EFPs, in Iraq. Second, the court will analyze each attack and determine whether it can be traced back to Iran and its proxies.

The court takes judicial notice of the decisions in *Karcher* and *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018), two other cases brought against Iran for its role in killing and injuring U.S. servicemembers in Iraq. The court does so pursuant to Federal Rule of Evidence 201(b), which "extends to judicial notice of court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). As "the FSIA does not require this Court to relitigate issues that have already been settled in previous decisions," the court can "review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (internal quotation marks omitted). The court therefore may rely on the evidence presented in the *Karcher* and *Fritz* courts but must nonetheless "reach [its] own independent findings of fact." *See Rimkus*, 750 F. Supp. 2d at 172. This court has done so.

### A.    Service of Process

As a threshold matter, the court must make a factual finding concerning Plaintiffs' attempts to serve Iran, which is a component of the court's personal jurisdiction analysis. The court addresses the sufficiency of these efforts later in this opinion.

Plaintiffs attempted to serve Iran by mailing "one copy of the summons, [amended] complaint, and notice of suit, together with a translation of each" by registered mail with return receipt through the U.S. Postal Service to Iran's head of the Ministry of Foreign Affairs, Dr. Mohammad Zarif. *See* Aff. Requesting Foreign Mailing, ECF No. 18; Certificate of Mailing, ECF No. 20.

When 30 days passed without a response from Iran, Plaintiffs served Iran via diplomatic channels. *See* Aff. Requesting Foreign Mailing, ECF No. 22 [hereinafter Diplomatic Service Request]. On December 18, 2019, the Department of State transmitted a summons, Amended Complaint, and notice of suit to Iran through the Embassy of Switzerland in Tehran. Ltr. from J. Hess, Attorney Adviser, Overseas Citizens Servs., Office of Legal Affairs, to Angela D. Caesar, Clerk of Court for the U.S. Dist. Court for the Dist. of Columbia (Jan. 21, 2020), ECF No. 26 [hereinafter Dep't of State Service Attempt]. Thereafter, Iran had 60 days—or until February 18, 2020, accounting for weekends and holidays—to respond to the Amended Complaint. 28 U.S.C. § 1608(d). It failed to do so.

### B.    Iran's Responsibility for the Attacks

#### 1.    Expert Testimony

In *Lee I*, *Lee II*, and *Lee III*, this court qualified seven experts that were previously qualified in *Karcher I*. *See Lee I*, 518 F. Supp. 3d at 481–82; *Lee II*, 656 F. Supp. 3d at 23; *Lee III* at 4–5. The court incorporates herein its prior qualification of Dr. Matthew Levitt, Lieutenant General

(Ret.) Michael L. Oates, Colonel (Ret.) Leo E. Bradley III, Captain (Ret.) Donald Wade Barker, Colonel (Ret.) Kevin Lutz, Russell L. McIntyre, and Michael P. Pregent.[1]

Additionally, the court qualifies Colonel (Ret.) Joel Rayburn as an expert. Rayburn is a national security professional with decades of experience in the military, intelligence community, executive branch, and Congress. Pls.' 4th Proposed Findings, Ex. A, ECF No. 149-1 [hereinafter Rayburn Report], at 60; Pls.' 4th Proposed Findings, Ex. B, ECF 149-2 [hereinafter Rayburn Decl.], ¶¶ 1–7. He holds graduate-level degrees in History and Strategic Studies, Rayburn Report at 61, and currently serves as the founder and director of a non-profit research organization that focuses on Middle East affairs, *id.* at 60. He served 26 years as a U.S. Army Officer and finished his military career as senior director for Iran, Iraq, Syria, and Lebanon on the National Security Council staff. *Id.* From 2005 to 2011, Rayburn served in various advisory roles related to strategic intelligence assessment in Iran, Iraq, Syria, and Lebanon with a focus on the activities and plans of the Islamic Revolutionary Guard Corps-Qods Force ("Qods Force"), Lebanese Hezbollah, the Assad regime, and major Sunni terrorist groups in the northern Middle East. *Id.* at 60–61. Rayburn also spent periods of time on the ground in Iraq between 2006 and 2015, *id.* at 2, 60, and he has been directly involved in formulating counterterrorism strategy, *id.* at 2. Finally, Rayburn has served as Special Advisor for Middle East Affairs in the office of Senator Bill Hagerty and as U.S. Special Envoy for Syria and Deputy Assistant Secretary of State for Levant Affairs. *Id.* at 60. The court finds Rayburn qualified to serve as an expert as to the Iranian government's "ability to conduct attacks in Iraq," *id.* at 8–9, and its delegation to the "[Qods Force], the Ministry of Intelligence and Security[,] . . . and the Iranian proxy group Lebanese Hezbollah[,] . . . the principal responsibilities of carrying out the Iranian policy of providing material support to Iraqi Shi'a

---

[1] For ease of reference, the court has omitted the titles of Plaintiffs' expert witnesses after the first reference.

terrorist groups." *Id.* at 8.  Additionally, the court finds Rayburn qualified to serve as an expert as to the "area[s] that Iraqi Shi'a terrorist groups either controlled or were able to operate in to a significant degree[,] . . . time[s] when Iraqi Shi'a terrorist groups had control in the area[s], . . . [and] [the] weapons typically used by Iraqi Shi'a terrorist groups." *Id.* at 7.

### 2.       *Iran's Material Support to Hezbollah and Other Proxies in Iraq*

Iran's involvement in Iraq dates to the late 20th century, when it began supporting Shi'a groups and terrorist organizations in the region that would ultimately operate in Iraq.  In 1979, the Supreme Leader of Iran, Ayatollah Khomeini, established what became known as the Islamic Revolutionary Guard Corps ("IRGC") to implement the Ayatollah's "vision for an Islamic theocratic government in Iran."  McIntyre Report, PX-157,[2] at 4–5.  In the 1980s, Iran created a "fully functional militia backed by the Islamic Revolutionary Guard Corps-Qods Force" composed of religious extremists.  Levitt Report, PX-154, at 7; McIntyre Report, PX-157, at 5 & n.6.  The Qods Force "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government."  McIntyre Report, PX-157, at 6.

At the same time, Iran and the IRGC were "provid[ing] critical assistance to newly-emerging Hezbollah, which swore an oath of fealty to Iran."  *Id.* at 7.  Iran "bankroll[ed], arm[ed], and train[ed] Hezbollah" in exchange for Hezbollah's dedication to Iran and its revolutionary aims.  *Id.*; *see also* Levitt Report, PX-154, at 9.

Iran's proxies were already operating in Iraq prior to 2003, when the United States and coalition forces launched Operation Iraqi Freedom and dismantled Saddam Hussein's regime.

---

[2] For simplicity, the court adopts a modified convention for citations to evidence submitted to the *Karcher I* court. Exhibits from the *Karcher I* trial are denoted by title and "PX," followed by the exhibit number assigned to the exhibit during the *Karcher I* trial.

Levitt Report, PX-154, at 6–7.  By 2003, both the Qods Force and Hezbollah had established long-standing working relationships with Iraqi Shi'a militant networks and terrorist groups.  Rayburn Report at 18.  With Hussein out of power, Iran seized the "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region."  Levitt Report, PX-154, at 7.  Iran sought to install "weakened decentralized and Shi'a-dominated" leadership in Iraq and therefore set out to "foster unity among Iraq's various Shi'a parties and movements so that [it] could consolidate Shi'a political control . . . over the new Iraqi government."  *Id.* at 8.

To that end, Iran developed numerous Shi'a proxies with a presence in Iraq.  Iran backed the Office of the Martyr Sadr, a movement that "spoke for Iraq's disenfranchised Shi'a" and was led by Muqtada al-Sadr.  Oates Report, PX-153, at 17.  In 2003, the Office of the Martyr Sadr opened "an armed wing" called Jaysh al-Mahdi ("JAM").  *Id.*  Iran offered the movement and its armed wing "financing and weapons training," and the Qods Force "dispatched Hezbollah operatives . . . to help establish JAM and provide it with logistical assistance."  *Id.*  al-Sadr ultimately split JAM into different branches to address competing priorities and developed "Special Groups" that were specifically designed to attack American and coalition forces.  *Id.* at 22–24.  The Special Groups were successful, and "[f]rom 2003 to 2006, the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq."  McIntyre Report, PX-157, at 16.  Iran later recruited new leadership for a Special Group called Asayb al-Haq, or AAH.  *Id.* at 38–39.  AAH also "acted as an Iranian proxy in Iraq, carrying out the IRGC's agenda and promoting its interests."  *Id.* at 39.

Iran provided its proxies with training, weapons, and financial support.  Through Hezbollah, Iran brought operatives "into Iran for training and smuggling weapons across the border into Iraq" and sent IRGC and Qods Force operatives to Iraq.  Pregent Report, PX-155, at

12.  Iran also used its resources specifically to support EFP attacks: "[O]ne of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs." Oates Report, PX-153, at 24.   Iran funneled to Special Groups in Iraq EFPs that "were professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor, such as armored patrols and supply convoys." *Id.* Iran also backed its proxies with extensive financial resources; by August 2007, Iran, through IRGC and the Qods Force, was estimated to be "providing between $750,000 and $3 million worth of equipment and funding to Special Groups *every month.*" Pregent Report, PX-155, at 12.

### 3. *Explosively Formed Penetrators (EFPs)*

Two of the 17 attacks Plaintiffs claim Iran materially supported involved a uniquely lethal weapon known as an explosively formed penetrator, or EFP.  EFPs are explosive devices that are intentionally "designed to defeat armor." Barker Report, PX-158, at 5.  According to Barker, the earliest known EFPs "appear[ed] on modern battlefields in the 1990s as a weapon deployed in Lebanon by Hezbollah." *Id.* at 6.  EFPs became insurgents' weapon of choice in Iraq after the United States began to "up-armor" its military vehicles, particularly its Humvees, in response to increased attacks from local militias and terrorist cells.  *See id.* at 12–13.  EFPs enabled insurgents to specifically target and explode even these heavily armored U.S. military vehicles, and their use against U.S. forces quickly proliferated starting in 2005.  *See id.* at 13–14.

The EFPs that were detonated "in Iraq were generally made with a precision manufactured concave copper disk liner and [high-energy] explosive . . . packed behind the liner." *Id.* at 6 (footnote omitted).  EFPs travel at high speeds and can "pierce through several inches of military-grade armor like a fist through a wall." *Id.* at 7 (internal quotation marks omitted).  The weapons create "a massive blast overpressure, capable of blowing the doors and turrets from vehicles close

to the device," and "the heat and force of the penetrator [can] shatter [a] vehicle's armor and materials inward," propelling "razor-sharp shards of Teflon and steel ripping through the interior compartment." *Id.* The heat generated by EFPs is powerful enough to "ignite engine fuel and set vehicles ablaze." *Id.*

EFPs detonate after being armed via remote frequency or insulated command wire. *Id.* at 10. EFPs that employ a command-wire trigger allow insurgents to detonate the device from up to 100 meters from the blast site, while remote-frequency triggers give insurgents a 300-meter range. *Id.* Once armed, EFPs are "triggered using a passive infra-red device" that is attached to the EFP and can, "for example, detect the heat signature of a passing vehicle" and "send an electrical current [to] set off [an] explosion within the EFP's casing." *Id.*

### 4. EFPs in Iraq

To combat lethal EFP attacks, the U.S. military began adding even more armor to its vehicles and increased its use of Bradley Fighting Vehicles ("Bradleys") in Iraq. *Id.* at 15. When the additional armor failed to provide meaningful protection, the U.S. military developed technology that jammed the radio frequencies that insurgents used to trigger EFPs and began using a device known as a Rhino, which was attached to the front of a combat vehicle and simulated the heat of the vehicle to prematurely trigger EFPs. *Id.* at 16. With each advancement in U.S. technology, however, EFP warfare evolved to become even more stealthy and sophisticated. *See id.* at 15–18. For example, when the United States introduced radio-frequency jammers, insurgents began "modulating the frequencies of their remote activators." *Id.* at 16. And when the United States began attaching Rhinos to its vehicles, insurgents began angling EFPs "backward to account for" the early triggers. *Id.* at 18.

The sophistication of the devices in Iraq was beyond the capacity of individuals with basic training in the construction of improvised explosive devices, or IEDs.  *See* Tr. 3 at 18:23–19:10; *see also* Barker Report, PX-158, at 16.  Barker opined that insurgents' ability to defeat the United States' sophisticated countermeasures would not have been possible "without the active involvement, training, equipment and support of the IRGC."  Barker Report, PX-158, at 16.  Oates testified similarly at the *Karcher* trial that "the rapid capability development of the Shi'a militia in Iraq from a weapons training and tactics procedure, the speed with which they achieved this capability and their ability to adapt led [him] to believe that there was external assistance provided."  Tr. 1 at 98:5-9.

These opinions are confirmed by U.S. military forensic analyses of IED and EFP detonations.  Tr. 5 at 27:14–28:10.  Via such analyses, the U.S. military was able to "identify signatures by bomb makers" and "the emerging enemy tactics, techniques and procedures" that were being used.  *Id.*  "The U.S. military traced much of the machinery used to manufacture the EFPs, high explosives and [passive infra-red] devices deployed in Iraq to Iran and its illicit supply chain."  Oates Report, PX-153, at 25.  U.S. intelligence ultimately traced tens of thousands of devices that interfered with the United States' counter-EFP measures from Iran to Baghdad.  Tr. 5 at 48:16–49:12.  Moreover, the U.S. military concluded that Iran and its proxies "provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry."  Off. of the Coordinator for Counterterrorism, U.S. Dep't of State, Country Reports on Terrorism 2008 (Apr. 2009), PX-18, at 183.

These reports are consistent with Barker's testimony at the *Karcher* trial.  Barker explained that "EFPs are extremely complicated systems to build," so Iran and its proxies "would build [EFPs] complete [and] bring them in as a complete total system, ready to go."  Tr. 3 at 44:13-16.

Iraqi operatives would then emplace the EFP by "get[ting] in a local vehicle" that was equipped with "a false floor." *Id.* at 44:19-22. The operatives would pretend that the vehicle had broken down on the road and "pull over on the side of the road" to "raise the hood." *Id.* at 44:20-21. Meanwhile, operatives inside the vehicle would "pull[] the floor out," "crawl out," "lay the device in the predetermined position[,] and drive away." *Id.* at 44:22-24.

### 5.    The Attacks

Having established Iran's presence in Iraq and its assistance in developing and providing EFPs, the court now turns to Plaintiffs' evidence of the 17 attacks at issue. The court here has independently reviewed the evidence, including supplemental evidence from expert Rayburn regarding Iran's responsibility for each attack. *See* Rayburn Decl.; Submission of Evidence for Seventeen Attacks Sealed Exs., ECF No. 150 [hereinafter Sealed Exs. for 4th Proposed Findings], Ex. C, ECF No. 150-2 [hereinafter Ex. C]; Sealed Exs. for 4th Proposed Findings, Ex. D, ECF No. 150-3 [hereinafter Ex. D].

The court will first address the two attacks where EFPs were alleged to have been used following the framework adopted by the *Karcher I* court: First, the court will "summarize each attack and identify the harms inflicted" on the respective Plaintiffs. *Karcher I*, 396 F. Supp. 3d at 30. Then, the court will "apply[] the evidence of EFP characteristics," rather than relying on expert testimony, to make its determinations and "identify the key elements of the attack" that indicate whether in fact EFPs were deployed. *Id.* Finally, the court "shall trace the connection," if any, to Iran, based in part on the expert assessment of whether a given attack was likely the work of an Iran-sponsored Special Group. *Id.*

As for the remaining 15 attacks, the court will rely on Rayburn's expert report, which considered several sources including military reports, casualty reports, witness reports, press

releases, story boards, and investigation materials.  *See* Rayburn Report at 9–13; Rayburn Decl. ¶ 12.  The court also considered these sources directly.

a.    <u>October 4, 2006 Attack in Baghdad: Guy Barattieri</u>

Plaintiff Laurel Barattieri, on behalf of the Estate of Guy Barattieri, claims that Iran is liable for an October 4, 2006 attack on U.S. forces in Baghdad, Iraq.  *See* Am. Compl., ECF No. 12, ¶¶ 461–464.  Guy Barattieri was killed in the attack.  *Id.* ¶ 463.

The attack took place on a major highway between Baghdad and Khalis.  Rayburn Report at 43.  Guy Barattieri, a civilian contractor for Falcon Securities, had just finished conducting a site survey at a power plant.  *See* Ex. C at 113–14.  On the way out of the power plant, the group took a different route because Iraqi police had lined the ingress route.  *Id.*  Barattieri's F-150 gun-truck was hit with an explosive, killing him.  *Id.*; *see* Rayburn Report at 43.

The court finds sufficient evidence in the record showing that the explosive responsible for Barattieri's death was an EFP.  The SIGACT Report attributes the damage to Barattieri's truck to an IED, noting that the charge was "directional."  Ex. C at 103.  Lutz explained that EFPs are sometimes described as "Directional IED[s]."  Pls.' 2d Proposed Findings, Ex. B, ECF No. 53-2 [hereinafter Lutz Report], at 2.  Photographs also show that the extensive damage to the vehicle and the six-foot crater left by the explosion in the road are consistent with an EFP attack.  Rayburn Report at 43; *See* Ex. C at 110–11.  Eyewitness accounts describe an EFP hitting the truck.  Rayburn Report at 43.  And the attack occurred in "a stronghold of JAM and associated Shia terrorist groups" where JAM often performed complex attacks.  *Id.*

Rayburn concluded that "the bomb itself showed characteristics of an EFP" and that this attack "was committed by Iranian-sponsored Shia terrorists."  *Id.* at 44.  He opined that "Sunni militants almost certainly could not have committed a complex attack in that particular area of

12

Baghdad" and that "[o]nly Iranian- and Lebanese Hezbollah-sponsored militias, especially JAM Special Groups, deployed EFPs at that point in the conflict," especially considering "the date and location of the attack." *Id.* Accordingly, the court agrees that the October 4, 2006 attack that killed Barattieri is traceable to Iran and its proxies.

     b.  <u>December 9, 2007 Attack in Zubadiyah: Micah Shaw, Michael Doheny, Steven Evrard, and Billy Johnson</u>

   Plaintiffs Elena Shaw, Estate of Michael Doheny, Melissa Doheny, Kathy Kugler, Robert Kugler, Tanya Evrard, and Billy Johnson, claim that Iran is liable for a December 9, 2007 attack on U.S. forces. *See* Am. Compl. ¶¶ 869–889. Elena Shaw is the widow of Micah Shaw, *id.* ¶ 869; Melissa Doheny, Kathy Kugler, and Robert Kugler are the widow, mother, and brother of Michael Doheny, respectively, *id.* ¶¶ 875, 877–878; and Tanya Evrard is the widow of Steven Evrard, *id.* ¶ 884. Micah Shaw, Michael Doheny, and Steven Evrard were all killed in the attack. *Id.* ¶¶ 867, 873, 882. Billy Johnson was injured in the attack.[3] *Id.* ¶¶ 887–891. All four victims were civilian contractors working in the 214th Fires Brigade. *Id.* ¶¶ 866, 872, 881, 887; Rayburn Report at 48.

   On December 9, 2007, the four contractors were attacked while traveling in a convoy on a reconnaissance mission in an armed F-350 gun truck on the main highway running between Kut and Baghdad. Rayburn Report at 48. At 12:55 p.m., the convoy came under small arms fire near the town of Zubaydiyah, southeast of Aziziyah. *Id.* Their vehicle was then struck by a powerful IED that blew the vehicle off the road. *Id.* Shaw, Doheny, and Evrard were killed by the blast. *Id.* Johnson was ejected from the vehicle's gun turret and suffered serious injuries. *Id.*

---

[3] This court has jurisdiction over injuries stemming from a defendant nation's acts of material support for an extrajudicial killing. *See* 28 U.S.C. § 1605A(a)(1). Although jurisdiction does not flow from attempted killings, *see Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1061 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025), courts retain jurisdiction over survivors' claims for non-lethal injuries suffered in an attack that resulted in the killing of another, like Billy Johnson. *See Boothe v. Islamic Republic of Iran*, No. 22-cv-1747 (TSC), 2026 WL 809887, at *9 (D.D.C. Mar. 24, 2026); *see also infra* Section IV.A.1.

The court finds sufficient evidence in the record to conclude that the attack was the result of an EFP.  That the truck was blown hundreds of meters off the road and the extent of catastrophic damage to the vehicle are both characteristic of EFPs.  *Id.* at 48–49.

Rayburn further points to the location and timing of the attack as evidence of Shi'a militant involvement.  *Id.* at 48.  The region between Aziziyah and Kut was a stronghold for JAM at the time, and it was almost wholly populated by Shi'a Iraqis, making it "highly unlikely that non-Shia militants could have had the freedom of maneuver and action required to carry out a complex ambush of a coalition convoy in that area."  *Id.* at 48.  Rayburn pinpoints JAM Special Groups ("JAM-SG") operatives as being responsible for the attack in part because, beginning August 2007, only JAM-SG was authorized to carry out attacks.  *Id.* at 49.  Accordingly, the court agrees that the December 9, 2007 attack that killed Shaw, Doheny, and Evrard and injured Johnson is traceable to Iran and its proxies.

c.  <u>August 5, 2004 Attack in Najaf: Sergeant Yadir G. Reynoso</u>

Plaintiffs Estate of Yadir G. Reynoso and Gloria P. Reynoso, Jasmin Reynoso, Patricia Reynoso, and José Reynoso—the mother, sisters, and brother of Sergeant Yadir G. Reynoso, respectively—claim that Iran is liable for an August 5, 2004 attack on U.S. forces.  *See* Am. Compl. ¶¶ 151–158.  Sergeant Reynoso was killed in the attack.  *Id.* ¶ 152.

Sergeant Reynoso was killed in a cemetery near the Imam Ali Shrine in Najaf as part of a major battle in the city during the JAM uprising of August 2004.  Rayburn Report at 35.  On August 5, 2004, hundreds of JAM militants assembled in the cemetery, which JAM militants used as an operations base, *id.* at 36, and launched a complex attack against coalition troops and Iraqi security forces.  *Id.* at 35–36.  After a large-scale battle, at around 9:00 p.m., Sergeant Reynoso

14

led a squad to clear a section of the cemetery when he suffered a fatal gunshot wound from militia fighters. *Id.* at 36.

In August 2004, JAM operatives staged several large-scale uprisings against U.S. coalition troops in Baghdad and Najaf, at a time when "JAM controlled large portions of Baghdad and other Shi'a-majority areas in central and southern Iraq and used them as operating bases for its terrorist activities." *Id.* at 21–22. Hezbollah operatives assisted JAM in maintaining that control and carrying out these uprisings. *Id.*

Considering the location, time, and circumstances of the attack, Rayburn concluded with "high confidence that the attack that killed Sergeant Reynoso was committed by IRGC- and Lebanese Hezbollah-sponsored JAM militants." *Id.* at 36. The August 5, 2004 attack occurred at a time and place of widespread JAM uprisings and was one conducted by a militia that was part of JAM, "which received extensive weapons, funding, and operational advice from the Iranian regime's IRGC-Quds Force and Lebanese Hezbollah." *Id.* at 36. Accordingly, the court agrees that the August 5, 2004 attack that killed Sergeant Reynoso is traceable to Iran and its proxies.

        d.      August 6, 2004 Attack in Najaf: Lance Corporal Larry Lloyd Wells

Plaintiffs Estate of Larry Lloyd Wells and Ashley Wells Simpson, Chad Wells, Crystal Stewart, Chastity Wells-George, Candice Machella, and Billy Doal Wells—collectively, the brothers and sisters of Lance Corporal Larry Lloyd Wells—claim that Iran is liable for an August 6, 2004 attack on U.S. forces. *See* Am. Compl. ¶¶ 161–170. Lance Corporal Wells was killed in the attack. *Id.* ¶ 162.

The attack on August 6, 2004, took place during the most intense phase of fighting during the August 2004 uprising in Najaf. Rayburn Report at 36. On that day, Lance Corporal Wells and his unit were fighting JAM troops gathered in the Najaf cemetery, which JAM militants used as

an operations base. *Id.* While attempting to push JAM troops out of the area, Lance Corporal Wells was hit and killed by sniper fire. *Id.*

Considering the location, time, and circumstances of the attack, Rayburn concluded with "high confidence that the attack that killed Lance Corporal Wells was committed by Iranian- and Lebanese Hezbollah-sponsored JAM militants." *Id.* at 37. Rayburn opined that sniper attacks like the one that killed Lance Corporal Wells "were a common tactic of the JAM militants who were attacking coalition troops in Najaf, especially in the very complex battleground of the cemetery." *Id.* at 37. Accordingly, the court agrees that the August 6, 2004 attack that killed Lance Corporal Wells is traceable to Iran and its proxies.

e.   August 15, 2004 Attack in Najaf: Private First Class Brandon Robert Sapp

Plaintiff Hope Elizabeth Veverka claims that Iran is liable for an August 15, 2004 attack on U.S. forces. *See* Am. Compl. ¶¶ 172–175. Hope Elizabeth Veverka is the mother of Private First Class ("PFC") Brandon Robert Sapp. *Id.* ¶ 175.

On August 15, 2004, PFC Sapp was on patrol in an M2 Bradley armored vehicle when an IED hit his vehicle. Rayburn Report at 37. The attack happened on the outskirts of Najaf in "one of the areas where the JAM offensive was most intense" during the height of the August 2004 uprising against coalition forces. *Id.* at 38. PFC Sapp, who was the driver of the vehicle at the time, suffered catastrophic injuries and died just a few minutes later. *Id.* at 38.

Considering the location, time, and circumstances of the attack, Rayburn concluded with "high confidence that the attack was committed by Iranian- and Lebanese Hezbollah-sponsored JAM militants." *Id.* Rayburn considered the location of the attack "on the outskirts of Najaf" as being attributable to Shi'a militants. *Id.* at 37. Specifically, he concluded that, because the area had a "heavy Shi'a majority population, . . . there is virtually no chance a non-Shi'a militant group

16

. . . could have had the freedom of movement or local support network required to emplace a deliberate IED ambush in that area, particularly one involving the kind of large IED that could do such extensive damage to an M2 Bradley fighting vehicle." *Id.*  Moreover, Rayburn concluded that the circumstances of the attack "indicates JAM culpability" because it "took place during the height of the JAM uprising against coalition forces, and in one of the areas where the JAM offensive was most intense." *Id.* at 38.  Accordingly, the court agrees that the August 15, 2004 attack that killed PFC Sapp is traceable to Iran and its proxies.

f.        August 16, 2004 Attack in Sadr City, Baghdad: Sergeant David Michael Heath

Plaintiffs Estate of David Michael Heath, Donna Jean Heath, Lola Jean Heath, and John David Heath claim that Iran is liable for an August 16, 2004 attack on U.S. forces.  *See* Am. Compl. ¶¶ 177–184.  The individual Plaintiffs are the widow and parents of Sergeant David Michael Heath. *See id.* ¶¶ 181–184.  Sergeant Heath was killed in the attack.  *Id.* ¶ 179.

Sadr City was a major battlefield during the August 2004 uprising in Baghdad.  Rayburn Report at 38.  While in Sadr City, Sergeant Heath came under small arms and rocket-propelled grenade ("RPG") fire in a predominantly Shi'a area that served as a major base of operations and support for JAM forces.  *Id.*  This attack came during "the most intense phase of fighting between JAM and coalition forces" during the uprising in Baghdad.  *Id.*

Considering the location, time, and context of this attack, Rayburn concluded with "high confidence that Iranian- and Lebanese Hezbollah-sponsored JAM militants committed the attack that killed David Heath." *Id.* at 39.  Rayburn observed that, in addition to the attack occurring at a time and location of widespread JAM attacks, "the complex ambush of a coalition patrol using small arms and RPGs was a common JAM tactic during the battles of August 2004." *Id.* at 38. And he concluded that it was "highly unlikely that a non-Shia group such as Al Qaeda in Iraq

17

committed the attack" and that "[i]t would have been nearly impossible for [non-Shi'a militant group] fighters to carry out operations from within that area of Sadr City" at the time. *Id.* at 39. Accordingly, the court agrees that the August 16, 2004 attack that killed Sergeant Heath is traceable to Iran and its proxies.

g.      August 18, 2004 Attack in Baghdad: Specialist Jacob David Martir

Plaintiffs Estate of Jacob David Martir, Olga Lydia Gutierrez, and Ismael Martir claim that Iran is liable for an August 18, 2004 attack on U.S. forces. *See* Am. Compl. ¶¶ 186–192. Gutierrez and Martir are the mother and brother of Specialist Jacob David Martir. *Id.* ¶¶ 190–192. Specialist Martir was killed in the attack. *Id.* ¶ 188.

Specialist Martir and his unit were engaged with a JAM element in the late afternoon of August 18, 2004. Rayburn Report at 39. While on dismounted patrol, Specialist Martir was hit and killed by JAM small arms fire. *Id.* The attack took place near a major traffic circle that was a known operating zone for JAM militants. *Id.* The broader East Baghdad area also was a Shi'a majority stronghold where a Sunni militant group could not have the support or freedom of movement to deploy attacks like the one that Specialist Martir encountered. *Id.*

Considering the location, time, and context of this attack, Rayburn concluded with "high confidence that the attack that killed Martir was committed by Iranian- and Lebanese Hezbollah-sponsored JAM militants." *Id.* at 40. Accordingly, the court agrees that the August 18, 2004 attack that killed Specialist Martir is traceable to Iran and its proxies.

h.      August 25, 2004 Attack in Najaf: Lance Corporal Alexander Scott Arredondo

Plaintiffs Estate of Alexander Scott Arredondo, Victoria M. Foley, and Nathanial Foley claim that Iran is liable for an August 25, 2004 attack on U.S. forces. *See* Am. Compl. ¶¶ 194–200. Victoria M. Foley and Nathaniel Foley are respectively the mother and brother of Lance

Corporal Alexander Scott Arredondo. *Id.* ¶¶ 198–200. Lance Corporal Arredondo was killed in the attack. *Id.* ¶ 196.

Lance Corporal Arredondo led a unit that was part of the coalition cordon that surrounded JAM militants who had fortified themselves in the Imam Ali shrine complex in the final phase of the August 2004 uprisings against U.S. and coalition troops. Rayburn Report at 40. Lance Corporal Arredondo was checking his team's defensive positions near the shrine when he was shot and killed by sniper fire. *Id.*

Considering the location, time, and context of this attack, Rayburn assesses with "high confidence that the attack that killed Arredondo was committed by Iranian- and Lebanese Hezbollah-sponsored militants belonging to [JAM]." *Id.* He noted that the grid location in the SIGACT report did not match the one listed in the casualty report but nonetheless concluded that "the details of the casualty report and other operational reporting indicate clearly he was killed in Najaf near the Imam Ali shrine complex." *Id.* at 40 n.36. Accordingly, the court agrees that the August 18, 2004 attack that killed Lance Corporal Arredondo is traceable to Iran and its proxies.

i.   January 12, 2004 Attack in Baghdad: Sergeant First Class Ricky Leon Crockett

Plaintiffs Estate of Ricky Leon Crockett, Maxine E. Crockett, and Marvise L. Crockett claim that Iran is liable for a January 12, 2004 attack on U.S. forces. *See* Am. Compl. ¶¶ 105–109. Maxine E. Crockett and Marvise L. Crockett are the widow and daughter of Sergeant First Class ("SFC") Ricky Crockett. *Id.* ¶¶ 107–108. SFC Crockett was killed in the attack. *Id.* ¶¶ 104–105.

On January 12, 2004, SFC Crockett's vehicle was traveling along the Army Canal in East Baghdad, specifically in the New Baghdad neighborhood, when it was hit by an IED. Rayburn Report at 34–35. At the time, the New Baghdad area was a major operating zone for JAM. *Id.* at 35.

19

Considering the location, time, and context of this attack, Rayburn concluded with "high confidence that this attack was conducted by Iranian and Lebanese Hezbollah-sponsored Iraqi Shi'a militants belonging to JAM." *Id.* Between 2003 and 2008, JAM and other Shi'a groups routinely conducted IED attacks against coalition convoys on the roads running on either side of the Army Canal. *Id.* at 35. Rayburn therefore opined that the January 12, 2004 attack "fits into a well-established pattern of attacks in that area." *Id.* Sunni militant groups also lacked the requisite freedom of movement and support required to place a deliberate IED on coalition convoy routes. *Id.* Accordingly, the court agrees that the January 12, 2004 attack that killed SFC Crockett is traceable to Iran and its proxies.

### j.  May 3, 2006 Attack in Nasiriyah: Eric Brandon Stoneking

Plaintiffs Eric Brandon Stoneking, his mother Carrie Sue Stoneking, and his sister Faith Renee Stoneking claim that Iran is liable for the May 3, 2006 attack against U.S. forces. *See* Am. Compl. ¶¶ 355–362. A security manager on site was killed in the attack. Ex. C at 60–64. Stoneking was seriously injured in the attack.[4] *Id.* ¶¶ 357–359.

On May 3, 2006, Stoneking was working as a civilian contractor in a convoy traveling toward Camp EOD 34 south of Nasiriyah in the Dhi Qar region when his vehicle was hit by a roadside bomb. Rayburn Report at 41. The Dhi Qar region was, at the time, a Shi'a-majority area where JAM-SG militants frequently conducted attacks against coalition convoys. *Id.* The sizeable IED that struck Stoneking's vehicle had been emplaced deliberately in the open on a coalition access road. *Id.*

Considering the location, time, and context of this attack, Rayburn concluded with "high confidence that the 3 May 2006 IED attack that injured Stoneking was committed by Iranian- and

---

[4] *See supra* n.3; *infra* Section IV.A.1.

Lebanese Hezbollah-sponsored JAM-SG militants." *Id.* Rayburn opined that only a Shi'a militant group in this Shi'a-dominated region could operate freely enough to plan and execute this kind of attack and that the Shi'a groups that operated in this region were JAM and JAM-SG. *Id.* Because of the heavy JAM and JAM-SG presence in the area, Sunni militant attacks in the region tended to be suicide car bombs, which did not require the same time, openness, or deliberation as that to execute a roadside IED attack. *Id.* Accordingly, the court agrees that the May 3, 2006 attack that injured Stoneking is traceable to Iran and its proxies.

    k.       July 25, 2006 Attack in Baghdad: Specialist Joseph A. Graves

Plaintiff Kevin Graves claims that Iran is liable for a July 25, 2006 attack on U.S. forces. *See* Am. Compl. ¶¶ 428–433. Kevin Graves is the father of Specialist Joseph A. Graves. *Id.* ¶ 432. Specialist Graves was killed in the attack. *Id.* ¶ 430.

Specialist Graves's convoy was traveling on a major highway when it was forced to halt because a civilian sedan rammed into one of the convoy's lead vehicles. Rayburn Report at 42. The highway divided the Shaab North and Basateen neighborhoods, areas with overwhelmingly Shi'a populations that served as "a base of operations and support for JAM" and connected northeast Baghdad with the Shi'a city of Husseiniyah, another "major JAM stronghold." *Id.* After the convoy stopped, a prepositioned IED or possibly an IED array, hit Specialist Graves's vehicle, killing him. *Id.* The attack occurred in an area where coalition troops had large bases nearby, lending to routine attacks on coalition convoys by JAM militants, especially on major highways. *Id.*

Considering the location, time, and context of this attack, Rayburn concluded "that Iranian- and Lebanese Hezbollah-sponsored JAM militants committed the attack that killed Joseph Graves." *Id.* at 43. He opined that such a complex attack required a level of planning, preparation,

21

and execution that could not have been carried out by Sunni militant groups in this Shi'a-dominated area. *Id.* at 42. Moreover, the attack occurred in an area of frequent confrontation. *Id.* Accordingly, the court agrees that the July 25, 2006 attack that killed Specialist Graves is traceable to Iran and its proxies.

l.      November 16, 2006 Attack and Abduction in Basra: Jonathon Coté, Paul Johnson-Reuben, Joshua Munns, and John Young

Plaintiffs Francis L. Coté, Nancy Coté, Christopher Coté, Samantha Dunford, and Maximillian Shroyer; Casey Reuben, Bree Reuben, and Patrick Reuben; Jackie Stewart, Mark Munns, and Crista Munns; and Sharon DeBrabander, Nicole DeBrabander, and Joella Pratt all claim Iran is liable for the November 16, 2006 attack on U.S. forces. *See* Am. Compl. ¶¶ 529–562. Plaintiffs are the family members of Jonathan Coté, Paul Johnson-Reuben, Joshua Munns, and John Young, respectively. *Id.* Coté, Johnson-Reuben, Munns, and Young were all abducted and killed in the attack. *Id.* ¶¶ 530, 540, 548, 556.

On November 16, 2006, Coté, Johnson-Reuben, Munns, and Young, all civilian security contractors, were traveling in a coalition supply convoy from Kuwait to a base north of Nasiriyah when they were stopped by five individuals dressed as Iraqi police manning a false security checkpoint. Rayburn Report at 44. When the convoy stopped, a group of more than 30 armed gunmen emerged to abduct the security convoy. *Id.* The four contractors were thereafter held in captivity. *Id.* In December 2006 and early January 2007, U.S. officials received proof of life videos and audio messages demanding the release of prisoners held in American and British jails in Iraq in exchange for the contractors' release. *Id.* at 44–45. In March 2008, U.S. officials received the severed fingers of several of the captives, and they identified the remains of the captives by the end of that year. *Id.*

22

Iranian-sponsored militants used abduction as an important means of gaining leverage in the war against the U.S.-led coalition. *Id.* The Special Group Asayb al-Haq, or AAH, consistently committed many similar abductions between 2006 and 2008. *Id.* Just two days prior to the abduction of the four contractors, AAH abducted 150 Ministry of Higher Education employees, later executing and burying dozens in the countryside. *Id.* And three days after that, Shi'a militants disguised as an official police convoy abducted Iraq's deputy Minister of Health. *Id.* In October 2006, AAH abducted a U.S. Army Sergeant. *Id.* at 46. In all these cases, the Shi'a militant abductors attempted to use the abductions to compel the coalition to release captured Shi'a militiamen and killed almost everyone they abducted. *Id.* AAH leader Qais al-Khazali revealed in a television interview years later that AAH had also been responsible for the abduction of five British citizens from the Iraq Ministry of Finance in a manner similar to the one used to abduct Coté, Johnson-Reuben, Munns, and Young. *Id.*

Considering the location, time, and context of this attack, Rayburn concluded with "high confidence that the 16 November 2006 abduction and subsequent killing" was committed by Iranian- and Lebanese Hezbollah-sponsored JAM-SG militants, most likely AAH. *Id.* The facts of this abduction are consistent with AAH's modus operandi: posing as Iraqi police to abduct coalition individuals, demanding prisoners in return, and ultimately killing their abductees. *Id.* Accordingly, the court agrees that the November 16, 2006 attack that killed Coté, Johnson-Reuben, Munns, and Young is traceable to Iran and its proxies.

m.     <u>March 27, 2007 Attack in Baghdad: Master Sergeant Sean M. Thomas</u>

Plaintiffs Estate of Sean M. Thomas; Carrie Thomas; minor A.T.; Daniel Thomas, Sr.; Daniel Thomas, Jr.; Kelly Gillis; and Melinda Flick claim that Iran is liable for a March 27, 2007 attack on U.S. forces. *See* Am. Compl. ¶¶ 651–661. Individual Plaintiffs are the widow, daughter,

father, brother, and sisters, respectively, of Master Sergeant ("MSG") Sean M. Thomas. *Id.* MSG Thomas was killed in the attack. *Id.* ¶ 653.

MSG Thomas was present for duty when he was killed in a rocket attack on the U.S. Embassy complex in the Green Zone. Rayburn Report at 46; Ex. C at 178. Coalition forces reported that the point of origin of the rocket attack was a playground and soccer field area in the Washash neighborhood of the Mansour district of west Baghdad. Rayburn Report at 46. The surrounding neighborhood of the launch site was Shi'a majority and a "frequent base of activities for JAM militants." *Id.* at 46–47. The rocket made impact just a few meters from the rear of the U.S. Embassy building, on the edge of the embassy's living quarters, *id.* at 47, and approximately 30 feet from office trailers, Ex. C at 139. MSG Thomas was found approximately 18 feet from the impact site. *Id.*

The attack occurred at a time of frequent attacks between coalition and JAM forces. Rayburn Report at 47. The Green Zone was frequently targeted by JAM because the Green Zone was the overall headquarters and seat of the Iraqi government. *Id.* The attackers had precise targeting information about the U.S. Embassy, and they used a 107 mm rocket, which was commonly used by JAM militants. *Id.* Non-Shi'a attacks against the Green Zone were infrequent by this time. *Id.*

Considering the location, time, and context of this attack, Rayburn concluded "with high confidence that Iranian- and Lebanese Hezbollah- sponsored JAM Special Groups militants committed the attack that killed Sean Thomas." *Id.* The launch site was an open playground in the neighborhood, ruling out the possibility that a non-Shi'a group was responsible, since the attackers would have been visible to the public for the setup and non-Shi'a militants would have faced pressure from locals. *Id.* Rayburn also noted that he was physically present in the

U.S. Embassy at the time of the attack, just 50 meters away from the point of impact, and personally witnessed the impact and damage the explosion caused shortly thereafter. *Id.* He stated that "[he] was aware as part of [his] [coalition] staff duties that the attack was part of a sustained pattern of JAM Special Groups indirect fire attacks against the US Embassy complex." *Id.* Accordingly, the court agrees that the March 27, 2007 attack that killed MSG Thomas is traceable to Iran and its proxies.

n.  March 12, 2008 Attack in Camp Adder, Nasiriyah: Private First Class Tenzin Lobsang Samten and Sergeant Juantrea Tyrone Bradley

Plaintiffs Estate of Tenzin Lobsang Samten; Rebecca L. Samten-Finch; minors D.A.S. and M.B.S.; Estate of Juantrea Tyrone Bradley; Ava Lanette Bradley; minors A.D.B, T.T.B, and J.T.B; and Anthony Hudson claim that Iran is liable for a March 12, 2008 attack in Camp Adder, Nasiriyah, Iraq on U.S. forces. *See* Am. Compl. ¶¶ 905–924. Rebecca L. Samten-Finch and minors D.A.S. and M.B.S. are the widow and children of Tenzin Lobsang Samten. *Id.* ¶¶ 909–912. Ava Lanette Bradley is the widow of Juantrea Tyrone Bradley; A.D.B., T.T.B., and J.T.B. are his children; and Anthony Hudson is his stepson. *Id.* ¶¶ 918–923. PFC Samten and Sergeant Bradley were both killed in the attack. *Id.* ¶¶ 907, 916; Ex. C at 274, 291.

PFC Samten and Sergeant Bradley were serving in the U.S. military at Contingency Operating Base ("COB") Adder, at the time a site of frequent attack by Shi'a militants. Rayburn Report at 49–50. On March 12, 2008, Sergeant Bradley was driving PFC Samten and three other soldiers from COB Adder's dining facility to the Visitor Control Center when a 122 mm rocket fired from a vacant lot on the southern edge of Nasiriyah city hit the group's vehicle, killing both Sergeant Bradley and PFC Samten. Ex. C at 225. Upon raiding the point of origin of the rockets,

25

Iraqi security forces found six 122 mm rockets and two IEDs left behind in a nearby house. Rayburn Report at 50.

Considering the evidence of the use of 122 mm rockets, context, location, timing, and his expertise on terrorist movements in the region, Rayburn assesses with "high confidence that Iranian- and Lebanese Hezbollah- sponsored JAM Special Groups militants committed the rocket attack that killed Tenzin Samten and Juantrea Bradley on 12 March 2008." *Id.* The 122 mm rocket was commonly used by Iranian-sponsored Shi'a militants, and non-Shi'a forces did not have the freedom to operate in the Nasiriyah region to build rockets at the point of origin. *Id.* Moreover, the attack happened during a sustained period of conflict between JAM special groups and the coalition, with frequent confrontations in the Nasiriyah region. *Id.* Accordingly, the court agrees that the March 12, 2008 attack that killed Samten and Bradley is traceable to Iran and its proxies.

o.      March 23, 2008 Attack in Baghdad: Paul R. Converse

Plaintiff Estate of Paul R. Converse and Frank L. Converse claims that Iran is responsible for a March 23, 2008 attack on U.S. forces. *See* Am. Compl. ¶¶ 905–924. Frank L. Converse is the brother of Paul R. Converse. *Id.* ¶ 930. Paul Converse was killed in the attack. *Id.* ¶ 928.

On March 23, 2008, Converse was working as a Department of Defense civilian in the U.S. Embassy complex in Baghdad. Rayburn Report at 51. That day, six rockets were fired into the International Zone, three of which hit Department of State property in the U.S. Embassy Annex. Ex. C at 356. One rocket struck Converse's living quarters behind the U.S. Embassy main building—just a short distance from the March 27, 2007 attack that killed MSG Thomas. Rayburn Report at 51. Converse was present for duty when the rockets hit, and he sustained major head trauma that ultimately killed him. Ex. C at 358–60. The rocket originated from Hamza Square on Qods Street, an overwhelmingly Shi'a area that was a stronghold for JAM and JAM-SG, and was

26

one of six 107 mm rockets fired, a munition commonly used by Shi'a militants.  Rayburn Report at 51.  The rockets were among several hundred that month that were fired during the Shi'a militias' campaign against coalition forces, a month infamously known to coalition troops as "March Madness."  *Id.*

Considering the location, time, and context of this attack, Rayburn concluded with "high confidence that Iranian- and Lebanese Hezbollah-sponsored JAM Special Group militants committed the rocket attack that killed Paul Converse on 23 March 2008."  *Id.* at 52.  The attack occurred in an area where there were no non-Shi'a militants operating and at a time infamously recognized for its attacks by Shi'a militants.  *Id.* at 51.  Rayburn also noted that he was physically present at the U.S. Embassy at the time of the attack and witnessed the destruction it caused.  *Id.* He stated that "[he] was aware as part of [his] [coalition] duties that the Coalition command assessed with high confidence that this attack was committed by Iranian- and Lebanese Hezbollah-sponsored JAM Special Group militants based in Sadr City, and that this rocket attack was part of the large, ongoing JAM Special Groups offensive against the Coalition that targeted the Green Zone in particular."  *Id.* at 52.  Accordingly, the court agrees that the March 23, 2008 attack that killed Converse is traceable to Iran and its proxies.

p.      May 1, 2008 Attack in Sadr City, Baghdad: John K. Daggett

Plaintiffs John Daggett and Colleen Czaplicki claim that Iran is liable for a May 1, 2008 attack on U.S. forces.  *See* Am. Compl. ¶¶ 1053–1059.  John Daggett and Colleen Czaplicki are the father and mother of John K. Daggett.  *Id.* ¶¶ 1057–1058.  John K. Daggett was injured in the attack and died from his injuries.  *Id.* ¶ 1055.

Daggett was mortally wounded by RPG fire while serving in the U.S. military on May 1, 2008, during what is now known as the Battle of Sadr City.  Rayburn Report at 52.  Daggett was

27

involved in a specific attack, "the Battle of Phase Line GOLD," during which coalition-led forces erected a concrete barrier to push JAM and JAM-SG militants eastward to take them out of rocket range from the Green Zone. *Id.* at 52–53. The RPG attack that wounded and ultimately killed Daggett came from the thousands of JAM and JAM-SG militants that were attacking the coalition units operating on Phase Line GOLD. *Id.* at 53.

Considering the location, time, and context of this attack, Rayburn concluded with "high confidence that the 1 May 2008 RPG attack that struck John Daggett was committed by Iranian- and Lebanese Hezbollah-sponsored Shi'a militants belongings to JAM or JAM special groups." *Id.* The attack occurred in Sadr City, which "was overwhelmingly Shia in population and a major stronghold for JAM and JAM Special Groups," and "[t]here were no non-Shia terrorist groups operating in that area at that stage in the war." *Id.* at 52–53. Moreover, employing small arms fire and RPGs was a common tactic among JAM and JAM-SG militants during the Battle of Phase Line GOLD. *Id.* at 53. Accordingly, the court agrees that the May 1, 2008 attack that killed Daggett is traceable to Iran and its proxies.

q.     <u>June 24, 2008 Attack in Sadr City, Baghdad: Steven Farley and Nicole Suveges</u>

Plaintiffs Donna Farley, Noel J. Farley, Barbara Farley, Brett Farley, Cameron Farley, Chris Farley, Vicki McHone, Noel S. Farley, and David C. Iverson claim that Iran is responsible for a June 24, 2008 attack on U.S. forces. *See* Am. Compl. ¶¶ 1060–1078. Donna Farley; Noel J. Farley and Barbara Farley; Brett Farley, Cameron Farley, and Chris Farley; and Vicki McHone and Noel S. Farley are the widow, parents, children, and siblings, respectively, of Steven Farley. *Id.* ¶¶ 1064–1071. David C. Iverson is the widower of Nicole Suveges. *Id.* ¶ 1077. Steven Farley and Nicole Suveges were killed in the attack. *Id.* ¶¶ 1062, 1073. Both were working as civilian contractors. Ex. C at 511–12, 517–18.

28

The Sadr City District Advisory Council ("DAC") was set to meet on June 24, 2008, to elect a new city council head and deputy. Rayburn Decl. ¶¶ 18, 20. The embedded Provincial Reconstruction Team ("ePRT"), along with four military police dismounts, entered the District Advisory Council office between 9:15 and 9:20 a.m. *Id.* ¶ 13. Steven Farley was present at the meeting as a member of the ePRT, and Nicole Suveges was present at the meeting as a part of a Human Terrain Team. *Id.* ¶¶ 28, 29. At 9:20 a.m., a bomb went off inside the office, killing Steven Farley and Nicole Suveges. *Id.* ¶ 13. The prepositioned explosive consisted of 9 mm ball bearings and three pounds of unknown explosives. *Id.* ¶ 17.

The attack took place in the aftermath of a major military confrontation in Sadr City between coalition forces and Qods Force proxies. *Id.* ¶¶ 31–33. What was for years a safe haven for Qods Force proxies had recently become the grounds of a military defeat that forced proxy groups to abandon their positions in the city. *Id.*

Considering the location and context of the attack, Rayburn concluded "it is highly probable that the attack which killed Steven Farley and Nicole Suveges was orchestrated by Special Group proxies of the IRGC and Lebanese Hezbollah and was committed at the general direction of the IRGC by one of its Jaysh al-Mahdi ("JAM")-related Special Groups." *Id.* ¶ 30. Rayburn opined that control of this council was crucial to the Qods Force and its proxies. *Id.* ¶ 34. He therefore concluded that the "meeting was bombed because the [Qods Force] proxies sought to prevent the election of a new DAC leadership team that was free of ties to the [Qods Force] and its proxies." *Id.* ¶ 36. Accordingly, the court agrees that the June 24, 2008 attack that killed Steven Farley and Nicole Suveges is traceable to Iran and its proxies.

## IV.     CONCLUSIONS OF LAW

The court next considers three questions of law: (1) whether there is subject matter jurisdiction over the claims arising from the 17 attacks at issue, pursuant to the FSIA's terrorism exception to sovereign immunity; (2) whether the court has personal jurisdiction; and (3) whether Iran is liable for Plaintiffs' injuries.  *Lee II*, 656 F. Supp. 3d at 51; *see also Karcher II*, 2021 WL 133507, at *63.

### A.     Subject Matter Jurisdiction

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  "Under the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within one of a list of statutory exceptions . . . ."  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  Plaintiffs claim that this court has jurisdiction over Iran under a statutory exception known as the "terrorism exception."  Pls.' 2d Proposed Findings at 2, 15.

Pursuant to the terrorism exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

In addition to the criteria set forth in § 1605A(a)(1), the terrorism exception applies only if three additional requirements are met.  First, the foreign state must have both (1) been "designated

30

as a state sponsor of terrorism at the time the" underlying act occurred or designated because of the act and (2) been so-designated at the time the claim was filed or in the six-month period before the claim was filed.  *Id.* § 1605A(a)(2)(A)(i)(I).  Second, at the time of the attack, the victim must have been a national of the United States, a member of the armed forces, or an employee or contractor of the United States.  *Id.* § 1605A(a)(2)(A)(ii).  Third, if "the act occurred in the foreign state against which the claim has been brought," the plaintiff must have "afforded the foreign state a reasonable opportunity to arbitrate the claim."  *Id.* § 1605A(a)(2)(a)(iii).

Plaintiffs have easily satisfied most of these jurisdictional prerequisites.  First, Plaintiffs seek money damages against a foreign state.  *See* Am. Compl. at 142.  Second, Plaintiffs are seeking to recover for their personal injuries, including "physical injury, extreme mental anguish, and pain and suffering that ultimately led to their deaths" and "severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, [and] the loss of their loved ones' society, companionship, comfort, advice[,] and counsel."  *Id.* ¶¶ 1167, 1172, 1177.  Third, Iran has been continuously designated as a state sponsor of terrorism since 1984.  *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2,836 (Jan. 23, 1984); *Salzman*, 2019 WL 4673761, at *12 ("Iran is a designated state sponsor of terrorism and has been since 1984.").  Fourth, Plaintiffs have submitted documentation establishing that the primary, non-family victims of the 17 attacks at issue are U.S. nationals or servicemembers.  *See generally* Ex. D.  Fifth, the relevant acts occurred in Iraq, not Iran, *see, e.g.*, Am. Compl. ¶1, so the requirement to afford Iran the opportunity to arbitrate is not implicated.

The only remaining jurisdictional inquiries are whether Plaintiffs' injuries were (1) caused by (2) "the provision of material support or resources" for (3) "an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking" by "an official, employee, or agent of such foreign

state while acting within the scope of his or her office, employment, or agency." *See* 28 U.S.C. § 1605A(a)(1). The court addresses these three factors in reverse order, starting with whether Plaintiffs' claims are predicated on an extrajudicial killing.[5]

### 1. An Act of Extrajudicial Killing

The FSIA defines "extrajudicial killing" by reference to the Torture Victim Protection Act of 1991 (TVPA). *Id.* § 1605A(h)(7). Under the TVPA an "extrajudicial killing" is:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992). "[T]his definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770.

The first element requires a "completed killing." *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1061 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025). That is, "an act of . . . extrajudicial killing" must result in the taking of another's life and thus does not reach the attempted killings or the death of an attacker. *Id.*; *see also Cabrera v. Islamic Republic of Iran*, No. 18-cv-2065 (JDB), 2025 WL 1423739, at *6–7 (D.D.C. May 16, 2025). Individuals who sustain nonlethal injuries from an act of extrajudicial killing satisfy this jurisdictional element. *See Boothe v. Islamic Republic of Iran*, No. 22-cv-1747 (TSC), 2026 WL 809887, at *9 (D.D.C. Mar. 24, 2026). In other words, an attack's survivor can assert a claim under the FSIA so long as the attack also resulted in a "completed killing" of another. Based on the record evidence, the

---

[5] Although some of the victims were also abducted, *see supra* Section III.B.5.l, the court does not reach the issue of whether there was a "hostage taking" under the FSIA, because those victims were also the subject of extrajudicial killings, *see infra* Section IV.A.1.

32

Plaintiffs as to these 17 attacks are the estates of victims of extrajudicial killings, family members of the deceased, or victims injured in an act of extrajudicial killing of another or their family members, thereby satisfying the first element. *See generally* Rayburn Report; Rayburn Decl.

Next, the court must determine whether the killings were "deliberated." *Owens*, 864 F.3d at 770. "A deliberated killing is simply one undertaken with careful consideration, not on a sudden impulse." *Salzman*, 2019 WL 4673761, at *13 (internal quotation marks omitted).

Two of the 17 attacks involved the detonation of EFPs. *See supra* Section III.B.5.a–b. EFPs must be strategically placed and later armed via either remote frequency or command wire to properly detonate. *See* Barker Report, PX-158, at 10. Planning an EFP's location and constructing a means to trigger the device requires forethought, and an EFP therefore cannot be detonated on "a sudden impulse." *See Salzman*, 2019 WL 4673761, at *13. In addition, the court received expert testimony that EFPs were constantly retooled to overcome U.S. defenses that attempted to make EFPs less deadly, indicating that EFPs were intentionally designed to inflict maximum harm on their targets. *See* Barker Report, PX-158, at 12–18. Accordingly, the court finds that causing death by detonating an EFP constitutes a "deliberated killing."

Five of the attacks were part of a month-long uprising in the cities of Baghdad and Najaf orchestrated by JAM militias in August 2004. *See supra* Sections III.B.5.c–f, h. Complex attacks that involve "prior planning and knowledge of mission[s] conducted by the Coalition forces," familiarity with the terrain to carry out attacks in efficient fashion, and training and use of the right weapons for the circumstance all "demonstrate[] that the attacks were planned." *Martino v. Islamic Republic of Iran*, No. 21-cv-1808 (RDM), 2024 WL 6824393, at *43 (D.D.C Sept. 30, 2024). There is ample evidence that all five of these attacks were planned and executed as a part of a large-scale insurgency against U.S. coalition forces by Iranian-funded terrorist militias, indicating

33

that they were not carried out on sudden impulse.  Four of these attacks occurred in and around the Imam Ali Shrine in Najaf, where hundreds of JAM militants launched a complex attack on U.S. coalition forces.  *See supra* Sections III.B.5.c–e, h; *see also Martino*, 2024 WL 6824393, at *43.  Attackers used snipers because of the complex nature of the battleground and employed small arms fire, which requires prior planning and knowledge of the terrain.  *Martino*, 2024 WL 6824393, at *43.  The fifth attack used small arms and RPG fire.  *See supra* Sections III.B.5.f. Accordingly, the court finds that these five attacks were deliberated killings.  *See also Salzman*, 2019 WL 4673761, at *13.

Three of the attacks involved targeted rocket attacks on the U.S. Embassy complex in the Green Zone in Baghdad, Iraq and Camp Adder in Nasiriyah.  *See supra* Section III.B.5.m–o.  There is ample evidence that these attacks were "planned and far from impulsive."  *Salzman*, 2019 WL 4673761, at *13.  The attacks on the U.S. Embassy complex were carried out with "precise targeting information."  Rayburn Report at 46–47, 51–52.  Attackers fired 11 rockets into COB Adder, and later investigation revealed a stash house containing more rockets and IEDs near COB Adder as the point of origin of the attack, indicating that the attack was meditated and executed. *Id.* at 49–50.  Accordingly, the court finds that these three attacks were deliberated killings.

Four of the attacks involved a complex ambush, forced halt, small arms fire, or emplaced IEDs.  *See supra* Section III.B.5.g, i–k.  Each of these attacks required knowledge of the terrain or movement of U.S. personnel to emplace a bomb or stage an ambush, indicating that they were planned and executed, rather than done on sudden impulse.  *See Martino*, 2024 WL 6824393, at *43.  Thus, the court finds these four attacks to be deliberated killings.

Of the last three attacks, the first involved the kidnapping, holding for ransom, torture, and murder of multiple U.S. personnel over the course of a year.  *See supra* Section III.B.5.l.

The second attack involved the bombing of the Sadr City District Advisory Council after JAM and the Qods Forces had been pushed out of Sadr City in 2008 by U.S. coalition forces. *See supra* Section III.B.5.q. This attack was orchestrated to prevent the election of a new District Advisory Council that would be free from control by Qods Forces and their proxies. *Id.* The final attack happened in the Battle of Sadr City, during the "Shi'a militias' campaign against the Coalition Forces and the Iraqi government" from March to May of 2008. *See supra* Section III.B.5.p. None of a long-term kidnapping, torture, and murder of U.S. forces for ransom, a targeted attack against political threats, or a two-month concerted effort to back down U.S. forces can be considered impulsive. There is ample evidence for this court to conclude that these three attacks were also deliberated killings.

Finally, there is no evidence that would suggest that the killings in any of the 17 attacks were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation. The killings of persons at issue here are therefore extrajudicial killings under the FSIA.

### 2. *Material Support or Resources by an Official or Agent of Iran*

Plaintiffs next must establish that an official or agent of Iran provided material support to the actors who carried out the attacks. The FSIA defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" by reference to 18 U.S.C. § 2339A).

Plaintiffs have provided numerous examples of Iran funneling material support through the IRGC and Qods Force to terrorist proxies in Iraq.  And, as the court in *Karcher I* held, the Qods Force "is at least an agent of Iran, if not a part of the government such that individuals working for [the Qods Force] would be officials or employees of Iran."  *Karcher I*, 396 F. Supp. 3d at 55.  This material support manifested as millions of dollars of funding, training, and advanced weaponry.  *See, e.g.*, Pregent Report, PX-155, at 12; Oates Report, PX-153, at 24.  Thus, Plaintiffs have established that Iran provided material support for the terrorist attacks that harmed them.

### 3.  Causation

Finally, for the court to have subject matter jurisdiction over this matter, Plaintiffs must prove that Iran's "provision of material support or resources" caused Plaintiffs' "personal injury or death." 28 U.S.C. § 1605A(a)(1).  The D.C. Circuit has adopted a proximate cause standard for the FSIA terrorism exception.  *See Kilburn*, 376 F.3d at 1128; *Owens*, 864 F.3d at 794 ("In *Kilburn*, we held a plaintiff must show proximate cause to establish jurisdiction under § 1605(a)(7), the predecessor of the current FSIA terrorism exception.  Because § 1605A(a) restates the predicate acts of § 1605(a)(7), it stands to reason that proximate cause remains the jurisdictional standard." (citation omitted)).  The touchstone of proximate causation is the existence of "'some reasonable connection between the act . . . of the defendant and the damage which the plaintiff has suffered.'" *Owens*, 864 F.3d at 794 (quoting *Kilburn*, 376 F.3d at 1128).  There are two components to this inquiry: "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury.  Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct."  *Id.* (citation omitted) (quoting Rothstein v. UBS, 708 F.3d 82, 91 (2d Cir. 2013)).

Plaintiffs have satisfied both components of proximate cause. Iran's support was a "substantial factor" leading to Plaintiffs' injuries because Iran provided the funding, training, and weaponry that was used to injure Plaintiffs. *See* Pregent Report, PX-155, at 12; Oates Report, PX-153, at 24; Lutz Report at 198. This support was particularly crucial with respect to EFPs: as the U.S. military developed countermeasures to make EFP attacks less lethal, Iran's training, technology, and provision of resources equipped insurgents with EFPs that could respond to U.S. countermeasures and inflict maximum damage. *See* Tr. 1 at 98:5-9; Oates Report, PX-153, at 25 (noting that the U.S. military traced components of EFPs to Iran's illicit supply chain); Tr. 5 at 48:21–49:12 (noting devices that interfered with counter-EFP measures were likewise traced to Iran).

Plaintiffs' injuries were also a reasonably foreseeable consequence of Iran's conduct. The U.S. military has successfully traced EFP devices that circumvented the United States' counter-EFP measures to Iran. Tr. 5 at 48:21–49:12. The U.S. government also has confirmed that the Qods Forces supplied "JAM Special Groups members with" improvised rocket-assisted munitions and "coordinated the training of JAM Special Groups." Lutz Report at 198. It is clear from Iran's financial support and its provision of evolving and ever-more lethal weaponry to insurgents in Iraq that Iran reasonably anticipated—and indeed, intended—that its support would lead to the death of U.S. soldiers. *See Karcher I*, 396 F. Supp. 3d at 56–57 (finding harm to plaintiffs was reasonably foreseeable consequence when Iran intended "to kill people, not just disable vehicles"); *see also Owens*, 864 F.3d at 797–98 (finding bombings were a reasonably foreseeable consequence of Sudan's provision of "opportunities" to Al-Qaeda and Osama bin Laden). Likewise, the suffering of the families of victims of these attacks was a reasonably foreseeable consequence of

37

Iran's support for terrorist attacks in Iraq.  *See Salzman*, 2019 WL 4673761, at \*14 (finding "the related suffering of [victims'] family members" was "reasonably foreseeable").

The court therefore concludes that Iran's material support for the extrajudicial killings and attempted killings involved in the 17 attacks proximately caused Plaintiffs' injuries, and the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1605A(a)(1).

## B.        Personal Jurisdiction

As with subject matter jurisdiction, the court has "an independent obligation . . . to satisfy itself of its personal jurisdiction before entering a default against a missing party." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018).  Under the FSIA, a court has personal jurisdiction over a foreign sovereign where the court has subject matter jurisdiction and "service has been made under" 28 U.S.C. § 1608; 28 U.S.C. § 1330(b).  "In other words, under the FSIA, subject matter jurisdiction plus service of process equals jurisdiction." *GSS Grp. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (internal quotation marks omitted).

The FSIA provides four means for serving a foreign state.  *See* 28 U.S.C. § 1608(a).  First, a plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." *Id.* § 1608(a)(1).  If service cannot be made under such an arrangement, then the plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). If the plaintiff cannot serve the defendant via the first two methods, then the plaintiff must attempt to effect service "by sending a copy of the summons and complaint and a notice of suit," as well as "a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry

38

of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). If, after 30 days, service cannot be effected by this third option, the plaintiff may attempt service through diplomatic means. To do so, the plaintiff must provide the clerk of court with two copies of the summons and complaint, and a notice of the suit, along with a translation of each into the official language of the foreign state, which the clerk of court transmits to the Secretary of State. *Id.* § 1608(a)(4). The Secretary of State will then "transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

Plaintiffs could not serve Iran under the first two mechanisms of service, as the United States and Iran do not have a "special arrangement" for service and "'Iran is not party to an international convention on service of judicial documents.'" *Salzman*, 2019 WL 4673761, at *15 (quoting *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)). Plaintiffs therefore first attempted to effect service under the third mechanism—via registered mail with return receipt requested. *See* Certificate of Mailing. When Iran did not respond after 30 days, Plaintiffs served Iran via diplomatic channels. *See* Diplomatic Service Request; Dep't of State Service Attempt. Under 28 U.S.C. § 1608(c)(1), service was deemed effected "as of the date of transmittal indicated in the certified copy of the diplomatic note"—in this case, December 18, 2019. *See* Dep't of State Service Attempt. Accordingly, this court finds that Plaintiffs properly effected service on Iran under 28 U.S.C. § 1608(a)(4).

Because the court concludes that it has subject matter jurisdiction and Plaintiffs have properly effected service, the court likewise has personal jurisdiction over Iran. *See GSS Grp.*, 680 F.3d at 811.

## C.    Liability

Finally, the court must determine whether Iran is liable for Plaintiffs' injuries with respect to the 17 attacks at issue.    Plaintiffs bring their claims under 28 U.S.C. § 1605A(c).  *See* Am. Compl. ¶¶ 1165–1178.  Section 1605A(c) provides that "[a] foreign state that is or was a state sponsor of terrorism" and any of its agents are liable "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(c).  The section "creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity."  *Karcher II*, 2021 WL 133507, at *67; *see also Karcher I*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338 (RJL), 2019 WL 2185037, at *6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87. "Importantly, Section 1605A(c) also creates vicarious liability 'for the acts of [Iran's] officials, employees, or agents,' in this case, the IRGC and its leadership, Hezbollah, and Iraqi proxies." *Karcher II*, 2021 WL 133507, at *67 (quoting 28 U.S.C. § 1605A(c)).  Liability is limited, however, to U.S. nationals, members of the armed forces, employees or contractors of the U.S. government, and legal representatives of any of those individuals.  *See* 28 U.S.C. § 1605A(c).

Plaintiffs' § 1605A(c) claims fall into three categories: (1) U.S. personnel injured in Iraq by acts of extrajudicial killings of other service members that Iran materially supported; (2) the estates of U.S. personnel killed in Iraq as a result of such acts; and (3) the family members of the injured and deceased U.S. personnel.  *See generally* Am. Compl.

40

The first two categories comprise the § 1605A(c) claims of 14 Plaintiffs:

**Surviving Plaintiffs:** (1) Eric Stoneking; (2) Billy Johnson.  Am. Compl. ¶¶ 363, 891.

**Estates of Deceased U.S. Soldiers:** (1) Maxine E. Crockett, on behalf of the Estate of Ricky Leon Crockett; (2) Gloria P. Reynoso, on behalf of the Estate of Yadir G. Reynoso; (3) Ashley Wells Simpson, on behalf of the Estate of Larry Lloyd Wells; (4) Donna Jean Heath, on behalf of the Estate of David Michael Heath; (5) Olga Lydia Gutierrez, on behalf of the Estate of Jacob David Martir; (6) Victoria M. Foley on behalf of the Estate of Alexander Scott Arredondo; (7) Laurel Barattieri, on behalf of the Estate of Guy Barattieri; (8) Carrie Thompson, on behalf of the Estate of Sean M. Thomas; (9) Melissa Doheny, on behalf of the Estate of Michael Doheny; (10) Rebecca L. Samten-Finch, on behalf of the Estate of Tenzin Lobsang Samten; (11) Ava Lanette Bradley, on behalf of the Estate of Juantrea Tyrone Bradley; (12) Frank L. Converse, on behalf of the Estate of Paul R. Converse.  Am. Compl. ¶¶ 108, 155, 165, 182, 191, 198, 466, 655, 876, 910, 931.

These Plaintiffs' claims "derive from the injuries or deaths of members of the U.S. armed forces" or civilian contractors.  *See Karcher II*, 2021 WL 133507, at *68.  "Given the factual and legal overlap," this court's finding of "subject-matter jurisdiction over each of these Plaintiff's claims also establishes their entitlement to relief under 28 U.S.C. § 1605A(c)."  *Id.*; *see also Salzman*, 2019 WL 4673761, at *15 ("There is almost total overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity, and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." (cleaned up)); *Allan*, 2019 WL 2185037, at *6 ("[M]ost courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to

41

prevail under § 1605A(c).")."). The court has subject matter jurisdiction over these Plaintiffs' claims under the terrorism exception; accordingly, the court also concludes that Iran is liable for these Plaintiffs' injuries under 28 U.S.C. § 1605A(c).

The remaining § 1605A(c) claims at issue are those of family members of U.S. personnel injured or killed in the 17 attacks. *See generally* Am. Compl. Family members may recover for emotional distress under § 1605A(c) if: "(1) they are members of a victim's immediate family" and "(2) they are present at the time, or the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019) (internal quotation marks omitted). Liability is limited to U.S. nationals. *See* 28 U.S.C. § 1605A(c)(1).

The second prong is easily met—"acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see Karcher II*, 2021 WL 133507, at *69 ("[T]he Court is satisfied that these acts of terrorism were 'sufficiently extreme and outrageous to demonstrate that' Iran's intent was 'to inflict severe emotional harm on even those not present at the site of the act.'" (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015))).

As to the first, the "immediate family requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover." *Roth*, 78 F. Supp. 3d at 400 (quoting *Murphy*, 750 F. Supp. 2d at 75). Here, the family-member Plaintiffs allege that they are immediate family, which the court accepts as true. *See Argonaut Ins. Co. v. Lynchburg Steel & Specialty Co.*, 308 F. Supp. 3d 218, 221 (D.D.C. 2018) (stating that a "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint" (internal quotation marks omitted)); *see* Am. Compl. ¶¶ 229, 294–295, 471–475, 638–639, 771, 777–780, 786–794, 818–

828, 850, 903, 1046–1051, 1114–1117.  But these Plaintiffs have neither offered allegations nor provided evidence establishing that they are U.S. nationals, as required by 28 U.S.C. § 1605A(c)(1).  In the absence of such evidence, the court makes no final determination as to the § 1605A(c) claims of the family-member Plaintiffs arising from the 17 attacks.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, the court grants the motion for default judgment against Defendant as to the 17 attacks considered herein as to the injured victims' and estates' claims, but not the immediate family-member claims.  Plaintiffs may within 30 days submit additional evidence establishing a family-member Plaintiff is a U.S. national.

Dated: May 6, 2026

Amit P. Mehta
United States District Judge